## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

      **v.**                                **Case No.  21-CR-175-2 (TJK)**

**JOSEPH RANDALL BIGGS,**

      **Defendant.**

## DEFENDANT BIGGS' OPPOSITION TO
## MOTION TO REVOKE PRETRIAL RELEASE

Defendant Joseph R. Biggs ("Biggs"), by undersigned counsel, files this Opposition to the United States' March 20, 2021 Motion to Revoke Pretrial Release ("Motion"). The Motion, like the superseding indictment unsealed the day before, is a re-presentation of facts available and known to the government about Biggs since his pretrial release on January 20.  No "new evidence," especially in Biggs' case, exists. No information acquired by the government since January 20 suddenly supports detaining Biggs now. Nor importantly does anything that has happened since his release. Biggs by all reports has been a compliant home detainee for well over two months. *See*, *e.g.*, March 22, 2021 Email from Mr. Charles Sweatt, Pretrial Services, U.S. District for the Middle District of Florida, Orlando Division ("Mr. Biggs has presented no concerns regarding compliance since his release from custody in our district."). *See*, Exhibit 1.

### BACKGROUND AND FACTS RELEVANT TO BIGGS' OPPOSITION

Biggs resides in Ormond Beach, a north Florida town in the Daytona Beach area. He has lived there since 2018. On January 20, 2021, as specifically agreed the day before with a Daytona Beach-based FBI Special Agent who Biggs knew and with whom he had been in regular contact with since July of 2020.  Biggs met with that same Special Agent at a place near but away from Biggs' home. Biggs turned himself over to that Special Agent and then drove by car with him and one other

Daytona-Beach-based FBI Special Agent on the 60-plus mile drive south to Orlando. There Biggs made his initial appearance in the U.S. District Court for the Middle District of Florida (Orlando Division) before U. S. Magistrate Judge Embry J. Kidd.

At this point, the January 6 incident at the Capitol was two weeks old. When Biggs stood before Magistrate Judge Kidd in Orlando on January 20, based on the complaint and supporting illustrated 16-page affidavit filed the day before (Docket Item 1-1), the three charges being made against Biggs were already substantial and carefully considered by the United States. Biggs was charged under 18 U.S.C Section 1512(c) (felony "obstruction of official proceeding"), 18 U.S.C. Section 1752(a) ("trespassing on restricted building or grounds") and 40 U.S.C. Sections 5104(e)(2)(D) and (F) ("violent entry or disorderly conduct").

Biggs' initial appearance before Magistrate Judge Kidd lasted thirty minutes. The United States did not seek detention. Defense counsel for Biggs opined that the three charges in the complaint lodged against Biggs were "speculative."  On his own, however, Magistrate Judge Kidd prudently raised issues concerning community safety and potential obstruction of justice. After hearing from counsel, Judge Kidd crafted a thoughtful, relatively stringent Order Setting Conditions of Release (Docket Item 5) featuring home detention, a GPS location monitoring device (paid for by Biggs), weekly drug testing, psychiatric evaluation and medical check-ups, DNA sampling, firearm surrender, passport surrender and highly restricted travel. Biggs was released and then driven home by the same Daytona Beach-area FBI Special Agents who had transported him to Orlando back to his home in Ormond Beach. The case was removed to the District of Columbia. *Id.* Biggs that day was also assigned to his current Pretrial Services Officer, Charles Sweatt, in Orlando. Since then Biggs and Mr. Sweatt have conferred on the phone or in person several times each week.

Between January 20 and March 9, Biggs's first appearance in the U.S. District Court for the District of Columbia, defendant Biggs faithfully complied with his conditions of release. On March 9, Biggs appeared before United States Magistrate Judge Zia Faruqi. Judge Faruqi heard from all counsel concerning any desired changes to Biggs' conditions of release. Undersigned counsel suggested that the same conditions of release imposed by Magistrate Judge Kidd on January 20 be maintained and continued in all respects until the next hearing. Counsel further suggested that at the that next hearing he would bring up two release-related items: (a) possible changes to Biggs' GPS monitoring program and related device and (b) a gradual loosening of his travel restrictions. The suggestion was made on March 9 on the basis of Biggs's compliance with his conditions of release in the then 7-week period of his home detention since January 20. There was no objection from the Government. It is undersigned counsel's good faith recollection that Magistrate Judge Faruqi was immediately amenable to this idea and specially urged counsel to bring up such adjustments at the next Biggs hearing. Judge Faruqi scheduled Biggs' preliminary hearing for March 31 and later that day issued another Order Setting Conditions Release dated March 9, 2021 (Docket Item 39) which repeated the January 20 Order of Judge Kidd. Under it, Mr. Charles Sweatt in Orlando would continue to serve on a courtesy basis for District of Columbia's Pretrial Offices as Biggs' Pretrial Services Officer.

Ten days later, on Saturday, March 20, 2021, the United States filed and served its instant Motion to Revoke Biggs's Pretrial Release. The superseding indictment, bootstrapping new conspiracy and property damage charges against Biggs which gave rise to the Motion, had been unsealed the day before. The following Monday Biggs' undersigned counsel wrote Pretrial Services officer Charles Sweatt in Orlando to inquire about Biggs' compliance based on his baseline period of

3

home detention since January 20. Mr. Sweatt responded:

> Mr. Biggs has presented no concerns regarding compliance since his release from
> custody in our district. He has maintained compliance regarding his conditions of
> release and location monitoring and maintained regular communications with me.

March 22, 2021 Email from Mr. Charles Sweatt, Pretrial Services, U.S. Middle District of Florida,

Orlando Division, to J. Daniel Hull. *See*, Exhibit 1.

*Joseph Randall Biggs*

Originally from North Carolina, defendant Biggs is 37 years old. He is a retired United States

Army Staff Sergeant who served in the military for eight years. He served in the Army Reserve from

2004 until 2007 and in the active Army from 2007 until 2012. For a year, between November 2005

and October 2006, he was deployed to Iraq. Late the following year, and for more than another year,

between December 2007 until February 2009, he was deployed to Afghanistan. Biggs was awarded

multiple awards for his military service, including two Purple Hearts. In 2012, at the age of 28, he

received a medical discharge from Army. He has struggled with combat-related PTSD (Post-

Traumatic Stress Disorder), depression and some related alcohol problems. In the last half-decade,

Biggs has been open and public about those struggles. Until recently, Biggs has worked as a

conservative activist, writer, podcaster and radio personality. He has worked for Right Side

Broadcasting Network, a pro-President Trump online channel, and InfoWars. He has also been self-

employed. Biggs is married but has been separated from his wife for a period of four years.

In 2018, he moved from Austin, Texas, to the Daytona Beach area. He relocated primarily to

be near and care for his mother, a cancer patient whose husband (and Biggs' stepfather) and day-to-

day caregiver had passed away shortly before. Biggs also brought with him from Texas to Florida his

one-year old daughter. His daughter's biological mother and Biggs' estranged wife soon followed

Biggs to Florida. The two parents for some time now have shared custody of their daughter under
an arrangement in which the child is physically with Biggs days during the workweek and with the
child's mother on the weekends. In recent months, his daughter spends each night with
either Bigg's mother or the child's mother.

The same year, 2018, after the move to Florida, Biggs became active as an organizer, event
planner and thought leader in the Proud Boys. He used his platform as a radio and social media
personality to promote Proud Boy events and ideas. In particular, he personally planned two major
events: rallies in Portland, Oregon in both 2019 and 2020 designed as counterdemonstrations against
Antifa, which had been active in and around Portland for over two decades. *See generally,* MARK
BRAY, ANTIFA: THE ANTI-FACIST HANDBOOK (August 2017) (history of Antifa
networks in the Americas and Europe by social historian and Dartmouth College lecturer); L.
Magelson, "Letter from Portland: In the Streets with Anitfa," *The New Yorker* (Nov. 2, 2020 issue).
As part of the planning, Biggs would regularly speak with by phone and in person to both local and
federal law enforcement personnel stationed in Portland, including the FBI's Portland Field Office.
These talks were intended both to inform law enforcement about Proud Boy activities in Portland
on a courtesy basis but also to ask for advice on planned marches or demonstrations, i.e., what
march routes to take on Portland streets, where to go, where not to go. Similar conversations were
held regularly with local police and FBI personnel for less major events in other cities. By late 2018,
Biggs also started to get "cautionary" phone calls from FBI agents located in Jacksonville and
Daytona Beach inquiring about what Biggs meant by something politically or culturally provocative
he had said on the air or on social media concerning a national issue, political parties, the Proud
Boys, Antifa or other groups. Biggs regularly satisfied FBI personnel with his answers. He also

stayed in touch with a number of FBI agents in and out of Florida. In late July 2020, an FBI Special Agent out of the Daytona Beach area telephoned Biggs and asked Biggs to meet with him and another FBI agent at a local restaurant. Biggs agreed. Biggs learned after he travelled to the restaurant that the purpose of the meeting was to determine if Biggs could share information about Antifa networks operating in Florida and elsewhere. They wanted to know what Biggs was "seeing on the ground." Biggs did have information about Antifa in Florida and Antifa networks in other parts of the United States. He agreed to share the information. The three met for approximately two hours. After the meeting, Biggs stayed in touch with the agent who had called him originally to set up the meeting. He answered follow-up questions in a series of several phone calls over the next few weeks. They spoke often.

On or about January 16, Biggs learned of a video showing him inside the Capitol on January 6. He affirmatively reached out by telephone to the same Daytona Beach-based Special Agent he had first met with in July to report his involvement with the January 6 incident. Two days later, the two of them made arrangements for Biggs to turn himself in to the FBI on January 20th and make his initial appearance before the U.S. District for the Middle District of Florida in Orlando.

## ARGUMENT

### A.  None of the Biggs Evidence Proffered by Government is New.

In the Motion (at 2-3), as well as in the superseding indictment, the government emphasizes "encrypted" messages by Biggs related to January 6 to demonstrate his "leadership position" and cache as a planner and organizer. The communications are unremarkable. They are out of context and difficult to understand. They reference "teams," "plans," rallying points and meeting places. They are typical upbeat Proud Boys chatter at any public event. None of the communications even

hint at entering the U.S. Capitol building and going inside it from either its west or east lawns, public

walkways or many entrances. This is hardly new evidence. As described above, the United States has

known since at least July of 2020 that Biggs was a high-profile Proud Boys organizer and thought

leader, had planned one major Proud Boy event (Portland in 2019) and was involved in other several

smaller events. Further, the nature of the "new evidence" communications are the same as Biggs'

communications known to the government at least as early as January 19. The supporting affidavit

to the original Biggs complaint (Docket Item 1-1) describes in part a routine Proud Boys "baiting"

of Antifa persons who could be expected to be present in Washington, D.C. during the week of

January 4 (as they had been in during the December and November). The government

highlights the following:

> 8. Beginning as early December 2020, public communications from Proud Boys organizers including BIGGS, encouraged members of the Proud Boys to attend the January 6, 2021, demonstration in Washington, D.C. As described in more detail below, such communications included messages sent by the current Chairman of the Proud Boys, Enrique Tarrio.

> 9. For example, on December 29, 2020, Tarrio posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows…we might dress in all BLACK for the occasion." I believe the statement about dressing in "all BLACK" is a reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black to demonstrations.

> 10. On or around the same day, BIGGS posted a similar message to his followers on Parler in which he stated, among other things, "we will not be attending DC in colors. We will be blending in as one of you. You won't see us. You'll even think we are you . . .We are going to smell like you, move like you, and look like you. The only thing we'll do that's us is think like us! Jan 6th is gonna be epic." I understand that BIGGS was directing these statements at "Antifa."

11. Separately, BIGGS has described the Proud Boys' efforts, in general, to plan for demonstrations and events attended by the Proud Boys. In an interview that was purportedly taped in December 2020 and posted online on or about January 3, 2021, BIGGS described how he, as an organizer of Proud Boys events, sets about planning them. BIGGS explained, in part: "When we set out to do an event, we go alright, what is or main objective? And that's the first thing we discuss. We take three months to plan an event. And we go, what's our main objective? And then we plan around that, to achieve that main objective, that goal that we want."

Most remarks about "plans," "teams," meetings and rallying points the government highlights, especially those of the evening of January 5, are in direct response to a sudden and important development within Proud Boys networks then arriving in Washington, D.C. The comments reflect a sudden regrouping. Proud Boy Chairman Enrique Tarrio had been arrested on January 4, the day before, based on allegations about his conduct during a pro-Trump march on December 12, 2020. Tarrio was released on bail the on the afternoon of January 5 but banned from reentering Washington, D.C. Proud Boy groups in Washington were suddenly without a leader.

**B.  No Presumption of Detention is Triggered. Even if Triggered, the Bail Reform Act Factors Favor Biggs' Continuation of His Home Detention in Florida.**

The government's legal case in support of revoking Biggs' pretrial release can be summarized as follows: "A presumption in favor of detention exists in this case which [Biggs] cannot rebut. Even if he could, all four of the Bail Reform Act factors weigh heavily in favor of detention." Motion at 10.  Biggs submits that such presumption can be triggered here. The Court need not even go through the exercise of weighing the four bail reform factors under 18 U.S.C. Section 3142(e)(3)(C). However, even if the presumption were triggered, the United States in Biggs' case cannot prevail on any of the four factors.  The United States has conveniently charged Biggs in the new indictment with violation of Section 1361 (destruction of "government property or contracts"), which is a one

8

of the myriad of offenses Section 3142(e)(3)(C) makes presumptive for detention by being listed in

18 U.S.C.  Section 2332b(g)(5)(B). Motion at 4. The government goes on to say that it also seeks

detention under 18 U.S.C. Section 3142(f)(1)(A) because destruction of property in violation of

Section 1361 is a crime of violence. *Id.*  The Court is again respectfully directed to both the

extensive affidavit in support of the January 19 complaint (Docket Item 1-1) against Biggs and the

recent superseding indictment. On January 6, this defendant did not "storm" anything. He was not

armed. He assaulted no one. He did not steal or damage anything. He did not threaten anyone. He

did not resist arrest. He did not scream or yell at anyone. He did not urge anyone else to do any of

these things. Except for "this is awesome" there is no record he said anything once inside that

building. There is no indication that, like others present that day, he had any intent to enter the

Capitol building until those last few seconds when he became part of a movement and flow of

people who unfortunately did.

      Even if the presumption were triggered, the four Bail Reform Act factors do not weigh in

favor of revoking Biggs' nine-week pretrial release. *See,* Motion at 5-9.  With respect to the first

factor of "nature and circumstances of the offense," the Motion paints a vague picture of what the

Government thinks constitutes the offense. It is at best part-working theory and part-artifice based

on Biggs's typical commentary since 2018 in public settings. It couples conspiracy with property

damage in relatively bald allegations to justify not only holding Biggs responsible for much of what

occurred on January 6 but to incarcerate him immediately based on "new" information.  The

government has known for at least a year about Biggs' leadership style and the kind of comments,

instructions and political or cultural rhetoric that typically routinely flow from it.  With respect to the

second factor, the weight of the evidence, the evidence linking his instructions to a planned breach

of the Capitol led by him and others is less than circumstantial. It is conjectural. It lacks context.

With respect to the third factor of history and characteristics, the United States itself notes that

Biggs "has no known criminal history" and "has strong ties to" the Daytona Beach-Ormond Beach

area where he lives. *Id.* at 8.  Finally, with respect to the fourth Bail Reform Act factor, risk of

danger to the community, this factor also weighs against the revocation of Biggs pretrial release and

home detention. Biggs loves and honors his family and community. As noted above, he has primary

responsibility for his daughter (who turns four soon) five days week. His mother is a cancer patient,

off and on in remission, and she lives nearby. Biggs moved to Florida two years ago to help care for

her after she was stricken with cancer at a time when his stepfather had recently died. Biggs is an

outgoing personality with strong ties in the community and close friends and colleagues of all colors,

religions, national backgrounds and cultures. Biggs served eight years as a Staff Sergeant with the

U.S. Army. He was deployed in both Iraq and Afghanistan. He earned multiple awards for his

service.

### C. **The Law of the Case Doctrine Likely Shuts Down the Government's Motion.**

The law of the case doctrine also supports Biggs' opposition to revocation of his home

detention. *Taylor v. FDIC,* 132 F.3d 753, 761 (D.C. Cir. 1997).  While the government never sought

pretrial detention in Biggs case until March 20, it could have based on the same kind of information

in its possession since at least January 20 (*see*, Docket Item 1-1), when Biggs appeared before

United States Magistrate Judge Kidd in Orlando, was released and driven back to his home in Ormond

Beach.  The government chose not to do so. ("In this case, happily, we need not bite this distasteful

bullet. The motion was denied [citation omitted], and that decision is the law of this case, preclusive

for all matters decided expressly or by necessary implication.") *See also,* Defendant Ethan Nordean's

Opposition to Government's Motion to Revoke Pretrial Release at 19-20.

## **CONCLUSION**

The Motion to Revoke Biggs' Pretrial Release should be denied.  The United States' argument to now incarcerate Biggs is pinioned on a handful of speculative, somewhat dramatic interpretations of certain "new evidence" of instructions Biggs gave on, before and after January 6. They are subject to several interpretations. Issues raised by his instructions by them can be resolved in discovery and at trial. Importantly, the FBI has known about his political commentary and role in planning events and counter-protests in Portland and other cities since at least July 2020 and arguably benefitted from that knowledge in efforts to gather intelligence about Antifa in Florida and Antifa networks operating across the United States. Nothing acquired by the government since his pretrial release on January 20 nor any of Biggs' actions since his release supports detaining him now.

.

Respectfully submitted,

JOHN DANIEL HULL
COUNSEL FOR DEFENDANT JOSEPH BIGGS

By: */s/ John Daniel Hull*
JOHN DANIEL HULL
DC Bar No. 323006; California Bar No. 222862
Hull McGuire PC
1420 N Street, N.W.
Washington, D.C.  20005
619-895-8336
jdhull@hullmcguire.com

11

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 29, 2021 he served a true and correct copy of the

foregoing Defendant Biggs's Opposition to Motion to Revoke Pretrial Release via the Electronic

Case Filing (ECF) system upon counsel for the government.

By:  /s/ *John Daniel Hull*
JOHN DANIEL HULL
DC Bar No. 323006; California Bar No. 222862
Hull McGuire PC
1420 N Street, N.W.
Washington, D.C.  20005
619-895-8336
jdhull@hullmcguire.com