UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case No. 21-CR-175-1 (TJK) |
| | : |
| ETHAN NORDEAN, | : |
| also known as "Rufio Panman," | : |
| | : |
| **Defendant.** | : |

**UNITED STATES' REPLY TO DEFENDANT'S OPPOSITION TO
THE UNITED STATES' MOTION TO REVOKE PRETRIAL RELEASE**

The question before the Court is whether the Government has proven "by clear and convincing evidence" that the Defendant, Ethan Nordean, "presents an identified and articulable threat to an individual or the community[.]" *United States v. Munchel*, No. 21-3010 at *16 (D.C. Cir. Mar. 26, 2021), quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987). The purpose of pretrial detention is to "disable the arrestee from executing that threat." *Id.* at *11.

As alleged in the Superseding Indictment, the Defendant planned, organized, fundraised, and ultimately led others onto the restricted grounds of the U.S. for the purpose of obstructing the Electoral College certification and interfering with law enforcement. Along with co-Defendant Joseph Biggs, he also directly interfered with law enforcement's efforts to control the crowd by knocking down a metal barricade. And, despite the violence and destruction of January 6 and the obstruction of the official proceedings that day, the Defendant apparently remains fully committed to his cause and without any remorse for the mayhem that he helped unleash. By his own words, the Defendant considers himself a revolutionary figure—charged with restoring the "spirit of 1776." The identified and articulable threat posed by the defendant is rooted in his belief that his acts of defiance against law enforcement and the lawful functions of government make him a

patriot. As he declared on January 8, ". . . if you feel bad for the police, you are part of the problem. They care more about federal property (our property) than protecting and serving the people. BACK THE BLACK AND YELLOW[.]" Responding to a text message that criticized his conduct, the Defendant explained that he was convinced that God would ultimately conclude that he is "doing right" by his life. These statements, when considered in light of the Defendant's role and conduct on January 6, evince the threat that he poses to the community.[1]

There appear to be no conditions that will ensure that the Defendant will not plan, organize, and finance further *attacks* on the government or others—simply out of a misguided belief that he is saving the republic. Given the Defendant's planning, preparation, and leadership of his men on January 6, the government has no level of comfort that the Defendant's communications can be monitored in such a way that would guard against future attacks directed by Defendant. *See United States v. Kelly Meggs*, 21-CR-28-8, Hr'g Tr. at 31:23 – 32:5 (J. Mehta) (Mar. 26, 2021). Because no condition or combination of conditions can protect the community, the government moves this Court to detain the Defendant pending trial.

### A. The Telegram Messages Are Compelling Evidence of a Criminal Conspiracy

The Defendant argues that the Telegram messages do not reveal evidence of a criminal conspiracy and do not contain a "single reference to the commission of crimes." Def. Opp. (ECF 41) at *1-2. The Defendant is wrong. Indeed, the very chats referenced by the Defendant in his Opposition *begin* with the premise that the Defendant and his co-Defendants might be criminally culpable for their plans.

After the Proud Boys chairman was arrested on January 4, Defendant Nordean's co-

---

[1] Contrary to the Defendant's claim (ECF 32 at *24), the government is not seeking detention because the Defendant "belongs to a political group." Rather, the government seeks detention to mitigate the risk of dangerousness posed by the Defendant's release.

Defendant Charles Donohoe advised the group, "Hey have been instructed and listen to me real good! There is no planning of any sorts. I need to be put into whatever new thing is created. Everything is compromised and we can be looking at Gang charges." Members of the Telegram group were then advised on operational security measures. Specifically, the person identified in the Superseding Indictment as Unindicted Co-Conspirator ("UCC-1") advised that participants "[s]houldn't be typing plans to commit felonies into your phone." UCC-1 later directed that, "if you're talkin[g] about playing Minecraft[2] you just make sure you don't use your phone at all or even have it anywhere around you." In other words, the plan "to commit felonies" was not to be memorialized in writing by those in the Telegram messages.[3] Rather, as co-Defendant Donohoe explained, "details will be laid out at the pre-meeting" on January 6.[4]

Notwithstanding the group's operational security measures, plans for criminal activity did, in fact, leak into plain view in the Telegram messages. On the morning of January 6, messages were exchanged in Telegram that reflected a desire that the "normies" would be set loose on Washington, D.C. These messages were exchanged among the small group of members in the

---

[2] Minecraft is a video game. Based on information provided by the FBI, the government understands that it is common for persons discussing criminal activity online to refer to such activity as occurring "in Minecraft" to conceal the true nature of the activity.

[3] The Defendant cites messages from Proud Boys members, such as "Kreeper 2nd HVNY" in support of a conclusion that no plan to storm the Capitol existed. ECF 41 at *3-5. Defendant's argument, however, provides only the first portion of that conversation. Indeed, after complaining about the lack of plans, "Kreeper 2nd HVNY" was told that plans would be forthcoming. As set forth in the Superseding Indictment and explained herein, the evidence shows that plans were still being discussed by leadership on January 5. The details of those plans were not communicated in writing but, as set forth in the Superseding Indictment, Co-Defendant Biggs announced to the group that he was with the Defendant and that "we have a plan."

[4] It must be noted that if the "plan" involved nothing more than lawful assembly or the protection of crowds from Antifa, it is highly unlikely that such operational security measures would have been necessary.

3

"New MOSD" message group,[5] which included the four Defendants, UCC-1, and a handful of other participants:

| | | |
|---|---|---|
| UCC-1: | I want to see thousands of normies burn that city to ash today |
| PERSON-2: | Would be epic |
| UCC-1: | The state is the enemy of the people |
| PERSON-2: | We are the people |
| UCC-1: | Fuck yea |
| PERSON-3: | God let it happen |
| PERSON-3: | I will settle with seeing them smash some pigs to dust |
| PERSON-2: | Fuck these commie traitors |
| PERSON-3: | It's going to happen. These normiecons have no adrenaline control |
| PERSON-3: | They are like a pack of wild dogs |
| DONOHOE: | I'm leaving with a crew of 15 at 0830 to hoof it to the monument no colors |
| PERSON-2: | Fuck it let them loose |

Moreover, as alleged in the Superseding Indictment, the manner and means of the charged conspiracy included storming the Capitol and thus obstructing the proceedings inside. To wit, as the Defendant and his co-Defendants marched the group of Proud Boys members around the Capitol, one of the men yelled, "Let's take the fucking Capitol." The man was chastised and told not to *say* that; specifically, he was told, "none of that; let's not fucking yell that." The Defendant followed by calling the man an "idiot." Another member of the crowd commented, "Don't say it, do it." When the Defendant, his co-Defendants, and the Proud Boys under the Defendant's command did, in fact, storm the Capitol grounds, messages on Telegram immediately reflected the event. PERSON-2 announced, "Storming the capital building right now!!" and then "Get there." UCC-1 immediately followed by posting the message, "Storming the capital building right now!!" four consecutive times.[6] These messages reflect that the men involved in the planning understood that the plan included storming the Capitol grounds. This shared understanding of the plan is

---

[5] MOSD is believed to stand for Ministry of Self Defense.

[6] UCC-1 and PERSON-2 are not believed to have been present on the Capitol grounds, but rather indicated that they were monitoring events remotely using livestreams and other methods.

further reflected in co-Defendant Biggs' real-time descriptions that "we've just taken the Capitol" and "we just stormed the fucking Capitol." *See Gov't Reply* (ECF 44) at *3-4. And this is precisely why Nordean and others did not want a member of their group *announcing* their intentions out loud in advance.

As the crowd advanced onto the west terrace of the U.S. Capitol, messages continued to be exchanged on Telegram that reflected—and encouraged—the criminal conduct. For example, UCC-1 posted a message that encouraged participants in the message group to "push inside!" Shortly thereafter, after Proud Boys member Dominic Pezzola robbed a Capitol Police officer of his riot shield, co-Defendant Donohoe was captured on video carrying the riot shield with Pezzola. Around the same time, co-Defendant Donohoe relayed the news to those on the Telegram message group, writing, "Got a riot shield!" Pezzola would later use the riot shield to break a window and enter the Capitol building. Approximately five minutes after Pezzola entered the Capitol, and after numerous Proud Boys had entered the building, it was announced by a user on Telegram, "We just stormed the capital" [sic]. Later that evening, after law enforcement had worked to clear the Capitol building, PERSON-2 wrote, "We failed. The house is meeting again."

That some in the Proud Boys ranks might have been surprised by the outcome (e.g., "That was NOT what I expected to happen today…") or concerned about what they had unleashed (e.g., "I don't think the plan was to attack[], damage, and attempt to control [a] government building") does not negate the criminal agreement among the conspirators. Likewise, the fact that the Defendant might have considered scheduling a live music event at 4pm on January 6, does not refute the existence of a criminal conspiracy to disrupt the proceedings at the Capitol that were scheduled to begin at 1pm. The Defendant and his co-Defendants organized a group of Proud Boys members and prepared for violent confrontation. The Defendant and co-Defendant Biggs

contributed directly to that violent confrontation by dismantling the final barrier that separated the crowd from law enforcement. Most importantly, the Defendant has expressed no remorse for his conduct. To the contrary, he has celebrated it. As he wrote in a message after January 6, "We stormed the capital [sic]. It was great[.] Basically, then [sic] the cops started shooting us with pepper balls and boom bombs and we stormed them and busted down the doors in the capital [sic]. Thousands and thousands of people it was insane."

### B. The Defendant is Criminally Liable for the Actions of His Co-Conspirators

At various points in his filings, the Defendant challenges the merits of the charge of destruction of property, in violation of 18 U.S.C. § 1361, which gives rise to a rebuttable presumption in favor of detention. As alleged in the Superseding Indictment and summarized again here, the Defendant was a leader in a conspiracy that aimed to disrupt the proceedings at the Capitol and interfere with law enforcement. The charged overt acts demonstrate the Defendant's role in the offense and his criminal culpability for those acts carried out by the Defendant's co-conspirators. The Defendant and his co-Defendants are plainly responsible for the actions taken by Pezzola and others in furtherance of their criminal scheme. Through their planning and individual contributions to the effort, the Defendant and his co-Defendants did aid and abet the violent and destructive entry into the Capitol, including that of Pezzola, who is charged elsewhere. These were the findings of the grand jury in the Superseding Indictment that was returned.

Under the Supreme Court's Pinkerton theory of liability, coconspirator liability exists where the substantive offense is committed "in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." *United States v. Moore*, 651 F.3d 30, 94 (D.C. Cir. 2011) (citing *United States v. Washington*, 106 F.3d 983, 1011 (D.C.Cir.1997). The natural and foreseeable consequence of storming the Capitol by trampling barriers and pushing past law enforcement in an effort to corruptly obstruct the proceedings inside

6

the Capitol most certainly made Pezzola's destruction of the Capitol's windows and doors a foreseeable and natural consequence of the plan.

Likewise, the Defendant is liable for Pezzola's actions by virtue of the Defendant's having aided and abetted the storming of the Capitol grounds. While aiding and abetting liability requires the aider-abettor to form an intent to facilitate the commission of the crime by a principal, the law does not require a perfectly shared-intent. *Id.* at 91 (requiring "proof of some shared intent" but not a perfect overlap). Here, the common design was to corruptly obstruct the proceedings. The Defendant took unlawful actions by advancing toward the Capitol, personally breaking down barriers, and effectively clearing a path for those acting at his command. The Defendant's liability does not flow from "general knowledge that criminal activity is afoot," but rather from his own criminal actions in furtherance of a plan of common design—to corruptly obstruct the proceedings. Pezzola's criminal actions to enter the Capitol were a natural consequence of the shared plan. "[O]nce a common design is established, the aider and abettor is responsible not only for the success of the common design, but also for the probable and natural consequences that flow from its execution, even if those consequences were not originally intended." *United States v. Walker*, 99 F.3d 439, 443 (D.C. Cir. 1996).

### C. The Defendant Remains Committed to His Cause, and Reports That He Has Nothing to Lose

"Whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *Munchel*, No. 21-3010 at *17.

The Defendant is a recognized leader of the Proud Boys, and he was heavily involved in organizing his men for what occurred on January 6. He used his online platforms to rally Proud Boys to come to Washington, D.C. to "fight" against what he viewed was a stolen election. He solicited funding and raised over $16,000 in support of the group's efforts on January 6. On

7

January 6, he was not a face in the crowd, but the recognized leader of the pack who led to the group to the First Street pedestrian entrance immediately prior to the storming of the Capitol grounds. The Defendant's successful storming of the Capitol and interruption of a Congressional proceeding has likely only served to increase his stature and influence over the men who joined him that day.

Through both his words and his actions, which backed up those words, the Defendant encouraged others to join him in taking unlawful action at the Capitol. As the Defendant marched his men around the Capitol complex, he repeated some of the same rhetoric that he had broadcast over social media in the leadup to January 6. For example, as the Defendant led his men toward the Capitol, he used his megaphone to announce, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [*unintelligible*] foreign enemies and domestic. Let us remind those who have forgotten what that means." As the Defendant arrived at the east side of the Capitol, he brought the men under his command to a halt. He then spoke through the megaphone, "Back the yellow. You've got to prove it to us….You took our boy in and let the stabber go. You guys got to prove your shit to us now." The group then marched on as the Defendant spoke through his megaphone again, "and don't forget, we don't owe you anything. Your job is to protect and serve the people, not property or bureaucrats." The Defendant would echo these same sentiments after January 6, explaining that "if you feel bad for the police, you are part of the problem." This was indeed the attitude that ruled the day on January 6, and the Defendant remains committed to it.

The Defendant argues (ECF 41 at 2-3) that he had plans to relocate to North Carolina prior to his arrest. The Defendant fails to mention that the alleged move was apparently being facilitated by one of his co-Defendants, Charles Donohoe. These facts merely highlight the Defendant's

connections with the men with whom he had planned the storming of the Capitol. Indeed, in a message posted around the same time, the Defendant explained that he would not quit being a Proud Boy—just as one can't "quit being a man" or "a patriot" or "a Christian." The Defendant reported that his family had "cut ties" with him, his marriage "has been destroyed," and his "own government seems to think [he's] the bad guy." The Defendant explained that he'd learned that "if you are going to stand for something good, expect the world to stand against you with everything it has[.]" The Defendant then closed by stating that he'd decided to move to Tennessee to "start a new life" because "nothing [is] left for me here [in Washington state]." The Defendant's commitment to the men with whom he had stormed the Capitol—above family, marriage and all else—underscores his future danger to the community.

As a leader on January 6, the Defendant played a central role in unleashing the violence and destruction at the U.S. Capitol. It is true that the ongoing danger he poses to the community is rooted less in the threat that he will personally engage in violence, although that is certainly of concern to the government. Rather, his ability and willingness to lead others to engage in violence, and his continued commitment to the same beliefs that animated that leadership and led to that violence on January 6, are what give rise to what the *Munchel* court characterized as the "identified and articulable threat" that requires detention. As noted above, the government is gravely concerned that, while the Defendant is on release, even on strict conditions, his communications cannot be monitored in such a way that would guard against future attacks by his followers. *See Meggs*, 21-CR-28-8, Hr'g Tr. at 31:23 – 32:5 (J. Mehta).

### D. The Court is Not Limited to Consideration of Destruction of Federal Property When Evaluating the Bail Reform Act Factors

The full course of the Defendant's conduct must be considered when evaluating his danger to the community. That conduct includes the Defendant's planning, fundraising, and organizing,

9

as well as his personal conduct in obstructing the proceedings, interfering with law enforcement, and encouraging others to do the same.

The Defendant's culpability for Destruction of Federal Property is not the sole metric on which the 3142(g) factors are to be assessed. Whatever the basis for detention, the Bail Reform Act's plain language does not limit the Court's consideration of the appropriate factors under § 3142(g). Indeed, exactly the opposite is true: § 3142(g) directs that judges "shall" consider the "available information concerning" the enumerated factors. Similar language in the sentencing and supervised-release statutes, 18 U.S.C. § 3553(a) and § 3583, for example, affords a court "wide discretion" to craft the most appropriate sentence or set of conditions. *See United States v. Hunt*, 843 F.3d 1022, 1030 (D.C. Cir. 2016).

Section 3142(g)'s language articulates no link between the rationale for a detention hearing under either §§ 3142(e) or 3142(f) and the factors a court considers under §3142(g). Instead, once "a hearing is appropriate, the judicial officer must consider several enumerated factors to determine" whether detention or release is appropriate. *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *see United States v. Holmes*, 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142](f)(1) or (f)(2)"); accord *United States v. Plata Hernandez*, 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language of §3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision. Those factors are listed in § 3142(g), which contains no language limiting the consideration of those factors to hearings held only under subsection (f)(1), not subsection (f)(2).")[7] Consistent with *Singleton*, therefore,

---

[7] Some out-of-circuit cases appear to follow a different approach. *See, e.g.*, *United States v. Ploof*,

this Court is not limited to consideration of the charge of Destruction of Government Property (18 U.S.C. § 1361) when evaluating the Defendant's danger to the community.

### E.  The "Law of the Case" Doctrine is Plainly Inapplicable

The Defendant asserts that the United States' motion is barred by the "law of the case" doctrine. *Def. Opp.* (ECF 32), at 21-22.  Notably, the Defendant fails to cite any case in which a Court has applied "law of the case" to pretrial detention. Moreover, even if it that doctrine were applicable here, it would still not govern unless the Defendant could establish that the pretrial release order was a ". . . fully considered *legal* decision based on a fully developed factual record. . . ." *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012) (emphasis added). This he cannot do, given that Chief Judge Howell's order was a factual decision that was based on a factual record less developed than the record before this Court.

## CONCLUSION

The additional charges in the Superseding Indictment, and the evidence supporting those charges, change the balance of the Bail Reform Act factors and justify reconsideration of pretrial detention.   A presumption in favor of detention exists in this case which Defendant cannot rebut. Even if he could, all four of the Bail Reform Act factors weigh heavily in favor of detention.

---

851 F.2d 7 (1st Cir. 1988) (holding that dangerousness is not appropriately considered in cases where the basis for detention is 18 U.S.C. § 3142(f)(2)); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986) (reasoning that the district court could only consider dangerousness in setting conditions of release where the defendant's case involved an offense specified in 18 U.S.C. § 3142(f)(1)). But those cases may simply stand for the proposition that "a finding of dangerousness" is not a basis for a detention hearing without satisfying a triggering factor in § 3142(f)(1) and (2) because such an approach would render those provisions "meaningless." *See United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (citing *Himler* and *Ploof* as supporting that proposition); *see also Singleton*, 182 F.3d at 9 (describing *Ploof* as addressing when a detention hearing is available). Here, the Court is permitted to consider all of the §3142(g) factors once the government has satisfied the threshold inquiry under §3142(f) that a detention hearing is appropriate.

                              CHANNING D. PHILLIPS
                              Acting United States Attorney
                              D.C. Bar No. 415793

By:      */s/ Jason McCullough*
            JASON B.A. MCCULLOUGH
            D.C. Bar No. 998006; NY Bar No. 4544953
            JAMES B. NELSON
            D.C. Bar No. 1613700
            LUKE M. JONES
            VA Bar No. 75053
            Assistant United States Attorneys
            555 4th Street, N.W.
            Washington, D.C. 20530
            (202) 252-7233
            jason.mccullough2@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on March 31, 2021.

By: /s/ Jason McCullough
JASON MCCULLOUGH
D.C. Bar No. 998006; NY Bar No. 4544953
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233
jason.mccullough2@usdoj.gov