IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.
                                  Washington, D.C.
1-ETHAN NORDEAN                   Tuesday, April 6, 2021
2-JOSEPH RANDALL BIGGS,           11:30 a.m.

              Defendants.
- - - - - - - - - - - - - - - - x
_____

                   TRANSCRIPT OF MOTION HEARING
          HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                  UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          James B. Nelson, Esq.
                          Luke M. Jones, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5    Biggs.

6              Present for the Government are James Nelson, Jason

7    McCullough and Luke Jones; present from Pretrial Services is

8    John Copes; present for Defendant 1 are David Smith and

9    Nicholas Smith; present for Defendant 2 is John Hull; and

10   also present is Defendant 1, Mr. Nordean; and Defendant 2,

11   Mr. Biggs.

12             THE COURT:  All right.  Well, welcome to everyone

13   here.

14             And we are here for argument on the Government's

15   motion to revoke release conditions for Mr. Nordean and

16   Mr. Biggs.  So without further ado, let me turn it over -- I

17   don't know whether it will be Mr. Nelson arguing for the

18   Government in both -- as to both defendants, but I'll go

19   ahead and hear from you, Mr. Nelson, or whoever from the

20   Government is going to take the lead.

21             MR. NELSON:  Thank you, Your Honor.  It will be

22   Mr. McCullough.

23             THE COURT:  Mr. McCullough?

24             MR. MCCULLOUGH:  Thank you, Your Honor, and good

25   morning.

1          As the Government has submitted in its papers, the

2     defendant, Ethan Nordean -- we'll address Ethan Nordean

3     first.  The defendant, Ethan Nordean, is dangerous and poses

4     a danger to the community.

5          The defendant, Ethan Nordean, planned, organized,

6     fundraised and led others onto Capitol grounds on January

7     6th.  The purpose of that effort was to obstruct the

8     certification that was taking place that day.  And, in fact,

9     he and his co-conspirators were successful in that effort.

10    They did, in fact, obstruct the certification; they did, in

11    fact, interfere with law enforcement that day; and they did

12    so through a coordinated effort to move onto Capitol grounds

13    and push past barriers and ultimately they did enter the

14    Capitol.

15          THE COURT:  Mr. McCullough, let me ask you to

16    start with -- there was some back-and-forth at the very end

17    -- actually, let me also just start by asking the

18    Government, does the Government object -- I know the --

19    Mr. Nordean's counsel filed something -- a motion to -- for

20    leave to file a surreply.  I think it was late last night.

21    Is there -- does the Government object to me receiving that

22    document?  I mean, this isn't a civil case.  I'm going to

23    let all the parties say their piece on this, obviously.  So

24    does the Government object to that?

25          MR. MCCULLOUGH:  Your Honor, the Government does

1    not object to it.  The Government does not think that it was

2    appropriate in the sense that it did not address new legal

3    issues from the Government's perspective, and I -- I'm happy

4    to start just on one point there.  I don't believe that the

5    Government or the defendant are in disagreement as to the

6    issues that put us into a detention hearing setting.

7              THE COURT:  Right.  Well, what -- that's what I

8    wanted to just refocus on first.  So I'm going to just, for

9    the record, grant that motion and I'll receive that

10   surreply.

11             Yes, Mr. McCullough.  I think starting there,

12   because I did not see that issue percolating until really

13   the very end there.  It sounds like what the -- by the end

14   of all the documents -- all the pleadings, it sounds like

15   the defense was arguing that you haven't -- that the grand

16   jury didn't charge felony destruction of property and so

17   there is no presumption and, in fact, you all don't even

18   have a basis to argue for detention.  So you know, the best

19   defense is a good offense.  So why don't you address,

20   Mr. McCullough, those arguments just before we get into,

21   sort of, the factors and the, sort of, various

22   considerations in play as far as the factors I have to

23   consider.

24             MR. MCCULLOUGH:  Sure.

25             So Your Honor, the grand jury has returned an

1    indictment.  That indictment includes a conspiracy to

2    obstruct and impede the administration of justice, the

3    official proceeding that was taking place, as well as the

4    second object of interfering with law enforcement.  The --

5    that conspiracy theory and the conspiracy indictment that

6    was returned by the grand jury includes statements as to the

7    destruction of property by co-conspirators that were

8    indicted in separate proceedings.  So there is a 371

9    indictment as to the destruction of federal property.  That

10   is one basis on which the grand jury's returned an

11   indictment as to destruction of government property.

12           Separately, as to 1361 itself, the grand jury

13   returned a count that charges the substantive offense of

14   destruction of government property as well as aiding and

15   abetting the destruction of government property.  In that

16   indictment, it is specifically alleged that the damage

17   amount was more than $1,000, and that is in the count that's

18   returned by the grand jury.  And so the Government would

19   basically point to that charge of 1361 as a -- basically, an

20   offense that gets you into the detention hearing setting,

21   and it does so in two ways.

22           One, it is an enumerated offense in Section

23   2332b(g)(5)(B) which is identified as one of the bases for a

24   detention hearing, and that's in -- so in 3142(f)(1)(A), it

25   says that, On motion of the Government, in a case that

1    involves, and then any of the enumerated offenses in 2332b,

2    one of those being a destruction of -- felony destruction of

3    government property.

4         The other, though, Your Honor, is also the fact

5    that there is a rebuttable presumption that applies with

6    respect to that same charge, and so that same charge of 1361

7    basically in 3142(e)(3)(C) states that someone is subject to

8    the rebuttable presumption that detention is appropriate if

9    they have committed one of these acts.  And now, that -- as

10   you know, Your Honor, that is slightly different language in

11   the rebuttable presumption that refers to probable cause by

12   -- a probable cause finding by Your Honor.  It's well

13   settled that the return of an indictment makes conclusive

14   the existence of probable cause, but nonetheless the

15   Government has proffered additional evidence as to the

16   probable cause as to the destruction of that property.

17        So --

18        THE COURT:  Yes, that's one -- Mr. McCullough,

19   just to -- just if I could interrupt for a moment, that

20   point, I thought, was interesting.  I don't know if you're

21   quoting from -- I mean, when Chief Judge Howell first had

22   Mr. Nordean before her, she cited a case -- a 1973 Circuit

23   case for that proposition.  And I suppose that's the

24   Government's -- it's -- that's the Government's position

25   that if it -- particularly -- well, under, I guess, either

1    prong, if -- or either bases that you just laid out, I --

2    under that case, I don't -- I can't look past that

3    indictment -- I'm not saying I would in this case or in any

4    other case, but just as a -- kind of, as a theoretical

5    matter, that case seems to suggest I can't look past the

6    indictment to, sort of, challenge the Government's evidence

7    and say, Gee, I don't think you have enough here, even for

8    the standard of probable cause.  The indictment's been

9    returned, and that case would seem to foreclose that.  I

10   suppose that -- is that the Government's position?

11            MR. MCCULLOUGH:  That is correct, Your Honor.  And

12   in that -- and with respect to that question, that is a

13   question under 3142(e)(3)(C) which is the question as to

14   whether there is a rebuttable presumption.  That is what

15   that case does stand for.  However, in (f)(1)(A), it's

16   simply that the case involves --

17            THE COURT:  Right.

18            MR. MCCULLOUGH:  -- this criminal act.

19            THE COURT:  Right.

20            MR. MCCULLOUGH:  And so it's not even a

21   probable --

22            THE COURT:  Right.

23            MR. MCCULLOUGH:  -- cause question.  We're,

24   frankly --

25            THE COURT:  That's right.

```
1              MR. MCCULLOUGH:  -- in -- we're in detention land

2     and --

3              THE COURT:  Yes.

4              MR. MCCULLOUGH:  -- so that's where we are, and

5     then it goes to the, kind of, four factors under -- the (g)

6     factors of 3142(g).  And so then, you know, it's

7     certainly -- there's plenty of -- there's fertile ground for

8     argument as to how those four factors stack up.  The

9     Government -- and that's where some questions as to the

10    strength of the Government's evidence and those might come

11    into play.  But, Your Honor, in terms of whether it is

12    appropriate to be having a detention hearing, that is -- we

13    are in the appropriate setting here.

14             THE COURT:  Right.  The language about -- the case

15    involves just -- if you were proceeding under that theory,

16    and let's assume for the moment I could look past the

17    indictment, the Government would lose the rebuttable

18    presumption, but we would still be in detention land through

19    that other provision.  And with the language, just does the

20    case involve it, it would seem to be not a question.  Right

21    or wrong, whatever, the grand jury has charged that offense.

22    I don't know what the argument would be that it -- this case

23    doesn't involve that offense; is that -- that's your

24    position?

25             MR. MCCULLOUGH:  That's correct, Your Honor.
```

1          THE COURT:  All right.  Yep.

2          All right.  So let's talk about the factors.

3          MR. MCCULLOUGH:  Sure.

4          And so, Your Honor, I think the question here is

5     whether Ethan Nordean poses an identified and articulable

6     threat.  And, as the Government has set forth in its papers,

7     the Government views this as Defendant Ethan Nordean having

8     an unwavering commitment to defying lawful functions of the

9     government.  The -- Ethan Nordean stated as much in advance

10    of January 6th; he then engaged in that conduct on January

11    6th; and he has shown no remorse for that action.

12          And so the -- Your Honor, that, coupled with his

13    ability to encourage, plan, organize and lead others to this

14    kind of activity in the future, that poses the identified

15    and articulable threat.  And, Your Honor, the core feature

16    here is that Ethan Nordean planned this from remote

17    locations.  He didn't plan this from the, you know -- the

18    west alcove of the Capitol.  The defendant planned these

19    actions and made these communications from his home and from

20    other locations.  And so as a result, putting this defendant

21    into home confinement does not adequately protect the public

22    from the danger that it faces from someone like Ethan

23    Nordean who is able to plan and organize and direct

24    individuals to follow him into, kind of, invoking the spirit

25    of 1776.  He's very clear in his messages before January 6th

1    that, What people think is that these -- that they're just

2    going to be complacent and they're just going to do -- issue

3    Facebook posts, but, no, we're going to take action.  That

4    is the message that Ethan Nordean was broadcasting, and he

5    has indicated no -- nothing to suggest that he would move

6    away from that.

7           So when this case went before Chief Judge Howell

8    on March 3rd, the Government had not returned this broader

9    indictment.  The Government had not pointed to the existence

10   of and been able to discuss the existence of the messaging

11   -- the Telegram messages in which Ethan Nordean and others

12   in that group indicated that they were planning for some

13   type of criminal activity.  There's very clear discussion of

14   the question that, Everyone stop what you're doing.  We

15   don't want to be subject to gang charges.  There's another

16   statement about, If we're -- if you're talking about playing

17   Minecraft, you shouldn't have your phone anywhere near you.

18   Minecraft being, kind of, a, you know, playful way to

19   describe engaging in criminal activity.

20          And so when Chief Judge Howell looked at this

21   without any of that evidence, she said this is a close call.

22   She said he -- Ethan Nordean is heavily involved in

23   pre-planning.  She said Ethan Nordean had lots of

24   communications in advance about the stolen election and,

25   kind of, motivating people to come to Washington, D.C.  He

1    had solicited donations, and those donations ultimately in

2    the amount of more than $16,000.  He had issued what Chief

3    Judge Howell referred to as fighting words in which he said,

4    you know, Fight now or lose everything, and also, pointed

5    out his statements about invoking the spirit of 1776.  And

6    on ground -- on the ground, she pointed out that he was a

7    ringleader of men who were prepared for violent

8    confrontation and he planned -- he himself planned on coming

9    here.  And what Chief Judge Howell was asking was, what ties

10   him to these other actions?  What ties him to the

11   destruction of property?  What ties him to others under his

12   command taking these actions in furtherance of the plan?

13   And that was the question that Chief Judge Howell raised and

14   the Government, at the time of the hearing on March 3rd, was

15   unable to answer those questions because of the pending

16   superseding indictment which indicated others' involvement.

17           And so here we are now with that additional

18   evidence, and evidence, as I mentioned, that describes the

19   Telegram messages in which individuals are discussing

20   planning for January 6th, and not just planning a march

21   because you don't -- one doesn't need this level of secrecy

22   around planning a march.  They're -- ultimately, in those

23   Telegram messages, they're explicit about what conduct is

24   taking place.  There are people that say, contemporaneous

25   with these actions, Storming the Capitol.  Get there.

1    People are directing them to push inside.  We just stormed

2    the Capitol.  That language is consistent with the language

3    that the defendants in this case were using.  Joseph Biggs,

4    on the ground, says, We've just taken the Capitol.  We just

5    stormed that motherfucker and took it back.  That is -- I

6    mean, conspiracies are, kind of, formed with winks and nods.

7    They're not often memorialized in writing.  Here, we

8    actually have the writing.  We have contemporaneous

9    communications and we have conduct that matches those

10   communications.  And after the fact, there is a celebration

11   of, What we accomplished.  We took the Capitol.  We took it

12   back, including statements by Ethan Nordean.

13           And in addition to that, Chief Judge Howell asked,

14   Well, what did Ethan Nordean specifically do?  How do we

15   know that he was committed to this plan of destroying

16   anything?  And the answer is in the returned indictment

17   which is that, as the crowd surged forward, Ethan Nordean

18   took up an advanced position in the initial entry into the

19   Capitol grounds and he and Joseph Biggs stood side by side

20   and they shook a metal barrier to knock it down.  Now, that

21   is -- I mean, it's the maximum -- the, you know -- actions

22   are louder than words.  When your commanding officer is

23   taking those actions, that speaks volumes as to what the

24   expectation is of the men who are following you.  We are

25   here to advance.  We are here to break things in the process

1   if we need to.  And so, Your Honor, it demonstrates not only

2   -- it puts the agreement and the plan to action and it shows

3   that Ethan Nordean was fully committed to this effort to

4   storm the Capitol; to push past law enforcement; and to

5   break things, if necessary.

6          And so then the question becomes, well, what did

7   we do with Dominic Pezzola and this -- and the question as

8   to this destruction of government property as a result of

9   Dominic Pezzola having stolen a riot shield and pushed into

10  the Capitol?  And, Your Honor, Dominic Pezzola is a

11  co-conspirator who is simply charged in a different

12  indictment.  He arrives at the First Street pedestrian gate.

13  He does so with -- he does so at the same time that Ethan

14  Nordean, Joe Biggs and others are there.  There are

15  coordinated actions to move forward.  Dominic Pezzola

16  participated in the process of -- as barriers are removed,

17  Dominic Pezzola is there at the front, much like his

18  co-conspirators and the charged defendants in this case, and

19  then Dominic Pezzola steals a riot shield.  And one of the

20  defendants in this case, Charles Donohoe, can later be seen

21  carrying the shield with Dominic Pezzola.  And Charles

22  Donohoe reports back to the Telegram messaging group, Got a

23  riot shield.  This is effectively adopting Pezzola's actions

24  as the work of the group.  And, in fact, Dominic Pezzola --

25  in his case, the 21-cr-52, Dominic Pezzola describes that

1    the objective was achieved; that stopping the certification

2    was the objective or acknowledged that that was the

3    objective.  Now, he attributes that to, Well, that was on

4    the orders of President Trump, but nonetheless the objective

5    of Dominic Pezzola matches perfectly with the objective of

6    this conspiracy.  For that reason, he is simply a

7    co-conspirator.

8              And so, Your Honor, when you go down the, you

9    know, kind of -- the factors here -- the -- if you will, the

10   Chrestman factors that have been discussed by Chief Judge

11   Howell as to how we, kind of, sort through all of this

12   evidence, the question is whether this -- he's been charged

13   with felony or misdemeanor offenses.  Clearly, felonies.

14   There's a question as to whether he engaged in prior

15   planning.  He did.  He fundraised over $16,000.  He engaged

16   in planning to obtain communications devices.  He obtained

17   protective equipment.  He came to Washington, D.C., with a

18   tactical vest and protective headwear.  He gave directives

19   in advance, what to wear -- dress in plain clothes, not in

20   the black and yellow -- where to go.  And he met -- as the

21   Telegram messages indicate, met with others the night before

22   in an effort to come up with the plan.

23             Now, there's no indication that he carried a

24   dangerous weapon during the riot, but the other factors all

25   point heavily towards -- in favor of this being a serious

1    act.  Did he coordinate with other participants?  Yes, he

2    did.  The Telegram messages make clear that he was

3    coordinating not just in ones and twos but with a large

4    group.  And when they marched, they marched not to the

5    Ellipse to hear the speeches.  They marched to the Capitol

6    and only the Capitol.  And during that march, as we point

7    out in our briefing, he makes statements that are

8    encouraging people to focus their attention on the police

9    and those at the Capitol.  We represent the spirit of 1776.

10   Remind those who have forgotten.  We're here to remind those

11   who have forgotten what that oath is.  He then says

12   something to the effect of, You've got to prove it to us.

13   Prove your shit to us, then, effectively pointing out that

14   the law enforcement had arrested one of their brethren and

15   now it was up to law enforcement to prove to them.  And he

16   said, We don't owe you anything.  You're here to protect and

17   serve the people, not property or bureaucrats, clearly

18   pointing and discussing that, We are going to focus on law

19   enforcement and what's happening inside that building.

20          As to whether he damaged federal property,

21   threatened or confronted law enforcement, his movements to

22   the front of the group clearly indicate that he is

23   representing both a threat to law enforcement and engaging

24   in damage to government property.  He moves to the front of

25   the group.  There are law enforcement officers on the other

1   side.  He takes action with Joseph Biggs to dismantle that

2   barrier.  And, as we've talked about, that action is a

3   communication to those under his command that, This is what

4   we're here to do.

5         So Your Honor, all the factors point heavily in

6   favor of this being a, you know, very serious crime.  The

7   nature and circumstances of the events charged point heavily

8   in favor of detention here for those reasons.  The weight of

9   the evidence against the person, particularly now with the

10  additional evidence that the Government has put forward as

11  to the returned indictment, the Telegram messages which

12  plainly reference criminal activity, that also points

13  heavily in favor of detention.

14        As to the history and characteristics of the

15  person, Your Honor, the Government appreciates that

16  Defendant Ethan Nordean does not have a criminal history,

17  but the, kind of, nature and characteristics here should,

18  and do, incorporate his statements as to the intent to storm

19  the Capitol, the intent to take violent action, and given

20  that he has shown absolutely no remorse for that action and

21  no remorse for what took place, saying, in fact, the day

22  after the event, If you feel bad for the police, you're part

23  of the problem, I mean, that demonstrates a commitment and a

24  total disregard for the mayhem that took place and the

25  injuries that were done to law enforcement that day.  So

1    that -- I think that speaks volumes to the history and

2    characteristics of the person.

3            And, Your Honor, the nature and seriousness of the

4    danger of this person to the community, quite simply, as

5    we've set out in the papers, this planning -- this was not

6    something that happened in an instant.  This was a planned

7    and coordinated effort and the conduct that took place was a

8    success and Ethan Nordean has celebrated that success, and

9    as a result that makes his potential to do something similar

10   in the future all the more dangerous and all the more acute.

11   The success of this action and the defendant's commitment to

12   continuing such an action in the future or directing others

13   to plan such an action in the future, that is the danger,

14   and that's why the Government is here seeking to revoke

15   detention.  The Government does not do it -- the Government

16   has made a careful and thoughtful decision as to why to do

17   this, and the Government believes that Ethan Nordean does

18   pose that danger to the community that these factors are

19   intended to address.

20           THE COURT:  All right.  Before -- I have some

21   follow-up questions even before I hear from the Government

22   -- I mean, even before I hear from defense counsel.  But,

23   Mr. McCullough, why don't you -- I think it makes -- it's

24   probably most efficient, since I think the arguments really

25   overlap, for you to address Mr. Biggs, as well.

 1          MR. MCCULLOUGH:  Sure, Your Honor.

 2          I think that many of the same --

 3          THE COURT:  Right.

 4          MR. MCCULLOUGH:  -- many of the same issues here

 5     go to Defendant Biggs.  The -- Defendant Biggs was also

 6     involved -- directly involved in the planning and

 7     coordination of this event.  He is involved in the

 8     communications as to when and where to meet, what to wear,

 9     etcetera.  He is also involved in fundraising, though, to

10     the Government's information, perhaps -- we don't have a

11     specific dollar sum to offer to the Court.  But, again, the

12     same language in advance of January 6th, the same

13     encouragement of this kind of violent action is present

14     from, you know, as far back as November 5th when Joe Biggs

15     says, It's time for fucking war if they steal this shit.

16     That drumbeat of language as to a plan for violent

17     confrontation on January 6th is there and it's present.  He

18     is involved in the planning of the January 6th effort.  He

19     had -- that marches and directs, much like Ethan Nordean,

20     this group of men to the United States Capitol.  They march

21     around to the First Street gate.  Joseph Biggs, as much like

22     Ethan Nordean, pushes toward the front.  As the Government

23     points out in its briefing, Joseph Biggs makes

24     contemporaneous statements as they are entering the Capitol

25     that reflect the plan.  We've just taken the Capitol.  We

1   just stormed this -- the Capitol.  The Government points out

2   those quotes that Joseph Biggs states that are, kind of,

3   contemporaneous with his actions.  Much like Ethan Nordean,

4   he pushes down this barrier which, again, that is an action

5   that speaks volumes as to what is expected and what is to be

6   done.

7           And so for the same reasons, Joseph Biggs is

8   committed to this common plan or scheme.  He understands

9   that destruction is a natural and foreseeable consequence of

10  what this conspiracy has wrought.  Defendant Biggs enters

11  the Capitol within -- close -- within two minutes of Dominic

12  Pezzola going through the window.  Defendant Biggs then

13  leaves the Capitol and 30 minutes later comes back in a

14  second time.  And so I mean, that just demonstrates his,

15  kind of, commitment to interrupting, interfering with the

16  official proceedings that were taking place inside as well

17  as a disregard for any efforts by law enforcement to have

18  cleared the building or keep the crowd away.

19          And, Your Honor, it's quite simply the same

20  question with respect to Joseph Biggs.  Joseph Biggs planned

21  for these -- this conduct -- engaged in the planning,

22  organization of this conduct from his home.  He advised

23  others where to go; what, you know -- what to wear; where to

24  meet; and how we were going to move to execute the plan.

25  And so the same question as to the Government -- the

1  Government's ability to protect the public goes to Defendant

2  Biggs.  It's simply the fact that Joseph Biggs, much like

3  Ethan Nordean, has not indicated that he has any different

4  view as to January 6th and the events of January 6th now

5  than he did on January 5th.  And so if Defendant Biggs is to

6  be left at home under home detention, there is no way to

7  effectively monitor his communications in a way that would

8  protect the public.

9           THE COURT:  Let me -- and I'm sure I'm previewing

10  what I'm going to hear from defense counsel, but let me just

11  play devil's advocate here in a variety of ways.

12           What we have to go on as far as defendants

13  associated with the Capitol breach and defendants generally

14  is what they do and what they say and other facts that are

15  -- we can associate with the defendant.  Here, we don't have

16  any weapons.  I think the Government has conceded that.  Not

17  only no weapons used that day at the Capitol, no weapons

18  found at their homes or that have been associated with them

19  in any other way, either defendant.  No criminal history for

20  either defendant.  We have a situation where they've both --

21  I don't weigh this too, too heavily, but I do have to weigh

22  it, I think -- that they've been out now since their release

23  in these cases initially.  I'm not -- I understand the

24  Government has new evidence, and I don't blame the

25  Government for coming forward later when the case, as far as

1    you all -- as far as you -- if you -- in your all -- in the

2    Government's view, changed when certain information came to

3    light.  That's fine.  But they've been out now for the many

4    weeks it's been without a problem.  And I have a -- PSA

5    reports from both of them that don't recommend changes in

6    their conditions.

7            And then we get to the issue which is really the

8    core issue which is, sort of, you know, dangerousness and

9    violence.  And, you know, the evidence of violence on that

10   day is, you know, pretty muted.  We have -- I take your

11   point, Mr. McCullough.  First of all, we have this fence --

12   the shaking of the fence.  Okay.  It's something, but it's

13   not directed at a person, certainly.  We do have, as I

14   think, Mr. McCullough, you mentioned, the -- both defendants

15   moving toward the front of a group -- maybe, not at the very

16   front -- in which case they would have had the opportunity

17   to, sort of, more directly engage in violence.  I -- so I

18   weigh that.  They're toward the front of a group of people

19   who are advancing on the Capitol.  Fair enough.  But it's

20   not, you know, violence through their -- directly through

21   their hand, if you will.  And then we have -- and then we go

22   to the evidence -- so -- and that's where we were when the

23   case first came in and the Government did not move to detain

24   them.

25           The new -- the delta here -- the new evidence is

1    this issue of planning and what -- the messages the

2    Government has put forth.  I think, you know, look, they do

3    show connectivity.  They do show planning of some sort.  And

4    I'm not saying that at a future hypothetical trial, the

5    Government's not going to be able to stitch together all of

6    this and lay a lot of things that happened that day at these

7    defendants' hands.  Maybe they -- at their feet.  Maybe you

8    will.  But in terms of weighing the question of

9    dangerousness and detention, there is no -- we have -- we

10   definitely have some invocations of fighting months

11   beforehand.  Okay.  I don't -- they're -- locking up

12   everybody who said, Gee, we've got to fight, clearly -- but

13   as for the -- when we get down to the day in question, there

14   isn't anything that is very clearly an invocation to

15   violence at least as I see it.

16          Now, again, you know, I'm looking at the evidence

17   you have as a snapshot right now and this doesn't, I don't

18   think, say anything one way or the other about the -- I

19   mean, it does say something about the strength of the case

20   at this moment, but whether you're able to connect all that

21   up, you may well be able to, but I don't know -- if I'm

22   looking solely not at criminal liability here but I'm

23   looking at dangerousness, how -- what's the best -- I'm

24   going to ask a couple of questions.  But in light of all of

25   that, you know, what's the best evidence that the Government

1     has really that what they were -- and, look, I also

2     understand the argument that, Judge, look at the context

3     and, from what happened, you can infer that this was a plan

4     to do violence.  Okay.  Maybe that gets you somewhere, but I

5     think there were probably a lot of people showing up that

6     day with a lot of -- it's possible, with a lot of different

7     plans.  Some went one way; some went the other way.  In

8     terms of connecting the planning to violence, it's not --

9     it's -- these messages don't, you know -- don't move the

10    needle that much.

11           The other piece I just want to mention while it's

12    on my mind is, you know, and that's one of the things -- I

13    mean, the other thing that has happened since -- the other

14    development in the -- in this area that's happened since at

15    least the Government filed its initial motion and since even

16    a lot of the briefing has taken place here is the Circuit's

17    decision in Munchel which, you know, suggests that I have to

18    look at the uniqueness and the context of what happened on

19    that day as part of a forward-going analysis of, is the

20    person a threat?

21           And so I guess, if you would, Mr. McCullough,

22    address those two things.  I mean, the issue of violence and

23    whether I can really infer -- what to make of the fact that

24    clearly there was messaging about a plan.  It's not at least

25    overtly a plan that they -- that anybody mentioned violence

1    about.  Now, you know, maybe, that's good operational

2    security, but it is what it is.  And then as far as Munchel

3    goes, how does the Government reconcile, kind of, what the

4    Circuit instructed me to do -- all courts to do going

5    forward in terms of Munchel and whether we, kind of, meet

6    the strictures that they laid out there?

7              MR. MCCULLOUGH:  Sure.  So Your Honor, the -- one

8    quick thing on -- you mentioned, kind of, whether they had

9    any weapons in their home.  They did have weapons in their

10   home, but we're not aware of any effort to bring those

11   weapons to --

12             THE COURT:  All right.

13             MR. MCCULLOUGH:  -- Washington, D.C., but --

14             THE COURT:  Thank you for that correction.

15             MR. MCCULLOUGH:  -- I just wanted to point that

16   out.

17             The -- Your Honor, the Telegram messages the

18   morning of the event -- there are others in this small group

19   of actors.  It's fewer than 10 participants in this Telegram

20   message group where plans were being discussed.  They say, I

21   want to see thousands of normies burn that city to ash

22   today.  I will settle with seeing them smash some pigs to

23   dust.  So this idea of preparing for some sort of violent

24   confrontation, including violent confrontation against law

25   enforcement, that is in the Telegram messages.  It's not,

1    Oh, you know, yes, and I agree, that's what the plan is, but

2    that is -- I mean, that's a pretty stark memorialization of

3    where this group was in terms of its thought process as to

4    January 6th.  This is not, We're going to march, we're going

5    to listen to the speech, and we're going to protect people.

6    This is, I want to see thousands of normies burn that city

7    to ash.  I would settle with seeing them smash some pigs to

8    dust.  Now, these are not words spoken by Ethan Nordean

9    or --

10              THE COURT:  Right.

11              MR. MCCULLOUGH:  -- Joseph Biggs, but these are

12    the statements of others in that group.  And when Ethan

13    Nordean and Joe Biggs moved forward and they -- and there is

14    a metal barrier separating this mob of people, that they

15    have led to the Capitol, from law enforcement, they take

16    action to rip it down.  I mean, that is -- that's a violent

17    action, Your Honor, and when you do that with -- when you --

18    when I, you know, do that with one person behind me, it says

19    one thing.  When I do it with 100 people behind me that I

20    led to the Capitol grounds, it says a different thing,

21    especially in this context.  And so --

22              THE COURT:  Mr. McCullough, can I just jump in and

23    ask you one question right there.  You -- the -- at various

24    times, the Government's motion references photos and videos

25    and you've embedded photos in the motion.  Do I have -- if

1    -- to the extent there are relevant video, do I have those

2    video?

3              MR. MCCULLOUGH:  You do not, Your Honor.  The

4    Government would be pleased to submit that video, the video

5    of them tearing down the barrier, or other video of them

6    marching to the Capitol.

7              THE COURT:  Well, whatever you think -- I mean,

8    you reference in the motion photos and video and there are

9    some photos here.  I just -- I wasn't aware that any -- I

10   had received any video.  So I would say, from the

11   Government's perspective -- I mean, I'm -- I think I'm

12   probably -- we're going to probably have to come back on

13   very short notice for me to rule on this because I, you know

14   -- I think it's -- I think, given the import of Munchel and

15   the different decisions that all of us in this courthouse

16   have to make with regard to defendants going forward, I, you

17   know -- I want to take my time and make the right decision

18   here.  And so if you all want to submit that as, you know --

19   obviously, provide a copy to the defense -- I think it makes

20   sense for me to receive it.  I don't know how you've been

21   doing that in other cases.  I've had other -- in some of my

22   other cases, I've had the Government simply, sort of, refer

23   to video that had been publicly posted.  I don't know if

24   this is that type of thing where you can point to a place on

25   the Internet where it exists or whether it's something you

1      would need to submit separately, but however you want to do

2      it I will receive it and consider it.

3                  MR. HULL:  If I may, Your Honor, Dan Hull for Joe

4      Biggs.  I would applaud and join in on the idea of getting

5      that tape on the fence to you.  I would very much like you

6      to see that.

7                  THE COURT:  Okay.  Good.

8                  All right.  So -- and anyway, Mr. McCullough, I'm

9      sorry.  I interrupted you, but I wanted to make that point

10     about the video.

11                 MR. MCCULLOUGH:  Sure.

12                 And so, Your Honor, with respect to the -- how

13     Munchel changes this, it fundamentally does not change the

14     question as to whether these defendants pose an identifiable

15     threat to the community.  And the question is whether --

16     prior to January 6th, whether there was a, you know -- a

17     leadership plan in place and these men led a group to attack

18     the Capitol.  That is the Government -- that's the

19     Government's evidence that they led this attack on the

20     Capitol and --

21                 THE COURT:  I mean, it's clearly your strongest

22     point, I think, no doubt.  Your strongest argument is a

23     leadership argument.  What that says -- what, exactly, they

24     were leading and how connected that is to violence and how

25     connected that is to, sort of, forward-looking violence, I

1    think, is, kind of, the core of the question.  Go ahead.

2             MR. MCCULLOUGH:  That's certainly right, Your

3    Honor.  I mean -- but I think the question here is whether

4    that effort to lead and direct a group, to fundraise for a

5    group can still be accomplished and whether the Government

6    has a -- sorry, whether Your Honor has a basis to believe

7    that any strictures put in place as to their home

8    confinement will be strictly followed.  And now, the

9    defendants have not -- there have been no identified issues

10   with their home detention and their release conditions thus

11   far, but, Your Honor, the Government would submit that there

12   -- we don't know what the communications have looked like.

13   And so it's certainly commendable and appropriate to point

14   out that there have been no identified instances, but that

15   doesn't answer the question, and one that was -- and one

16   that's posed, as to whether they can launch another similar

17   event from their homes and whether the release conditions

18   provide any comfort that we can protect the public from that

19   effort.

20             And so, again, it's -- it, you know -- the -- if

21   we look at, you know, kind of, the breaking of the barrier

22   and the leadership forward in isolation, right, if we say,

23   well, it's a, you know -- it's a breaking of a barrier;

24   right?  Big, you know -- big deal; right?  Come on.  It's

25   like, how is that violent?  It's violent when you have --

1    when you're, you know -- it's the difference between opening

2    a bottle of wine and opening a bottle of champagne.  When

3    you've got 100 people behind you and that -- and you unleash

4    that force, what does it mean; right?  What does it mean?

5    And what is the -- and what does that act really tell those

6    people who are following you?  That we are here to advance;

7    we are here to --

8              THE COURT:  I think that exact question has always

9    been at the heart of these cases and why, you know --

10   viewing the individual act and looking at the context, but

11   then also trying to consider it was -- I mean, on, you

12   know -- on the record as being -- as recognizing the

13   unique -- the uniquely bad and pernicious -- how uniquely

14   bad and pernicious that effort was that day to interrupt the

15   peaceful transfer of power.  I think, in some ways, the

16   Circuit has flipped that a little bit and -- at least in the

17   detention context and, I think, appropriately made -- has

18   instructed us to look closely at, you know, that's a unique

19   -- that was a uniquely bad situation.  Well, what is the

20   risk of danger going forward?  And I think, you know, that's

21   the question.  You've mentioned Pezzola a few times.

22   There's a defendant who had weapons-making and bomb-making

23   equipment in his house.  He had -- or instructions, not

24   equipment.  Instructions.  He -- and there were several

25   statements of people that were close to him indicating a

1    future -- that they could be a future -- a vector for future

2    violence.  We don't have those direct similar statements

3    here, but we do have a leadership role that is clearly

4    different and more advanced.

5            Let me turn to whoever wants to address this --

6    whichever Mr. Smith will be addressing this question for

7    Mr. Nordean.

8            MR. NICHOLAS SMITH:  Thank you, Your Honor.  It

9    will be Nick Smith, and good afternoon.

10           THE COURT:  Good afternoon.

11           MR. NICHOLAS SMITH:  We'd like to say at the

12   outset thank you to Your Honor for accepting the surreply

13   brief.  We understand that Your Honor is correct that that's

14   normally a civil litigation tool, but thank you nonetheless.

15           And going on that point to begin with, we

16   understand that the Court is likely to rule -- or already

17   has ruled that the Government has satisfied a detention

18   hearing predicate under 3142(f), but with Your Honor's

19   indulgence I'd just like to make a few points on that in

20   response to the Government, if that's okay with the Court.

21           THE COURT:  Absolutely.  I mean, look, I -- for

22   this -- on this point and on the other -- on the earlier

23   point about the surreply and letting the Government -- look,

24   I -- and letting the Government submit some of this video

25   they want me to see, you know, this isn't -- I'm happy to

1   enforce the civil rules and try to get civil cases as

2   streamlined as possible.  Criminal cases have to move

3   quickly, too.  But when someone's liberty is at stake, I'm

4   going to hear your arguments.  I'm going to receive whatever

5   both sides want me to hear and see.  So please, Mr. Smith.

6          MR. NICHOLAS SMITH:  Okay.  Thank you, Your Honor.

7          So to follow up on that point, Your Honor noted

8   correctly that the Court -- it's not the Court's role at

9   this point to look past an indictment, and Mr. Nordean would

10  agree with that point.  I think the argument that we were

11  trying to make in the surreply -- and I think it was alluded

12  to in some of the earlier briefs -- is that even though the

13  Court doesn't second-guess the grand jury, the Government

14  still has a burden of pleading the elements of a defense

15  [sic], and I think I heard Mr. McCullough here say this

16  morning that the Government agrees that its sole predicate

17  for detention here today, notwithstanding the conversation

18  about the new conspiracy charge, is destruction of federal

19  property under 1361.  And, Your Honor, our briefs are

20  pointing out that the indictment -- the superseding

21  indictment does not actually allege any specific destruction

22  of property.  There's a reference that the parties have been

23  making to shaking a metal barricade.  That appears in

24  Paragraph 58 of Government's indictment.  And if Your Honor

25  carefully reads Paragraph 58, you'll see that it says,

1    quote, Nordean and Biggs shook a metal barricade with

2    Capitol Police on either side of the barricade until Nordean

3    and Biggs and others in the crowd were able to knock it

4    down.  The crowd, including Nordean, Biggs, Rehl and

5    Donohoe, advanced past the trampled barricade.

6          Now, the Government doesn't allege destruction in

7    this paragraph, and in other Capitol cases it has.  When

8    there's damage exceeding $1,000 to satisfy the 3142

9    predicate, the Government knows how to plead it and does,

10   and this isn't just a pleading issue.  I understand this

11   isn't Twombly and Iqbal, Your Honor.  We -- this is not

12   pleading with, you know -- but nevertheless, there is a

13   burden to plead the elements of an offense.  There is no

14   destruction of property pled here.  And there's a reason,

15   Your Honor, and it goes to the video that Your Honor hasn't

16   seen, because there isn't destruction of property in that

17   video, Your Honor.

18         Now, if Your Honor would scroll down to Count 3 --

19         THE COURT:  Well, Mr. Smith -- all right.  All

20   right.  I'll -- I -- let me just ask this question while

21   it's on my mind, then.  Well, if all of that is true, why do

22   you concede -- I mean, you're pointing all this out because

23   it -- number one, obviously, in the various factors I have

24   to consider, strength of the Government's evidence is one of

25   them, and this would go to that, for sure.  But is there --

1   are you making a residual or a predicate argument -- an

2   argument before that that if they haven't pled it, even if

3   the grand jury has returned -- and the -- clearly, the grand

4   jury has charged them with that offense -- we're still

5   properly in detention land even if the grand jury has --

6   even -- I would argue, even if the -- I mean, as I discussed

7   with the Government earlier, the language, I think it's

8   whether the case involves a particular charge.  I think

9   that's right.  Maybe something slightly different.  But it's

10  hard to get away from that language if -- even if there's a

11  count on here that charges felony destruction of property,

12  even if that might be subject to challenge by a pretrial

13  motion or whatnot, I mean, isn't it fair to say the case

14  involves that if that's the quote?

15          MR. NICHOLAS SMITH:  I think Your Honor is putting

16  your finger on the verb, "involves," and -- but what we're

17  countering with here is we're saying the case involves an

18  offense of government -- destruction of government property

19  if it's pleaded.  Now, there's one reference in the

20  indictment to destruction of property.  You've read that

21  paragraph, Your Honor, and it doesn't allege destruction of

22  property because the Government's video doesn't show that,

23  but I'll get to that in a second.

24          But then if Your Honor scrolls down to Count 4 of

25  the indictment which --

```
 1                    THE COURT:  I --

 2                    MR. NICHOLAS SMITH:  -- is the charging count --

 3                    THE COURT:  I'm there.

 4                    MR. NICHOLAS SMITH:  -- and if Your Honor sees

 5       this, it says, quote, They aided and abetted others known

 6       and unknown to forcibly enter the Capitol and thereby cause

 7       damage to the building in an amount more than $1,000, Your

 8       Honor.  There is no allegation of damage to the building

 9       from the co-conspirators in this case in this indictment.

10       What it alleges is that there's damage to a barricade at

11       some stage outside of the Capitol.  So Your Honor, we're

12       making the point that it -- our argument is actually that

13       3142(f) is not satisfied.  And we don't think it's a

14       technicality either, Your Honor, because if Your Honor looks

15       at the 3142(f)(1) offenses, they're not just all felony

16       offenses.  They're all -- there's large parts of the Federal

17       Criminal Code that are not included in 3142(f) because, as

18       the D.C. Circuit pointed out in the Singleton case citing

19       Salerno, Your Honor, this is supposed to be -- detention is

20       supposed to be reserved for the most serious felony

21       offenses.

22                    Now, we're hearing a lot about conspiracy charges

23       and obstruction of justice and civil disorder, but none of

24       those offenses are actually listed in 3142(f).  Okay?  So

25       we're in a very unusual scenario where the gravamen of the
```

1    Government's case is not the legal basis for its detention

2    request.  The tail is wagging the dog here with the -- there

3    is some -- there is a misdemeanor offense -- there's two

4    misdemeanor offenses they've pled, trespass which doesn't

5    distinguish these defendants from hundreds of others and

6    destruction of property, but destruction of property is not

7    pleaded in this indictment.

8              So Your Honor --

9              THE COURT:  So --

10             MR. NICHOLAS SMITH:  Yeah.  So --

11             THE COURT:  I mean, I'll just point you to

12   Paragraph 23 that talks about the Capitol suffering millions

13   in damage, broken windows, doors, graffiti, blah, blah,

14   blah, blah, blah.  Is it not fair to read that and read --

15   indictment along with that to plead a factual basis for the

16   conspiracy that they were engaged in to tag them or at least

17   to charge them with -- well, to lay that at the feet of

18   their conspiracy that at least some of that damage that's

19   set forth in Paragraph 23 can be linked back to their --

20   the, sort of, organization and the conspiracy that they

21   allegedly engaged in?

22             MR. NICHOLAS SMITH:  Well, Your Honor, I think

23   that would be their best argument.  I agree with Your Honor

24   that that's the best hook they've got, but if that's the

25   case there's a problem here, because this paragraph is in

1    virtually every indictment they've filed in the Capitol

2    cases.

3              THE COURT:  Yeah.

4              MR. NICHOLAS SMITH:  So if it were --

5              THE COURT:  I don't know that that's a problem.  I

6    mean, is it?  Why is that a problem?

7              MR. NICHOLAS SMITH:  It's a problem because, Your

8    Honor, the charge that's the hook under 3142(f) has to be

9    pleaded in connection with specific property damage.  If it

10   were sufficient to just cite all of the damage to the

11   Capitol in one paragraph and plead no facts linking the

12   specific charge in the indictment to it, then this would be

13   -- then really there is no reason why 360 people have not

14   automatically satisfied 3142(f) and, Your Honor, we would

15   argue that's contrary to Salerno.  This is about -- bail

16   determinations are about individualized analysis based on

17   the specific crimes that are pleaded -- properly pleaded

18   against the defendant in front of the Court.  And so we

19   agree with the Court that that's probably the only hook in

20   the indictment to connect damage to the defendants, but that

21   that's -- forget about Iqbal and Twombly.  That doesn't

22   satisfy, you know, basic pleading requirements because

23   there's no causation alleged here, Your Honor.

24              But, you know, we appreciate that the Court has

25   thought about this issue already and it would -- thinks that

1       there's more important issues to discuss here.  So getting

2       to Munchel, Your Honor, the Munchel decision, we argue, is

3       actually a fortiori of everything that the Government has --

4       we've heard this morning as the most powerful argument the

5       Government has for detention.  And in Munchel, Your Honor,

6       the court emphasized that a couple of arguments that the

7       Government has made here today just simply don't work; don't

8       satisfy dangerousness.  Judge Katsas, dissenting in Munchel,

9       pointed out that he would not just have sent the case back

10      for a do-over; he would have reversed outright.  And one of

11      the arguments Judge Katsas zeroed in on was the contention

12      that bravado about patriotism and a stolen election and

13      comments of a political nature that don't identify a

14      specific articulable threat to anyone simply don't even

15      sound under 3142(g)(4).  That's what Judge Katsas's point

16      was.  And I think the kinds of arguments you're hearing

17      today are, sort of, as though this decision doesn't exist or

18      that what Judge Katsas says didn't happen.  These are the

19      types of arguments the D.C. Circuit is saying don't work.

20      They're infringements on people's liberties and free speech

21      rights to put people in prison -- in jail pretrial because

22      of their political beliefs or because they think that

23      something wrong happened in the election.  The court is

24      saying that can't happen, Your Honor.

25              The next best argument the Government comes up

1    with is to cherry-pick messages, Your Honor, from a Telegram

2    chat in which 60 participants were in there.  There's no

3    allegation the defendant even knows them.  And, Your Honor,

4    we'll point out that one individual in these Telegram chats

5    is cited repeatedly over and over and over.  He's an

6    unindicted co-conspirator in this case, Your Honor.  There's

7    no allegation that the defendant knows this person.  Okay?

8    So if the Government's right that it can just put together a

9    chat window of 60 people where some people make vague but

10   alarming remarks and then jail a defendant on the basis of

11   those remarks that a defendant might not even know, Your

12   Honor, then consider the implications of that.  Why limit it

13   to a Telegram chat window with 60 people?  Why not say the

14   defendant was on a Twitter thread online where there was 150

15   people and way down -- the defendant himself might not have

16   made any violent comments, but way down in the Twitter

17   thread there's someone who says, This politician should be

18   killed or dead.  Your Honor, that's -- so the --

19          THE COURT:  Mr. Smith, I'll just say -- I mean,

20   the -- Twitter, you know -- anybody can jump into a Twitter

21   thread; right?  But people are generally not randomly

22   connected on the kinds of messaging systems that we're

23   talking about here.  It's a -- Twitter's a -- much more of

24   an open forum; isn't that fair to say?

25          MR. NICHOLAS SMITH:  It is fair to say, Your

1    Honor, and -- but that goes to how these people --

2    individuals -- the 60 individuals got into this Telegram

3    message, and this connects up to a larger point about

4    basically a series of claims the Government has had -- made

5    in this case, ever-shifting claims to detain Nordean which

6    it's been -- through all right after, and I'll explain how

7    this connects to the Telegram chat.

8           At first, the Government was representing to the

9    Court that these are encrypted communications --

10          THE COURT:  Right.

11          MR. NICHOLAS SMITH:  -- encrypted -- end-to-end

12   encrypted.  And the -- and that's actually a manner and

13   means of the conspiracy, Your Honor.  It turned out the

14   Government was wrong factually.  These messages are not

15   end-to-end encrypted.  Telegram doesn't encrypt messages for

16   group chats, Your Honor.  So there is no -- that whole

17   species of the means of the conspiracy was based on a

18   premise that could have been verified on Google in 30

19   seconds, Your Honor.

20          So there's a second point here, Your Honor.  The

21   Government has said, basically, it comes down to this video

22   that, you know -- Munchel says that the Government has to

23   identify a specific and articulable threat to an individual

24   or the community and vague comments don't suffice about

25   politics, much less comments of other people.  So they say

1    there's a video of a destruction of a barricade.  The

2    Government's brief represents, quote -- it's the video that

3    Your Honor hasn't seen -- quote, Personally dismantled a

4    barricade.  Your Honor, the video you're going to see does

5    not show the defendant touching a barricade, much less

6    physically dismantling it, Your Honor.  It doesn't show him

7    trampling on a barricade, and it doesn't show the

8    destruction of the barricade.  It shows a barricade sideways

9    on the ground, Your Honor.  And the reason this is important

10   is because in the first two attempts to detain Nordean

11   pretrial, there were different explanations for why he

12   needed to be detained pretrial.  They had nothing to do with

13   a barricade, Your Honor.  At first, he was a risk of flight

14   because there was a fake passport in his home.  That claim

15   is --

16           THE COURT:  Mr. Smith, I -- let me just interrupt

17   you on one point just before you -- you've set this up as,

18   Gee, the, you know -- you've set up the video to knock it

19   down, and I'm not so sure that's -- I mean, I asked to see

20   the video today.  They didn't provide it to me.  So I don't

21   think we can -- I don't think it's fair to say, The

22   Government has said it's all about this video, because I

23   don't -- I mean, they reference it.  I understand they do.

24   But I take their argument now at least, and I don't -- I

25   mean, those -- what you're pointing out happened before I

1    was assigned to the case, and not that it's not relevant.

2    I'm going to let you complete your point.  But I see their

3    argument or at least -- and at least as I interpret the

4    strongest point of their argument not necessarily a thing

5    about the video, although I think the video's relevant, but

6    it -- I think the planning aspect is -- I mean, put aside

7    the -- I mean, I know you don't want to and I'm not going

8    to, but regardless of what the specifics of these messages

9    say, the thrust of the Government's argument, it seems to

10   me, is the, kind of, leadership/planning aspect of this.

11   Maybe their evidence isn't as strong as in other cases about

12   that, but that seems to me to be at least conceptually what

13   they're arguing.

14          Anyway, continue.  I'm sorry to have taken you

15   away from the thrust of your argument, but I just wanted to

16   make -- you, kind of, set up this video as -- I mean,

17   obviously, Mr. Hull had said he wants me to see it, you

18   know?  I -- now, I really can't wait to see it.  But I don't

19   know that the whole -- the detention decision is going to

20   turn on that, but --

21          MR. NICHOLAS SMITH:  Okay.  Your Honor, fair

22   enough.  The reason we brought up the video is because I

23   believe that Mr. McCullough is using the video to show -- to

24   try to reach for some sort of element of potential

25   violence --

1          THE COURT:  Sure.

2          MR. NICHOLAS SMITH:  -- because in the Munchel

3    decision -- I'm looking at it now and it says that what was

4    important to the court was the absence of evidence that,

5    quote, Munchel or his wife -- or his mother committed any

6    violence on January 6th, the absence of evidence that

7    Munchel or the co-defendant assaulted a person on January

8    6th, and in light -- if -- and what the court said -- that's

9    the end of the quote -- if, in light of the lack of evidence

10   that, quote, Munchel or the co-defendant committed violence

11   on January 6th, the District Court finds that they do not

12   pose a threat of committing violence in the future, the

13   District Court should consider this finding in making its

14   dangerous [sic] determination.  So I think, Your Honor, that

15   the video seems to be what the Court [sic] is using to show

16   potential violence here, but I think Your Honor pointed out

17   something at the beginning of -- before throwing it to the

18   defense that it almost doesn't matter what the video shows

19   about the barricade because, as Judge Katsas pointed out,

20   this determination of the 3142(g) is not backward-looking.

21   It's forward-looking.  So -- and Judge Katsas also pointed

22   out that, The transition has come and gone and that the

23   threat has long passed.

24          So what the Government is trying to do here is to

25   force the Court, notwithstanding Munchel, to look backwards

1    to look at what happened to a barricade on January 6th

2    rather than looking forwards.  And the reason this is so

3    much stronger than Munchel from the defendants' perspective

4    is that Munchel, unlike Mr. Biggs and Mr. Nordean, didn't

5    have a history of perfect compliance with the strictest

6    conditions of confinement that you can imagine that Judge

7    Howell imposed in this case.  We have a record now of the

8    defendants not making mistakes.  They're limited to the

9    Districts in which they live.  They have to wear ankle

10   bracelets.  It becomes very difficult to find work, as Your

11   Honor knows, when you're confined to your home; when you

12   have a child, like the defendant does, to raise.  He's

13   limited to his home.  He has a third-party custodian in the

14   form of his wife who has guaranteed his appearance in these

15   cases.  He's made exemplary efforts to not just get rid of

16   any firearms that could possibly be in his constructive

17   possession, but to get rid of all of his wife's owned --

18   legally owned firearms.  They're gone as well, Your Honor.

19   What you haven't seen is any articulation of what -- how

20   this threat is supposed to materialize.  Judge Katsas says,

21   The transition has come and gone and the threat has long

22   passed.  The Government responds, Well, he's still a danger.

23   These aren't facts.  A danger how?  Where?

24          THE COURT:  Well, their argument is that he's a --

25   he -- it stems from the planning point I was making before.

```
 1    And I'll read you another quote from Munchel.  In our view,

 2    those who actually assaulted police officers and broke

 3    through windows, doors and barricades, and those who aided,

 4    conspired with, planned or coordinated such actions, are in

 5    a different category of dangerousness than those who cheered

 6    on the violence or entered the Capitol after others cleared

 7    the way.  My only point is they -- that the Circuit also put

 8    planners in a category along with other folks who, you know,

 9    did display clear violence that day, etcetera.  I'm not

10    saying that means that carries the day for the Government

11    here at all, but they -- there is that language in the

12    opinion.

13              MR. NICHOLAS SMITH:  And, Your Honor, I thought

14    Your Honor would ask me about this.  So I have a canned

15    response.  I am sorry.

16              THE COURT:  Good.

17              MR. NICHOLAS SMITH:  But what the Circuit was

18    saying, Your Honor, is that if the evidence fits.  The

19    Circuit was not saying if this case falls into a category of

20    offenses regardless of how many times the Government's

21    explanation for its detention decision has shifted --

22              THE COURT:  Sure.

23              MR. NICHOLAS SMITH:  -- no matter what the facts

24    are.  Your Honor, so I think what the court was saying there

25    is that if there's an element of a conspiracy that's
```

1   factually established that so -- indicates violence in the

2   future at some articulable moment in time, then, of course,

3   the Circuit's saying, you know, we would -- that -- the

4   outcome would be different than in Munchel.

5          But, Your Honor, to go to Your Honor's next --

6   second point which was leadership, leadership per se, of

7   course, is not criminal.  I think, Your Honor -- so -- and

8   plans per se are not criminal.  And I think the Court did a

9   very fine job pointing out that these references to plans

10  and leadership are very equivocal.  I think that's the best

11  way of putting it; that a reference to coming to D.C. to do

12  a plan can't be sufficient to jail somebody for what could

13  be longer than a year when we don't know what -- the

14  Government hasn't shown what that plan is.

15         But, Your Honor, it's worse than that.  Whatever

16  Your Honor might think of the evidence we've put together to

17  try to rebut this plan notion being a conspiracy, Your

18  Honor, I think it's significant that the Court has not

19  contested the veracity of affidavits we've filed showing

20  that Nordean and Mr. Biggs actually did have a plan on

21  January 6th and it was -- involved a musician coming to an

22  Airbnb house they rented in Washington, D.C., around 3:00 to

23  4:00 o'clock.  Now, the Government might come back and say,

24  There is a -- there's a possible conspiracy to assume

25  control of Congress -- one of the most grave offenses you

1    can imagine -- that is not inconsistent with having a music

2    party in D.C. blocks away from the scene of this notorious

3    offense within a number of hours.  The Court -- the

4    Government might say that, Your Honor, but we think at the

5    very least at this stage when an affidavit has not been

6    rebutted and its veracity is not questioned that that

7    serious doubt should have some effect on the weight of the

8    Government -- the weight of the evidence analysis to the

9    extent that conspiracy is -- to the extent that conspiracy

10   is a basis for detention, Your Honor.  So we think that the

11   Court should seriously consider the implications of a plan

12   to hold a music party at 3:00 to 4:00 in the afternoon when

13   the Government is alleging a multi-month, long-planned,

14   intricate conspiracy to assume control of Congress.  We

15   think that's a relevant point, Your Honor.  And so we don't

16   think leadership per se is a basis for detention.

17          And, Your Honor, there's a couple of other points

18   that Mr. McCullough didn't hit on that are relevant here.

19   So as the Court knows, we're still in the pandemic.  The

20   trial calendar is very congested.  The Government might say

21   that's the fault of the defendants, not their charging

22   decisions, but nevertheless there's a very congested

23   calendar from the Capitol cases.  There is still a prison

24   pandemic in -- it is well known, and Your Honor could almost

25   take judicial notice at this point, that there is a much

1    higher incidence of COVID-19 in jails and prisons than out

2    in the outside world.  And as a result of that, you're

3    seeing hundreds and thousands of prisoners who have been

4    convicted of crimes that are beyond, you know, comparison

5    with what's alleged in this case -- you're talking about

6    leaders of mafia families being released; you're talking

7    about importers of tens of thousands of, you know -- dozens

8    of kilos of cocaine being released; armed violent felonies

9    of criminals being released, having their sentences reduced.

10   The other day, Your Honor, I saw one where a double life

11   sentence was reduced to time served because of COVID-19.

12          So this is -- this context is important, Your

13   Honor, because you have the Government saying, although two

14   federal judges have found that there -- that 3142(g) is not

15   satisfied, there are conditions of confinement.  Although

16   they're complying with their conditions; although the

17   conspiracy charge is based on things that might not be a

18   criminal conspiracy, Your Honor, they should go to prison --

19   jail for possibly up to a year or longer in the middle of a

20   pandemic, Your Honor, when there are people who have been

21   convicted of more serious crimes -- not alleged,

22   convicted -- who are being released.

23          So Your Honor, I don't understand the Government's

24   position with how those two things are reconcilable, Your

25   Honor.  So we think that if a defendant is complying with

1    his strict conditions, to jeopardize their lives and put

2    them in jail when people who are convicted are being

3    released, Your Honor, is not appropriate, and we think

4    that's why the Government doesn't have a response to that

5    point, Your Honor.

6         And the last point I'll make, Your Honor, is these

7    -- the Government's motions are based on proffers.  This

8    isn't like a trial where the evidence -- there's a fact

9    finder who's had an opportunity to weigh the evidence and

10   decide the claims.  These are -- these cases are based on

11   the Government's proffers basically saying, you know, the

12   Government's credible, they're putting forward this

13   evidence, and the Court should trust it.  But, Your Honor,

14   there's this.  I don't think that the history of the efforts

15   to detain Nordean should be disregarded here as though they

16   didn't happen.

17        The Court will see in our papers that they -- the

18   Government initially claimed that Nordean was a flight risk

19   because of a passport that looked like him.  It turned out

20   that was not accurate.  But it also -- the Government

21   represented this passport had been found next to Nordean's

22   bed.  The purpose of that representation, Your Honor, was to

23   show that he's a flight risk.  But it actually wasn't found

24   next to his bed.  It was found in his wife's jewelry box,

25   and this is significant because it's a falsehood, Your

1    Honor.  It's a falsehood that's put forward in an attempt to

2    detain someone pretrial.  The claim has been abandoned, Your

3    Honor.

4              But there's something more significant, and this

5    is the last point.  In front of Judge Howell, the Government

6    represented that Nordean used, quote, Encrypted

7    communications on January 6th to lead a multi-point invasion

8    of the Capitol.  Okay?  At the same time it made that

9    representation, it had Nordean's phone.  It had seized his

10   phone.  The phone showed that his -- the record showed his

11   phone was off during January -- the January 6th events, Your

12   Honor.  So why is the Government saying that Nordean used

13   encrypted communications on January 6th to lead a

14   multi-point invasion if his phone is off?  But it's worse,

15   Your Honor.  The Government also said he used a BaoFeng

16   radio which is a ham radio, an amateur radio, to lead people

17   into the Capitol if his phone didn't.  It turned out, Your

18   Honor, that he didn't receive that radio until after January

19   6th.  Then the Government comes back and says, Actually, the

20   radio we seized from his home is not the one that he got

21   after the 6th.  But it turns out it was, Your Honor.  So the

22   larger point is not -- it's not the minutia of these points,

23   but at what point do the shifting explanations and

24   rationales for detention mean something, Your Honor?

25              THE COURT:  All right.  Very well, Mr. Smith.  I

1     read your papers on that latter point.

2              As to the point about COVID, you mentioned a case

3     in which someone -- a defendant's two lifetime sentences

4     were reduced to time served; is that --

5              MR. NICHOLAS SMITH:  Correct, Your Honor.

6              THE COURT:  That was not one of my cases, was it?

7              MR. NICHOLAS SMITH:  No.

8              THE COURT:  No, I didn't think so.

9              All right.  Let's -- let me hear, Mr. Hull, from

10    you, please.

11             MR. HULL:  Good afternoon, Your Honor.

12             And let me, first of all, say that I support

13    almost everything that Mr. Smith said, but let me make some

14    points that are related, supportive of his arguments and, I

15    think, very important.

16             I want to step back a little bit.  All of -- we're

17    all lawyers.  Most people in this room or this discussion

18    are lawyers.  We like theories.  And the Government has had

19    a number of rolling theories in this case about how this all

20    occurred, and I made a list of them that I'm not going to go

21    through in graphic detail, but they, kind of, go like this.

22    The Proud Boys were responsible for this.  The second theory

23    was that there was multiple small conspiracies of people and

24    groups of people who did this and the rest of it was

25    spontaneous and, kind of, attributable to the madness of

1    crowds, if you will.  The third is Oath Keeper, Three

2    Percent.  The fourth theory was -- and my favorite -- Alex

3    Jones, Roger Stone; then, about three weeks ago, it was back

4    to an alliance between Proud Boys and Oath Keepers probably

5    in Central Florida, although I guess both the indictments

6    and the news media had problems putting those two together.

7    So that was abandoned for a while.  Now, we're back to Oath

8    Keeper.  And I'm not sure what it will be next week, but I

9    just gave you six.

10           I like theories.  That's one of the reasons I

11   became a lawyer.  I like ideas.  But I think we need to

12   really be thinking about all of this as, you know, officers

13   of the court, me for my client, Joe Biggs.  Why are we

14   rolling theories and, at the same time which is just as

15   important, having accumulating or snowballing discovery

16   going at the same time?  We've got new theories that are

17   being put forth in large part arising out of certain

18   indictments, and that's fine.  They can, you know, plead

19   alternatively.  They can be inconsistent.  But we have

20   accumulating discovery at the same time.  And from what I

21   understand -- I went through a lot of the discovery.  I had

22   a little bit of a delay but finally finished the discovery

23   I'd been given -- which is voluminous -- over the weekend.

24   And I understand from talking to Mr. McCullough there will

25   be a lot more discovery.  The discovery in this -- there

1     will be discovery that I can possibly get from other
2     defendants, but certainly I will get from the Government.  I
3     appreciate the discovery has not -- I appreciate that it is
4     trickling in, if you will, but that tricking in is, from
5     what I understand, at some point, likely to be from time to
6     time a snowball.  We've got -- a snowballing, if you will.
7     So we've got all these shifting theories and discovery that,
8     you know, keeps building up and, at the same time, I have a
9     client who is here today, I think, because, in fact, we are
10    in detention land.  We're talking about, is he dangerous?
11    And we're also talking about whether he's a flight risk,
12    whether he would flee.  So I would hope that the Court
13    could, kind of, look at all of this through the lens of
14    shifting theories and more discovery to come, because
15    there's quite a bit.  And Mr. Smith's right.  There's a
16    tendency here a little bit, maybe, by everyone on both sides
17    to cherry-pick about what's there, but I understand a lot
18    more is coming.
19              Now, on Mr. Biggs himself, Mr. Biggs was
20    arrested -- and I say that in quotations -- turned himself
21    over on January 20th, Inauguration Day.  He did that to the
22    care of two FBI agents that he knew.  One in particular,
23    he'd known for a long time.  He has been on home detention
24    for -- I wrote this down -- 11 weeks or 77 days or 2 months
25    and a week.  There's different ways of, you know, putting

1    it.  And the day that -- two days after the Government filed

2    its motion -- they filed it on a Saturday.  On Monday, I got

3    in touch with Mr. Biggs's probation officer or Pretrial

4    Services person and there is in Document No. -- I filed two

5    versions of it, one proofread -- better proofread and the

6    other was the original, 42 and 47.  And you will see at the

7    end of that one exhibit is where the Pretrial Services,

8    Mr. Sweatt, in Orlando says he -- that, I have no concerns

9    about his compliance with his conditions of release or his

10   location monitoring equipment.

11           Now, what's really interesting -- and I did not

12   notice this until really about a week ago -- is that the

13   same day or the day afterwards, there was also a Pretrial

14   Services report, I think, that His Honor had ordered from

15   D.C.  And D.C., of course, has had Orlando be the Pretrial

16   Services point people.  That would be Charles Sweet --

17   excuse me, Charles Sweatt, not Sweet.  And there is a

18   comment in there that was given to Christine Schuck -- I

19   might be mispronouncing her name -- who's with Pretrial

20   Services in D.C., and that is that Mr. Biggs has been super

21   compliant.  Super compliant since January 20th.  Your Honor,

22   you've probably seen more reports than I have.  I've seen a

23   lot of these.  Maybe Mr. McCullough's seen more.  But I have

24   never seen the nomenclature "super compliant" be used in a

25   Pretrial Services assessment of someone who was a defendant

1    in a case, and I wanted to bring that to your attention.

2            As, I think, the Court knows from my filing which

3    is hopefully short and sweet, the primary thing in

4    Mr. Biggs's life is a young daughter who's --

5            (Brief interruption.)

6            Excuse me.  I'll get rid of that.  I apologize.

7            (Brief pause.)

8            My apologies.

9            The primary thing in Mr. Biggs's life and has been

10   for three or four years under this -- excuse me, under --

11   three years under this regime is a daughter who he

12   extricated for a lot of different reasons from Austin,

13   Texas, when he moved in 2018 to the Ormond Beach area.  When

14   he is at home during the day, he has primary care for his

15   daughter.  She will turn four this month.  And there are

16   other people that can help, but that is the primary thing in

17   his life, and it may be the reason why he's been speaking

18   almost daily -- pretty close to daily, maybe, about four or

19   five days -- would be an exception to his Pretrial Services

20   person, Mr. Sweatt, in Orlando.  He has been -- as I've

21   mentioned in other hearings, he's been a model pretrial

22   defendant.

23           I don't know -- I could go on about certain

24   aspects of Mr. Biggs not being dangerous and not being a

25   risk, but I'm not sure that -- I think, maybe, if the Court

1     would ask me some questions, I'd be happy to field them.

2     But I'm not sure that I need to say much more than what's in

3     the record about his compliance so far.  Is he dangerous?

4     Is he a risk?  The answer to both is clearly no.  We can

5     nitpick on some things.  It happened with respect to the

6     fence; what planning is; what fundraising is; and what

7     certain comments are that were made, sort of, right after

8     this event, but I would like to focus on the things I just

9     mentioned about Mr. Biggs's home detention so far.

10              He has, by the way, also been --

11              (Brief interruption.)

12              MR. NICHOLAS SMITH:  Your Honor, if I may, I think

13    I --

14              MR. HULL:  I'm sorry?

15              THE COURT:  Go ahead, Mr. Hull.

16              MR. HULL:  I would be more than happy to answer

17    questions that His Honor had.  There is a number of things

18    that I wrote down when Mr. McCullough was talking, a few

19    points when Mr. Smith was talking, and I'm not sure all of

20    them need to be addressed today, but this has been a model

21    pretrial defendant, and the evidence that's been used so far

22    has been somewhat vague and flimsy and, I think,

23    cherry-picking would be the word that I would use, as well.

24    I was surprised this was filed and, to be honest with you, I

25    asked that it be withdrawn and it was not, and I was

 1      surprised at that, too.

 2              THE COURT:  No, Mr. Hull.  I don't have any

 3      specific questions.  I think you've made the point about

 4      your client and his both lack of a record and compliance

 5      while on supervised -- while on release in this case.

 6              Mr. McCullough, why don't I give you -- before we

 7      -- so what I plan to do is, then, just pick a very quick

 8      turnaround date, have the Government -- Mr. McCullough, I

 9      assume -- how quickly do you think you'll be able to get me

10      whatever you -- whatever video you want to get me or --

11              MR. MCCULLOUGH:  Before the close of business

12      today.

13              THE COURT:  Okay.

14              MR. MCCULLOUGH:  Before 5:00 p.m. today.

15              THE COURT:  All right.  Great.

16              So before we pick a quick turnaround time, and

17      I'll rule when we come back, I want to allow you,

18      Mr. McCullough, to address anything either Mr. Smith or

19      Mr. Hull has raised in their argument.

20              MR. MCCULLOUGH:  I appreciate that, Your Honor.

21              A couple things that Mr. Smith raised.

22              And so Mr. Smith refers to a series of arguments

23      that the Government made and then had to withdraw or --

24      that's just factually untrue.  The Government made

25      statements as to the use of encrypted messages to lead this

1    group of men.  Now, the -- these messages -- these Telegram

2    messages are encrypted messages, and that is just a fact.

3    And Mr. Smith can shake his head as to what "encrypted"

4    means, but there is a difference between end-to-end

5    encryption and end-to-server encryption, and Mr. Smith can

6    basically make these, kind of, windup arguments as though

7    the Government has changed course.  The Government has put

8    forward Telegram messages in which planning was occurring

9    and there was an understanding at least -- well, the -- I

10   will say this; that these messages could be, you know, kind

11   of, shielded from public view by nuking them and otherwise.

12   So the Government has not withdrawn its claim as to the use

13   of this Telegram messaging application from which Telegram

14   proudly declares they've never answered service of process

15   on.  So I think that's pretty stark that that's where this

16   planning was going on and that's where they're talking about

17   the use of -- sorry, they're talking about, kind of, you

18   know, Let's all, you know -- every -- all the planning stops

19   now unless we're going to be, you know, brought up on gang

20   charges.  So I think that's pretty significant.

21          Second, this question about the passport.  Your

22   Honor, you can see Mr. Nordean on the video today.  You can

23   look at other pictures.  Mr. Smith concocted a distorted

24   picture of Ethan Nordean's face and said, Doesn't look

25   anything like him.  Your Honor, it looks exactly like him.

1    And so, you know, Your Honor can make that comparison as

2    well and we can put that in front of you.  Now, the

3    Government did not press forward with the passport argument

4    as to Ethan Nordean and flight risk because he has been home

5    for 30 days and he has not fled.  And I'll point out two

6    things.  Mr. Smith says exemplary compliance with Pretrial.

7    Perhaps true; however, the, you know -- two points in the

8    Pretrial report, one being the do-not-possess-firearms.  In

9    the Pretrial report, On March 31st, 2021, the supervising

10   officer reported that defendant informed him he was missing

11   a firearm and he hadn't reported it stolen.  The firearm was

12   reportedly stolen in late December or early January.  Just

13   went missing, as it does.  You know what else is missing?

14   His passport.  The defendant reported to the Western

15   District of Washington that he lost his passport.  PSA has

16   no additional information to report.  So you know, this idea

17   about exemplary compliance, I think there's -- there are

18   some issues there, you know?

19          Finally, you know, with respect to, kind of, this

20   idea that there's no future dangerousness, the leadership

21   point that Your Honor pointed to from the Munchel decision

22   is important.  It is critical.  There are specific and

23   articulable issues that can arise with someone like

24   Defendant Ethan Nordean and Defendant Joe Biggs who are able

25   to plan and organize a group of men to take a violent and

1    criminal action.  Mr. Smith referred to this idea that this

2    is, you know -- that the ransacking of the Capitol would be

3    this kind of a grave crime.  Well, it -- the defendants did,

4    in fact, carry that crime out.  That is what they are

5    charged with.  They are charged with committing a grave act

6    against an institution of democracy.  And the idea that

7    someone walks away from that and says, If you feel bad for

8    law enforcement, you're part of the problem, and, you know,

9    I can't quit this, you know -- I'll lose my family; I'll

10   lose my marriage; I can't quit this, I think that that poses

11   a danger.  And as to what that danger may be, correct, there

12   will not be another counting of the Electoral College vote.

13   But will there be another meeting of Congress, whether it be

14   the State of the Union?  Will there be another meeting of a

15   state or local legislature?  Yes, there will be.  And so

16   that's the issue, is what will this conspiracy wrought in

17   the future?  And I think that there -- for someone that is

18   capable of moving this group of men and to commit these

19   acts, I think that is an important point for Your Honor to

20   consider.

21          So that -- those were the primary points that I

22   wanted to make and, Your Honor, thank you very much.

23          MR. NICHOLAS SMITH:  Your Honor, since the

24   Government referenced the quality of the evidence we

25   submitted, I'd just like to quickly respond to --

1          THE COURT:  I'll give you a minute, Mr. Smith.

2          MR. NICHOLAS SMITH:  Thank you, Your Honor.

3          So Mr. McCullough just said that the defense

4     concocted the passport photo of Mr. Nordean that we

5     submitted in our briefs.  We didn't concoct it.  It was

6     taken right from the Government's briefs.

7          On the second point, the stolen firearm point,

8     Mr. Nordean has already cleared this up with his probation

9     officer.  The fact is, it took him several steps under a

10    state procedure to track down the firearm to accurately

11    represent to the probation officer that it had been stolen

12    and the context and the facts in which it had been stolen.

13    It was left in a vehicle in December or January before a

14    get-together in Seattle.  The doors were left unlocked.  The

15    gun was taken out.  And the reason Mr. Nordean explained

16    this to the probation officer in March was he had to verify

17    his facts to get them represented accurately to the

18    probation officer.  And, Your Honor, the probation officer,

19    Mr. Beetham, now acknowledges that there's nothing untoward

20    about the stolen firearm claim.

21         The one last point, Your Honor, is that you'll

22    notice that Mr. McCullough did not respond to my point about

23    the phone being off during the day or Mr. Nordean supposedly

24    using BaoFeng radios, although he didn't possess them on

25    January 6th.  There's no response to that point and it's

```
1    significant, Your Honor.
2              And finally, Your Honor, the thrust of the
3    Government's argument here is that there's some sort of
4    danger that's possible even though he's locked up in his
5    home.  They've seized his phone, but let's say there was
6    some theoretical way in which he could communicate
7    inappropriately with others from within the confines of his
8    phone [sic].  That's, sort of, where the Government has
9    retreated to at this point; that there could be
10   communications within a home.  So Your Honor, as Your Honor
11   knows, there are --
12             THE COURT:  But, Mr. Smith, when you say within a
13   home, you mean using a computer.
14             MR. NICHOLAS SMITH:  Well, within the place in
15   which he's now -- his strict conditions of release now
16   include home confinement.
17             THE COURT:  Right.  No, I understand that --
18             MR. NICHOLAS SMITH:  So with --
19             THE COURT:  -- but my point is --
20             MR. NICHOLAS SMITH:  With a computer --
21             THE COURT:  Right.
22             MR. NICHOLAS SMITH:  -- and I think Your Honor
23   knows that it's not unusual at all, if that is the
24   Government's argument, to impose a separate special
25   condition that would prevent those -- exactly the sorts of
```

1    communications the Government is discussing.  And, in fact,

2    some judges in the Capitol cases have imposed that

3    condition.

4          THE COURT:  Well, I -- you were going to -- that's

5    where I was about to wind up in this whole thing.  That was

6    a -- something I was going to raise, but continue.

7          MR. NICHOLAS SMITH:  And so, Your Honor, we think

8    that if -- a condition -- if the Court is inclined to

9    subscribe to the Government's theory of risk in this case

10   which is virtual risk, the Court could simply impose a

11   condition that would prevent the defendant from not just

12   discussing the case except through lawyers with defendants

13   but from any Proud Boy, period.  And in that case, there is

14   no -- then that leaves no articulable risk that the

15   Government has identified to anyone in society.

16         THE COURT:  Well, you have -- you -- the question

17   is whether he would comply, but -- so --

18         MR. NICHOLAS SMITH:  Well, and he -- I -- we would

19   argue his perfect compliance to date would -- is indicative

20   of his compliance with a special condition.  But, Your

21   Honor, the last point that Mr. McCullough made was that the

22   future risk is not concerning January 6th.  Judge Katsas

23   said we have to look forward, not backward.  So the Court --

24   so the Government has pointed to future meetings of

25   Congress, Your Honor, but that's exactly the point that

1   Judge Katsas addressed in his dissent.  He said that the

2   Government in that case -- in the Munchel case had said,

3   What about March 4th?  There was a threat to the Capitol on

4   March 4th.  Your Honor probably knows the city was on

5   lockdown, and then this threat didn't materialize.  And what

6   Judge Katsas said is the Government cannot keep coming back

7   with threats that don't materialize when they're not

8   connected to the defendant in the case.

9           THE COURT:  All right.  I've heard enough on

10  Munchel.  I mean, I would just say the fact that a threat

11  doesn't materialize doesn't mean there is no threat going

12  forward, you know?  The absence of evidence is not the -- is

13  not evidence of absence -- whatever that old saying is.

14          All right.  So --

15          MR. HULL:  Your Honor, may I have two minutes?

16          THE COURT:  Who -- Mr. --

17          MR. HULL:  Two minutes?

18          THE COURT:  What -- I -- yes, you can have one

19  minute.  How's that?

20          MR. HULL:  I -- thank you, Your Honor.

21          I wanted to make a couple of comments about --

22  responses quickly to what Mr. McCullough had said about

23  planning, fundraising -- which we're not too worried --

24  these kinds of things, and I would also ask that all the

25  parties be allowed to supplement somehow, if they did it

1    within 24 hours, what's been done here today.

2              THE COURT:  Mr. Hull, you --

3              MR. HULL:  Yes?

4              THE COURT:  This isn't -- Mr. McCullough had made

5    these points before and you had an opportunity to respond to

6    them.

7              MR. HULL:  No, no, no, no, these -- well, he did,

8    and I could do them by way of supplement, but I think

9    they're important to raise here.

10             Mr. Biggs -- and I didn't want to belabor Mr. --

11   my argument on Mr. Biggs that it would be just to have him

12   remain free.  What -- Mr. Biggs has been a planner and a

13   coordinator his whole life.  He planned two events like

14   this.  They always go to the Capitol.  And he's also done

15   them in Portland.  Fundraising is always important and it

16   usually goes to, you know, Airbnb.  The -- what to wear and

17   what not to wear was because of a stabbing that happened on

18   December 12th in the Harrington Hotel and wanted to make

19   sure that Antifa could not easily locate Proud Boys.  There

20   are --

21             THE COURT:  Mr. Hull, all these --

22             MR. HULL:  Yes?

23             THE COURT:  -- arguments you could have made --

24             MR. HULL:  I agree, Your Honor.  I'm done.

25             THE COURT:  This is -- and so if you want to file

```
1    something, I -- if -- because I'm giving -- because I'm

2    letting the Government go ahead and --

3              MR. HULL:  I would like to.  I was trying to cut

4    this short and let you ask me questions.  That didn't

5    happen.  But I agree.  I will just do it by supplement.

6              THE COURT:  All right.  If -- let me say this.  If

7    any party wants to file a supplement by the -- by today,

8    you're given permission to file something today -- something

9    responding to our discussion here today.  And we'll come

10   back shortly and I'll make a decision.

11             But, Mr. Hull, I didn't mean to cut you off.  It's

12   just that -- you could have made -- those are all points you

13   could have made when I called on you to make your argument.

14   So you know, I --

15             MR. HULL:  You're exactly correct, Your Honor.  I

16   stand corrected.  I appreciate your comments.

17             THE COURT:  All right.  So let me ask the parties

18   if they're available -- just looking at -- I have quite a

19   full week.  How does 3:00 o'clock on Thursday work or 2:00

20   o'clock on Friday?

21             Mr. McCullough, for you first.

22             MR. MCCULLOUGH:  Both of those times work for the

23   Government, Your Honor.  Thank you.

24             THE COURT:  All right.  Mr. Smith?

25             MR. NICHOLAS SMITH:  Your Honor, we would prefer
```

```
 1      the earlier hearing, if --
 2                  THE COURT:  Thursday?
 3                  MR. NICHOLAS SMITH:  Yes.
 4                  THE COURT:  Thursday at 3:00 o'clock.  All right.
 5                  MR. DAVID SMITH:  Excuse me, Your Honor.  I have
 6      to butt in here.  David Smith here.
 7                  THE COURT:  Yes.
 8                  MR. DAVID SMITH:  I can't make it on Thursday.  My
 9      partner doesn't realize that because I just -- I -- he
10      doesn't have my calendar.  I can do it on Friday at 2:00
11      o'clock, though.
12                  THE COURT:  All right.  Mr. Hull, can you do it
13      at -- Friday at 2:00 o'clock?
14                  MR. HULL:  Yes, sir.
15                  THE COURT:  All right.  So I'll receive whatever
16      additional -- whatever supplements the parties want to file
17      today; and, Mr. McCullough, I'll receive that -- you'll send
18      someone over with the video; and then we'll be back here
19      Friday at 2:00 o'clock in which -- at which time I will
20      rule.
21                  Right now -- let me just ask -- I guess,
22      Mr. McCullough, you're the best person to ask.  I know --
23      what is the -- had we tolled the speedy trial clock until we
24      were -- until our last scheduled hearing on the 8th?
25                  MR. MCCULLOUGH:  That -- our last scheduled
```

1    hearing on the --

2              THE COURT:  I'm sorry, the 1st.

3              MR. MCCULLOUGH:  -- 2nd -- the 1st --

4              THE COURT:  On the --

5              MR. MCCULLOUGH:  On Thursday --

6              THE COURT:  The 1st.

7              MR. MCCULLOUGH:  -- the 1st.  Correct.

8              THE COURT:  The 1st.

9              MR. MCCULLOUGH:  So we were tolled through April

10   1st.  I think these -- I think we should -- the Government

11   would propose to continue tolling from the 1st and through

12   this date and until Your Honor renders a decision on this

13   motion.  The efforts to provide discovery to the defendants

14   is ongoing.  As you -- as Your Honor has pointed out, the

15   discovery is quite voluminous; will give the defendants an

16   opportunity to receive and review that discovery.  So the

17   Government would submit that tolling is in the interests of

18   justice at least through the time of Your Honor rendering a

19   decision.  The Government would also submit that there --

20   that that time should continue to toll afterwards.  The

21   Government has not obtained Mr. Smith or Mr. Hull's view on

22   that.

23             THE COURT:  All right.  Mr. -- let me ask

24   Mr. Smith and Mr. Hull.  I'm not going to ask you to toll it

25   or suggest that we toll it until I -- I mean, at -- to some

1    indeterminate time in the future.  My thought is we could do

2    it nunc pro tunc to the 1st which is where, I think, we left

3    off and then simply to Friday, the 9th.  So it would be nunc

4    pro tunc from the 1st to the 9th and for the reasons the

5    Government laid out in terms of voluminous discovery.  I'll

6    rule when we come back on the 9th, and then we'll figure out

7    where we go from here with regard to speedy trial.

8            MR. NICHOLAS SMITH:  No objection, Your Honor.

9            MR. HULL:  No objection.

10           THE COURT:  All right.  So that's what I will do.

11           I will find that the time nunc pro tunc to April

12   1st through our next hearing April 9th is excludable under

13   the Speedy Trial Act because the ends of justice that are

14   served by taking such action outweigh the best interests of

15   the public and this -- and the defendant -- both defendants

16   in a speedy trial.  I'm doing so here to give the defendant

17   -- both defendants a continuing opportunity to receive the

18   very voluminous discovery in this case.  And we will further

19   address that, then, on the 9th.

20           Is there anything further, Mr. McCullough?

21           MR. MCCULLOUGH:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  Is there anything further,

23   Mr. Smith?

24           MR. NICHOLAS SMITH:  No.  Thank you, Your Honor.

25           THE COURT:  Anything further, Mr. Hull?

1          MR. HULL:  No, sir.

2          THE COURT:  All right.  Very well.  I will see

3     everyone on Friday and we will go from there.

4          Counsel are dismissed.

5          (Proceedings concluded at 1:25 p.m.)

6                    * * * * * * * * * * * *

7              <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

8     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

9     **that the above and foregoing constitutes a true and accurate**

10    **transcript of my stenographic notes and is a full, true and**

11    **complete transcript of the proceedings to the best of my**

12    **ability, dated this 14th day of April 2021.**

13                         <u>**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**</u>
                          **Official Court Reporter**
14                         **United States Courthouse**
                          **Room 6722**
15                         **333 Constitution Avenue, NW**
                          **Washington, DC 20001**

16

17

18

19

20

21

22

23

24

25