IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 1:21-CR-175-4 |
| v. | ) | |
| | ) | |
| CHARLES DONOHOE, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO GOVERNMENT'S MOTION FOR DETENTION
AND MOTION FOR BOND**

Defendant, Charles Donohoe, respectfully submits the following Response to the Government's Motion for Detention and Motion for Bond because there are a combination of conditions sufficient to ensure the defendant's appearance for trial and ensure the safety of the community. In support, the Defendant shows as follows:

A. Procedural History.

On March 10, 2021, a grand jury in the District of Columbia issued a six-count superseding indictment, charging defendant Charles Donohoe with Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official Proceeding (and Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Obstruction of Law Enforcement During Civil Disorder (and Aiding and Abetting), in violation of 18 U.S.C. §§ 231(a)(3) and 2; Destruction of Government Property (and Aiding and Abetting), in violation of 18 U.S.C. §§ 1361 and 2; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §

1752(a)(1); and Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

Donohoe was taken into custody at his place of work Kernersville, North Carolina on March 17, 2021.  He appeared in the United States District Court for the Middle District of North Carolina, where he waived his right to an identity hearing and a detention hearing, electing to have the detention hearing before this Court.

Donohoe was arraigned on these charges on April 6, 2021 and the undersigned was appointed counsel for Donohoe the same day, *pro hac vice*, pending admission to the District of Columbia Federal District Court.

B.  Personal History and Background.

Charles Donohoe is 33 years old, he was born in Long Branch, New Jersey, and he moved with his mother and twin brother to North Carolina when he was three years old.  His mother, Mrs. Stuart Picket lives nearby in East Bend, North Carolina and his paternal grandparents, Mr. and Mrs. Charles and Jacklyn Donohoe live in adjacent Winston Salem, North Carolina.  In addition to his twin brother Liam, Charlie has five siblings, all but two of them live in North Carolina.  Charlie is very close to his family, especially his twin brother and his grandparents.  A letter from his grandparents is attached as Exhibit A.

Prior to his arrest, Donohoe resided in Kernersville, North Carolina with his partner of almost three years, Stephanie Burnette.  He was employed at Brewers Kettle as a handyman, where he has worked for four months.  Donohoe has a four-year old son, from a prior relationship.  Although his son lives primarily with his mother, Donohoe is a very involved parent – his son is with him three days a week and Charlie pays child support.  A letter from

Stephanie, attached as Exhibit B, describes the loving relationship between Charlie and his son.



Charlie and his son

In 2006, after both graduating from high school and earning the rank of Eagle Scout, Donohoe enlisted in the Marines.  He left for training at Paris Island on June 9, 2006.  He served in the Marines from 2006 – 2010.



Charlie and his twin brother, Liam age eighteen, upon earning the rank of Eagle Scout



Charlie when he first enlisted in the Marines.

After completing his basic training, Donohoe was primarily stationed in Hawaii, and served two separate seven month deployments in Iraq as Infantry.  Donohoe saw combat mostly in the city of Karma.

After being honorably discharged, Donohoe worked as a contractor with the United States Department of State, working for Blackwater, XE and Academi as a Cobra contractor. During this time, he was stationed in remote bases in Afghanistan and Pakistan.  As a contractor, he provided civilian defense and monitored and disrupted Taliban operations.  He received praise from his superiors for his work as a contractor.



photo of Donohoe in Afghanistan

When Donohoe left his work as a contractor, he returned to his home in Kernersville, North Carolina.  For a while he struggled with adjusting to civilian life, but eventually settled down with his partner Stephanie, and devoted himself to raising his son.  He also began working at Brewer's Kettle, a job he really enjoyed.  There he did handyman work, and also landscaping.  In addition to his work at Brewer's Kettle, he did landscaping at other locations. A letter from Charlie's employer is attached as Exhibit C.

During Donohoe's time in the Proud Boys, he participated in charitable endeavors such as collecting and delivering Christmas gifts for impoverished children in the community.



Photo of Donohoe and others assisting the Winston-Salem Jaycees in a toy drive for children in 2019

Consistent with his upbringing and military experience, Donohoe has always exhibited respect for law enforcement.



Charlie engaging with a law enforcement officer at a prior rally in Washington D.C.

Pretral Release Recommendation from U.S. Probation

After his arrest, Donohoe was interviewed by the U.S. Probation officer who recommended pretrial release under certain conditions.  Specifically, the U.S. Probation Office recommended home incarceration and approved Donohoe's grandmother, Jacklyn Donohoe as the third-party custodian, and she remains willing to so serve.  Charlie is not a flight risk – he does not have a current passport and has not exhibited any behavior that would indicate that he is unwilling or unable to follow each and every one of the requirements of home incarceration.  Donohoe respectfully requests that the Court adopt the release plan of home incarceration proposed by U.S. Probation and allow him to live with his grandparents.

C.  Argument.

Donohoe did not use any force or commit acts of violence during the events of January 6, 2021.  Critically, he did not enter the Capitol Building, nor did he destroy, vandalize, or

even move any Government property.  He did not assault or harass any law enforcement

officer or security guard, nor did he instruct or encourage anyone to act in a violent or

destructive manner.

After the events of January 6, Donohoe returned to his home in Kernersville, North

Carolina where he continued his life as normal.  He did not take measures to go into hiding or

change his identity.  In fact, on February 20, 2021, when an Amber alert was issued for a

missing teenager, Charlie voluntarily joined other community members to locate the young

girl by participating in an organized search for her, using his trained German Shorthaired

Pointer Blitz to try to locate her whereabouts.  Donohoe and Blitz can be seen on a story run

by local news station WFMY about the search for the young girl.  *See*

https://www.wfmynews2.com/mobile/video/news/savannah-childress-davidson-county-

denton-missing-teen-amber-alert/83-b4043d2a-7ebf-4f42-8903-86d0449894f1 as well as on

the twitter feed of one of the WFMY reporters:

https://twitter.com/BenSmartWFMY/status/1363142705736527874?s=20 , on the video

posted at the bottom of the tweet.

Donohoe was taken into custody at his place of work Kernersville, North

Carolina on March 17, 2021.  Authorities took possession of some items of clothing with Proud

Boys logo, but no contraband of any kind was located by the arresting authorities.

### 1. Nature and Circumstances of the offense

The Government alleges no facts which show that Donohoe committed any acts of

violence.  The Government states the following:

- **Chat Rooms** - Prior to January 6, Donohoe created a new Telegram chat room out of concern that the privacy of a prior chat room had been compromised. The Government contends that Donohoe directed others to leave the old chat room so that prior messages could be "nuked."  While it is true that after the arrest of the Proud Boys' national chairman, some members were concerned about prior chats, there is nothing in the records provided by the Government indicating that Donohoe or other members of the chat room were trying to delete messages concerning any plan to commit acts of violence on January 6, much less plan an "insurrection."

- **Telegram Messages/Directives** – According to the Government, Donohoe used Telegram to send messages to communicate plans and directives for January 6, such as not to wear Proud Boy "colors" and where and when to meet.  Mr. Donohoe did not originally plan to go to Washington D.C. for the January 6 rally. The Telegram records show that Donohoe did not leave North Carolina for Washington D.C. until around 2:00 a.m., and that Donohoe was primarily concerned with finding a place to stay and a place to purchase beer. On his way to Washington D.C., he asked others if he could stay with them in their hotel room or at a local campground and how late he could buy beer in either Virginia or Maryland.  He arrived in Washington D.C. at approximately 6:00 a.m. Donohoe did communicate to others messages from "higher ups" - not to wear colors and where and when to meet on January 6.  There is no evidence that purpose of Donohoe passing the messages to other members not

to wear colors was to plan a "stealth attack" on the Capitol.  Recent rallies attended by Proud Boys had ended in violence.  Charlie thought that the purpose of not wearing colors on January 6, members of the group would be less likely to be at risk of being violently attacked and/or blamed out for the misdeeds of others. There was no discussion in the chat rooms of any plan to commit acts of violence, forcibly enter the Capitol or disrupt the proceedings in Congress.  In fact, video provided by the Government shows approximately 15-20 Proud Boys meeting at the designated place and marching while they chant about ANTIFA.  The men in the video possessed no weapons and made no threats of violence towards the Government.

- **Walking past barriers** – According to the Government, Donohoe and others walked past barriers that had been previously knocked down by others. Notably, Donohoe did not destroy, knock down, or even touch a barrier.  Nor did he ever tell anyone else to do so.  He did not threaten or interfere with law enforcement, he did not assault anyone, and he did not go inside the Capitol.

- **Carrying a shield with Dominic Pezzola** – According to the Government, Donohoe carried a riot shield with Pezzola.  Donohoe is seen briefly in a video walking with Pezzola with his hand on a shield.  He is a good distance away from the entrance to the Capitol and there is no indication as to the time this took place.  Moreover, this conduct appears to be well before Pezzola used the shield to break a window, which occurred at 2:13 p.m.  There is an alleged Telegram message from Donohoe stating, "got a riot shield!," posted at 1:37

p.m., so the brief video of him with the shield must have been taken before then.  There is no evidence that Charlie had anything to do with Pizzola's acquisition of the shield.  There is no further video of Donohoe touching the shield or having any sort of interaction with Pezzola.  When Pizzola is seen prior to the advance up the stairs of the west terrace of the Capitol Building, he is not with Donohoe.

- **Advancing up the stairs of the west terrace of the Capitol Building** – According to the Government, Donohoe "took action to overwhelm law enforcement with the goal of advancing up the stairs to the west terrace of the Capitol Building.  This action supposedly allowed other rioters, including Pezzola to advance towards the Senate side of the building and use the shield to break a window.  At approximately 1:48 p.m., a group of people, many more than the group of people that gathered with Donohoe at the Washington Monument that morning, surge up the stairs to the west terrace of the Capitol Building.  Donohoe can be seen in the crowd.  It appears that something, maybe a Gatorade bottle, hits him in the head as he is ascending the stairs, pushed in part by the crowd behind him.  Donohoe does not appear to be pushing anyone or aggressively going forward.  When his section of the crowd reaches the top of the stairs, Charlie goes to the left and disappears from sight.  No further video has been provided to counsel which shows Donohoe after ascending the stairs.  It appears that he left the immediate area of the Capitol.  As far as Donohoe's Telegram message "we are regrouping with a second force," further

11

messages show that this did not happen.  Instead, messages show that he took steps to notify others about "incoming" law enforcement in order to encourage others to leave the Capitol.  He also sent out the message from Vice President Pence asking everyone to stop and leave the Capitol.

- **Telegraph Bravado** - According to the Government, Donohoe made the following statements:  "I stood on that front line and pushed it twice," that he felt "like a complete warrior," and that "we stormed the Capitol unarmed and took it over unarmed"  This braggadocio in no way supports the Government's theory that he was somehow responsible for the violence that took place. There is simply no evidence that Donohoe committed any acts of violence nor ever encouraged anyone else to do so.

- **Alleged covering his tracks** – According to the Government, Donohoe asked others if they wanted him to nuke the Telegram group.  He did not do so and a review of the Telegram messages shows that there were no tracks to cover and no planning of violence to delete.

## 2.  Weight of the evidence

It is true that the Government has evidence that Donohoe was in communication with other Proud Boys and that he went to Washington D.C. on January 6.  However, whether the Government can prove that Donohoe committed the crimes alleged in the indictment is questionable.  A review of the Telegraph messages produces no evidence of any planning on the part of Donohoe to initiate violence that occurred on January 6.  Donohoe was the only person from the North Carolina triad area that attended the rally and he decided to go at the

last minute.  After the rally, Donohoe had no ride back to Washington D.C. – he was left behind by the people he originally rode with.  This further supports the lack of planning and the lack of leadership on Charlie's part. Prior to January 6, Donohoe's messages to others on Telegraph concerned the specifics of meeting for the rally - not storming the Capitol.  His bragging after he left the Capitol area was just that – bragging.  He did not damage property, assault anyone, or even enter the Capitol on January 6 nor did he encourage anyone else to do so.[1]

### 3.  History and characteristics.

Donohoe is an honorably discharged United States Marine, who served his country both during and after his military service.  He has a strong community of friends and family. He is gainfully employed and a great father to his young son.  He has no history of violence and no criminal history of violent offenses.  He loves his country and has great respect for those who work in law enforcement as evidenced by his nonviolent behavior on January 6. Donohoe contributes to his community by being involved in charitable projects and volunteering to help others.

For these reasons, Donohoe does not present an identified and articulable threat to an individual or community.  This is evidence both by his behavior on January 6 and after.

### 4.  Donohoe has overcome the statutory presumption.

---

[1] In their memorandum, the Government attacks Donohoe's 5th Amendment rights by asserting that Donohoe's "lack of remorse" and failure to disclaim the Proud Boys as a gang should be held against him in the detention hearing. It appears that the Government believes that in order to obtain pretrial release, Donohoe must waive his 5th Amendment rights and admit guilt.  (Doc. #36 at 10).

The Bail Reform Act (BRA) retained Congress' preference for the release of most defendants before trial.  *See United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors non-detention.").  The BRA should be *narrowly* construed for detention and *broadly* construed for release.  *See e.g. United States v. Singleton,* 182 F.3d 7, 23 (D.C. Cir. 1999); *United States v. Hinote*, 789 F.2d 1490, 1941 (11th Cir. 1986) (It is required "that we strictly construe provisions of the Bail Reform Act of 1984). *Cf. Williams v. United States*, 458 U.S. 279, 290 (1982) (Criminal statutes should be narrowly construed in favor of the defendant).

In this case, based on the charge in count four of the indictment, the BRA presumption of detention applies. 18 U.S.C. § 3142(e). Donohoe, therefore, must present "some" credible evidence to overcome the presumption. *United States v. Fortna*, 769 F.2d 243, 251 (5th Cir. 1985).  Considering the § 3142(g) factors, Donohoe has met his burden of production to overcome the BRA presumption of detention.

Donohoe is not a flight risk.  He has significant ties to the community.  As set out in the Pretrial Services Report, Donohoe has lived in North Carolina for thirty years.  The majority of Donohoe's family live in North Carolina, close to his home in Kernersville.  Additionally, his young son lives nearby, as does his grandparents, mother, and girlfriend.

Donohoe has also demonstrated there are bond conditions which will reasonably assure the safety of others and the community.

Donohoe has a de minimis criminal history, consisting only of misdemeanor possession of alcohol by a minor, for which he received a prayer for judgment.  There are no charges or convictions for violent offenses of any kind.

14

**5. The presumption should be viewed with caution.**

Donohoe further submits the statutory presumption should be viewed with caution because it leads to the Congressionally unintended consequence of detention for low-risk defendants.

Congress enacted the statutory presumptions of detention in the BRA "to detain high-risk defendants who were likely to pose a significant risk of danger to the community if they were released pending trial."[2]  But as many acknowledge, the presumption of detention has not worked as intended, and federal pretrial detention rates have increased dramatically since 1984.[3]  Before the BRA, *less than two percent* of federal arrestees were jailed pending trial.[4]  According to the Bureau of Justice Statistics, the detention rate across the country increased from 59% in 1995, to 76% in 2010.[5]  A recent study by the Administrative Office of the Courts (AO) attributed this monumental increase in detention rates to the BRA's presumptions of detention, especially as they are applied to low-risk defendants such as Donohoe. For example, the statutory presumptions in drug and firearm cases applied to *nearly half* of all federal cases each year.[6]  If not for the presumptions of detention, low-risk

---

[2] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 Federal Probation 52, 56–57 (2017), archived at https://perma.cc/9HGU-MN2B.

[3] *Id.* at 53

[4] U.S. Department of Justice, Bureau of Justice Statistics, *Pretrial Release and Detention: The Bail Reform Act of 1984* Table 1 (1988), archived at https://perma.cc/CS86-NJA8 (showing 1.7% of federal arrestees were detained pretrial in 1983).

[5] Austin, note 1, at 53 (citing U.S. Department of Justice Bureau of Justice Statistics, *Pretrial Detention and Misconduct in Federal District Courts, 1995-2010 (2013),* archived at https://perma.ccU2V5-GYYP.

[6] *Id.* at 55 – "the drug presumption is "applied to between 42 and 45 percent of [all federal] cases every year.

defendants "might be released at higher rates."[7]  Instead, the presumptions of detention have become "an almost de facto detention order in almost half of federal cases."[8]

The well recognized problems with the statutory presumptions of detention in the BRA are important to Donohoe's case because - as the AO study confirms - high federal pretrial detention rates come with significant and wide-ranging social and economic costs. For example, the study explains that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a defendant towards relapse and/or new criminal activity."[9]

The economic harms stemming from being detained pretrial persist for years: even three to four years after their bail hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[10]

Further, the harmful effects of pretrial detention are not just limited to the detained person—once someone is incarcerated, the odds that their children become homeless increase by 95%, and the odds that their partner becomes homeless increase by 49%.[11]

---

[7] *Id.* at 57.

[8] *Id.* at 61.

[9] *Id.*; *see also* Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) Federal Probation 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76% had a negative job-related consequence and 37% had an increase in residential instability).

[10] Will Dobbie, et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AMER. ECON. REV. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[11] Regarding children, *see* Christopher Wildeman, *Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment*, 651 The Annals of the American Academy of Political and Social Science 74, 88 (2013); regarding partners, *see* Amanda Geller & Allyson Walker

Other emotional and psychological harms visited upon the children of incarcerated parents are well documented.[12]  It is unsurprising that another AO study found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[13] Other, more recent studies have confirmed that pretrial detention is criminogenic,[14] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[15]

One reason pretrial detention is criminogenic is because jails' physical and mental health screening and treatment is often inadequate.[16] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence

---

Franklin, *Paternal Incarceration and the Housing Security of Urban Mothers*, 76 Journal of Family and Marriage 411, 420 (2014), archived at https://perma.cc/G3NQ-NWH7.

[12] *See, e.g.,* Joseph Murray, et al., *Children's Antisocial Behavior, Mental Health, Drug Use, and Educational Performance After Parental Incarceration: A Systematic Review and Meta-Analysis*, 138(2) Psychological Bulletin 175, 186 (2012).

[13] Austin, *supra* note 1, at 54 (citing Christopher T. Lowenkamp, Marie Van Nostrand, & Alexander Holsinger, *Investigating the Impact of Pre-trial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78.

[14] Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta, et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 Jour. of Legal Studies 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities in terms of additional crime.").

[15] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 Jour. of Law and Econ. 529, 555 (2017).

[16] *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics 9 (2014), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman, et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 Journal of Substance Abuse and Treatment 239, 247, 249 (2007), archived at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2266078/.

length," even after controlling for criminal history, offense severity, and socio-economic variables.[17]

These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[18]  In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, to prevent crimes unlikely to happen.

There are also significant fiscal costs associated with high federal pretrial detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[19]  Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day. Thus, 255 days of pretrial detention cost taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time cost an average of $1,785.25.

**6.  The Pandemic.**

The national and state emergencies declared earlier this year because of the COVID-19 pandemic are still in effect.  As of March 25, 2021, over 29,976,00 people in the United States have been infected with COVID-19, and over 546,000 have died.[20]  As the Court has

---

[17] James C. Oleson, et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime and Delinquency 313, 325 (2017), archived at https://perma.cc/QAW9-PYYV.

[18] Thomas H. Cohen, et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summar*y, 82(2) FEDERAL PROBATION 23, 27 (2018), archived at https://perma.cc/8VM9-JH9T.

[19] Austin, *supra* note 1, at 53.

[20] https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/

heard often since March 2020, conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[21]

The pandemic is still pervasive throughout the United States, and jail populations are particularly vulnerable to infections and spread of COVID-19.

Donohoe respectfully requests the Court take the pandemic into consideration in making its bond decision.

E.  Conclusion.

The Supreme Court said in *United States v. Salerno*, 481 U.S. 739, 755 (1987), that "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." This presumption of release is encapsulated in the BRA, which provides generally that the Court "shall order" pretrial release, except in certain narrow circumstances.

Release is warranted in Donohoe's case. He has significant ties with the community. He has a work history. He will live with his grandparents on home incarceration with electronic monitoring and be supervised by a Pretrial Services Officer.

Donohoe respectfully submits that what will undoubtedly be a lengthy pretrial incarceration will serve no federal criminal justice goal.

The foregoing facts rebut the presumption of detention and demonstrate there are conditions of release, such as home detention with electronic monitoring, that will reasonably assure both Donohoe's appearance in Court and the safety of others and the community.

---

[21] Joseph A. Bick,  *Infection Control in Jails and Prisons*,  Clinical Infectious Diseases 45(8)1047-1055 (2007), at https://loi.org/10.1086/521910.

Donohoe respectfully requests the Court set a secured bond, in an amount he can meet, with such conditions as the Court deems appropriate.

Respectfully submitted, <u>April 15, 2021.</u>

/s/ Lisa S. Costner
_____

LISA S. COSTNER
Lisa S. Costner, P.A.
NC State Bar #14308
952 W. 4th St., Ste 200
Winston Salem, NC 27101
(336) 748-1885
lisa@lisacostnerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>April 15, 2021</u>, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following:

Jason McCullough
Assistant United States Attorney


Respectfully Submitted,

/s/ Lisa S. Costner
_____

LISA S. COSTNER
Lisa S. Costner, P.A.
NC State Bar #14308
952 W. 4th St., Ste 200
Winston Salem, NC 27101
(336) 748-1885

lisa@lisacostnerlaw.com