```
                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
       - - - - - - - - - - - - - - - - x
       UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                                 1:21-cr-00175-TJK-2
            v.
                                         Washington, D.C.
       1-ETHAN NORDEAN                    Monday, April 19, 2021
       2-JOSEPH RANDALL BIGGS,           12:00 p.m.


                    Defendants.
       - - - - - - - - - - - - - - - - x
```

---

                    TRANSCRIPT OF ORAL RULING
           HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                  UNITED STATES DISTRICT JUDGE

---

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          Luke M. Jones, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233


For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5    Biggs.

6              Present for the Government are Jason McCullough

7    and Luke Jones; present from Pretrial Services are Christine

8    Schuck and Shay Holman; present for Defendant 1 are David

9    Smith and Nicholas Smith; present for Defendant 2 is John

10   Hull; also present is Defendant 1, Mr. Nordean; and

11   Defendant 2, Mr. Biggs.

12             THE COURT:  All right.  Well, good afternoon to

13   everyone.

14             And my apologize -- my apologies for having to

15   delay ruling on these motions a few times.  The parties

16   continued to submit materials to me right up until, I think

17   it was, April 13th.  I had a little health issue that

18   sidelined me a few days, and then I had another emergency

19   matter that was assigned to me late last week, and so that's

20   the reason for the delay.

21             Pending before me are the Government's motions to

22   revoke pretrial release as to Defendant Ethan Nordean,

23   according to the second superseding indictment -- or

24   according to the superseding indictment, also known as Rufio

25   Panman -- that's ECF No. 30 -- and Defendant Joseph Biggs,

1    ECF No. 31.  I am going to grant the motions and order the

2    defendants detained until trial for the reasons that follow,

3    obviously, subject to whatever process the defendants may

4    undertake with our Court of Appeals.

5              THE DEPUTY CLERK:  Excuse me, Judge Kelly.

6              THE COURT:  Yes?

7              THE DEPUTY CLERK:  We seem to have lost Mr. Biggs.

8    I know he said that he was experiencing some storms down in

9    Florida and we may lose him.  He has the phone number to

10   call in.  So hopefully, we can get him back, but at this

11   time he is not on the hearing.

12             THE COURT:  All right.  Let me ask Mr. Hull.

13   Obviously, you'll have a transcript of our ruling here today

14   to share with your client.  My inclination would be just to

15   keep going on the ruling and even without your client being

16   present, given the technological problems.

17             MR. HULL:  No objections, Your Honor.  That would

18   be fine.

19             THE COURT:  All right.  First, let me -- let me

20   first run through some history in the case to describe how

21   we got here.  Defendant Nordean was arrested on a warrant

22   linked to a criminal complaint on February 3rd in his home

23   state of Washington.  And at a detention hearing a few days

24   later, he was ordered released by a magistrate judge there,

25   but the Government asked for and received a stay of that

1    order from Chief Judge Howell until she had the opportunity

2    to take up the Government's renewed motion to detain him.

3          On March 3rd, Chief Judge Howell heard argument on

4    the Government's motion to detain Nordean.  She noted that

5    many of Nordean's remarks and activities before January 6th

6    were very troubling.  The Government's argument for

7    detention, though, focused on Nordean's role as a leader and

8    organizer of what happened on January 6th.  And on that

9    score, Chief Judge Howell found the evidence related to his

10   role in planning coming -- that he -- she found that it came

11   up short of warranting detention.  Moreover, she noted, the

12   proffered evidence of what Nordean actually did on that day

13   did not suggest dangerousness in a way that defendants'

14   conduct has -- other defendants' conduct has in other

15   Capitol riot cases.  For example, there was no evidence that

16   Nordean carried a weapon and no evidence that he injured any

17   law enforcement officer.  In the end, she decided that the

18   Government had not met its burden and that there were a set

19   of conditions or combination of conditions that could

20   reasonably assure Nordean's appearance at future proceedings

21   and the safety of any other person and the community.

22         But Chief Judge Howell also thought -- also said

23   that she thought it was a, Close case -- a, quote, Close

24   case, closed quote, as to whether detention was warranted

25   and suggested that the judge assigned to the case could end

1    up reviewing the matter all over again.  She released

2    Nordean with a series of conditions, including home

3    detention, location monitoring, and requirements that he

4    surrender his passport and not possess firearms or other

5    weapons in his home.  Later that day, the grand jury

6    returned a superseding indictment against Nordean.

7          Defendant Biggs -- or, in fact, at that point, I

8    guess it would have just been an -- the first indictment

9    against Nordean.

10          MR. MCCULLOUGH:  That is correct, Your Honor.

11          THE COURT:  All right.

12          Defendant Biggs was arrested in his home state of

13    Florida -- before Nordean was -- on January 20th, and he was

14    charged via complaint.  The Government did not seek his

15    detention at that time.  He was released in that

16    jurisdiction by a magistrate judge there with similarly

17    tight conditions of release, again, home detention and

18    location monitoring, and the conditions also required him to

19    turn in his passport and not possess any firearms or

20    weapons.

21          Then on March 20th, the grand jury returned a

22    superseding indictment -- there it is -- against Nordean,

23    Biggs, and two additional defendants, Zachary Rehl and

24    Charles Donohoe, and charged them with, among other

25    offenses, conspiracy under 18 United States Code Section

1    371.  And the Government moved to revoke both Nordean's and

2    Biggs's pretrial release after the superseding indictment

3    was returned against them.  The Government also proffered

4    new evidence to back up its request in the form of a series

5    of Telegram messages that pertained to the defendants,

6    uncharged co-conspirators, and others.  Over the next few

7    weeks, and even after I held argument on the motion, the

8    parties peppered me with additional pleadings and evidence

9    right up until a few days ago on April 13th.

10               Before I talk about the nature and circumstances

11   of the offense as a whole, let me set out the basic legal

12   framework we're operating under.

13               Quote, In our society, liberty is the norm, and

14   detention prior to trial or without trial is the carefully

15   limited exception, closed quote.  That's United States v.

16   Salerno, 481 U.S. 739 at 755, a Supreme Court case from

17   1987.  Under the Bail Reform Act, or the BRA -- that's 18

18   United States Code Sections 3141 through 3156 -- quote,

19   Congress limited pretrial detention of persons who are

20   presumed innocent to a subset of defendants charged with

21   crimes that are the most serious compared to other federal

22   offenses, closed quote.  That's United States v. Singleton,

23   182 F.3d 7 at 13, a D.C. Circuit case from 1999, and

24   quoting, The most serious -- the quote, The most serious --

25   quoting Salerno, 481 U.S. at 747.  Thus, a detention hearing

1     must be held at the Government's request only in a case that

2     involves a charged offense falling in one of five enumerated

3     categories, 18 United States Code Section 3142(f)(1)(A)

4     through (E), or if the defendant poses a serious risk of

5     flight or of trying to obstruct justice or threaten, injure,

6     or intimidate a witness or juror.  And the cite there is

7     Section 3142(f)(2)(A) through (B).

8           A subset of offenses requiring a detention hearing

9     triggers a rebuttable presumption, quote, That no condition

10    or combination of conditions will reasonably assure the

11    appearance of the person as required and the safety of the

12    community if the judicial officer believes [sic] there is

13    probable cause to believe that the person committed, closed

14    quote, that subject [sic] of offenses.  That's Section

15    3142(e)(3).  This subset includes any, quote, Offense listed

16    in Section 2332b(g)(5)(B) of Title 18, United States Code,

17    for which a maximum term of imprisonment of 10 years or more

18    is prescribed, closed quote.  That's 3142(e)(3)(C).  The

19    presumption places, quote, A burden of production on the

20    defendant to offer some credible evidence contrary to the

21    statutory presumption, closed quote.  That's United States

22    v. Taylor, 289 F. Supp. 3d 55 at 63, a D.D.C. case from

23    2018, quoting United States v. Alatishe -- that's

24    A-L-A-T-I-S-H-E -- 768 F.2d 364 at 371, a D.C. Circuit case

25    from 1985.  But even when the defendant offers evidence to

1     rebut the presumption, it, quote, Is not a bursting bubble

2     that becomes devoid of all force once a defendant has met

3     his burden of production.  That's Taylor, 289 F. Supp. 3d at

4     63, quoting United States v. Jessup, 757 F.2d 378 at 387, a

5     First Circuit case from 1985.  Instead, the presumption is,

6     quote, Incorporated into the other factors considered by the

7     court in determining whether to grant a conditional release

8     and is given substantial weight, closed quote.  That's

9     United States v. Ali, 793 F. Supp. 2d 386 at 391, a D.D.C.

10    case from 2011.

11            Now, the BRA provides that a judicial officer,

12    quote, Shall order, closed quote, the detention of the

13    defendant before trial if, after a detention hearing held

14    under 18 United States Code Section 3142(f), and upon

15    consideration of, quote, The available information

16    concerning, closed quote, certain enumerated factors --

17    that's, again, Section 3142(g) -- quote, The judicial

18    officer finds that no condition or combination of conditions

19    will reasonably assure the safety of the appearance as --

20    the appearance of the person as required and the safety of

21    any other person and the community, closed quote.  That is

22    Section 3142(e)(1).  In common -- quote, In common parlance,

23    the relevant inquiry is whether the defendant is a flight

24    risk or a danger to the community.  United States v.

25    Vasquez-Benitez, 919 F.3d 546 at 550, a D.C. Circuit case

1    from 2019.  The BRA requires that detention be -- the BRA,

2    quote, Requires that detention be supported by clear and

3    convincing evidence when the justification is the safety of

4    the community, closed quote.  That's United States v.

5    Simpkins, 826 F.2d 94 at 96, a D.C. Circuit case from 1987.

6    And even if the defendant does not pose a flight risk,

7    danger to the community alone is sufficient reason to order

8    pretrial detention.  That's Salerno, 481 U.S. at 755.

9           So in order -- in assessing whether pretrial

10   detention or release is warranted, the judicial officer

11   must, quote, Take into account the available information

12   concerning, closed quote, these four factors: one, the

13   nature and circumstances of the offense charged, including

14   whether the offense is a crime of violence; two, the weight

15   of the evidence against the person; three, the history and

16   characteristics of the person, including the person's

17   character, physical and mental condition, family ties,

18   employment, financial resources, length of residence in the

19   community, community ties, past conduct, history relating to

20   drug or alcohol abuse, criminal history, and record

21   concerning appearances at court proceedings, closed quote;

22   and, four, quote, The nature and seriousness of the danger

23   to any person or the community that would be posed by the

24   person's release, closed quote.  And all of those factors

25   are found at -- those four factors are found at 18 United

1    States Code 3142(g).  At the detention hearing, both the

2    Government and the defendant may offer evidence or proceed

3    by proffer.  That's United States v. Smith, 79 F.3d 1208 at

4    1210, a D.C. Circuit case from 1996.

5              If a judicial officer [sic] is ordered released

6    under Section 3142 by a judicial officer, including, quote,

7    By a magistrate judge, closed quote, the BRA allows the

8    Government, quote, To file, with the court having original

9    jurisdiction over the offense, a motion for revocation of

10   the order or amendment of the conditions of release.  That's

11   18 United States Code 3145(b).  In this case, given the

12   return of the superseding indictment with new factual

13   allegations, new substantive charges, and a proffer of new

14   evidence, I don't understand my role here in resolving these

15   motions as reviewing either Chief Judge Howell's order or

16   the magistrate's order in Mr. Biggs's case.  I'm making my

17   own independent determination on this detention question.

18   Therefore, I don't believe I owe any deference to the

19   determinations made by those judges, again, which were based

20   on different charging documents, different substantive

21   charges, and different proffered evidence.  In any event,

22   even if I were reviewing the magistrate's decision in

23   Biggs's case, District Courts in this District typically

24   review such decisions de novo, and every Circuit to have

25   decided the question, although not the D.C. Circuit, has

1     said that that is the correct standard.

2             Now, the Government mainly seeks to detain Nordean

3     and Biggs under 18 United States Code Section 3142(e)(3)(C)

4     which provides a rebuttable presumption of detention if

5     there is probable cause to believe that they committed,

6     quote, An offense listed in Section 2332b(g)(5)(B) of Title

7     18, United States Code, for which a maximum term of

8     imprisonment of 10 years or more is prescribed, closed

9     quote.  The grand jury found probable cause to believe that

10    they committed such an offense.  18 United States Code 1361,

11    destruction of government property, is the offense charged

12    in Count 4 of the superseding indicted -- indictment, and it

13    is specifically enumerated in 18 United States Code

14    2332b(g)(5)(B)(i).  Count 4 charges both defendants with the

15    felony variety of that offense, as it alleges that they,

16    quote, Together with those known and unknown aided and

17    abetted others known and unknown to forcibly enter the

18    Capitol and thereby caused damage to the building in an

19    amount more than $1,000, closed quote.  That felony offense

20    carries a maximum sentence of 10 years in prison.  And under

21    Circuit precedent, the return of that indictment, quote,

22    Makes conclusive the existence of probable cause to hold the

23    accused for further prosecution, closed quote.  That's

24    United States v. King, 482 F.2d 768 at 776, a D.C. Circuit

25    case from 1973.  Thus, the defendants are eligible for

1    detention and the rebuttable presumption arises, at least in

2    the first instance.

3              Now, defendants made a few arguments suggesting

4    that pretrial detention is unavailable to the Government as

5    a matter of law here because Count 4 is defective in some

6    way or because the evidence against Nordean and Biggs as to

7    Count 4 is weak.  And just a few points on that.  The

8    statute says there is a rebuttable presumption of detention

9    only if there is, quote, Probable cause, to believe --

10   closed quote, to believe that the defendants committed one

11   of the enumerated offenses which, as everyone here knows, is

12   a relatively low standard.  And, as I mentioned, King says

13   that the return of an indictment charging the offense,

14   quote, Makes conclusive the existence of probable cause to

15   hold the accused.  Now, I don't see anything obviously

16   defective with Count 4 as a matter of law, despite the

17   defendants' arguments, and whether the Government ends up

18   being able to prove felony destruction of property, whether

19   directly or on an aiding and abetting theory, against these

20   defendants really isn't the question before me here today.

21   In light of the text of the statute, though, and King, I

22   think pretrial detention is clearly available to the

23   Government, and the rebuttable does -- presumption does

24   arise under 18 United States Code Section 3142(e)(3)(C).

25             But I'll also point out that defendants are also

1    eligible for detention, at least in my view, under

2    3142(f)(1)(A).  Because the grand jury has charged felony

3    destruction of property under 18 United States Code 1361, at

4    this point the case clearly, quote, Involves, closed quote,

5    an offense listed in Section 2332b(g)(5)(B) for which a

6    maximum term of imprisonment of 10 years or more is

7    prescribed, no matter what motions the defendant [sic] may

8    eventually file to attack the charging document.  The only

9    difference is if that were the only base [sic] for

10   detention, then the rebuttable presumption would not arise.

11          Now, let me move on to the pretrial detention

12   factors that I must consider.  The first statutory factor

13   requires me to consider, quote, The nature and circumstances

14   of the offense charged, closed quote.  18 United States Code

15   Section 3142(g)(1).  There's a lot to unpack here in this

16   case.

17          Nordean, Biggs and their two co-defendants are

18   charged with six offenses, four of which are felonies.  The

19   felonies include conspiracy, felony destruction of property,

20   in violation of 18 United States Code Section 1361;

21   obstruction of law enforcement during civil disorder, in

22   violation of 18 United States Code 231(a)(3); and

23   obstruction of an official proceeding, in violation of 18

24   United States Code Section 1512(c)(2).  The three

25   substantive felonies are charged under an aiding and

1      abetting theory, as well.

2              Now, the 1512(c)(2) offense is one for which the

3      maximum term of imprisonment is 10 -- is 20 years.  So it is

4      plainly a serious offense, at least from that perspective.

5      In addition, as part of this factor, I must also consider,

6      quote, Whether the offense is a crime of violence, a

7      violation of Section 1591, a federal crime of terrorism, or

8      involves a minor victim or a controlled substance, firearm,

9      explosive or destructive device, closed quote.  That is 18

10     United States Code Section 3142(g)(1).  The Government

11     argues, and neither defendant contests, that Congress has

12     characterized one of the offenses, felony destruction of

13     property, as a federal crime of terrorism under the facts

14     proffered by the Government.  18 United States Code Section

15     2332b(g)(5) defines "federal crime of terrorism" as an

16     offense that, quote, Is calculated to influence or affect

17     the conduct of government by intimidation or coercion or to

18     retaliate against government conduct, closed quote, and it

19     is included in an enumerated list of -- and is included in

20     an enumerated list of statutes which includes Section 1361.

21     That is the destruction of property statute.  And see 18

22     United States Code Sections 2332b(g)(5)(A) through (B).

23             But in addition to the maximum sentence that

24     Congress has established, and the characterization of at

25     least one of these offenses as a federal crime of terrorism,

1    it is the broader circumstances of the alleged conspiracy

2    that underscores the seriousness of at least the charges

3    against these defendants.  The grand jury has charged that

4    they conspired with each other and others, one, to stop,

5    delay or hinder Congress's certification of the Electoral

6    College vote, in violation of 18 United States Code Section

7    1512(c)(2); and, two, to obstruct or interfere with law

8    enforcement officers engaged in their official duties to

9    protect the Capitol and its occupants while that was

10   happening, in violation of 18 United States Code 231(a)(3).

11   In other words, the defendants stand charged with seeking to

12   steal one of the crown jewels of our country, in a sense, by

13   interfering with the peaceful transfer of power.  I won't

14   belabor the point, but it's no exaggeration to say that the

15   rule of law, the durability of our constitutional order and,

16   in the end, the very existence of our Republic is threatened

17   by such conduct.

18          But it's also fair to say that the allegations the

19   Government is relying on here are not the kind that courts

20   in our District have typically relied on to detain most

21   January 6th defendants before trial, at least so far,

22   because they lacked some of the usual markers -- the more

23   obvious markers of dangerousness.  For example, as I

24   mentioned before, there's no allegation that Nordean or

25   Biggs carried weapons themselves or that they themselves

1    took it upon themselves to fight with police officers

2    directly.  So let's look closely at the specific factual

3    allegations here.

4         To begin with, it bears noting that the defendants

5    and their alleged co-conspirators are alleged to be leaders

6    in an organization known as the Proud Boys.  The grand jury

7    charges that Nordean was a member of the group's leadership

8    through what's known as an Elders chapter and is President

9    of his local chapter in Washington State.  Biggs is a

10   self-described organizer of Proud Boys events.  The other

11   two co-conspirators are alleged to be Presidents of their

12   local chapters in Philadelphia and North Carolina.  Now,

13   quite obviously, there's nothing criminal about being a

14   member of the Proud Boys or sharing their views.  But these

15   allegations about the defendants are relevant to the nature

16   and circumstances of the offense insofar as they show that

17   the defendants were leaders and shared a pre-existing common

18   bond which provides context to explain how these

19   individuals, from disparate parts of the country, are at

20   least alleged to have wound up together in Washington, D.C.,

21   on January 6th.

22        In addition, defendants and their alleged

23   co-conspirators are alleged to have made statements well in

24   advance of January 6th to the effect that they considered

25   the election stolen and that it was important that something

1    be done about it.  Now, I want to emphasize there is no

2    allegation that these crimes -- that these statements are

3    crimes in and of themselves.  I mean, certainly, using

4    profanity -- which I will have to do on numerous occasions

5    when I -- as I'm reading some of these posts -- isn't a

6    crime either.  But they do shed light on the nature and

7    circumstances of the offense, in my view.  And while I

8    certainly weigh what each co-conspirator said against that

9    specific person more heavily since it goes to the weight of

10   the evidence against them, I do think that I can consider

11   what one co-conspirator is alleged to have said against all

12   the co-conspirators to some degree, again, when I consider

13   the nature and circumstances of the offense.

14        The Government has proffered, or the superseding

15   indictment has alleged, the following.  And I'm going to

16   note the ECF docket number that corresponds to where each

17   one of these things is in the record, including ECF No. 26,

18   which you'll hear a lot, which is the reference to the

19   superseding indictment.

20        So on November 4th, 2020, Biggs posted on social

21   media, quote, The left doesn't realize they are radicalizing

22   people by stealing this election.  They are gonna create

23   their own worst enemy from this, closed quote.  ECF No. 31

24   at 5.  The next day, he posted on social media that, quote,

25   It's time for fucking war if they steal this shit, closed

1    quote.  ECF No. 26 at Paragraph 31.

2              On November 10th, 2020, Biggs posted a list [sic]

3    to an article entitled, The Second Civil War is More

4    Realistic Than You Think, closed quote.  ECF No. 31 at 5.

5              On November 16th, Nordean posted on social media

6    that, quote, What's more disturbing to me than the Dems

7    trying to steal this election is how many people -- and then

8    there's an ellipses, dot, dot, dot -- just accepted Biden

9    won, despite the obvious corruption.  ECF No. 26 at

10   Paragraph 32.

11             That same day, November 16th, Nordean, through a

12   post on his social media, said that, quote, Any militia

13   groups, quote -- closed quote, in his area should contacted

14   him -- should contact him through an encrypted social media

15   application or direct messaging.  That's ECF No. 17 at 12.

16             On November 24, 2020, Biggs, in response to

17   another person's social media post calling for unity after

18   the election, posted, quote, No, bitch.  This is war, closed

19   quote.  That's ECF No. 26 at Paragraph 33.

20             A few days later on November 27th, 2020, Nordean

21   posted that, quote, We tried playing nice and by the rules.

22   Now, you will deal with the monster you created.  The spirit

23   of 1776 has resurfaced and created groups like the Proud

24   Boys and will not be extinguished.  We will grow like the

25   flame that fuels us and spread like love that guides us.  We

1    are unstoppable, unrelenting, and now unforgiving.  Good

2    luck to all you traitors of this country we so deeply

3    love -- and then there's an ellipses -- you're going to need

4    it.  ECF No. 26 at Paragraph 34.

5              That same day, Co-Defendant Rehl posted that,

6    quote, Hopefully, the firing squads are for the traitors

7    that are trying to steal the election from the American

8    people, closed quote.  That's ECF No. 26 at Paragraph 35.

9              On December 4th, 2020, as things moved into

10   December and -- Nordean posted, You can take a hard stand

11   now or watch as everything we've built crumble before your

12   eyes and have nothing to leave to your children.  Enough is

13   enough, closed quote.  ECF No. 17 at 12.

14             On December 14, 2020, Biggs posted that the Proud

15   Boys would be coming back to Washington, D.C., and that they

16   would be, quote, Bigger and stronger than ever.  ECF No. 31

17   at 5 to 6.

18             Two days later on December 16, 2020, Biggs posted

19   on social media, quote, This is a war on Americanism.  This

20   is only the beginning, closed quote.  ECF No. 31 at 6.

21             The allegations then turn to include certain types

22   of preparations that the defendants undertook in advance of

23   January 6th.  To provide some context, on January 3rd, 2021,

24   an interview with Biggs was posted on YouTube in which Biggs

25   discussed his role in planning Proud Boys events.  During

1    that interview, Biggs stated, quote, When we set out to do

2    an event, we go, all right, what is our main objective?  And

3    that's the first thing we discuss.  We take three months to

4    plan an event.  And we go, what's our main objective?  And

5    then we plan around that to achieve that main objective,

6    that goal that we want.  ECF No. 31 at Pages 6 through 7.

7             Now, the Government alleges that on December 27th,

8    Nordean created an online fundraising campaign soliciting

9    donations for, quote, Protective gear and communications,

10   closed quote, to be used on January 6th.  That's ECF No. 26

11   at Paragraph 37.  And in the days that followed, Nordean is

12   alleged to have exchanged direct messages with several

13   individuals about receiving donations of tactical vests,

14   steel plates, protective gear, communications equipment, and

15   in one instance bear mace to be used on January 6th.  That's

16   ECF No. 17 at 14.  Also in the days that followed, on

17   December 30, 2020, Co-Defendant Rehl posted a link to an

18   online fundraiser with the campaign name of, Travel Expenses

19   for Upcoming Patriot Events, closed quote.  The campaign

20   generated over $5,500 in donations between December 30th and

21   January 4th, 2021.  That's ECF No. 26 at Paragraph 38.

22            Then the day after he created his online

23   crowdfunding campaign, on December 28th, Nordean posted,

24   Fight now or lose everything.  ECF No. 17 at 12.

25            The next day, on December 29, the Proud Boys

1    National Chairman posted a message on social media stating

2    that the Proud Boys would, quote, Turn out in record numbers

3    on January 6th, but this time with a twist.  We will not be

4    wearing our traditional black and yellow.  We will be

5    incognito and we will be spread across downtown D.C. in

6    smaller teams.  And who knows?  We might dress in all black

7    for the occasion.  ECF No. 26, Paragraph 12.  Biggs posted a

8    video message that same day echoing these comments.  Quote,

9    We will not be attending D.C. in colors.  We will

10   bleeding -- we will be blending in as one of you.  You won't

11   see us.  You'll even think we are you.  We are going to

12   smell like you, move like you, and look like you.  The only

13   thing that we'll do that's us is think like us, exclamation

14   point.  January 6th is gonna be epic.  ECF No. 31 at 6.

15          Beginning on January 2nd, 2021, of this year, and

16   continuing through the next day, Nordean exchanged direct

17   messages via social media with an individual who offered to

18   contribute $1,000 to the Proud Boys', quote, Travel fund,

19   closed quote, in order to send, quote, A combat veteran and

20   Marine who wants to get in the street and fight, closed

21   quote, to join the Proud Boys in Washington, D.C., on

22   January 6th, 2021.  That's ECF No. 17 at 14.

23          And in the early days of January 2021, defendants

24   are then alleged to have made additional statements online

25   along the lines of those they made in November and December

1    2020 just about the election and certain political matters.

2            On January 20 -- January 1st, Biggs posted, quote,

3    2021 is the year we take back America, closed quote.  That

4    same day, he posted, quote, Trump exposed the swamp.  Now,

5    we can -- now, we need to cast out every backstabbing

6    Republican.  Rip them from their high horse and put in good

7    men and women who are God-fearing, conservative Christian

8    warriors.  Again, the same day, quote, Mike Pence will

9    betray President Trump.  This is my prediction.  I will be

10   in D.C. to witness this historic Judas moment when he turns

11   on the right thing to do for mere coin.

12            The next day, January 2nd, Biggs posted that

13   people who, quote, Carry thin blue line flags, quote [sic],

14   which indicate support for law enforcement officers, quote,

15   Are totally unaware of what's really going on, closed quote,

16   and that, quote, Most law enforcement departments in

17   metropolitan areas are no on [sic] side of the people, and

18   that they exist, quote -- to, quote, Enforced [sic] tyranny.

19   ECF No. 31 at 6.  And with reference to mask mandates, he

20   posted, quote, Every fuck -- every lawmakers who breaks

21   their own stupid fucking laws should be dragged out of

22   office and hung.  The government should fear the people, not

23   the other way around.  ECF No. 46 at 1 through 2.

24            A few days later on January 4th, Nordean posted,

25   It is apparent now more than ever that if you are a patriot,

1    you will be targeted and they will come after you.  Funny

2    thing is that they don't realize is we are coming for them.

3    ECF No. 17 at 12.

4           And that same day, Nordean also posted a link to

5    an episode of his video podcast, Rebel Talk with Rufio,

6    which had been recorded a few days earlier.  In that video

7    podcast, Nordean addressed the Electoral College

8    certification on January 6th.  While discussing alleged

9    voter fraud in the presidential election and the public's

10   purported complacency, Nordean stated, quote, I think

11   they're relying on complacency.  I think they're relying on

12   the Facebook posts, and that's all we're going to do, closed

13   quote.  He went on to say that rather than being complacent,

14   Proud Boys were going to, quote, Bring back that original

15   spirit of 1776 of what established the character of what

16   America is.  And it's not complacency.  It's not low

17   standards.  It's, quote, This is how it's going to be, and I

18   don't give a goddamn, closed quote.  ECF No. 17 at 13.

19          The superseding indictment then lays out more

20   specific evidence of planning in the days before January 6th

21   that it alleges were reflected in the encrypted

22   communications and on an application called Telegram.  I'll

23   just pause here and say that I understand defendants to have

24   made the point that these communications were not end-to-end

25   encrypted which is a higher level of encryption, as I

understand it, and the Government doesn't contest that.  But
the Government has represented, and the superseding
indictment has charged, that these communications were
encrypted in some way and defendants have not challenged
that basic assertion.

So on January 4th, 2021, shortly after the Proud
Boys Chairman's arrest pursuant to an arrest warrant issued
by D.C. Superior Court, Co-Defendant Donohoe expressed
concern that encrypted communications that involved the
Proud Boys Chairman would be compromised when law
enforcement examined his -- the Proud Boy Chairman's phone.
Donahue [sic] then allegedly created a new channel on the
encrypted messaging application entitled New MOSD and took
steps to destroy or, quote, Nuke, closed quote, the earlier
channel.  After its creation, the, quote, New MOSD, channel
included Nordean, Biggs, Rehl, Donohoe and a handful of
additional members.  ECF No. 26 at Paragraph 39.  The
Government proffers that "MOSD" is believed to stand for
"Ministry of Self-Defense."  ECF No. 45 at 4.

On January 4th, 2021, at 7:15 p.m., Donohoe posted
a message on various encrypted messaging channels, including
New MOSD, which read, quote, Hey, have been instructed and
listen to me real good.  There is no planning of sorts.  I
need to be put into whatever new thing is created.
Everything is compromised and we can be looking at gang

1    charges, closed quote.  Donohoe then wrote, Stop everything

2    immediately, closed quote, and then, quote, This comes from

3    the top.  ECF No. 6 [sic] at Paragraph 40.

4         The Government then represents that a person

5    identified in the superseding indictment as Unindicted

6    Co-Conspirator 1 advised that participants, quote, Shouldn't

7    be typing plans to commit felonies into your phone, closed

8    quote.  Unindicted Co-Conspirator 1 -- I'll call UCC-1 --

9    later directed that, quote, If you're talking about playing

10   Minecraft, you should just make sure you don't use your

11   phone at all or even have it anywhere around you.  ECF No.

12   45 at 3.  The Government represents that, based on

13   information provided by the FBI, it is common for persons

14   discussing criminal activity online to refer to Minecraft, a

15   video game, as a way of concealing the nature of the

16   activity.  That's ECF No. 45 at 3, Note 2.

17        About an hour after Donohoe's message to stop, at

18   8:20 p.m., UCC-1 posted to the New MOSD channel, quote, We

19   had originally planned on breaking the guys into teams.

20   Let's start divvying them up and getting BaoFeng channels

21   picked out, closed quote.  ECF No. 26, Paragraph 41.

22        The superseding indictment alleges that BaoFeng --

23   spelled B-A-O-F-E-N-G -- is a manufacturer of handheld

24   radios and other communications equipment at Paragraph 41.

25   There is no evidence that Nordean himself used such a radio

1    on January 6th, but one such radio was found by law

2    enforcement in his home, and the defendant provided evidence

3    that the radio was received by him on January 7th -- the day

4    after, obviously, January 6th -- although the Government

5    alleges that it was tuned to the channels that had been

6    picked out by the alleged conspirators in advance of January

7    6th.  That's ECF No. 17 at 15 and Note 5.  Biggs and Rehl,

8    as described later, are alleged to have had equipment --

9    communications equipment on that day.

10          The next morning, on January 5th, Biggs messaged,

11   What -- quote, What are the teams?  I keep hearing team are

12   picked already, closed quote.  A few minutes later, Biggs

13   messaged, Who are we going to be with?  I have guys with me

14   in other chats saying teams are being put together, closed

15   quote.  That's ECF No. 31 at 2.

16          About the same time, a member of a Proud Boys

17   Telegram group stated, quote, It seems like our plan has

18   totally broken down and Rufio -- referring to Defendant

19   Nordean -- has taken control as a single point of contact.

20   ECF No. 30 at 1.

21          That afternoon, a new encrypted messaging channel

22   entitled, quote, Boots on the Ground, closed quote, was

23   created for communications by Proud Boy members in

24   Washington, D.C.  In total, over 60 users participated in

25   Boots on -- in the Boots on the Ground channel, including

1    Nordean, Biggs, Rehl, Donohoe and UCC-1.  After the

2    channel's creation, Biggs posted a message to the channel

3    that read, quote, We are trying to avoid getting into any

4    shit tonight.  Tomorrow's the day, closed quote, and then,

5    quote, I'm here with Rufio and a good group, closed quote.

6    ECF 26, Paragraph 42.

7         Later that afternoon, at 5:22 p.m., Biggs stated

8    in an encrypted Telegram message, quote, Woth -- W-O-T-H,

9    presumably "with" -- Rufio trying to get numbers so we can

10   make a plan.  ECF No. 31 at 2.  A few moments later, Biggs

11   posted a message to the Boots on the Ground channel that

12   read, Just trying to get our -- quote, Just trying to get

13   our numbers so we can plan accordingly for tonight and go

14   over tomorrow's plan, closed quote.  ECF No. 26 at Paragraph

15   43.

16        Subsequently, Rehl, who was traveling to

17   Washington, D.C., on January 5th, stated that he was

18   bringing multiple radios with him and that there was a

19   person who was planning to program the radios later that

20   evening.  That's ECF No. 26, Paragraph 44.

21        As things moved into the evening on 8 -- at 8:28

22   p.m., a message was posted to the Boots on the Ground

23   channel that read, quote, Everyone needs to meet at the

24   Washington Monument at 10:00 a.m. tomorrow morning.  Do not

25   be late.  Do not wear colors.  Details will be laid out at

1    the pre-meeting.  Come out as a patriot.  ECF No. 26 at 45.

2         At 9:03 p.m., Rehl notified Nordean, Biggs,

3    Donohoe and others that he had arrived in Washington, D.C.

4    Donohoe responded by requesting one of the radios that Rehl

5    had brought.  ECF No. 26 at 40 -- at Paragraph 46.

6         At 9:07 p.m., Donohoe asked, quote, Hey, who's

7    boots on the ground with a plan RN?  Guys are asking, closed

8    quote.  A participant in the encrypted chat stated, quote,

9    Supposed to be Rufio, closed quote.  ECF No. 30 at 2.

10        At 9:09 p.m., UCC-1 broadcast a message to the New

11   MOSD and Boots on the Ground channels that read, quote,

12   Stand by for the shared BaoFeng channel and shared Zello

13   channel.  No colors.  Be decentralized and use good judgment

14   until further orders, closed quote.  UCC-1 also wrote, Rufio

15   -- quote, Rufio is in charge.  Cops are the primary threat.

16   Don't get caught by them or BLM.  Don't get drunk until off

17   the street, closed quote.  UCC-1 then provided a specific

18   radio frequency of 477.985.  ECF No. 26 at 47.

19        At 9:17 p.m., Biggs posted a message on New MOSD

20   that read, We just had a meeting -- again -- woth a lot of

21   guys.  Info should be coming out, closed quote, and then

22   posted, quote, Just spoke with, and the bracket here

23   indicates it's the Proud Boys Chairman, and, quote, I was

24   able to rally everyone here together who came where I said,

25   closed quote.  ECF No. 26, Paragraph 48.

1           And at approximately 9:20 p.m., Biggs posted a

2    message that read, quote, We have a plan.  I'm with Rufio,

3    closed quote.  Donohoe responded, What's the plan so I can

4    pass it on to the MOSD guys?  Biggs responded, quote, I

5    gave -- and, again, brackets here in the indictment

6    referring to the Proud Boys Chairman -- a plan.  The one I

7    told the guys, and he said he had one.  ECF No. 26, the

8    superseding indictment, Paragraph 48.

9           Then January 6th came the next day.  And here are

10   the Government's allegations about what happened on that

11   day.

12          At 6:37 a.m. that morning, Donohoe posted a

13   message to the New MOSD that asked, quote, Are we gonna do a

14   commanders' briefing before the 10:00 a.m., closed quote.

15   ECF No. 26 at Paragraph 49.

16          Subsequently, Donohoe communicated to others that

17   he was on his way to the Washington Monument.  He added,

18   quote, I have the keys until Rufio and Zach show up, closed

19   quote.  ECF No. 26 at Paragraph 50.

20          On the morning of January 6th, Telegram messages

21   were exchanged among the small group of members in the New

22   MOSD message group, which included Nordean, Biggs, Rehl,

23   Donohoe, UCC-1 and a handful of other participants.

24          UCC-1 then said on those Telegram messages:  I

25   want to see thousands of normies burn the city to ash today.

1              Person-2 responded:  Would be epic.

2              UCC-1:  The state is the enemy of the people.

3              Person-2:  We are the people.

4              UCC-1:  Fuck, yeah.

5              Person-3:  God, let it happen.

6              Person-3:  I will settle with seeing them smash

7      some pigs to dust.

8              Person-2:  Fuck those commie traitors.

9              Person-3:  It's going to happen.  These normiecons

10     have no adrenaline control.

11             Person-3:  They are like a pack of wild dogs.

12             Donohoe then chimes in:  I'm leaving with a crew

13     of 15 at 0830 to hoof it to the monument for [sic] colors.

14             Person 2 then responded:  Fuck it.  Let them

15     loose.

16             ECF 45 at 4.

17             Of course, on January 6th, a joint session of the

18     United States Congress had convened at the Capitol to

19     certify the vote count of the Electoral College of the 2020

20     presidential election.  That's Paragraph 4 of the

21     superseding indictment.  And only authorized individuals

22     were permitted to be on the Capitol grounds or inside the

23     building that day.  That's Paragraph -- that's also the

24     superseding indictment at 13.

25             At 10:00 o'clock a.m., a group of Proud Boy

1    members then gathered at the Washington Monument.  Shortly

2    after 10:00, Nordean, Biggs, Rehl and Donohoe walked the

3    group to the east side of the Capitol.  That's ECF 26 at

4    Paragraphs 51 through 52.

5            Consistent with the directive issued by the Proud

6    Boys National Chairman, Nordean, Biggs, Rehl and Donohoe

7    were not wearing the Proud Boys colors of black and yellow

8    that day.  Several men in the group, including Biggs and

9    Rehl, were holding walkie-talkie-style communication

10   devices.  At different times, Nordean and Biggs carried and

11   used a bullhorn to speak to the group.  That's ECF No. 26 at

12   Paragraph 53.  Nordean was dressed in all black and was

13   wearing a tactical vest.  ECF 17 at 5.

14           As Nordean walked to the Capitol, he used his

15   megaphone to announce, quote, We represent the spirit of

16   1776.  If you haven't noticed, real men are here.  We know

17   [sic] the oath is, and then there's a bracket for something

18   unintelligible.  We know [sic] the oath is, unintelligible,

19   foreign enemies and domestic.  Let us remind those who have

20   forgotten what that means.  ECF 45 at 8.

21           As Nordean arrived at the east side of the

22   Capitol, he brought the group to a halt.  He then spoke

23   through a microphone [sic], quote, Back the yellow.  You've

24   got to prove it to us.  You took our boy and let the stabber

25   go.  You guys got to prove your shit to us now.  The group

1  then marched on as the defendant spoke through his megaphone

2  again, quote, And don't forget, we don't owe you anything.

3  Your job is to protect and serve the people, not property or

4  bureaucrats.  ECF No. 45 at 8.

5       As Nordean and his co-defendants marched the group

6  of Proud Boy members around the Capitol, one of the men

7  yelled, Let's take the fucking Capitol, closed quote.  The

8  man was chastised and told not to say that.  Specifically,

9  he was told by someone present, quote, None of that.  Let's

10  not fucking yell that, closed quote.  Nordean followed up by

11  calling the man, quote, An idiot.  Another member of the

12  crowd commented, quote, Don't say it.  Do it.  ECF No. 45 at

13  4.

14       Shortly before 12:53 p.m., Nordean, Biggs and Rehl

15  led the group, which also included Donohoe, to the First

16  Street pedestrian entrance which was secured by a small

17  number of Capitol Police who were standing behind waist-high

18  metal barriers.  Biggs led the assembled crowd in a series

19  of chants using a megaphone.  Nordean, Rehl and Donohoe

20  stood nearby.  ECF 26 at Paragraph 54.

21       Nordean, Biggs, Rehl and Donohoe moved toward the

22  Capitol, then, by crossing over barriers that had been

23  violently disassembled and trampled by the crowd moments

24  before they advanced.  That's the superseding indictment,

25  ECF 26 at Page [sic] 55.

1          Biggs recorded himself at some point during this

2     period.  He said, quote, Dude, we're right in front of the

3     Capitol right now.  American citizens are storming the

4     Capitol, taking it back right now.  There's millions of

5     people out here.  This is fucking crazy.  Oh, my God.  This

6     is such history.  This is insane.  We've gone through every

7     barricade thus far.  Fuck you.  ECF No. 46 at 3.

8          As the crowd approached additional set [sic] of

9     metal barriers, certain individuals who had arrived at the

10    First Street pedestrian gate with Nordean, Biggs, Rehl and

11    Donohoe removed additional metal barriers.  That's ECF 26 at

12    56.  Nordean positioned himself near the front of the crowd

13    as these events took place.  And as they unfolded, messages

14    were posted to the encrypted message boards used by Nordean,

15    Biggs, Rehl and Donohoe that people were, quote, Storming,

16    the Capitol.  ECF 26 at Paragraph 56.

17         Nordean, Biggs, Rehl and Donohoe advanced toward

18    the west plaza of the Capitol where additional metal

19    barricades and law enforcement were deployed to protect the

20    Capitol and its occupants from the advancing crowd.  ECF 26

21    at Paragraph 57.

22         While standing next to one another, Nordean and

23    Briggs [sic] are alleged to have shook a metal barricade,

24    with Capitol Police on the other side of the barricade,

25    until Nordean and Biggs and others in the crowd were able to

1    knock it down.  The crowd, including Nordean, Biggs, Rehl

2    and Donohoe, advanced past the trampled barricade.  That's

3    ECF 26 at Paragraph 58.

4         I'll just pause and say the parties have provided

5    me video clips of this event.  I don't find it terribly

6    compelling in terms of showing that Nordean and Biggs

7    themselves shook a barricade.  It's obvious -- it's not, to

8    me, clear evidence that either one of them purposely shook

9    it to make it come down.  On the other hand, Nordean and

10   Biggs had positioned themselves right against the fence as

11   the mob pressed against it, and they are clearly happy about

12   law enforcement becoming overwhelmed and the mob pressing

13   forward.  They were clearly happy about what was happening

14   at that point.

15        Upon arriving at the west plaza, Nordean, Biggs

16   and Rehl positioned themselves at or near the front of the

17   crowd.  Upon arriving at the police line, Biggs took a video

18   in which he announced, quote, We've just taken the Capitol,

19   closed quote.  ECF 26 at Paragraph 59.

20        Nordean, for his part, paced at the edge of the

21   line of law enforcement while the group that he had led to

22   the First Street gate spread out in the west plaza of the

23   Capitol.  ECF 26 at Paragraph 60.

24        As the crowd advanced onto the west terrace of the

25   Capitol, messages continued to be exchanged on Telegram.

1   UCC-1 posted a message that encouraged participants in the

2   message group to, quote, Push inside, exclamation point,

3   closed quote.  ECF No. 45 at 5.

4            Shortly thereafter, after Proud Boys member

5   Dominic Pezzola, who is charged in a separate case, robbed a

6   Capitol Police officer of his riot shield allegedly,

7   Co-Defendant Donohoe was captured on video carrying the riot

8   shield with Pezzola.  That's ECF No. 45 at 5.

9            Indeed, Donohoe relayed the news to those on

10  Telegram, announcing, quote, Got a riot shield, exclamation

11  point, closed quote.  ECF No. 45 at 5, also.

12           Around 2:00 o'clock p.m., Donohoe assisted the

13  crowd's effort to advance up a flight of stairs toward the

14  Capitol.  The crowd overwhelmed law enforcement there who

15  were attempting to stop the crowd from advancing.  ECF No.

16  26 at 61 -- at Paragraph 61.

17           At 2:13 p.m., Pezzola then used the riot shield to

18  break a window that allowed rioters to enter the building

19  and force open an adjacent door from the inside.  ECF No. 26

20  at Paragraph 62.  Within a minute of Pezzola breaking the

21  window, Biggs entered the Capitol building through a door

22  that had been forced open by rioters who had entered through

23  the window he had broken.  "He" being Pezzola.  And at least

24  three other Proud Boys who are charged elsewhere also

25  entered through the door within two minutes of its opening.

1          That's ECF No. 26 at Paragraph 62.

2                    I'll pause here and note that Pezzola is not

3     charged in this case and not charged as a co-conspirator in

4     this case, but he is charged in a separate case before me.

5     But I don't see why I can't consider what he did, at least

6     to some degree, when I consider the nature of the

7     circumstances of the offense here.  The grand jury has

8     charged that Pezzola -- in this case that Pezzola was a

9     Proud Boy like these defendants, even though Nordean and

10    Biggs do challenge that characterization.  Donohoe, their

11    co-defendant and alleged co-conspirator, was seen carrying

12    the riot shield with Pezzola, even exclaiming that he had

13    got a riot shield.  And consistent with the allegations here

14    concerning the use of communications equipment and radios,

15    Pezzola was apparently wearing an earpiece on January 6th.

16    I'll note that the Government hasn't made that

17    representation to me in this case, but in Pezzola's case it

18    proffered a photo to me clearly showing that earpiece.  So

19    I'm going to ask the Government to supplement the record

20    here to include that photo by 5:00 o'clock p.m. so it's

21    included in the record in this case.

22                    Mr. McCullough, do you have a problem doing that?

23                    MR. MCCULLOUGH:  Understood, Your Honor, and the

24    Government will do so.

25                    THE COURT:  Biggs exclaimed shortly thereafter,

1   quote, This is awesome, closed -- exclamation point, closed

2   quote, after entering the Capitol.  That's ECF No. 31 at 7.

3          As these events unfolded, again, messages were

4   posted to the encrypted messaging group that encouraged

5   participants in the group to participate in what was

6   happening.  One post directed the participants in the group

7   to, quote, Get there, closed quote.  ECF No. 45 at 4.

8          UCC-1 immediately followed that by posting, quote,

9   Storming the Capitol building right now, closed quote, four

10  consecutive times.  ECF No. 45 at 4.

11         Biggs is alleged to have exited the Capitol, posed

12  for a picture on the east side of the building, then, 30

13  minutes later, re-entered the building on that side by,

14  quote, Pushing past at least one law enforcement officer,

15  closed quote.  According to the superseding indictment, he

16  then entered the Senate chamber with another Proud Boys

17  member.  That's ECF No. 26 at Paragraphs 64 through 65.

18         Nordean, for his part, entered and remained in the

19  Capitol, including in the Rotunda, before exiting the

20  Capitol with another member of the Proud Boys.  That's ECF

21  No. 26 at Paragraph 66.

22         At 3:30 [sic] p.m., as some rioters were leaving

23  the Capitol, Donohoe announced on the Boots on the Ground

24  channel, quote, We are regrouping with a second force.  ECF

25  No. 26, Paragraph 68.  But it should be noted that the

1    Government has not proffered any evidence that such a force

2    ever materialized as law enforcement gained more control

3    over the situation.

4           And to close out the story of what happened that

5    day, the allegations, at about 2:20 p.m., members of

6    Congress and Vice President Pence had been evacuated.  ECF

7    No. 26, Paragraph 21.  The joint session of Congress did not

8    reconvene until 8:00 o'clock p.m.  ECF No. 26 at Paragraph

9    22.  And on that day, the grand jury alleges, approximately

10   81 members of the Capitol Police, 58 members of the

11   Metropolitan Police Department were assaulted and the

12   Capitol suffered millions of dollars' worth of damage.  ECF

13   No. 26 at Paragraph 23.

14          And later that evening, Person-2 from the New MOSD

15   message group posted, quote, We failed.  The House is

16   meeting again, closed quote.

17          Now, after January 6th, the superseding indictment

18   alleges, or the Government represents, that the defendants

19   made the following additional statements.

20          Biggs posted a message on Parler that read, quote,

21   What a day, closed quote.  That's ECF No. 26, Paragraph

22   24(b).

23          Donohoe posted a message that read, in part,

24   quote, We stormed the Capitol unarmed, quote -- closed

25   quote, and then, quote, We took it over unarmed.  ECF No.

1     26, Paragraph 24(d).

2             Nordean posted a message that read, quote, We

3     stormed the Capitol.  It was great.  Basically, the cops

4     started shooting us with pepper balls and boom bombs and we

5     stormed them and busted down the doors in the Capitol.

6     Thousands and thousands of people.  It was insane.  ECF No.

7     45 at 6.

8             In a private message on January 7th, 2021,

9     Co-Conspirator Rehl wrote, quote, I'm proud as fuck for what

10    we accomplished yesterday, but we need to start planning,

11    and we are starting planning, for a Biden presidency, closed

12    quote.  ECF No. 26, Paragraph 24(c).

13            And that same day, January 7th, Nordean exchanged

14    messages with an individual via an encrypted messaging

15    application.  During the exchange, the individual asked if

16    Nordean had been at the Capitol and, if so, if he was all

17    right.  Nordean responded that he had, quote, Stormed the

18    Capitol, closed quote; that he was all right; and that he

19    had stolen a flag from inside the Capitol building.  ECF No.

20    17 at 18 through 19.

21            And on January 7th, again, that same day, Biggs

22    posted, quote, R.I.P. America, 1776 through 2021, closed

23    quote.  That's ECF No. 31 at 9.

24            And on or about the next day, January 8th, Nordean

25    posted a message on social media that included a picture of

1    a Capitol Police officer administering pepper spray on

2    January 6th with a caption that read, in part, quote, If you

3    feel bad for the police, you are part of the problem.  They

4    care more about federal property, our property, than

5    protecting and serving the people.  ECF No. 30 at 19.

6         So that was a long way to get there, I understand,

7    but I think in a case like this, it's important to put on

8    the record all the evidence -- at least a significant

9    portion of it.

10        Considered as a whole, then, I do conclude that

11   the nature and circumstances of the offense weigh strongly

12   in favor of detention.

13        Let me just say a few words about how I see that

14   evidence or how I see those allegations.

15        Chief Judge Howell has set forth a number of

16   considerations which this -- which I have found helpful to

17   differentiate the severity of the conduct of the hundreds of

18   defendants connected to the events of January 6th for

19   purposes of detention.  Cite the parties to the Chrestman

20   opinion, 2021 WL 765662 at 7, Judge Howell's opinion from

21   February 26th, 2021.  These considerations include whether a

22   defendant, one, has been charged with felony or misdemeanor

23   offenses; two, engaged in prior planning before arriving at

24   the Capitol; three, carried or used a dangerous weapon

25   during the riot; four, coordinated with other participants

1    before, during, or after the riot; five, assumed either a

2    formal or a de facto leadership role in the assault by

3    encouraging other rioters' misconduct; and, six, the nature

4    of the defendant's words and movements during the riot,

5    including whether he damaged federal property, threatened or

6    confronted federal officials or law enforcement, or

7    otherwise promoted or celebrated efforts to disrupt the

8    certification of the electoral count -- vote count during

9    the riot.

10           Most of these considerations here weigh in favor

11   of detention.

12           On the first consideration, defendants are charged

13   with multiple felony offenses, including one Congress has

14   characterized under these circumstances as a federal crime

15   of terrorism, and another that exposes them to a 20-year

16   sentence.  The grand jury has charged that they conspired

17   with each other and others, one, to stop, delay or hinder

18   Congress's certification of the Electoral College vote; and,

19   two, to obstruct or interfere with law enforcement officers

20   engaged in their official duties to protect the Capitol and

21   its occupants while that was happening.  I won't belabor the

22   point I meant earlier -- I made earlier.  These are gravely

23   serious matters.  So this factor weighs in favor of

24   detention.

25           On the third [sic], fourth and fifth

1    considerations, the allegations include extensive

2    involvement in prior planning for January 6th, coordinated

3    -- coordination with other participants before, during, and

4    after the riot, and leadership roles for both of them.  This

5    is so even though Nordean only used a bullhorn that day, or

6    at least there's no evidence that he had a walkie-talkie

7    like Biggs or also no evidence that he used his phone on

8    that day.  And although Nordean did not apparently use the

9    encrypted communications channels a lot, Biggs and others

10   who used them said that Nordean and Biggs were the ones with

11   the plan and that Nordean in particular was in charge.

12   Finally, it's important that both Nordean and Biggs are

13   alleged to have made statements in the wake of the election

14   that they believed the election had been stolen and that

15   something had to be done about it.  Biggs, for example,

16   invoked war on several occasions.  And Nordean posted, You

17   can take a hard stand now or watch as everything we've built

18   crumble before your eyes and have nothing to leave your

19   children.  Enough is enough.  Also Nordean:  We tried

20   playing nice and by the rules.  Now, you will deal with the

21   monster you created.  These considerations weigh in favor of

22   detention.

23            On the other side of the ledger, consideration

24   three weighs against detention.  Neither defendant carried

25   or used a weapon that day, although their co-conspirator

1    Donahue [sic] was captured on video possessing a riot shield

2    that was used as a weapon by someone else.

3            And the sixth consideration is a mixed bag.  On

4    the one hand, as I've discussed, the evidence that

5    defendants themselves used physical violence that day at all

6    is relatively modest as compared to many others at the

7    Capitol.  And there's no evidence that they used violence

8    directly against any person.  All of that is significant.

9    On the other hand, both said and did things that day that

10   are highly troubling.  As Nordean walked to the microphone

11   -- or walked to the Capitol, he allegedly used his megaphone

12   to announce that, quote, We represent the spirit of 70 --

13   1776.  If you haven't noticed, real men are here.  We know

14   what the oath is, unintelligible, foreign enemies and

15   domestic.  Let us remind those who have forgotten what that

16   means.  I think it's obvious that that's a reference, even

17   though part of that is unintelligible, to protecting the

18   United States from enemies, foreign and domestic.  Nordean

19   and Biggs positioned themselves at the very front of the

20   crowd that pushed through barricades on their way to the

21   base of the Capitol itself.  Biggs entered the Capitol,

22   left, then re-entered to go back into the Senate chamber

23   which are highly concerning movements.  Nordean suggested

24   that if you feel bad for the police, you're part of the

25   problem.  Both defendants celebrated what happened that day.

1    And Nordean, at least on his own account, stole a flag.

2    Neither defendant has, at any time, expressed regret or

3    remorse for what they did or for what happened that day.

4         So to repeat, given the nature of the charges, the

5    evidence of leadership, prior planning, coordination with

6    other participants particularly by acquiring and using radio

7    communications, the nature and circumstances of the offense

8    weigh, in my view, in favor of detention.

9         The second factor I have to consider is the weight

10   of the evidence against the person.  In many Capitol riot

11   cases, courts often simply note that there are photos or

12   video of the defendants engaging in the key acts for which

13   they're charged, they conclude the evidence is strong, and

14   they move on.  But in a case like this one, this factor

15   takes on a larger importance, given that much of the

16   Government's evidence is circumstantial about the precise

17   nature of the alleged conspiracy.  And as for the other

18   substantive offenses, the strength of the Government's case

19   appears to rest on attempt theories or aiding and abetting

20   theories that depend on what other people did.  In the end,

21   the evidence is overwhelming that Nordean and Biggs had a

22   plan for that day.  But the question is, what is the

23   strength of the Government's case that the plan is what the

24   grand jury charged?

25         In my view, the weight of the evidence is strong

1    enough to weigh in favor of detention, even if, as in most

2    conspiracy cases, we don't have a document or a conversation

3    that lays out the conspiracy plainly.  Defendants -- mostly

4    Defendant Nordean -- make some fair points about some

5    weaknesses in the case, but let me walk through them and

6    explain why I don't think they weaken the case very much in

7    light of all the other evidence.

8              First, they argue that the Proud Boys have worn

9    protective gear, raised funds for travel, and used the

10   Telegram communications application on occasions other than

11   January 6th.  Biggs argues that the Proud Boys gave up

12   marching in their colors because of prior incidents where

13   Proud Boys had been assaulted by Antifa.  Those are fair

14   points, and they take some of the wind out of those

15   allegations.  But still, as I've laid out, the charged

16   conspiracy depends on far more allegations and evidence than

17   those.  On no other occasions do defendants claim that the

18   Proud Boys used radios tuned to the same preset frequency to

19   be able to communicate in real time which, to me, suggests a

20   certain tactical coordination.  And Donohoe's comment that,

21   quote, We can be looking at gang charges, closed quote, and

22   Unindicted Co-Conspirator 1's admonition that, quote --

23   they, quote, Shouldn't be typing plans to commit felonies

24   into your phone, closed quote, suggest that what was going

25   on here was planning to do something unlawful.

1          Second, Nordean also points out that the evidence

2    does not show, as Chief Judge Howell had suggested, specific

3    directions or precise orders to commit a federal offense.

4    But those things aren't necessary for a conspiracy case to

5    be relatively strong, and Chief Judge Howell did not have a

6    conspiracy charge, nor much of the specific Telegram

7    evidence, nor the evidence related to Biggs and the other

8    co-conspirators in front of her when she called detention in

9    this matter a close case.

10         Third, Nordean presents a few other Telegram chats

11   that suggest that there was no coherent plan for January

12   6th, that a few Proud Boys were surprised by what happened

13   that day, and that some thought the focus was protecting

14   supporters of the President from Antifa.  But the

15   superseding indictment does not charge a conspiracy that

16   encompasses all Proud Boys.  And even if someone who was a

17   part of the conspiracy expressed surprise at the way events

18   unfolded that day or what the other -- ultimate outcome was,

19   that does not necessarily mean that there wasn't a

20   conspiracy of the kind alleged in the superseding

21   indictment.

22         Fourth, Nordean points to the 60 Minutes interview

23   of Michael Sherwin, the former Acting United States Attorney

24   for this District who ran this investigation for a time.

25   Sherwin told 60 Minutes that the Government did not know

1    whether there was a plan specifically to breach the Capitol

2    and did not know, quote, What their full plan was, closed

3    quote.  I don't think either of those statements weakens the

4    case much here, given the allegations in the superseding

5    indictment that were broader than merely breaching the

6    Capitol.  And the grand jury does not know -- does not need

7    to know every aspect of a conspiracy to charge one.

8          Let me just pause here, because I haven't

9    addressed this to the parties before in this case and,

10   relatively early on in this briefing, Defendant Nordean

11   raised this issue of former Acting United States Attorney's

12   -- Sherwin's comments.  Obviously, this was a highly

13   unprofessional interview that Mr. Sherwin gave.  And I

14   understand just from news reports about how this has come up

15   in other cases that Mr. Sherwin was referred to DOJ's Office

16   of Professional Responsibility for it.  I know none of the

17   prosecutors here today made those statements, but I am going

18   to warn all the -- all sides here that comments like that

19   violate the local rules of this court, and I'm certainly not

20   going to put up with anything like that from the attorneys

21   who enter their appearance in this case going forward.

22         Fifth, Nordean presented the Court with affidavits

23   from a singer and her agent that, after first proposing the

24   evening of January 5th, Nordean at some point proposed that

25   the singer perform for him and other Proud Boys on January

1    6th at an Airbnb beginning at 3:00 or 4:00 in the afternoon.

2    To some degree, these affidavits undercut the Government's

3    theory.  But on the other hand, the timeline isn't that off,

4    depending on precisely what the defendants anticipated their

5    role to be and how they expected the day's events to unfold.

6    The superseding indictment alleges that the Capitol was

7    breached at about quarter after 2:00, as -- and many people

8    began to pour into the building.  The indictment doesn't

9    necessarily presuppose any further role for the defendants

10   to play such that being back at their rented quarters a few

11   hours later is that strange.

12         Sixth, Nordean has proffered a snippet of video

13   that shows him grabbing a man by the shoulder after the

14   man -- who he represents he does not know -- pushed a police

15   officer that day.  He also offers a video clip of his voice

16   suggesting, apparently, after January 6th but before his

17   arrest in this case, that the Proud Boys should stop

18   rallying, but that clip doesn't contain any further context.

19   Similarly, Biggs says that he twice came to the aid of a

20   police officer that day who was being beaten, but there is

21   no video or photos of those encounters.  The Court can glean

22   little from these representations against the entire weight

23   of all the other evidence we've gone through.  Certainly,

24   the small snippets of video and audio do not preclude a

25   conspiracy to interfere with law enforcement that has been

1    charged.  It's hard for me to give Biggs's unverified

2    representations much weight, but even if they're true, both

3    men -- again, I don't think it precludes the charged

4    conspiracy -- both men have expressed views on social media

5    that express little sympathy for the police and their role

6    in certain -- at least in certain contexts.

7              Next, I have to consider, quote -- as the second

8    -- as the third factor, quote, The history and

9    characteristics of the person, including the person's

10   character, physical and mental condition -- and before I --

11   I guess, let me just circle back.

12             I do, then, find that the weight of the evidence,

13   even though just like -- even the -- that the first factor

14   strongly favors detention; and that the second factor, the

15   weight of the evidence, does favor detention, although not

16   as strongly as the first.

17             Next, I have to consider the history and

18   characteristics of the person, including, quote, The

19   person's character, physical and mental condition, family

20   ties, employment, financial resources, length of residence

21   in the community, community ties, past conduct, history

22   relating to drug or alcohol abuse, and -- let's just see --

23   and -- hmm.

24             (Brief pause.)

25             Out of order here.

1          Drug or alcohol abuse, criminal history, and

2     record concerning appearance at court proceedings, closed

3     quote.

4          Let me get straight to the most important things

5     here.  Neither defendant has any criminal record, and

6     neither has violated any condition of release in this case

7     while out so far.  Biggs, who is 37, has been super

8     compliant according to his -- the Pretrial Services officer,

9     and also, had a distinguished military career to his great

10    credit.  All of that is enough to rebut the presumption

11    which remains in the case as, quote, Incorporated into the

12    other factors considered by this court in determining

13    whether to grant a conditional release and is given

14    substantial weight, closed quote.  That's, again, United

15    States v. Ali, 793 F. Supp. 2d 386 at 391, a D.D.C. case

16    from 2011.

17         The remaining information about Biggs and Nordean

18    is a mixed bag to some degree.  Biggs has struggled with

19    PTSD and some alcohol problems; nonetheless, has relatively

20    strong community ties.  He has lived in Daytona Beach,

21    Florida, since -- well, only since 2018, but he does live

22    there with his mother and shares custody of a young daughter

23    with his ex-wife.  He is a Proud Boy -- Proud Boys rally

24    organizer.  He claims to have planned the Proud Boy event in

25    Portland in 2019.  And he represents that he provided the

1    FBI with information about Antifa on a number of occasions.

2    He also represents that he turned himself in once he learned

3    of a video of himself in the Capitol on January 6th.

4         On the other hand, Biggs represents that he began

5    to get, quote, Cautionary, closed quote, phone calls from

6    the FBI starting in 2018 about things he had said on air and

7    on social media.  And although he represents that he has

8    always satisfied the FBI, that he gets the calls in the

9    first place is troubling.  And the Government represents

10   that Biggs at first lied to the FBI when he was contacted on

11   January 8th by telling them that he had not entered the

12   Capitol on January 6th.  That's ECF No. 46 at Pages 4

13   through 5.  According to the Government, Biggs came -- only

14   came clean when the video of him in the Capitol hit social

15   media.

16        Nordean, for his part, lives in Washington State

17   with his wife, who agreed to be his third-party custodian.

18   But his community ties are, in some ways, less than they

19   might seem.  He represents that his ties to the Seattle,

20   Washington area were deep -- are deep and longstanding, and

21   the Court has no reason to doubt that they are longstanding.

22   But at some point after January 6th, the Government

23   represents that he posted -- and this is at ECF No. 45 at 9

24   -- that his family had, quote, Cut ties with him; that his

25   marriage, quote, Has been destroyed, closed quote; and that,

1    quote, His own government seems to think he's the bad guy,

2    closed quote.  He explained that he'd learned that, quote,

3    If you are going to stand for something good, expect the

4    world to stand against you with everything it has, closed

5    quote.  He then closed by stating that he'd decided to move

6    to Tennessee to start a new life because, quote, Nothing is

7    left for me here.  And in the Telegram chats cited by

8    Nordean himself, he appears to be considering moving to

9    North Carolina.  That's ECF 41 at Page 3.

10            And while Nordean does not have any violations of

11   his conditions of release either, Pretrial Services reported

12   two highly troubling things on April 1st reflected in ECF

13   No. 48.  First, Nordean represented to them that he had lost

14   his passport, so he could not turn it in to them; and,

15   second, Nordean reported to Pretrial Services on March 31st,

16   after the Government moved to revoke his conditions of

17   release, that for the first time he reported a firearm of

18   his was stolen back in December or early January, but that

19   he didn't report it stolen to the authorities until March

20   5th, two days after Chief Judge Howell had imposed a

21   condition on him that he not possess firearms.  When the

22   Pretrial Services officer asked Nordean why he was just

23   reporting it, quote -- according to the Pretrial Service

24   officer's report, quote, He didn't have an answer as to why

25   he waited so long, closed quote.

1          Nonetheless, this factor weighs in favor of

2     release, but not overwhelmingly so.

3          The final factor I have to look at is the nature

4     and circumstances [sic] of the danger to any person or the

5     community that would be posed by the person's release,

6     closed quote.  That's 18 United States Code 3142(g).

7          And then, as the Circuit recently found in the

8     recent Munchel decision, to justify detention on the basis

9     of dangerousness, I must find by, quote, Clear and

10    convincing evidence, closed quote, that, quote, No condition

11    or combination of conditions will reasonably assure the

12    safety of any other person and the community, closed quote.

13    That's not a new standard reflected in Munchel.  It is, in

14    fact, 18 United States Code Section 3142(f).  But as the

15    Circuit reminded us in that case, quote, A defendant's

16    detention based on dangerousness accords with due process

17    only insofar as the District Court determines that the

18    defendant's history, characteristics, and alleged criminal

19    conduct make clear that he or she poses a concrete,

20    prospective threat to public safety, or as the Supreme Court

21    articulated in Salerno, quote, An identified and articulable

22    threat to an individual or the community.

23         I do believe that this final factor weighs in

24    favor of detention and that this ultimate standard is met

25    when all the factors are considered here.  Let me explain

1   why.

2          First, the defendants have expressed strongly held

3   views that the 2020 presidential election was stolen and

4   have made statements suggestion -- suggesting that force or

5   violence was justified in response.  I don't weigh this very

6   much, frankly, and it doesn't come close to justifying

7   pretrial detention on its own, but it is part of the record

8   and it is something that I have to weigh.

9          Second, I suppose it's worth repeating that the

10  presumption of detention, although it -- I believe it has

11  been rebutted, remains in the case and weighs in favor of

12  detention.  Again, not a crucial or decisive thing here, but

13  weighing in the balance nonetheless.

14         Third, these defendants have alleged, by their --

15  are alleged, by their leadership and their planning, to have

16  facilitated political violence on January 6th, even if they

17  themselves did not carry a weapon or strike a blow.  Thus, a

18  finding that these defendants pose a threat accords with the

19  Circuit's view, as expressed in Munchel, that, quote, Those

20  who actually assaulted police officers and broke through

21  windows, doors, and barricades and -- and here's the

22  language I'll emphasize -- those who aided, conspired with,

23  planned, or coordinated such actions, are in a different

24  category of dangerousness than those who cheered on the

25  violence or entered the Capitol after others had cleared the

1        way, closed quote.

2               Fourth, and as the court noted in Munchel, the

3        threat must be considered in context, and whether a

4        defendant poses a particular threat depends on the nature of

5        the threat identified and the resources and capabilities of

6        the defendant.  In this case, through their leadership in

7        the case of Nordean and their planning skills in the case of

8        Biggs and the networks that these two individuals can draw

9        on, these defendants can produce events that draw large

10       numbers of people, including Proud Boys, others sympathetic

11       to Proud Boy perspectives, and still others on the opposite

12       side of the political spectrum like Antifa.  And they have

13       now -- they're at least alleged to have facilitated

14       violence, either against other civilians or law enforcement,

15       at a large event.  Even if the election has passed, all of

16       politics has not.  Along these lines, it also matters that

17       the defendants have never, at least on the record before me,

18       expressed regret or remorse about their actions or, even

19       more broadly, about what occurred on January 6th.  The audio

20       clip of Nordean does suggest that, at some point, he agreed

21       that the Proud Boys should stop rallying, but without any

22       further context there's no indication that that was some

23       kind of permanent decision.

24               Fifth, especially as to the last of the four

25       factors, I looked closely at the kinds of conditions I could

 1    impose on Nordean and Biggs, and at the end of the day I

 2    don't think even the most stringent suffices.  That is so

 3    because these two individuals could invade -- evade

 4    conditions like, for example, as the parties have suggested,

 5    requiring no contact with other Proud Boys or even being

 6    prohibited from using a computer by simply having an

 7    associate in their network come over to their house and lend

 8    them a smartphone.  There's really -- that's a pretty simple

 9    thing to do, it doesn't require technological savvy, and

10    there's really no way to ensure that doesn't happen.

11         But I think it is incumbent upon me to explain why

12    I don't have confidence that these defendants would abide by

13    such conditions, especially when they've been compliant in

14    this case so far.  So let me explain why.

15         First, the allegations here involve taking steps

16    to conceal communications from others, including law

17    enforcement, including by using Telegram.  If there were any

18    doubt about that as far as Telegram goes in the first place,

19    Co-Defendant Donohoe's creation of a new channel when he

20    believed, quote, Everything was compromised and we can be

21    looking at gang charges, closed quote, strongly suggests

22    that part of the use of Telegram was to avoid detection by

23    law enforcement -- to avoid their communications being

24    detected by law enforcement.  And, not to be forgotten, the

25    use of the radios on January 6th also appears to be a method

1    of concealing communications, at least from law enforcement.

2    So you have that -- those allegations as part of the crimes

3    charged that suggest these are individuals who have a

4    history and some know-how in concealing communications from

5    law enforcement.

6              Next, Biggs is alleged to have further concealed

7    his activity on January 6th by lying to the FBI about

8    whether he entered the Capitol.

9              And, third, Nordean's reporting of his passport

10   being lost, and especially the timing of his reporting of a

11   stolen firearm to authorities and then to his Pretrial

12   Service officer much later, seem, together, to be highly

13   suspect, raising the possibility that these items are

14   stashed somewhere or being held by an associate of his.

15             Fourth, that these men have devoted huge portion

16   [sic] of their lives to be leaders and planners in the Proud

17   Boys organization and, again, that they have not expressed

18   regret or remorse for what they did or what happened that

19   day does not inspire confidence that they would adhere to a

20   condition of release to sever ties from that group.

21             And finally, although defendants have complied

22   with their conditions of release, I simply don't know what I

23   don't know.  Both are ordered not -- currently ordered not

24   to have contact with witnesses or victims in the case, but

25   if they had violated those conditions there is really no way

1    I would know.  And it would not be a violation of their

2    current conditions to, say, contact a Proud Boy who wouldn't

3    fall into the category of witness or victim in the case or

4    to use a computer or to use an Internet -- the Internet.

5         So I do find that this last factor weighs in favor

6    of detention and, upon review of all the factors, I find by

7    clear and convincing evidence that because of the

8    prospective danger they present that no condition or

9    combination of conditions will reasonably assure the safety

10   of any other person and the community.  And I will enter an

11   order ordering the defendants to report to the marshals at

12   the direction of their Pretrial Services officer.

13        I thank everyone for --

14             MR. NICHOLAS SMITH:  Your Honor -- Your Honor --

15             THE COURT:  Yes.

16             MR. NICHOLAS SMITH:  Your Honor, this is Mr. Smith

17   for Mr. Nordean.

18             THE COURT:  Yes.

19             MR. NICHOLAS SMITH:  We appreciate that the Court

20   has ruled and has laid the table well with setting out all

21   of the rules on bail and, you know, we appreciate that that

22   was extremely thorough and we're grateful for that.  But,

23   Your Honor, if possible -- and we -- without repeating

24   anything that the Court has considered or any of the

25   voluminous briefing, we'd like to make an offer of proof on

1    a couple of facts that haven't been put into the record yet,

2    if Your Honor will allow it orally or --

3              THE COURT:  Well, here's what -- I know -- and I

4    hate to do this because you've been all so patient with me,

5    but I think -- does it make more sense -- I'm not, you know

6    -- I do want to give the Government an opportunity at the

7    end of the day to file this additional piece showing Pezzola

8    with the earpiece -- additional photo.  Is there any way,

9    Mr. Smith, you can make these representations on paper and I

10   can certainly take them up before I enter the order, if

11   necessary.

12             MR. NICHOLAS SMITH:  Well, Your Honor, I think --

13   thank you for that opportunity, but I think it relates to

14   the findings that Your Honor just made on conditions, and I

15   think it would behoove the record to have some interaction

16   on the conditions element, if the Court will allow some just

17   very brief points to be made that are not in the record

18   right now, and we would just appreciate the opportunity to

19   clarify some of the conditions points.

20             THE COURT:  Well, I mean, I don't feel -- let me

21   --

22             What's the Government's view on this?

23             I mean, Mr. Smith, here's just the problem, you

24   know?  I have received, like, you know -- the parties

25   submitted, as you are mentioning, extensive briefing and,

1   even after that, additional video, additional audio even

2   after I had heard argument on the motions.  So I mean, why

3   should I give -- why should I --

4           MR. NICHOLAS SMITH:  Your Honor, this doesn't have

5   to do with new facts.  This is just about conditions that

6   the defendant is willing to offer that bear on the Court's

7   analysis of whether -- so the standard, as the Court pointed

8   out, is whether any conditions would suffice to guarantee

9   appearance.  So Your Honor, we'd just like to quickly just

10  run through a couple of these points.

11          THE COURT:  All right.  Let me just ask, does the

12  Government have any objection to this?

13          MR. MCCULLOUGH:  Your Honor, the -- Your Honor has

14  ruled.  Your Honor has weighed all of the factors in

15  considering whether pretrial detention is necessary to

16  protect the public.  I think Your Honor has described your

17  concerns about whether the defendants would be able to abide

18  by those conditions and has explained your logic and

19  reasoning.  I think that we're about to hear from defendant

20  as to some reason that he disagrees with that analysis and,

21  Your Honor, I don't believe it's appropriate to address

22  that.

23          MR. NICHOLAS SMITH:  Your Honor, just to be clear,

24  I'm -- this is not about raising objections with the Court's

25  analysis.  This is just about just clarifying some of the

1    points about conditions that could potentially work that

2    have not been addressed by the Court yet but would -- it

3    would -- we would be grateful for the opportunity to raise a

4    condition with the Court so that it could be addressed as an

5    offer of proof.

6              THE COURT:  Well, then I have to -- but, see, I

7    guess my point, then, Mr. Smith, is then I have to -- what

8    you're asking me to do is consider a new -- more information

9    about my ruling.  And so, you know, then you're not giving

10   me -- you're not giving the Government the opportunity -- I

11   mean, I'm not saying you're not letting folks respond, but

12   now I'm delaying my ruling further to give the Government an

13   opportunity to respond and to give me an opportunity to

14   think about what you're proffering when, all along, for now

15   quite a while you've had the opportunity to clarify these

16   points before.

17             MR. NICHOLAS SMITH:  Your Honor, I should clarify

18   one more thing which is the Government has given the -- been

19   given the opportunity to respond.  In order to save the

20   Court some time, we reached out to the Government last week

21   and proposed a series of conditions.  The Government

22   actually took a few hours to think about them, came back to

23   me, and I would just like to put on the record, Your Honor,

24   that colloquy which I think is very significant to the

25   Court's ruling.

1          THE COURT:  All right.  That -- you can go ahead

2     and put that on the record.

3          MR. NICHOLAS SMITH:  Okay.  Thank you, Your Honor.

4          So as Your Honor noted, the standard is whether

5     any condition or combination of conditions would suffice to

6     guarantee the safety of the public and the defendant's

7     appearance in court.  And so there are -- your -- the Court

8     addressed the condition of perhaps banning communications

9     between Mr. Nordean and other Proud Boys but indicated that

10    -- the Court's finding that it was not satisfied that the

11    defendants, given the record, would comply.  So Your Honor,

12    we approached the Government last week and offered to --

13    offered the following conditions which I'm going to give to

14    Your Honor very briefly.

15         The first condition is to remove all electronic

16    devices from the phone [sic], including -- the home, excuse

17    me, including all cell phones, all laptops, all computers,

18    everything except a telephone -- a landline telephone that

19    could be used to communicate solely with Mr. Nordean's

20    counsel to preserve his right to counsel.

21         The -- we also proposed as a combination or in a

22    -- or alternatively to restrict whatever discretion the

23    probation officer currently has under the conditions of

24    release to allow Mr. Nordean to leave the home for any

25    reason.  So currently, there's just educational and job and

1    religious opportunities outside the home.  We have proposed

2    restricting every single limitation to leave the home except

3    for medical emergency.

4            We've also offered to allow -- and Your Honor's

5    familiar with this type of condition.  We will offer to

6    allow the probation officer to enter the home without a

7    warrant to investigate at any opportunity the probation

8    officer deems fit to examine whether somehow the ankle

9    bracelet that Mr. Nordean is wearing and that the strict

10   conditions of confinement are being complied with, Your

11   Honor.

12           And I think -- at the point where there's no

13   electronic devices in the home, I think we've eliminated the

14   possibility of using the types of encrypted communications

15   that the Court found suspicious in its finding.

16           Your Honor, we're also willing to post the bond of

17   every dollar that the defendant has raised to support

18   himself.  He -- it's, obviously, very difficult to find work

19   in -- when you're confined to your home, but he's willing to

20   post a bond of about $20,000 which he's using to support his

21   mother and his -- excuse me, his wife and his child.  And,

22   Your Honor, if $20,000 is not sufficient, the defendant is

23   willing to place his home as collateral.  The home is the

24   shelter for his child and his wife.  And Your Honor might

25   respond that the home is normally used as a condition -- a

1    collateral condition for risk of flight; however, the

2    defendant would be willing to post the home as collateral

3    against any breach of the conditions of release the Court is

4    willing to impose.  So for example, to take the Court's

5    example, if Mr. Nordean were to insight a rally or some sort

6    of political violence, despite foreswearing it on a couple

7    of occasions in the public record, his home would be seized.

8    That's the home in which his child lives, Your Honor.

9         So I think these are conditions that don't really

10    rely on the Court's trust in the character of the defendant.

11    These are conditions that would, essentially, bankrupt the

12    defendant and cripple his family, Your Honor, and I think

13    those are conditions that show the defendant is not going to

14    breach any order Your Honor imposes and that -- and with a

15    telephone left to speak to your lawyer and no electronic

16    devices in the home, Your Honor, we asked the Government,

17    Well, at this point, can you explain the good-faith basis

18    for asserting that Mr. Nordean may pose some vague harm that

19    hasn't been articulated yet?  And the Government responded

20    that the spirit of 1776 imbues the defendant, and so there

21    are no conditions of release.  But, Your Honor, I think Your

22    Honor would agree that comments about, sort of -- vague,

23    sort of, political comments don't really address the

24    specific conditions we're offering to impose on Mr. Nordean

25    so that he does not leave the home for any reason or

1          communicate with anyone except for his lawyer.

2                    THE COURT:  Okay.  So Mr. Smith, I'll -- let me

3          just respond this way.

4                    I definitely thought very carefully about the

5          types of conditions that you are proposing here.  And the

6          question is, at what point -- and, in fact, undertook to

7          learn about the -- whatever computer monitoring program

8          there might be -- there is in the Western District of

9          Washington, etcetera.  The problem, I think, is, at the end

10         of the day, given the reasoning I laid out here -- and I'm

11         not going to go over it again -- but given the reason I've

12         laid out here, it's still -- nothing you've said actually

13         prevents -- and I'm not, you know -- prevents an associate

14         from visiting Mr. Nordean or Mr. Biggs in their home and

15         providing them with a smartphone for some period of time.

16                   You make the point -- and I think, you know,

17         you're right -- that there are all sorts of things that you

18         can do, for example, to try to mitigate against that to some

19         degree.  As you've said, you can have the probation -- the

20         Pretrial Services person be able to give spot checks.  You

21         can have a -- but, look, there -- that person is not

22         standing outside Mr. Nordean's door.  We know that.  There

23         is a limit to the resources the government can use to

24         ensuring that he not contact -- that he would comply with a

25         non-contact order.

1          So I thought very clearly about the types of

2     things you're talking about.  And I think on the -- for the

3     reasons I've stated, I don't think they're sufficient.

4          MR. NICHOLAS SMITH:  And, Your Honor, just one

5     follow-up.  Is Your Honor finding that a condition of the

6     collateralized home and a bond would not suffice to ensure

7     compliance?

8          THE COURT:  Well, again, the problem with that is,

9     I have no way of knowing what I don't know.  In other words,

10    Mr. Nordean or Mr. Biggs could engage in all sorts of

11    communications with other people -- it -- as -- for the --

12    in exactly the way I suggested, and there would not be any

13    way for the Court to know that that had happened so -- such

14    that it wouldn't be the risk to him of being caught and then

15    having -- I understand.  That is a -- that would create a

16    risk for him, but it is not some -- I think the problem for

17    me is I don't -- I would not know what I don't know and he

18    could be doing all sorts of things that there would be no

19    way of ever finding out, and so there wouldn't be an obvious

20    -- I mean, it's -- like, as I mentioned, I think it's easy

21    for someone to show up to someone's house with a smartphone

22    these days.  That's the way it -- technology works now

23    and --

24          MR. NICHOLAS SMITH:  Your Honor is -- Your Honor's

25    probably familiar with surveillance options outside the

1     home.  Is that an option that Your Honor would be willing to

2     consider?

3              THE COURT:  I -- look, Mr. Smith, if you want to

4     -- I've thought about a lot of options, but I'm not going to

5     sit here and have you pepper me with, you know, things that

6     you haven't presented before.  The types of things you've

7     talked about, I have considered, and I have ruled here

8     today.  I feel -- I'm going to give the Government until the

9     close of business today to enter that photograph in the

10    record.  And, obviously, the parties are free to seek review

11    of this -- of the order that I'll enter either later today

12    or first thing tomorrow if you see fit.

13             MR. NICHOLAS SMITH:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. HULL:  If I may, Your Honor?  Dan Hull for Joe

16    Biggs, Defendant --

17             THE COURT:  Yes.

18             MR. HULL:  -- No. 2.

19             THE COURT:  Yes, Mr. Hull.

20             MR. HULL:  It pays to be Defendant No. 1 at some

21    point.  I -- as you know, Mr. Biggs was not able to get on

22    the regular Zoom process.  I think he got back on the phone

23    by the conference call --

24             THE COURT:  Okay.

25             MR. HULL:  -- device, but I'm not sure

 1    everything -- that he heard everything.  So if I wanted to,

 2    I couldn't -- I have not enough information.  I haven't been

 3    able to confer with my client about anything that was just

 4    said since Mr. McCullough spoke on the conditions; however,

 5    I do want to thank you for the thoroughness which -- that

 6    you took in this task.  And you have made your ruling.  I

 7    agree with Mr. McCullough.  And while it's not that it was

 8    unexpected, they've not -- I am not sure at this point how

 9    we will proceed.  I can't really do much on this level or

10    any other level until I'm able to talk to Mr. Biggs.  I'm

11    not sure how much Mr. Biggs heard of this today.  I think he

12    heard most of it, but I don't know the parts that he didn't.

13              THE COURT:  And, you know, obviously, there will

14    be a transcript available if -- well, for --

15              MR. HULL:  There will be.

16              THE COURT:  -- to order.  So --

17              MR. HULL:  And thanks, again, for -- thanks --

18    thank you for your efforts on that, sir.  This is novel and

19    difficult.

20              THE COURT:  Well, you're welcome.

21              I guess the question now is -- and, maybe -- what

22    we want to do going forward here with the co-defendants, the

23    possibility of the speedy trial clock and, you know, how the

24    parties want to respond to that ruling.  I'm open to hearing

25    from either side about, sort of, whether we need to build in

1    a little time for the parties to, sort of, assess how they

2    want to go forward.  If that makes sense, I'm happy to give

3    the parties a little breathing space to do that and then to

4    come back and figure out how we want to proceed.

5              I'll just, I guess, turn to Mr. McCullough to

6    start.  But really, this is a, kind of, defendants' call

7    more than the Government's call.

8              MR. MCCULLOUGH:  Yes, Your Honor.  Thank you.

9              I think just first, as a matter of housekeeping,

10   Your Honor had tolled speedy trial up and through April 9th.

11   I think it would be appropriate, based on previous rulings

12   and the record that we had laid at our hearing, to toll the

13   speedy trial through today's date, April 19th, and to do

14   that nunc pro tunc.  So as just a housekeeping matter, we

15   think that that would be appropriate.

16             There -- I'm very happy to, kind of, lay a

17   complete record on the -- how the interests of justice are

18   served by tolling the speedy trial clock here.  And even

19   before doing so, I think the -- frankly, the -- at minimum,

20   it does make sense to get all of our co-defendants on the

21   same track.  And, as I see it, Defendant Rehl is scheduled

22   to have his detention in front -- detention hearing in front

23   of Your Honor on May 3rd which is Monday, May 3rd.

24   Defendant Donohoe is having his hearing before the

25   magistrate judge this afternoon.  So the Government would

1    propose that we continue and toll the time for the speedy

2    trial clock through the -- at least the May 3rd date if not,

3    perhaps, May 5th date to allow time for the defendants to

4    consider this ruling, and also, ensure that we can get all

5    the defendants on the same track.

6          More broadly, Your Honor, I think that this is an

7    unusual and complex case.  It is a conspiracy that is

8    charged.  There are a number of defendants.  There are

9    co-conspirators outside of this charged indictment, as Your

10   Honor knows.  There are a number of agencies that are

11   involved in the investigation.  The volume and sources of

12   evidence, both from witnesses and victims who were present

13   that day as well as the official documents, all of that

14   speaks to, kind of, the unprecedented nature of the volume

15   and complexity of this case.  Certainly, tolling through

16   that period is sensible.  The Government would argue that a

17   -- that it would be appropriate to toll for a period of 60

18   days to allow for continued production of discovery, to

19   allow both the Government and defendants to prepare with

20   respect to that discovery, and to represent their clients

21   accordingly.  But, as I said, I think there's an

22   intermediate ground which would allow the defendants to

23   consider and get us all on the same track and schedule.

24          MR. HULL:  Your Honor --

25          THE COURT:  Mr. --

1          MR. HULL:  -- if I --

2          THE COURT:  Please --

3          MR. Hull:  -- if I may?

4          THE COURT:  -- Mr. Hull.

5          MR. HULL:  I don't want to go out of order, but I

6    would suggest a shorter time until -- at least until about

7    14 or 15 days from now which would be -- and I understand

8    what, you know, Mr. McCullough's saying and I appreciate it,

9    but the -- I was thinking more along the last day of -- say,

10   May 6th or May 7th and, maybe, we can have another idea

11   thrown in there, but I would like it to be a shorter time,

12   especially given what happened today.

13         THE COURT:  Mr. Smith?

14         MR. NICHOLAS SMITH:  I agree with Mr. Hull's

15   sentiments on the Speedy Trial Act timing.

16         But if Your Honor will allow me just to take up

17   one more housekeeping item which is Your Honor proposed a

18   process for moving forward, and we would just note that now

19   that Your Honor's ruled it can take weeks -- sometimes

20   several weeks -- Your Honor is probably familiar with

21   this -- to set up attorney-client calls in jails right now

22   in the country because of the pandemic.  This is going to

23   seriously slow down the process moving forward on every

24   motion.  I can tell you that when Mr. Nordean was in the

25   Seattle SeaTac facility, it was a struggle to get email

1   communications with him, much less attorney-client calls,

2   Your Honor.

3          There's one more item, which is transferring

4   Mr. Nordean to this District.  The Government has

5   represented to us in the past that they will seek his

6   transfer to the D.C. Jail where -- Your Honor -- well, Your

7   Honor was very thorough with putting our supplemental facts

8   into the record, but one additional fact is that there's now

9   been reporting that Capitol defendants have been assaulted,

10  have had their eyes knocked out, and have been beaten up in

11  the D.C. Jail.  That was one reason we thought that finding

12  some kind of conditions with the Government would be

13  appropriate for home confinement.  But, Your Honor, we would

14  ask for a recommendation from the Court that Mr. Nordean

15  remain in Seattle at least temporarily until we can work out

16  how to proceed.

17         THE COURT:  So let me -- okay.  So I think it does

18  make sense to address that issue first.  So let's address

19  the issue.

20         What is the Government's position?

21         I certainly -- again, I suppose, as you point out,

22  Mr. Smith, all I can do is recommend, I think.  And I

23  certainly, you know -- or I suppose I can not request a

24  transfer or not sign a transfer order.

25         Mr. McCullough, what is the Government's position

1    on just -- we'll get to the speedy trial and when we come

2    back and all like that, but this does strike me as a more

3    antecedent matter.  What is the Government's view on that?

4    And how can I -- it, you know -- what's the Government's

5    view on what I should do regarding the placement of these

6    two defendants at this point?

7              MR. MCCULLOUGH:  Well, Your Honor, as you know,

8    the -- that the detention orders have been combined with

9    transfer orders to this District.  I would say that, given

10   some of Mr. Smith's concerns about the ability to confer

11   with defendants particularly while they may be in transit,

12   that it would be appropriate to at least stay or hold off on

13   any transfer order for a time period here to ensure that

14   Mr. Smith and Mr. Hull have an opportunity to have, kind of,

15   continued consultation with their clients as they may be

16   considering appeals and the like, and so --

17             THE COURT:  Mr. McCullough, what did you -- you

18   started by saying that transfer orders and detention orders

19   have been combined?

20             MR. MCCULLOUGH:  I -- my understanding -- the

21   Government -- the -- to date, where we have had a detention

22   order, that has been combined, then, with a transfer order.

23   So someone that is ordered detained is being transferred to

24   the D.C. Jail.  I don't know that the Government has taken a

25   formal position on that.  And so I would want to, basically,

 1     make sure that I'm conferring appropriately, but I do think

 2     that the main consideration here from the Government's

 3     perspective is to ensure that the defendants do have access

 4     to counsel.  And at this, kind of, critical time where they

 5     may be appealing and considering how to proceed, I think

 6     that it's appropriate to at least delay a transfer order to

 7     ensure that that can continue.

 8              THE COURT:  Sure.  And then I would just -- I --

 9     look, I think that makes sense.  And I assume, Mr. Smith and

10     Mr. Hull, you agree.  I -- at least, you know -- we'll talk

11     about when we're going to come back.  But, yes, I think that

12     makes sense and it sounds like something that both

13     defendants would sign on to.

14              MR. HULL:  Yes.

15              THE COURT:  All right.  So let's -- so I will not

16     sign, then, any transfer order pending further consultation

17     with the parties and we'll see how that goes.  I don't know

18     whether -- I guess I don't know what I -- I assume that the

19     defendant would not be automatically transferred here if I

20     don't sign such an order.  But if someone finds out that

21     that's the case and you want to let me know to make sure

22     that I can -- if I need to sign an order to make sure that

23     doesn't happen, then I'm certainly willing to do that,

24     because I think it -- as all the parties have said, it will

25     be easier on everyone if that doesn't happen.

1          MR. NICHOLAS SMITH:  And, Your Honor, one way of

2     resolving this problem because of the conflation of the

3     detention order and the transfer is to -- is a stay -- is a

4     temporary stay on detention so that the defendants can

5     decide when and whether to appeal.  And, you know, we can

6     talk about how long that might be, but that could be one

7     efficient way of resolving this.  I --

8          THE COURT:  Mr. Smith, I appreciate that, and you

9     represent your client well.  I don't think -- given what I

10    have found here, I don't think a stay of that is

11    appropriate.  I don't think a stay of that is appropriate.

12    But I won't enter a transfer order.  And if anyone here

13    thinks -- I'll certainly reach out to try to see what I can

14    find out about this, but if any party -- the Government or

15    counsel -- finds out -- if I need to do something to make

16    sure, at least temporarily, your client stays at the --

17    where -- in the location he's at, just let -- contact

18    chambers jointly and we'll work through it.

19          Mr. McCullough?

20          MR. MCCULLOUGH:  Yes, Your Honor.  And the

21    Government will reach out to the U.S. Marshals Service and

22    confirm what we need to do to ensure that this takes place

23    and is held.  And just for the record, the Government

24    opposes the stay of the detention order.

25          THE COURT:  I thought you would, but I oppose it,

 1     too.

 2              All right.  So I agree, then, again, consistent

 3     with that, let's try to figure out, you know -- I think --

 4     we do have the motion hearing for Co-Defendant Rehl on the

 5     3rd.  Just trying to do this, I -- what about -- and I

 6     want -- I also want to come back, you know, as quickly as we

 7     can here.  So I'm looking -- I guess I would have to find

 8     out, you know -- the question is going to be whether we can

 9     --

10              Ms. Harris, what is the challenge going to be in

11     terms of getting our defendants who will be detained in --

12     maybe, detained in other, you know -- in other jurisdictions

13     at that point?  Is it just -- I mean, there's no way to know

14     whether we'll have lines available into those facilities at

15     this point; is that fair to say?

16              THE DEPUTY CLERK:  That's --

17              THE COURT:  We just --

18              THE DEPUTY CLERK:  -- fair to say.

19              THE COURT:  We'll try to make it work and we'll

20     see.

21              THE DEPUTY CLERK:  Yeah, that's fair to say.  It's

22     going -- it's probably going to be a big challenge.  You

23     have four defendants in four different facilities and every

24     facility has different platforms that they use, and also,

25     various times.  So it's going to be a challenge, but --

1          THE COURT:  Well, at a minimum, we can -- they

2     don't have to -- especially -- well, for these two

3     defendants who are not proceeding with a substantive motion

4     or an arraignment, I think we can do it by audio.  They

5     could call in and just appear by audio, if we need to do

6     that.  It would strike me that that at least obviates the

7     issue of different video platforms.

8          All right.  So what about the 4th as a day that --

9     for us to -- two weeks from tomorrow -- we can pick a time,

10    you know -- 2:00 o'clock in the afternoon as a day when we

11    can all huddle up?  We'll know what, if any, action the

12    defendants might take to appeal my ruling today.  We'll know

13    -- I don't know -- how the landscape of the litigation has

14    changed in a relatively short period of time.  What does the

15    -- it's a day after the Rehl motion hearing.  So again,

16    presumably we could -- we can get them to appear the next

17    day.  We could --

18          THE DEPUTY CLERK:  Judge Kelly --

19          THE COURT:  Yes?

20          THE DEPUTY CLERK:  -- I don't know if you recall,

21    but Tuesday the 4th was not available in the afternoon at

22    the facility where Mr. Rehl is being held, because we were

23    originally going to have that on the 4th, but we had to

24    change it to the 3rd because they don't have a slot in the

25    afternoon.

1          THE COURT:  But could he appear via audio, though?

2          THE DEPUTY CLERK:  No, they don't do any

3     hearings -- the only hearings they have is in the morning.

4     And I have to check with them to see if they could even do

5     audio in the morning.

6          THE COURT:  Okay.  Well, so then -- okay.  Maybe

7     as late as -- just looking at what I have on the 4th --

8     11:30 on that day, perhaps.

9          THE DEPUTY CLERK:  I would have to check with her

10    and see.

11         THE COURT:  Okay.  I mean, all we can do is make

12    an effort here.

13         But how's that for the Government?

14         MR. MCCULLOUGH:  That time works for the

15    Government, Your Honor.  Thank you.

16         THE COURT:  And, Mr. Hull and Mr. Smith?

17         MR. HULL:  Your Honor, that's 11:30 on Tuesday,

18    May 4th?

19         THE COURT:  Tuesday, the 4th.  I think that was

20    the date you suggested, Mr. Hull.

21         MR. HULL:  It was very close.

22         THE COURT:  Please.

23         MR. HULL:  And just for the record, I join in

24    Mr. Smith's motion for a temporary stay.

25         THE COURT:  All right.  I've denied the motion,

1    but okay.

2              MR. NICHOLAS SMITH:  And the 4th works for the --

3    Mr. Nordean, Your Honor, as well.  The 4th at 11:30.  Yes.

4              THE COURT:  Okay.  It does work for you.  Okay.

5              All right.  So given that we're having that short

6    a turnaround, what is -- what are the defendants' positions

7    on Speedy Trial Act for the next two weeks?

8              MR. NICHOLAS SMITH:  Your Honor, we have no

9    objection to tolling through today to accommodate the Court

10   and, you know, through the 4th, as well.  We think that's

11   reasonable.

12             THE COURT:  All right.  Well, thank you,

13   Mr. Smith.  I mean, I think, at the end of the day --

14             Well, Mr. Hull --

15             MR. HULL:  Through the 4th, Your Honor.  Yes, sir.

16             THE COURT:  All right.  Yeah.  I mean, look, we're

17   going to take this one step at a time and see how things go.

18   Obviously, I'm, you know -- I'm sensitive now to the status

19   the defendants are in and so, you know, we'll take it one

20   step at a time.

21             So based on the representations Mr. McCullough has

22   made and the agreement of the two defendants, I will go

23   ahead and find that the time between -- well, nunc pro tunc

24   to the 9th and then going forward until May 4th that the

25   speedy trial between those two dates, April 9th and May 4th,

1    is excludable under the Speedy Trial Act because the ends of

2    justice that are served by taking such action outweigh the

3    best interests of the public and the defendant [sic] in a

4    speedy trial.  I'm doing so here, again, with the consent of

5    both defendants and in light of the extraordinary complexity

6    and extraordinary volume of discovery that is being produced

7    to toll the Speedy Trial Act from the 9th until May 4th.

8            All right.  Is there anything further that either

9    side thinks I need to address today?

10           Mr. McCullough?

11           MR. MCCULLOUGH:  Your Honor, the parties have been

12   in touch about the proposed protective order, and I do want

13   to revisit that with Mr. -- unless Mr. Smith will tell me

14   right now, I think we want to revisit that with Mr. Smith,

15   who I understand was going to reconsider that given whatever

16   the detention result was, but I believe that we had made

17   some progress on agreeing on a protective order with all of

18   the defendants.

19           THE COURT:  All right.  I -- remind me.  So in

20   this case -- at the moment at this case, we do not have a

21   protective order in place?

22           MR. MCCULLOUGH:  That is correct, Your Honor.

23           THE COURT:  Yeah.  So -- okay.  Obviously, that's

24   -- you all don't need me to tell you that that should be a

25   priority.

1          MR. NICHOLAS SMITH:  Your Honor, one of the issues

2     here on the protective order is that there's a provision in

3     the standard order that says that when the Government

4     designates material as highly sensitive, normally, the

5     procedure is that the defendant cannot look at it outside of

6     the presence of the lawyer.  There's a provision that's

7     supposed to accommodate detained defendants that it uses

8     cloud services that will allow, in theory, the defendant to

9     look at the sensitive materials but not to copy them, but

10    we're just not sure what the -- Your Honor knows that every

11    federal facility's a little bit different and they have

12    their own rules and quirks, and so we're not even -- we're

13    not sure whether Mr. Nordean will have access to a

14    cloud-based server.  So that's one issue with that.

15         THE COURT:  All right.  So obviously, that's, you

16    know -- that's something for the parties to look into.  And,

17    again, you don't have to wait until two weeks from tomorrow

18    if you, you know -- obviously, you all know where to find

19    me.

20         MR. MCCULLOUGH:  Thank you, Your Honor.

21         THE COURT:  All right.  Very well.  So if there's

22    nothing further, then, the parties are dismissed until May

23    --

24         MR. HULL:  If I may, Your Honor?  I -- just a --

25         THE COURT:  Oh, I'm sorry.

```
 1              MR. HULL:  -- clarification.  I --

 2              THE COURT:  Sure.

 3              MR. HULL:  No, I apologize.  I meant to barge in

 4    earlier, but a clarification without burdening the Court or

 5    the court reporter, Mr. Miller.  Can you reiterate, again,

 6    your sense of the timing in your order for transfer to the

 7    U.S. Marshals.  How did you phrase that?  I mean, what was

 8    your idea?  Give me a little bit --

 9              THE COURT:  So --

10              MR. HULL:  -- more of a sense of that.

11              THE COURT:  Yes.  Yes.  I -- what I think I'll --

12    I mean, and I -- I'll -- what my intention is, is to just

13    simply say that they should report to the U.S. Marshals as

14    directed by Pretrial Services.  I think that's an

15    appropriate language.

16              MR. HULL:  Thank you.  Thank you, Your Honor.

17              THE COURT:  All right.  Very well.

18              All right.  We'll see everyone on May 4th.  Until

19    then, the parties --

20              MR. NICHOLAS SMITH:  March 4th.

21              THE COURT:  I'm sorry.  What did I say?

22              MR. NICHOLAS SMITH:  May.  I think you said May

23    4th, but I -- Your Honor meant March 4th.

24              THE COURT:  No, I meant May 4th.

25              MR. NICHOLAS SMITH:  Oh, excuse me.
```

1          (Laughter.)

2          There's been a lot of hearings.

3          THE COURT:  We already --

4          MR. SMITH:  There's been a few hearings here.

5          THE COURT:  We already did March, Mr. Smith.

6          All right.  So with that, we'll see everyone May

7    4th.  The parties are dismissed.

8          MR. MCCULLOUGH:  Thank you, Your Honor.

9          (Proceedings concluded at 2:13 p.m.)

10                 * * * * * * * * * * * *

11              **CERTIFICATE OF OFFICIAL COURT REPORTER**

12   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

13   **that the above and foregoing constitutes a true and accurate**

14   **transcript of my stenographic notes and is a full, true and**

15   **complete transcript of the proceedings to the best of my**

16   **ability, dated this 23rd day of April 2021.**

17                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                            **Official Court Reporter**
18                          **United States Courthouse**
                            **Room 6722**
19                          **333 Constitution Avenue, NW**
                            **Washington, DC 20001**

20

21

22

23

24

25