**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-175-1 (TJK)** |
| | : | |
| **ETHAN NORDEAN** | : | |
| also known as "Rufio Panman," | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT NORDEAN'S**
**MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT**

Mere hours after he opposed the tolling of the Speedy Trial Act, defendant Ethan Nordean ("Nordean" or "Defendant") filed a nearly 60-page motion to dismiss the first superseding indictment (hereinafter, "indictment"),[1] alleging that the indictment is flawed because it rests upon inaccurate interpretations of the relevant statutes, and because it violates "several" constitutional provisions.[2]  The Defendant posits that during his "nonviolent protest of acts of Congress" on January 6, 2021, Defendant committed none of the crimes charged. In support of his arguments, Defendant breezes past the plain language of the statutes at issue and marshals case law to address issues that are simply not present in this case.

Defendant first argues that his unlawful invasion of the United States Capitol on the day of a Joint Session of Congress, as alleged in Counts 1 and 2, does not amount to obstruction of an

---

[1]     All references to the indictment, herein, are to the first superseding indictment (ECF No. 26), filed March 10, 2021.

[2]     All citations to Defendant's motion ("Mot.") are to ECF No. 94, and the page number citations are to the page numbers at the bottom of the page, rather than the page numbers in blue at the top.

official proceeding in violation of 18 U.S.C. § 1512(c)(2). In support of this argument, Defendant alleges that Congress's certification of the Electoral College vote on January 6, 2021, does not constitute an "official proceeding" for the purposes of 18 U.S.C. § 1512(c)(2), that this statute is "void for vagueness" when applied to address Defendant's mere act of "political speech, assembly, and petition of the government for a redress of grievances," and that this statute, as applied to him, violates the First Amendment. Defendant is wrong on all accounts. As discussed below, the certification of the Electoral College vote is in fact a "proceeding before the Congress," and Defendant did act corruptly to obstruct the proceeding. Defendant's actions are prohibited by the obstruction statute, and they are not protected First Amendment speech.

Defendant then argues that the government's application of 18 U.S.C. § 231(a)(3) to his conduct, as alleged in Court 3, lacks a sufficient nexus to interstate commerce. Here again, Defendant has it wrong. Federal jurisdiction is established by Congress's power to regulate the conduct or performance of a federally protected function, *i.e.,* proceedings at the Capitol, the very seat of the U.S. Government. The government need not rely, and has not relied, upon interstate commerce to establish federal jurisdiction. As with his obstruction argument, Defendant again argues vagueness – specifically that the statute provided "inadequate notice" and that he is being subject to "discriminatory enforcement" under a vague statute. Defendant's argument is difficult to reconcile with his conduct on January 6, when he intentionally interfered with law enforcement's efforts to stop the crowd *en route* to his invasion of the Capitol and then bragged about it on social media (*e.g.*, ". . . if you feel bad for the police, you are part of the problem. They care more about federal property (our property) than protecting and serving the people.").

2

Defendant further argues that the government's application of 18 U.S.C. § 1752 criminalizes only the unlawful entry into areas protected by the United States Secret Service ("USSS"), and that the breach of the Capitol alleged against Defendant in Counts 5 and 6 must be dismissed because USSS did not establish a "restricted" area for purposes of the statute. But here again, Defendant ignores the fact that the statute does not require formal action by the USSS. The statute operates to ensure the safety of USSS protectees, *e.g.*, the Vice President. The Capitol was a restricted area on January 6, with signs prominently posted and law enforcement deployed. Multiple USSS protectees, including the direct line of succession to the President of the United States, were present during the attack. The statute plainly applies here.

Finally, Defendant argues, as he has already done in his Motion for a Bill of Particulars (ECF 88), that the indictment's "boilerplate January 6 allegations" are not specific enough to provide him with full notice of the allegations against him, that these charges therefore violate his constitutional right to presentment before the grand jury, and that the indictment should therefore be dismissed. Contrary to Defendant's claims, the indictment sets forth the alleged conspiracy in detail and provides a clear and concise statement of the offenses charged that is more than sufficient to withstand Defendant's challenge to its sufficiency.

For the reasons set forth below, the Court should deny Defendant's motion to dismiss the indictment.

## Procedural History

On February 2, 2021, Defendant was charged in a criminal complaint, supported by a 20-page affidavit, for offenses related to the January 6, 2021, attack on the U.S. Capitol. He was first indicted on March 3, 2021. On March 10, 2021, he and three co-defendants were charged in the

18-page first superseding indictment with conspiracy and other offenses. The indictment sets forth the alleged conspiracy in detail, identifying the conspirators' manner and means, asserting dozens of specific overt acts, and providing a clear and concise statement of the offenses charged.[3]

Specifically, the indictment charges defendant Nordean and codefendants Joseph Biggs, Zachary Rehl and Charles Donohoe with one count of conspiracy (18 U.S.C. § 371); one count of obstruction of an official proceeding (and aiding and abetting the same) (18 U.S.C. §§ 15212(c)(2), 2); one count of obstruction of law enforcement during a civil disorder (and aiding and abetting the same) (18 U.S.C. §§ 231(a)(3), 2); one count of destruction of government property (and aiding and abetting the same), in an amount in excess of $1,000 (18 U.S.C. §§ 1361, 2); one count of entering and remaining in a restricting building or grounds (18 U.S.C. § 1752(a)(1)); and one count of disorderly conduct in a restricted building or ground (18 U.S.C. § 1751(a)(2)) (ECF No. 26).

## Statement of Facts

The government hereby incorporates the allegations set forth in the indictment. As alleged in the indictment:

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building ("the Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election ("the Electoral College vote"). ¶ 4. The Capitol is secured 24 hours a day by United States Capitol Police

---

[3]     In addition to the detailed indictment, the parties have engaged in extensive litigation regarding detention—in the district of defendant's arrest, before the Chief Judge in this district, before this Court, and before the D.C. Circuit. This litigation has involved extensive briefing and several hours of oral argument regarding the nature and circumstances of the offenses charged, the conduct at issue, and the weight of the evidence against Defendant.

("Capitol Police") and permanent and temporary barriers that restrict access to the Capitol grounds and building. *Id.* at ¶ 13. On January 6, 2021, only authorized individuals with appropriate identification were allowed on the Capitol grounds or inside the Capitol. *Id.* The First Street pedestrian entrance was guarded by Capitol Police. *Id.* at ¶ 15. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board." *Id.*

At 1:00 p.m., the Joint Session convened in the Capitol to certify the Electoral College vote. Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session. Id. at ¶ 17. At 2:20 p.m., members of the House and Senate (including Vice President Pence)—who had withdrawn to separate chambers to resolve an objection—were evacuated from their respective chambers as the result of rioters' breach of the Capitol. *Id.* at ¶ 21. The Joint Session was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol building and grounds of the unlawful occupants. *Id.* It took hours for law enforcement to regain control of the Capitol building and grounds. *Id.* at ¶ 22. At approximately 8:00 p.m., the Joint Session reconvened, presided over by Vice President Pence, who had remained within the Capitol building in a secure location throughout the disruption of the proceeding. *Id.*

From as early as November 3, 2020, through January 6, 2021, in the District of Columbia and elsewhere, the defendants, did knowingly combine, conspire, confederate, and agree with each other and others known and unknown, to commit offenses against the United States, namely, (1) to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote, and to attempt to do so, in violation of Title 18, United States Code,

Section 1512(c)(2), and (2) to obstruct, impede, and interfere with law enforcement officers engaged in the lawful performance of official duties incident to and during the commission of a civil disorder, in violation of Title 18, United States Code, Section 231(a)(3). *Id.* at ¶ 26.

On November 16, 2020, Defendant posted on social media "What's more disturbing to me than the Dems trying to steal this election, is how many people . . . just accepted Biden won, despite the obvious corruption... Luke warm Patriots are dangerous." *Id.* at ¶ 32. On November 27, 2020, Defendant posted on social media

> "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. *Id.* We will grow like the flame that fuels us and spread like love that guides us. We are unstoppable, unrelenting and now . . .unforgiving. Good luck to all you traitors of this country we so deeply love . . . you're going to need it."

*Id.* at ¶ 34. On December 19, 2020, plans were announced for a Stop the Steal protest event in Washington, D.C. on January 6, 2021, which protest would coincide with Congress's certification of the Electoral College vote. *Id.* at ¶ 11. On December 29, 2020, the national chairman of the Proud Boys ("Proud Boys Chairman") posted a message on social media that read, in part, that the Proud Boys planned to "turn out in record numbers on Jan 6th but this time with a twist . . . .  We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows . . . we might dress in all BLACK for the occasion." *Id.* at ¶ 12. At different times, Nordean and his co-defendants reiterated that Proud Boys members should avoid wearing Proud Boys colors on January 6, 2021. *Id.*

On January 5, 2021, at 1:23 p.m., a new encrypted messaging channel entitled "Boots on the Ground" was created for communications by Proud Boys members in Washington, D.C. In

total, over sixty users participated in the Boots on the Ground channel, including Nordean, his co-defendants, and Unindicted Co-Conspirator 1 ("UCC-1"). *Id.* at ¶ 42. Shortly after the channel's creation, Biggs posted a message to the channel that read: "We are trying to avoid getting into any shit tonight. Tomorrow's the day" and then "I'm here with [Nordean] and a good group[.]" *Id.* Later that evening, Biggs posted a message to Boots on the Ground channel that read, "Just trying to get our numbers. So we can plan accordingly for tonight and go over tomorrow's plan." *Id.* at ¶ 43.

At 9:17 p.m., Biggs posted a message in a separate Telegram message group that read, "We just had a meeting woth [sic] a lot of guys. Info should be coming out" and then posted "Just spoke with [first name of Proud Boys Chairman.]" *Id.* at 48. At approximately 9:20 p.m., Biggs posted a message that read, "We have a plan. I'm with rufio." *Id.* Donohoe responded, "What's the plan so I can pass it to the MOSD guys." *Id.* Biggs responded, "I gave [first name of Proud Boys Chairman] a plan. The one I told the guys and he said he had one." *Id.* At 6:37 a.m. on January 6, 2021, Donohoe posted a message that asked, "Are we gonna do a commanders briefing before the 10 a.m.?" *Id.* at ¶ 49.

On January 6, 2021, at 10:00 a.m., a group of Proud Boys members gathered near the Washington Monument. *Id.* at ¶ 51. Shortly after 10:00 a.m., Nordean, Biggs, and Rehl led the group, which included Donohoe, to the east side of the Capitol. *Id.* at ¶ 52. Consistent with the directive issued by Proud Boys Chairman, Nordean, Biggs, Rehl, Donohoe, and others, the group of men standing with Nordean, Biggs, Rehl, and Donohoe were not wearing Proud Boys colors of black and yellow. *Id.* at ¶ 53. Several of the men in the group, including Biggs and Rehl, were

holding walkie-talkie style communication devices. *Id.* At different times, Nordean and Biggs carried and used a bullhorn to direct the group. *Id.*

Shortly before 12:53 p.m., Nordean, Biggs, and Rehl led the group, which included Donohoe, to the First Street pedestrian entrance, which was secured by a small number of Capitol Police who were standing behind waist height metal barriers. *Id.* at ¶ 54. Prominent signs posted on metal barriers at the pedestrian entrance and other locations stated, "AREA CLOSED By order of the United States Capitol Police Board." *Id.* at ¶ 15.

Shortly after 12:53 p.m., Nordean, Biggs, Rehl, and Donohoe charged toward the Capitol by crossing over the barriers that had been violently disassembled and trampled by the crowd moments before Nordean, Biggs, Rehl, and Donohoe advanced. *Id.* at ¶ 55. As these events unfolded, messages were posted to encrypted messaging boards used by Nordean, Biggs, Rehl, and Donohoe that people were "storming" the Capitol. *Id.* at ¶ 56.

Outside the Capitol, between 12:53 and 2:00 p.m., law enforcement struggled to maintain control of the growing crowd, which included Nordean, Biggs, Rehl, and Donohoe. *Id.* at ¶ 18. As described herein, crowd members eventually forced their way through, up, and over additional Capitol Police barricades and advanced to the building's exterior façade. *Id.* at ¶ 19. During this time, Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building—the doors and windows of the Capitol building were at that time locked or otherwise secured. *Id.*

Upon entering Capitol grounds, Nordean, Biggs, Rehl, and Donohoe advanced toward the west plaza of the Capitol where additional metal barricades and law enforcement were deployed to protect the Capitol and its occupants from the advancing crowd. *Id.* at ¶ 57. While standing next

to one another, Nordean and Biggs shook a metal barricade until they and others in the crowd were able to knock it down. *Id.* at ¶ 58. The crowd, including Nordean, Biggs, Rehl, and Donohoe, advanced past the trampled barrier. *Id.*

Upon arriving at the west plaza, Nordean, Biggs, and Rehl positioned themselves at or near the front of the crowd. *Id.* at ¶ 59. Upon arriving at the police line, Biggs took a video in which he announced, "we've just taken the Capitol." *Id.* Nordean paced at the edge of the line of law enforcement while the group that he had led to the First Street gate spread out in the west plaza of the Capitol. *Id.* at ¶ 60. Around 2:00 p.m., Donohoe assisted the crowd's effort to advance up a flight of stairs toward the Capitol. *Id.* at ¶ 61. The crowd overwhelmed law enforcement who were attempting to stop the crowd from advancing. *Id.*

At 2:13 p.m., Proud Boys member and co-conspirator, Dominic Pezzola, used a riot shield at 2:13 p.m. to break a window that allowed rioters to enter the building and force open an adjacent door from the inside. *Id.* at ¶ 62. Biggs entered the Capitol through the door on the northwest side. *Id.* At 2:19 p.m., a member of the Boots on the Ground channel posted, "We just stormed the capitol." *Id.* As noted herein, *supra*, around this time members of the House and Senate (including Vice President Pence) were evacuated and the proceedings were halted. *Id.* at ¶ 21.

Biggs subsequently exited the Capitol, and Biggs and several Proud Boys posed for a picture at the top of the steps on the east side of the Capitol. *Id.* at ¶ 63. Thirty minutes after first entering the Capitol on the west side, Biggs at two other members of the Proud Boys, among others, forcibly re-entered the Capitol through the Columbus Doors on the east side of the Capitol, pushing past at least one law enforcement officer. *Id.* at ¶ 64. After re-entering the Capitol by force, Biggs and another member of the Proud Boys traveled to the Senate chamber, which had been

9

evacuated. *Id.* at ¶¶ 21, 65. Nordean entered and remained in the Capitol, including in the Rotunda, before exiting the Capitol with another member of the Proud Boys. *Id.* at ¶ 66. Rehl entered the Capitol at approximately 2:53 p.m. through the same door first entered by Biggs on the west side of the building. *Id.* at ¶ 67. At 3:38 p.m., as some rioters were leaving the Capitol, Donohoe announced on the Boots on the Ground channel, "[w]e are regrouping with a second force." *Id.* at ¶ 68.

In the course of these events, approximately 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted. *Id.* at ¶ 23. The Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by Capitol Police officers trying to restore order. *Id.* Additionally, many media members were assaulted and had cameras and other news-gathering equipment destroyed. *Id.*

Nordean, Biggs, Rehl and Donohoe celebrated the events of the January 6, 2021, through communications on social media and in encrypted chat messages. *Id.* at ¶ 24. Nordean posted a message on social media that included a picture of a United States Capitol Police Officer administering pepper spray on January 6, 2021, with a caption that read, in part, ". . . if you feel bad for the police, you are part of the problem. They care more about federal property (our property) than protecting and serving the people. BACK THE BLACK AND YELLOW". *Id.* Biggs posted a message on social media that read "what a day". *Id.* Rehl posted a message that read, in part, "I'm proud as fuck what we accomplished yesterday, but we need to start planning

and we are starting planning, for a Biden presidency." *Id.* Donohoe posted a message that read, in part, "We stormed the capitol unarmed" and then "And we took it over unarmed." *Id.*

Through the actions summarized herein, the grand jury returned a six-count indictment, which charged that Nordean and his co-defendants had:

1. knowingly combined, conspired, confederated, and agreed with each other and others known and unknown, to commit offenses against the United States, namely, (1) to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote, and to attempt to do so, in violation of Title 18, United States Code, Section 1512(c)(2), and (2) to obstruct, impede, and interfere with law enforcement officers engaged in the lawful performance of official duties incident to and during the commission of a civil disorder, in violation of Title 18, United States Code, Section 231(a)(3) (Count One);

2. unlawfully entered the Capitol grounds or the Capitol building to, and did, stop, delay, and hinder Congress's certification of the Electoral College vote (Count Two);

3. committed and attempted to commit an act to obstruct, impede, and interfere with law enforcement officers lawfully engaged in official duties incident to and during the commission of a civil disorder, and did aid and abet others known and unknown to do the same, and the civil disorder obstructed, delayed, and adversely affected the conduct and performance of a federally protected function (Count Three);

4. willfully injured and committed depredation against property of the United States and aided and abetted others known and unknown to forcibly enter the Capitol and thereby caused damage to the building in an amount more than $1,000 (Count Four);

5. unlawfully and knowingly entered and remained in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-Elect were temporarily visiting, without lawful authority to do so (Count Five); and

6. knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engaged in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-Elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions (Count Six).

## **Legal Standard**

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial.   *See* Fed. R. Crim. P. 12(b)(3)(B)(v).   "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged. *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).   The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.   *Id.*   An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed."   *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and

definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

## **ARGUMENT**

### I.       **The Obstruction Counts Are Legally Sound and Firmly Established by the Allegations in the Indictment.**

Defendant advances two principal arguments in support of his motion to dismiss Counts 1 and 2 (18 U.S.C. § 1512(c)(2)). First, Defendant seeks to have this Court find that Congress's certification of the Electoral College—a Joint Session of Congress mandated by the Constitution—does not qualify as an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). Second, Defendant suggests that there is something Constitutionally infirm about Congress's use of the term "corruptly" when applied to Defendant's unlawful efforts to obstruct, influence, and impede Congress's certification of the vote on January 6, 2021. These arguments are then rebranded and recycled and advanced by Defendant through various legal theories. All fail here because the statute plainly prohibits the unlawful acts taken by Defendant with the intent to obstruct a Congressional proceeding.

Contrary to Defendant's arguments, Congress's certification of the Electoral College vote as set out in the Constitution and federal statute is undeniably a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). As required by the United States Code, a Joint Session of Congress is to convene and may not be "dissolved" until a "result [is] declared"—the certification of the Presidential election. 3 U.S.C. §§ 15-16. This solemn process, mandated by the Constitution, requires no further formalism to be considered an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal review within

the Bureau of Prisons was an "official proceeding" because the review panel followed formal procedures).

Likewise, the statute's use of "corruptly" establishes the required culpability. That is, the action to "obstruct[], influence[], or impede[]" Congress must be taken with a wrongful, immoral, depraved, or evil purpose. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) ("[C]orruptly" is "normally associated with wrongful, immoral, depraved, or evil"). Here, Defendant's wrongful—indeed, independently unlawful—actions to impede the Congressional proceeding are self-evident. As set forth in the indictment, Defendant's unlawful advance onto Capitol grounds past law enforcement and into the Capitol building violated multiple federal criminal laws. These corrupt actions, taken by Defendant and his co-conspirators with the intent to obstruct, influence, and impede the certification of a Presidential Election, establish Defendant's criminal culpability.

### A.  Background.

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of Senate, "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."  U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors."  3 U.S.C. § 15.  Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the

floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which Defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A)   a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B)   *a proceeding before the Congress*;
>
> (C)   a proceeding before a Federal Government agency which is authorized by law; or
>
> (D)   a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

**B.  The term "official proceeding" is not limited to investigative proceedings before a tribunal.**

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2).  This conclusion flows principally from the obstruction statute's plain text.  Skipping past the text, Defendant argues that Congress's intent and other language in the obstruction statute import a "quasi-judicial" requirement into the term "official proceeding."  That argument is incorrect, but even if it were correct, the Electoral College vote certification—with its extensive formal procedures—satisfies any such requirements.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding."  *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).   The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting Proceeding, Oxford English Dictionary, available at http://www.oed.com).  Here, the Constitution and the U.S. Code combine to set forth a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified. U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII; 3 U.S.C. § 15 *et seq*. These extensive formal procedures—for the most solemn acts in our democracy—firmly establish that Congress is engaged in an "official proceeding."  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal

16

government agencies, and proceedings "involving the business of insurance."   18 U.S.C. § 1515(a)(1); see S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by Defendant—courts analyze the degree of formality involved in an investigation.  *See, e.g., United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *Perez*, 575 F.3d at 169 (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term "contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)");

*see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "formal investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505).[4]

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 p.m. on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors

---

[4] At 4:34 p.m. today, Defendant Joseph Randall Biggs filed a motion to join Defendant Nordean's Motion to Dismiss. (ECF 105). Defendant Biggs cites four cases that he suggests "are helpful to this Court's interpretation" of "official proceeding." Indeed, they are "helpful," but not in the manner likely intended by Biggs. All four of the cases underscore the conclusion that the Joint Session of Congress on January 6—with its "formal" procedures established *in the Constitution and the United States Code* and its solemn responsibility to declare a result of nothing less than the Presidency of the United States—"fits comfortably" within the statute as an "official proceeding." *Perez*, 575 F.3d at 169 ("Because the review panel must 'determine' if there has been a violation of BOP policy, must make 'findings,' and may 'decide' to refer the matter to senior departmental authorities, its work is sufficiently formal to satisfy the 'official proceeding' element of subsection 1512(c)(1).") A Joint Session of Congress presided over by the Vice President to declare the result of the Presidential Election simply cannot be equated with an "internal informal investigation, in its most preliminary stages, of employee violations of an agency policy" (*United States v. Ramos*, 537 F.3d 439, 463 (5th Cir. 2008) or a "preliminary investigation" (*i.e.*, not a "formal investigation") by the Securities and Exchange Commission where investigators conducted a telephone call with the defendant in which they "chose to give their conversations with [d]efendant a far more casual appearance" (*United States v. Binette*, 828 F.Supp.2d 402, 404 (D. Mass. 2011). Defendant Biggs' suggestion that the Joint Session lacks the requisite "formality" because of some missing component finds no support in the cases. Indeed, Congress's certification of the Electoral College is among the most "formal" of proceedings contemplated in the Constitution.

throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id*.  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."  *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared."  *Id*.  In short, the certification of the Electoral College vote is a "proceeding before the Congress."  *See* 18 U.S.C. § 1515(a)(1)(B).

Other textual features do not alter that straightforward reading.  Defendant argues (Mot. at 21 - 23) that the adjective "official" and the preposition "before" limits the definitions in Section 1515(a)(1) to "quasi-judicial" proceedings.  As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of Congress.  Moreover, whatever the merits of Defendant's argument for other provisions in Section 1515(a)(1), such arguments find no textual support when applied to Section 1515(a)(1)(B), which speaks plainly and broadly of "a proceeding before the Congress."  Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal

department or agency. And to the extent that "before" refers to "some formal convocation of the agency in which parties are directed to appear," *see United States v. Young*, 916 F.3d 368, 384 (4th Cir.) (internal quotation marks omitted), *cert. denied*,  140 S. Ct. 113 (2019), the certification of the Electoral College vote involves a "formal convocation" of Congress to assess the Electoral College vote and "declare[]" the "result" of the presidential election, 3 U.S.C. § 16. In any event, there is simply no requirement in the statute that the proceeding mirror a court proceeding. *See Perez*, 575 F.3d at 169 (finding the existence of an "official proceeding" notwithstanding the lack of witnesses or a final adjudication).

Defendant's attempt to equate obstruction of Special Agents of the FBI during a routine investigation (*see Ermoian*, 752 F.3d 1165) with the Constitutionally-mandated, formal procedures for a Joint Session of Congress to determine the outcome of a Presidential Election is misguided. Courts interpreting the statute's reach look first to the plain language of the statute. To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (*quoting Moskal v. United States*, 498 U.S. 103, 108 (1990)).  In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, a proceeding before the Congress.  Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). Defendant offers no rationale for breezing past the statute's plain text for other interpretive tools. More importantly, Defendant's unduly narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—in essence, importing an extra-textual "quasi-judicial" requirement— would undercut the broad statute that Congress enacted.  The certification of the Electoral College

vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426. Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them.

### C. Section 1512 is not vague.

A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir. 1996). The statute at issue here is neither.

Defendant first argues that there is "no notice, much less fair notice," that section 1512(c)(2) can be applied outside the context of interfering with a proceeding that resembles a legal tribunal. (Mot. at 25). In support of this assertion, Defendant states baldly that 1512(c) has "never been used to prosecute a defendant for [] obstruction … unrelated to the administration of justice. *Id.* Indeed, as discussed herein, the touchstone is the formality of the proceeding, not the procedural or structural format. For Defendant to suggest that there was no "fair notice" that "a proceeding before the Congress" (as defined in 18 U.S.C. § 1515(a)(1)(B)) included a Joint Session with statutorily-required formal procedures simply cannot be credited. Simply because Section 1512(c)(2) has never been applied to the unprecedently brazen attack that Defendant and others carried out on the Capitol does not mean that a "person of ordinary intelligence" would fail to

understand that a statute prohibiting impeding or obstructing congressional proceedings encompassed such conduct.

Relying on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), Defendant also argues that the term "corruptly" as used in 18 U.S.C. 1512(c)(2) is unconstitutionally vague because it invites "arbitrary and discriminatory law enforcement." (Mot. at 27). That claim fails for various reasons.  First, the court in *Poindexter* did not hold the term was vague *per se*; instead, it concluded the term was vague as applied to Poindexter's conduct of making false statements to Congress.  *See* 951 F.2d at 378-80.  Second, *Poindexter*'s analysis was confined to 18 U.S.C. § 1505, and other courts have "decline[d] to extend *Poindexter* to another section of the obstruction-of-justice statutes." *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998); *see also United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (rejecting vagueness challenge to "corruptly" under 18 U.S.C. § 1512(b) premised on rationale from *Poindexter*).  Finally, *Poindexter* predated *Arthur Andersen*, where the Supreme Court "did not imply the term ["corruptly"] was too vague." *Edwards*, 869 F.3d at 502.

The "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President[.]" *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991). The omnibus clause that appears at Section 1512(c)(2) is broad and intentionally so. Indeed, the obstruction statute's legislative history in fact underscores that Congress intended official proceeding to reach "broadly," and to encompass "the rare type of conduct that is the product of the inventive criminal mind."  S. Rep. No. 97-532, at 17-18.  The specific statutory provision under which Defendant is charged, 18 U.S.C. § 1512(c)(2), was intended to reach broadly: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute

a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (*quoting United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)). Accordingly, to prove that an attempted or actual obstruction of an official proceeding amounted to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government need establish that Defendant acted with a wrongful, immoral, depraved, or evil intent to obstruct, influence, or impede the proceeding.

Here, Defendant intended to obstruct, influence, or impede the Congressional proceeding, and, in fact, did so. Defendant's actions to obstruct the proceeding were not lawful acts of protest in support of a "sincerely held political belief," but rather were "wrongful, immoral, depraved, or evil" acts, *i.e.*, the unlawful invasion of the Capitol and its grounds and interference with federal law enforcement deployed to protect the Capitol and its occupants on January 6, 2021. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose and to engage in conduct knowingly and dishonestly with specific intent to subvert, impede, or obstruct"); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing"); *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007) (upholding instruction defining "corruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

**D.  The rule of lenity does not apply.**

Defendant's rule of lenity argument fails for many of the same reasons. The rule of lenity is a canon of "last resort." *Guedes v. Bureau of Alcohol, Tobacco and Firearms*, 920 F.3d 1, 27-

29 (D.C. Cir. 2019). The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). There is no grievous ambiguity here.

Here, Defendant took intentional and unlawful action to disrupt a Joint Session of Congress. Section 1512(c)(2) criminalizes "corruptly" obstructing an "official proceeding." Section 1515(a)(1)(B) defines that term to include a "proceeding before the Congress," which, as discussed above, encompasses the certification of the Electoral College vote. No guess work is needed.

**E.  The Due Process Clause does not immunize Defendant's unlawful actions.**

Defendant argues that because no court has construed Section 1512(c)(2) to apply a "novel construction" of the statute against him violates the novel construction principle of the Due Process Clause of the Fifth Amendment, and that he did not "violate the statute as written." (Mot. at 31-32). This argument is meritless.

"[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). To be sure, no court of which the government is aware has interpreted the meaning of "proceeding before the Congress" in the obstruction statute. Even if Defendant's premise that the obstruction statute's application in his case was "not expressly anticipated by Congress" were correct, that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v.*

*Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation marks and brackets omitted).  That is so even if the statute's application in a particular case "reaches 'beyond the principal evil' legislators may have intended or expected to address."  *Id*.  (*quoting Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 79 (1998)).  If the policy considerations (Mot. at 26-27) that Defendant advances for a narrowed view of the statute "suggest that the current scheme should be altered, Congress must be the one to do it."  *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020).

## F.  Likewise, the First Amendment does not insulate Defendant's unlawful acts from prosecution.

Defendant suggests that storming the Capitol building and grounds and interfering with law enforcement's efforts to stop him are somehow protected from prosecution because they were acts of "political expression, assembly and petitioning the government for a redress of grievances." (Mot. at 32). Defendant's argument is both legally and factually flawed. Notwithstanding Defendant's efforts to characterize his conduct as mere political demonstration "outside the [Capitol] with a view to affecting … legislation," (Mot. at 35), Defendant intentionally invaded the Capitol grounds and the Capitol building. These unlawful actions by Defendant plainly distinguish his conduct from lawful assembly.

Even assuming that Defendant is correct that the *O'Brien* factors apply, Defendant's argument still fails.[5]  *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Under *O'Brien*, the statute is constitutional only if (1) "it is within the constitutional power of the government"; (2) "it

---

[5]     "Later decisions make clear that once a regulation is deemed content neutral, this inquiry reduces to whether the requirements 'are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information.'" *Am. Libr. Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994).

furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. Defendant argues that the government's application here violates the third and fourth O'Brien factors, *i.e.*, Defendant asserts that the "government interest *is* related to the suppression of free expression" and "the incidental restriction on alleged First Amendment freedoms *is* greater than is essential to the furtherance of that interest" (Mot. at 33) (emphasis in original).

Here, the government interest in protecting the integrity and continuity of Congressional proceedings is unrelated to any incidental impact that the application of the law may have on the ability to petition government for a redress of grievances. Second, the statute goes no further than what is "essential" to prevent the obstruction of official proceedings of Congress. The Supreme Court has upheld restrictions on demonstrations in Washington, D.C. with less at stake than the integrity of the U.S. Presidential Election. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties.")

## II.     Contrary to Defendant's Various Arguments, Section 231(A)(3) is Constitutional.

Defendant is charged in the indictment with conspiring to violate (Count 1) and substantively violating (Count 3) Title 18, U.S.C., § 231(a)(3). Section 231(a)(3) criminalizes interference with a police officer or fire fighter "lawfully engaged in the lawful performance of his

official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the *conduct or performance of any federally protected function*" (emphasis added). The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  And criminal liability extends to actions directed against any federal, state, or local law enforcement officer.  18 U.S.C. § 232(7).

Defendant launches two constitutional attacks on Section 231(a)(3), but only one is even properly before the Court.  First, Defendant argues that Section 231(a)(3) exceeds Congress's Commerce Clause authority (Mot. at 36-42).  Even if that argument were meritorious—and it is not[6]—it is entirely irrelevant here because prosecution of the Defendant does not depend on the

---

[6]  The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. Art. I, § 8, Cl. 3.  "[I]t is now well established that Congress has broad authority under th[at] Clause."  *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.).  Among other things, "the Commerce Clause has . . . long been interpreted" to grant Congress authority "extend[ing] beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce."  *McLain v. Real Estate Bd. of New Orleans, Inc*., 444 U.S. 232, 241 (1980).  The Supreme Court's precedents accordingly establish that, "under its commerce power," Congress may regulate the "channels of interstate commerce," "instrumentalities of interstate commerce" and "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce."  *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting *United States v. Lopez*, 514 U.S. 549, 558-559 (1995)); *accord Morrison*, 529 U.S. at 608-609; *see also, e.g., Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *Perez v. United States*, 402 U.S. 146, 150 (1971).

Although the government did not rely on the first two prongs impacting interstate commerce, Section 231(a)(3) is one of many statutory provisions enacted by Congress to protect the flow of interstate commerce from unwarranted interference.  Where a civil disorder is "obstruct[ing], delay[ing], or adversely affect[ing]" interstate commerce or the movement of an

Commerce Clause.  Instead, the indictment is plead under the theory that Defendant's conduct adversely affected the "*conduct or performance of any federally protected function*."  18 U.S.C. § 231(a)(3) (emphasis added).

Second, Defendant alleges that Section 231(a)(3) is unconstitutionally vague (Mot. at 42-45). The civil disorder statute criminalizes the intentional interference with the lawful activities of police and firefighters during a civil disorder.  It prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder."  *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971).  Yet, Defendant argues that the statute is vague and, therefore, unconstitutional because its terms are "vague and imprecise," it contains "no express *mens rea* at all," and it is overbroad (Mot. at 43-45).

A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. at 732 (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also Wunsch,* 84 F.3d at 1119. The civil disorder statute punishes intentional conduct directed against firefighters and law enforcement officers working to protect the public during violent protests.  The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement.  Contrary to Defendant's arguments, those terms

------

item in interstate commerce, Congress sought to provide law enforcement and firefighters with the ability to contain and ultimately end the crisis without obstruction from persons like Defendant who would impede them.  In doing so, Congress acted to protect the channels of interstate commerce, including roads and highways, to protect the flow of things in interstate commerce, and to regulate activity that substantially affects interstate commerce.  Section 231(a)(3) thus fits comfortably within all three of the areas of Congressional power identified by the Supreme Court in *Lopez, Morrison*, and *Taylor*.

are quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether a defendant's conduct was "annoying" or "indecent." *See United States v. Williams*, 553 U.S. 285, 306 (2008).

Section 231(a)(3) criminalizes "any act to obstruct, impede, or interfere with any fireman or law enforcement officer" who is engaged in the lawful performance of his official duties during a civil disorder that obstructed, delayed, or adversely affected the conduct or performance of a federally protected function. 18 U.S.C. § 231(a)(3).  And it does so in the context of a civil disorder, which is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).  The statute's scope consists primarily, if not exclusively, of conduct or unprotected speech, such as threats.

The civil disorder statute prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *Mechanic*, 454 F.2d at 853.  It covers intentional conduct, not "mere inadvertent conduct." *United States v. Featherston,* 461 F.2d 1119, 1122 (5th Cir. 1972).  Moreover, Section 231(a)(3) is not unique; many state and federal statutes likewise criminalize obstructing the government's efforts to enforce the law and maintain public order. *See, e.g.,* 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice,* 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties); *see also* Cal. Penal Code § 148 (prohibiting resisting, delaying, or obstructing any peace officer or emergency medical technician); *State v. Illig-Renn,* 341 Or.

228 (2006) (rejecting constitutional attacks leveled against O.R.S. 162.247(1)(b), which prohibits interference with a police officer); *State v. Steen,* 164 Wash. App. 789, 808 (2011) (rejecting as-applied constitutional challenge to RCW 9A.76.020(1), which criminalizes obstructing police officers).

Defendant's argument that the statute lacks an express *mens rea* ignores the fact that Section 231(a)(3) requires intent, which narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad). The requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech). The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.* the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement). And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a *mens rea* element even when none appears on the face of the statute.").

Defendant's argument that Section 231(a)(3) is unconstitutionally vague and facially overbroad under the First Amendment also fails. Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's

plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982)); *see also Williams*, 553 U.S. at 293; *City of Houston v. Hill*, 482 U.S. 451, 458 (1987) (citing *Ferber*, 458 U.S. at 769).

"A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams,* 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep uphill climb when the statute focuses mainly on conduct. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Moreover, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ." *Id.* at 801. And laws that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124; *see id.* (observing that an "overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

Invalidating a statute for overbreadth is "strong medicine" to be applied "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Thus, if the statute is "readily susceptible" to a narrowing construction that would make it constitutional, it must be upheld. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *accord Broadrick*, 413

U.S. at 613; *United States v. Rundo*, No. 19-50189, 2021 WL 821938 at *2 (9th Cir. 2021) ("we construe [the riot statute] as constitutional if we can reasonably do so").

Because Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden," *Mechanic*, 454 F.2d at 854, Defendant's motion to dismiss as to Counts 1 and 3 should be denied.

## III.   Defendant Misconstrues the Elements of Section 1752.

### A.   18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.

Defendant argues that Counts 5 and 6 the indictment should be dismissed because they do not allege, nor can the government prove, that the USSS designated the "restricted area" under 18 U.S.C. § 1752 (Mot. at 46-49). His argument misconstrues the plain language of Section 1752, which provides in relevant part:

> (a) Whoever—
>     (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
> (c) In this section—
>     (1) [T]he term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>         (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[.]

18 U.S.C. § 1752.  In short, Section 1752 "prohibits persons from knowingly entering without lawful authority to do so in any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd*, 831 F. App'x 513 (D.C. Cir. 2020).

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal*, 498 U.S. at 108); *see Public Investors Arbitration Bar Association v. U.S. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C., 2013) (Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question."). Where, as here, the statute in question's words "are unambiguous, the judicial inquiry is complete." *See Babb*, 140 S. Ct. at 1177 (internal quotation marks omitted).

Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). By cross-reference, "person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1) (Count 5), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2) (Count 6).

The indictment alleges that, on January 6, 2021, Vice President Michael R. Pence, and Vice President-elect Kamala Harris, both persons who are protected by the USSS, were present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or

grounds" under § 1752(c)(1). The indictment further alleges that Defendant knowingly and without lawful authority entered and remained in that restricted buildings and grounds, and that he knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. In short, the allegations closely track the statutory language.

Defendant urges (Mot. at 46-47) the Court to import an extra-textual requirement that the USSS be required to designate the restricted area. That is so, Defendant claims, because Section 1752 is "directed to the USSS," and its "legislative history . . . is saturated with references to the USSS and to no other federal agency." *Id.* at 46. That arguments fails on the merits. Section 1752 is directed not at the USSS, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). Second, the legislative history in fact undercuts Defendant's argument. As he explains (Mot. at 8-10), an earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the USSS) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations). But Congress's decision in 2006 to "eliminate reference to regulations," (Mot. at 11), indicates that, after the amendment, the statute no longer depends on whether the USSS has defined an area as "restricted."

Defendant's reliance on statutory purpose and legislative history suffers a bigger flaw: it focuses outside the text when the text itself is clear. Such an inquiry is permissible only where literal application of statutory language either results in an outcome that can truly be characterized

as absurd, that or produces an outcome that is demonstrably at odds with clearly expressed Congressional intent. *See United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940). The plain meaning of the statute does not result in an outcome that can be characterized as absurd. The example cited by Defendant regarding the Postal Service extending the restricted area of the White House to the E. Barrett Prettyman U.S. Courthouse falls outside the conduct criminalized by the statute (Mot. at 47).  Contrary to his assertion that "the government claims that any federal or state agency may unilaterally set a 'restricted area,'" the statute sets clear limitations on where restricted areas may be established. *Id.* The statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement. In short, the plain meaning of the statute does not result in an "absurd" outcome.

Nor is the literal application of the statute at odds with Congressional intent. The language of the statute is the best evidence of Congressional intent. *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 84 (1991). This statute was intended to ensure the safety of USSS protectees. If Congress intended to give USSS sole authority to designate a restricted area, it could have written that into the statute or amended the statute to reflect that intent. In 1970, Congress enacted 18 U.S.C. § 1752 to include subsection (d), which gave authority to the Department of Treasury, which then oversaw USSS, to "prescribe regulations governing ingess or egress to such buildings and grounds and to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).

Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006).  Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by USSS, but chose not to include that in the revised statute.

*Bursey* does not counsel a different result. In *Bursey*, the Fourth Circuit affirmed the defendant's conviction under 18 U.S.C. § 1752 for entering an airport hangar that was restricted by USSS working in tandem with local law enforcement. 416 F.3d 301. Responding to the Bursey's claim that he was not advised the hangar was a federally restricted zone designated by USSS, the court found that the lower court's factual findings belied Defendant's claim because he had admitted that he was aware that the USSS coordinated security for the President at the hangar. *Bursey*, 416 F.3d at 309.  The court in *Bursey* did not address the issue of which law enforcement agencies may designate a restricted area, nor did it hold that only USSS is allowed to designate a restricted area.

### B.  18 U.S.C. § 1752 is not vague.

Defendant contends (Mot. at 49-53) that the straightforward interpretation described above is unconstitutionally vague.  A statute is vague where it (1) fails to give ordinary people fair notice of the conduct it punishes or (2) is so standardless that it invites arbitrary enforcement. *Johnson v. United States* 576 U.S. 591 (2015).  Neither applies to Section 1752.

As described above, Section 1752 prohibits Defendant from knowingly engaging in certain conduct in "any posted, cordoned off, or otherwise restricted area, of…grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." § 1752(a), (c)(1)(B). Because the area on the Capitol grounds was cordoned off by plainly visible

metal barricades as well as a row of USCP officers, Defendant was on notice that the area surrounding the Capitol was restricted. Defendant had fair notice that his entry onto the Capitol grounds and into the building itself was unlawful.

Defendant further contends (Mot. at 53) that the government is relying on an ambiguous phrase—"within such proximity to"—in Section 1752(a)(2).  That contention misunderstands the charged crime. Defendant is not alleged to have engaged in unlawful disruption because he was within proximity to the Capitol building. Instead, he was squarely within the restricted area. The charges against Defendant do not include criminalizing "pure political speech, assembly and Defendant's right to petition the government" (*id.*). Instead, the government charged Defendant with entering an area he knew was restricted and engaging in disruptive conduct that in fact disrupted government business, namely, the certification of the Electoral College vote.

### C.  The rule of lenity is inapplicable.

Defendant further invokes the rule lenity (Mot. at 54).  The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber,* 560 U.S. at 488; *see Shular*, 140 S. Ct. at 789 (Kavanaugh, J., concurring).  There is no grievous ambiguity here.  As noted above, Section 1752 prohibits certain knowing conduct within restricted zone established to ensure the protection of certain individuals such as the Vice President and Vice President-elect.  No guess work is required.

### D.  The novel construction principle does not apply.

Finally, Defendant asserts (Mot. at 54) that the "novel construction principle" requires dismissal of Counts 5 and 6.  "[D]ue process bars courts from applying a novel construction of a

criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. As with Defendant's other arguments, this claim is rooted in the faulty premise that the statute requires that the USSS designate the restricted area. Because Section 1752's plain language includes no such requirement—and encompasses the precise conduct that Defendant is alleged to have committed—the novel construction principle has no application here.

### IV.    The Indictment Is Properly Framed and Constitutionally Adequate.

An indictment is sufficient if it contains the elements of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117-119 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108-10 (2007); *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004). Beyond that, the Federal Rules of Criminal Procedure simply require an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c). An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir. 2007) (citing *United States v. King,* 200 F.3d 1207, 1217 (9th Cir. 1999)).

### A.  The destruction of property count is sufficiently pled.

The indictment alleges that Defendant was part of a conspiracy, and his membership in that conspiracy gives rise to vicarious liability for offenses committed by other conspirators. The indictment plainly alleges that Defendant and his co-defendants "together with others known and unknown, aided and abetted others known and unknown to forcibly enter the Capitol and thereby

caused damage to the building in an amount more than $1,000." Indictment at ¶ 74. The indictment also plainly pleads that "Proud Boys member, Dominic Pezzola, [] used a riot shield" to break a window of the U.S. Capitol building.  Indictment at ¶ 62. The government has identified Pezzola as a co-conspirator of the defendants in this case, and defendant Nordean is vicariously liable for Pezzola's destruction of the Capitol window, as plead in the indictment.[7]

To be sure, there is other evidence in this case that the government believes is relevant to the destruction of property charge.  In this opposition filing, however, the government is simply addressing why there is sufficient information in the indictment and the record in this case, as well as the discovery provided, to rebut the need for the relief sought by Defendant.  The indictment is plainly pled and provides detailed notice of the charges.

### B.  The civil disorder count is sufficiently pled.

Defendant argues that the indictment fails to show how Nordean "obstructed, impeded, and interfered with law enforcement during a civil disorder" (Mot. at 56). In support of this argument, Defendant suggests that a CONTROL+F (i.e., "find") for "law enforcement" in the indictment captures the full scope of any such allegations. *Id.* Not only does this ignore the maxim that the indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied[,]" but it is also factually incorrect.  *Berger,* 473 F.3d at 1103. Curiously overlooked by Defendant's brief are the numerous descriptions of attempts by law enforcement to safeguard the building (indictment at ¶¶ 13, 15, 18, 19, 22, 54, 55, 57, 58,

---

[7]      To the extent that Defendant asserts that the government has not specifically alleged that Pezzola is a co-conspirator, the government has specifically set forth its theory of liability in several pleadings. The indictment plainly alleges that the defendants did knowingly combine, conspire, confederate, and agree with others known and unknown.

60, 61) and Nordean and his co-defendant's blatant disregard for them (*id.* at ¶¶ 16, 18, 19, 20, 24, 55-58, 61-67). The indictment plainly pleads a set of facts to support the conclusion that Nordean and his co-defendants knowingly and willfully advanced past police lines and barricades set out to stop the crowd's advance. *See*, *e.g.*, *id.* at ¶¶ 55 – 58, 61. The government would further highlight that the indictment plainly alleges that Defendant and Biggs knocked down a metal barricade "with Capitol police on the other side of the barricade" and then "advanced past the trampled barricade" with Rehl and Donohoe. *Id.* at ¶ 58.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that Defendant's motion be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

/s/ *Jason McCullough*

JASON B.A. MCCULLOUGH, DC Bar No. 998006
LUKE M. JONES, VA Bar No. 75053
U.S. Attorney's Office for the District of Columbia
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
jason.mccullough2@usdoj.gov
(202) 252-7233 (McCullough)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on July 1, 2021.

By:   /s/ Jason McCullough
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233
jason.mccullough2@usdoj.gov