## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-175 |
|  | ) |
|  | ) **Judge Timothy J. Kelly** |
| ETHAN NORDEAN, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## DEFENDANT NORDEAN'S REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

# TABLE OF CONTENTS

Preliminary statement ................................................................ 1

Argument ................................................................................ 4

    I.      The Section 1512(c)(2) counts should be dismissed ................................. 4

           A.     The FSI fails to state a § 1512(c)(2) offense ......................... 4

                  1.     The FSI misconstrues "official proceeding" ................... 4

                  2.     The government's interpretation of § 1512(c)(2) conflicts with ejusdem generis ................................ 8

           B.     The government's interpretation of § 1512(c)(2) is unconstitutionally vague ............................................. 12

                  1.     § 1512(c)(2) does not provide fair notice that "official proceedings" includes proceedings unrelated to the administration of justice ......................... 12

                  2.     The government's interpretation of "corruptly" fails this Circuit's *Poindexter* test ................................. 16

           C.     The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Nordean's favor ................................. 20

           D.     The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an ex post facto law ................................. 21

           E.     The FSI's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Nordean ......................... 22

    II.     The Section 231(a)(3) counts should be dismissed ......................... 23

           A.     Congress does not satisfy § 231(a)(3)'s "federally protected function" element ............................................. 23

           B.     Section 231(a)(3) is unconstitutionally vague ......................... 27

    III.    The Section 1752 counts should be dismissed ......................... 30

           A.     The FSI fails to state an offense because only the USSS restricts

areas under § 1752 .................................................................................... 30

B.   If the government's interpretation of § 1752 is applied, it is
     unconstitutionally vague as to Nordean ....................................... 36

C.   The rule of lenity dictates that any ambiguities in § 1752 be resolved
     in Nordean's favor ..................................................................... 37

D.   The novel construction principle dictates against the government's
     interpretation, which would operate as an ex post facto law ............ 37

IV.  The FSI should be dismissed because it does not provide adequate
     notice and does not ensure the grand jury made determinations
     required by the Fifth Amendment ................................................. 38

A.   The federal property depredation allegations are not elucidated
     sufficiently ................................................................................. 39

B.   The civil disorder allegations are not elucidated sufficiently ........... 40

Conclusion .................................................................................................. 41

## TABLE OF AUTHORITIES

**CASES**                                                                                      **Page**

*Abramski v. United States*, 537 U.S. 169 (2014) ............................................................ 37

*Alvarez v. Lynch*, 828 F.3d 288 (4th Cir. 2016) ................................................ 12, 22, 27

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ........................................................ 38-39

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ................................ 8, 17-18

*Begay v. United States*, 553 U.S. 137 (2011) ........................................................ 10-11

*Bond v. United States*, 544 U.S. 211 (1987) .................................................................. 28

*Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) ....................................... 22

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ................................................... passim

*Citizens for Resp. & Ethics in Wash. v. U.S.*, 922 F.3d 480 (D.C. Cir. 2019) ............ 34

*City of Houston v. Hill*, 482 U.S. 451 (1987) ................................................................ 29

*Guerrero v. Whitaker*, 908 F.3d 541 (9th Cir. 2018) ................................................... 28

*Hubbard v. United States*, 514 U.S. 695 (1995) ..................................................... passim

*Johnson v. United States*, 576 U.S. 591 (2015) ...................................................... passim

*McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013) ................................ 29

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ....................................... passim

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .......................................................... passim

*Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019) ......................................... 26

*United States v. Batten*, 226 F. Supp. 492 (D.D.C. 1964) ............................................. 7

*United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998) ...................................... 13

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ............................................... 18

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..................................................... passim

*United States v. Dorri*, 15 F.3d 888 (9th Cir. 1994) .................................................... 19

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) .................................... 5, 8, 13

*United States v. Granderson*, 511 U.S. 39 (1994) .............................................. passim

*United States v. Griffin*, 2021 U.S. Dist. LEXIS 123952 (D.D.C. July 2, 2021) ............. passim

*United States v. Kanchanalak*, 37 F. Supp. 2d 1 (D.D.C. 1999) ............................... 16, 39

*United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) ...................................... 6-7

*United States v. Kelly*, 147 F.3d 172 (2d Cir. 1998) ........................................ 19

*United States v. Lopez*, 514 U.S. 549 (1995) ................................................ 27

*United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971) ..................................... 28, 40

*United States v. Morrison*, 529 U.S. 598 (2000) ............................................. 27

*United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996) .................................... 16

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ...................................... 18-19

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) ...................................... 26

*United States v. O'Brien*, 391 U.S. 367 (1968) ............................................. 23

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) ...................................... passim

*United States v. O'Connell*, 2017 U.S. Dist. LEXIS 172491 (E.D. Wisc. 2017) ................ 4, 13

*United States v. Perraud*, 672 F. Supp. 3d 1328 (S.D. Fla. 2009) ............................ 26

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ........................................ 6

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ................................. passim

*United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ....................................... 6

*United States v. Reeves*, 752 F.2d 995 (5th Cir. 1985) ...................................... 19

*United States v. Santos*, 553 U.S. 507 (2008) .............................................. 21

*United States v. Sutton*, 732 F.2d 1483 (10th Cir. 1984) .................................... 7

*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019) .................................. 8, 23

*United States v. Vixie*, 532 F.2d 1277 (9th Cir. 1976) ............................................................. 7

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................. 18

*Yates v. United States*, 574 U.S. 528 (2015) ............................................................................. 9-10

**STATUTES**

18 U.S.C. § 1752 .......................................................................................................................... passim

18 U.S.C. § 3056 .......................................................................................................................... 31

18 U.S.C. § 1512(c)(2) ................................................................................................................. passim

18 U.S.C. § 231(a)(3) ................................................................................................................... passim

18 U.S.C. § 1505 .......................................................................................................................... passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I .................................................................................................................... 2, 22-23

U.S. Const. amend. V ................................................................................................................... passim

U.S. Const. amend. VI .................................................................................................................. 38-41

**OTHER AUTHORITIES**

*Authority of the Secretary of the Treasury to Order the Closing of Certain Streets*
*Located Along the Perimeter of the White House,*
19 Opinion of the Office of Legal Counsel 109 (1995) .............................................................. 37-38

**Preliminary statement**

The government's prosecution of Nordean's case is abusive. The problems range from a series of misleading statements the government has filed in Court to its withholding of mitigating material past the point at which Nordean can make use of it.[1] Just last week—weeks after it successfully detained him—the government produced a video from the Capitol showing law enforcement permitting Nordean to enter the building on January 6. Its response to Nordean's motion to dismiss the First Superseding Indictment (FSI) continues the pattern.

The government does not just concede the absence of precedent supporting one or two of its charges against Nordean. It concedes that no precedent exists for the manner in which three federal statutes—18 U.S.C. § 1512(c)(2), § 231(a)(3), and § 1752—have been used to return five charges against him. That would be unusual enough even if Nordean had been released pretrial, as the Bail Reform Act demands in all but the most serious cases. But here the government insists that a presumptively innocent person be detained for up to a year or longer—on the basis of liability theories it concedes have never before been charged in federal court and claims unsupported by evidence. Those theories provided the color of law to send a SWAT team to his home to extract information from his wife as she kneeled handcuffed at gunpoint. All of this is done in the name of defending the rule of law.

**Section 1512(c)(2).** The government concedes that every federal circuit to address the issue has construed the phrase "official proceeding," as defined in Section 1515, to mean a legal proceeding before a tribunal that hears evidence and makes findings. It concedes the joint

---

[1] An example of its misleading arguments can be seen on the first page of the government's opposition. It places scare quotes around the phrase "nonviolent protest," leading the reader to believe that Nordean committed acts of violence on January 6. Gov't Opp., p. 1. Similarly, the government represented to the D.C. Circuit that Nordean was accused of planning to "attack" law enforcement. Neither representation is accurate.

session of Congress that convened on January 6 was not such a proceeding.  It concedes there is no precedent supporting its argument that a ceremonial function of Congress that does not wield the legislature's power of investigation satisfies Section 1515.

It cannot do otherwise: the Department of Justice's prosecutorial handbook agrees with Nordean's reading of "official proceeding," a reading the government itself urged on courts within the last three years.  Even if the Court were to create rather than apply law by accepting the government's just-this-once construction of Section 1512, the government does not meaningfully distinguish any of the authorities cited by Nordean concerning the vagueness doctrine, the rule of lenity and the novel construction principle.  These are clear that Nordean cannot be held liable under a new enlargement of a criminal statute retroactively applied to him and a select group of defendants alone.  As the government does not limit its obstruction charge to Nordean's entry into the Capitol Building, does not allege violence or threats, and does not allege the impairment of evidence or testimony, it necessarily criminalizes activity protected by the First Amendment.  Meanwhile, the government's interpretation of Section 1512(c)'s adverb "corruptly" collapses any distinction between the alleged obstructive acts and their purpose, reading the corruptly element out of the statute.  It is not only January 6 defendants who will feel the weight of the obstruction law's hypertrophied interpretation here.

**Section 231(a)(3).**  The government does not defend its Section 231(a)(3) charges on Commerce Clause grounds, relying instead on the alleged civil disorder's effect on a "federally protected function."  Behind door number two stands an argument even more contrived.  Section 231(a)(3)'s definition of "federally protected function" requires the government to establish that the "function" at issue was by a "department, agency, or instrumentality of the United States." 18 U.S.C. § 232(3).  Yet the government does not disclose that the Supreme Court has held that

Congress is none of those things.  See 18 U.S.C. § 6 (defining "department" and "agency").

Accordingly, because the FSI does not even alternatively rely on the civil disorder's possible

effect on interstate commerce, the § 231(a)(3) criminal object of Count 1 and all of Count 3 must

be dismissed.  They must be dismissed for the separate reason that vagueness doctrine and the

First Amendment prohibit criminalization of "any act," including nonviolent protest and speech,

that "interferes" with law enforcement.  The reason no authority exists to support the § 231

counts is that the government almost never charges this embarrassing relic of a time when certain

Senators advocated the statute as a nightstick for civil rights leaders.

**Section 1752.**  The government concedes that, before January 6, it had never prosecuted

a person for entering a § 1752 "restricted area" that had been restricted by some entity other than

the Secret Service.  It concedes that the original § 1752 vested only the Secret Service with the

power to federally criminalize a person's movements.  Its argument that Congress's original

intent has somehow evolved since § 1752's enactment in 1970 lacks support in the text,

legislative history, and case law.  DOJ's Office of Legal Counsel has issued an opinion agreeing

with Nordean's reading of § 1752.

**All Counts, including Count Four.** The FSI does not allege what federal property

Nordean destroyed on January 6 or the amount of the damage.  It does not allege how Nordean

interfered with law enforcement that day.  No clues are found in the opposition papers.  These

manifest pleading errors violate the presentment and notice functions of grand jury indictments

under the Fifth and Sixth Amendments and Rule 7(c) of the Federal Rules of Criminal

Procedure.

There is a reason the FSI presents one legal kluge after the next.  The government started

with the political premise that it needed a conspiracy to explain the events of January 6.  Then it

3

labored backward to make the law and facts fit.  That is not surmise.  The former leader of the investigation proclaimed it on primetime television.

**Argument**

**I.     The Section 1512(c)(2) counts should be dismissed**

      **A.     The FSI fails to state a § 1512(c)(2) offense**

            1.     *The FSI misconstrues "official proceeding"*

The government cites no authority supporting its argument that § 1512(c)(2)'s "official proceeding" is satisfied by a ceremonial function of Congress lacking the defining characteristics of a legal proceeding: a tribunal that hears evidence and makes findings.  Neither of the two positive arguments made by the government demonstrates otherwise.

First, as no authority supports the government's position, it leads the Court to believe that precedent cited by Nordean somehow leaves room for the government's novel construction of the phrase "official proceeding." Gov't Opp., pp. 16-17.  It does not.  Every circuit that has addressed the issue has rejected the government's argument that an "official proceeding," as defined in Section 1515, exists wherever a proceeding may be characterized as "formal," in the government's vague usage.  Indeed, the government fails to disclose that, as recently as three years ago, the government argued in federal courts that the meaning of "official proceeding" in § 1512(c) is "limited to quasi-adjudicative investigations or inquiries that involve the making of findings of fact and the issuance of rulings or recommendations for government action." *United States v. O'Connell*, 2017 U.S. Dist. LEXIS 172491, *14 (E.D. Wisc. Sept. 5, 2017) (summarizing DOJ's interpretation of § 1512(c)).

The government first suggests that courts have interpreted § 1512(c)'s "proceeding" in a broad, nonlegal sense to mean "'[t]he carrying on of an action or series of actions; action, course

of action; conduct, behavior.'" Gov't Opp., p. 16 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013)).  That is misleading.  The *Ermoian* decision, from which the government's definition derives, rejected that "lay" meaning of the word in the context of § 1512(c).  *Ermoian*, 752 F.3d at 1169.  All of its reasons for doing so apply with equal force to Section 1515(a)(1)(B)'s "a proceeding before Congress":

- First, the descriptor "official" indicates a sense of formality associated with "*legal proceedings*." 752 F.3d at 1169 (emphasis added).

- Second, the word "proceeding" in § 1515(a)(1) is "surrounded with other words that contemplate a *legal usage* of the term, including 'judge or court,' 'federal grand jury,' '*Congress*,' and 'federal government agency.'" *Id.* (emphasis added).

- Third, legal dictionaries define "proceeding" as "'a word much used to express the *business done in courts*.'" *Id.* (quoting Black's Law Dictionary 1241 (8th ed. 2004)) (emphasis original).

- Fourth, the "use of the preposition 'before' suggests an appearance in front of [a body] *sitting as a tribunal*." *Id.* at 1171 (emphasis added).

- Fifth, "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.' 18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv).  The use of the terms 'attendance,' 'testimony,' 'production,' and 'summon[]' when describing an official proceeding strongly implies that some formal hearing *before a tribunal* is contemplated." *Id.* at 1172 (emphasis added).

Further to the fifth point, the Court will notice that § 1512(c) refers to the "impair[ment] [of an] object's integrity or availability for use in an official proceeding," § 1512(c)(1), which also "strongly implies that some formal hearing *before a tribunal* is contemplated." *Ermoian*, 752 F.3d at 1172 (emphasis added).

Next, the government contends that "even if" the legal rather than lay interpretation of "official proceeding" governs Section 1515, decisions from other circuits imply that "the Electoral Collect vote certification qualifies." Gov't Opp., p. 17.  Not even close.

5

The government cites *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008), implying the Fifth Circuit held that a § 1515 "official proceeding" is satisfied by any "'formal environment.'" Gov't Opp., p. 17 (quoting *Ramos*, 537 F.3d at 463).  That is misleading.  Here is the full holding of *Ramos*, of which the government selectively omitted the italicized portion: "'[O]fficial proceeding' is consistently used throughout § 1512 in a manner that contemplates a formal environment *in which people are called to appear or produce documents*." *Ramos*, 537 F.3d at 463 (emphasis added).

Consider the government's citation to, and description of, *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009).  Gov't Opp., p. 17.  The government represents that the Second Circuit held there that an internal investigation conducted by the Bureau of Prisons was a § 1515 "official proceeding" because the review panel's "work [was] sufficiently formal." *Id.* (quoting *Perez*, F.3d at 169).  Added the government, "the formality involved in the certification of the Electoral College vote places it 'comfortably within the category' of an official proceeding," as construed in *Perez*.  Gov't Opp., p. 18 (quoting *Perez*, 575 F.3d at 169).

Here is what the government omitted from its description of *Perez*.  The Second Circuit held there that the BOP's investigation qualified as an "official proceeding" because "the review panel must '*determine*' if there has been a violation of BOP policy, must make '*findings*,' and may '*decide*' to refer the matter to senior departmental authorities . . ." *Perez*, F.3d at 169 (emphasis added).  The government selectively omitted that portion of *Perez* because none of those attributes is true of a hearing in Congress that is not pursuant to its investigative power, nor does the government contend otherwise.

Consider too the government's citation to, and description of, *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994).  Gov't Opp., p. 18.  The government represents that the D.C. Circuit

held there that an investigation conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" under § 1505 merely because it was "formal." *Id.*  Again, that is misleading.  The D.C. Circuit held instead that the investigation in *Kelley* qualified as a "proceeding" because, pursuant to the investigation at issue, the Inspector General was empowered to, and did, "issue subpoenas and compel sworn testimony in conjunction with an investigation of agency activities." 36 F.3d at 1127.  The D.C. Circuit relied on precedent from this Circuit as well as others in determining that the use of subpoenas was *determinative* of the "proceeding" *vel non* question.  *Id.* (citing *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation including issuance of subpoena was a proceeding under § 1505); *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505)).  Crucially, in *Kelley*, the government "agreed" that § 1505's "proceeding" was "parallel" to "proceeding" under § 1512(c). 36 F.3d at 1128.

Second, because the relevant precedent from every circuit rejects the government's construction of "official proceeding," it attempts to craft novel arguments based on obscure language from the Electoral College Clause of Article II, § 1 of Constitution; the Twelfth Amendment; and the Electoral Act of 1887.  Gov't Opp., pp. 18-21.  The Electoral Vote count, the government uncontroversially observes, is "solemn." *Id.* at 18.  During the count, the Vice President serves as "presiding officer." "Members may object." *Id.*  And "just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the 'Hall.'" *Id.* (citing 3 U.S.C. § 16).  For example, the government notes, the Electoral Act of 1887 specifies

where certain desks should be placed in the "Hall." *Id.* The solemnity—but also the furniture. The antique desks fit comfortably within the dimensions of § 1515, leaving room to spare for as many other objects from the "Hall" as are needed to improve the statute's original appearance.

These examples betray a category mistake. "Chapter 73 of Title 18 of the United States Code," including Section 1512 and all other obstruction statutes, "provides criminal sanctions for those who *obstruct justice*." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) (Rehnquist, J.) (emphasis added). The Electoral Act procedures cited by the government do not concern the "back and forth between citizens and government" within which zone the obstruction statutes aim to prevent the former's impairment of information bearing on the latter's decision-making. *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (Wilkinson, J.). Rather, those procedures dictate how governmental officials interact *with each other*, not with the public. That is why the government does not cite a single obstruction-of-Congress case where the legislature was not exercising its investigatory power.[2] It asks the Court to make law.

> 2.   *The government's interpretation of § 1512(c) conflicts with* ejusdem generis

Beyond the government's misunderstanding of § 1512's "official proceeding" there are other reasons the FSI fails to state offenses under that statute. Nordean's motion noted that the text and legislative history of § 1512(c)(2) show that, in the judgment of a former U.S. attorney

---

[2] The government suggests that its just-for-January-6 reading of "official proceeding" is the only "plain meaning" of § 1512(c). Gov't Opp., p. 20. That ignores that the *Ermoian* (Ninth Circuit), *Ramos* (Fifth Circuit), *Perez* (Second Circuit), and *Kelley* (D.C. Circuit) courts rejected the government's construction based on the plain meaning of "proceeding." These circuits did not "import[] an extra-textual 'quasi-judicial' requirement" into § 1512(c) and § 1505. Nor did *the government* import one when *it* used to make *Nordean's argument* in federal courts. Rather, they merely interpreted the word "proceeding" using the standard tools of statutory construction, such as legal dictionaries, statutory comparison, statutory and legislative history, and common sense.

general, Congress intended that the statute serve as a "loophole closer meant to address the fact

that the existing section 1512(b) covers document destruction only where a defendant has

induced another person to do it and does not address document destruction carried out by a

defendant directly." Nordean Br. at 23 (citing Mem. of William P. Barr, dated June 8, 2018, p. 5,

available at: https://bit.ly/2RYVZ47.) The text itself shows this is the case:

>  Whoever corruptly—

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

§ 1512(c) (emphasis added).

"*[E]jusdem generis* counsels: Where general words follow specific words in a statutory

enumeration, the general words are usually construed to embrace only objects similar in nature to

those objects enumerated by the proceeding specific words." *Yates v. United States*, 574 U.S.

528, 545 (2015) (cleaned up).  In *Yates*, the Supreme Court showed that the FSI misapplies §

1512(c), a document impairment statute, to criminalize political protest at Congress.

In *Yates*, a fisherman caught an undersized red grouper in the Gulf of Mexico, contrary to

federal law.  To prevent federal authorities from finding out, he ordered a crew member to toss

the catch into the sea.  He was charged with an obstruction offense under § 1519, which

penalizes "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or

makes a false entry in any record, document, *or tangible object* with the intent to impede,

obstruct, or influence the investigation . . ." 574 U.S. at 532 (quoting § 1519) (emphasis added).

The Supreme Court reversed Yates' conviction as the term "tangible object" did not encompass

the grouper.  Like Section 1512(c), Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002.  574 U.S. at 532.  To apply Section 1519 to sea creatures, the Court held,

> would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with an obstructive intent. *Mindful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups, we conclude that a matching construction of § 1519 is in order*: A tangible object captured by § 1519, we hold, must be one used to record or preserve information.

574 U.S. at 532 (emphasis added).

Nearly every aspect of *Yates'* limitation of the phrase "tangible object" in Section 1519 applies to the phrase "or otherwise obstructs, influences, or impedes" in Section 1512(c)(2).  As in *Yates*, the government implies here that § 1512(c)(2) "extends beyond the principal evil motivating its passage." 574 U.S. at 536.  But *Yates* held that Section 1519, a companion to § 1512(c)(2) in Sarbanes-Oxley, could not be properly read outside the context of the Sarbanes-Oxley financial and audit reforms.  *Id.* at 541. The Court also held that "the words immediately surrounding 'tangible object' in § 1519—'falsifies, or makes a false entry in any record [or] document]'—also cabin the contextual meaning of that term." *Id.* at 542.  The *noscitur a sociis* canon thus operated to limit "tangible object" to "the subset of tangible objects involving records or documents, i.e., objects used to record or preserve information." *Id.* at 544.  And under the related *ejusdem generis* canon—"[Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words"—"tangible object" could not be read "to capture physical objects as dissimilar as documents and fish." *Id.* at 546.

In reaching that interpretation of § 1519, *Yates* relied on *Begay v. United States*, 553 U.S. 137, 142-43 (2008).  *Yates*, 574 U.S. at 545.  In *Begay*, the Court used *ejusdem generis* to determine what crimes were covered by the statutory phrase "any crime . . . that . . . is burglary,

arson, or extortion, involves use of explosives, or *otherwise involves* conduct that presents a serious potential risk of physical injury to another." 553 U.S. at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis added). *Begay* held that the "otherwise involves" provision covered "only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id*. Had Congress intended the latter "all encompassing meaning," "it is hard to see why it would have needed to include the [preceding statutory] examples at all." *Id.*

*Yates* and *Begay* plainly mean that § 1512(c)(2)'s reference to acts that "*otherwise* obstruct[], influence[], or impede[] any official proceeding," covers "only similar crimes" to those enumerated in § 1512(c)(1), i.e., "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Had Congress intended the "or otherwise obstructs. . ." language to create an unlimited obstruction catch-call crime, "it is hard to see why it would have needed to include the examples [in § 1512(c)(1)] at all." *Yates*, 553 U.S. at 142. Indeed, or why it would have any need for the rest of the obstruction crimes in Chapter 73. Here, the FSI's obstruction theory has nothing to do with the impairment of evidence. Rather, it contends Nordean violated § 1512(c)(2) by virtue of his physical presence inside a building.

A simple comparison of the penalty provisions in § 1505 and § 1512(c) demonstrates that Congress could not possibly have intended to give the latter the all-encompassing meaning pushed by the government here. As indicated previously, Section 1505 criminalizes the obstruction of a congressional "inquiry or investigation" by "threats or force." § 1505. The statutory maximum sentence is five years' imprisonment. *Id.* By contrast, the statutory maximum sentence under Section 1512(c) is 20 years' imprisonment. § 1512(c). According to the government's novel interpretation of these statutes, then, Congress views obstruction of legal

proceedings in Congress by "threats and force" far less seriously than it does obstruction of ceremonial proceedings by means short of "threats and force." That would be incoherence, but not Congress's; it is the incoherence of the gloss the government attempts to impose on the statutes to reach a predetermined decision that it must charge a conspiracy crime and cannot find any other federal statute vague enough to fit.

The Section 1512(c)(2) charges should be dismissed because (1) the government does not even contest this argument, which is therefore forfeited, *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) (party's failure to address a clearly briefed argument constitutes a forfeiture of the issue); and (2) it is correct on the merits.

**B.      The government's interpretation of § 1512(c)(2) is unconstitutionally vague as applied to Nordean**

1.      *Section 1512(c)(2) does not provide fair notice that "official proceedings" includes proceedings unrelated to the administration of justice*

The government concedes that no precedent supports its argument that § 1512(c)'s "official proceeding" encompasses ceremonial functions that are not proceedings understood in the legal sense. Gov't Opp., p. 21. Before January 6, the government had never prosecuted a person under that theory of liability. Indeed, the DOJ's handbook for prosecutors adopts the position that the meaning of "official proceeding" in Section 1512 is the same as the meaning given to "proceeding" by courts construing Section 1505—which is explicitly limited to congressional hearings in exercise of the legislature's investigatory power. DOJ Resource Manual, § 1730 ("This definition [of 'proceeding' in § 1512] is in large part a restatement of the judicial interpretation of the word 'proceeding' in § 1503 and 1505."), available at: https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-

processes-official-proceeding-requirement.[3]  Yet the government simultaneously argues that §

1512(c) provided fair notice to Nordean that he would be prosecuted under its novel theory.

Gov't Opp., p. 21.

      That makes little sense.  As noted, every circuit to address the issue had rejected the

government's understanding of "official proceeding" before Nordean was charged.  *Ermoian*,

752 F.3d at 1172; *Ramos*, 537 F.3d at 463; *Perez*, F.3d at 169; *Kelley*, 36 F.3d at 1127.  The

government had never prosecuted a person under its new statutory understanding before January

6.  The DOJ's own handbook for prosecutors adopts Nordean's interpretation of a § 1512

"official proceeding." DOJ Resource Manual, § 1730.  The government itself adopted Nordean's

interpretation in court.  *O'Connell*, 2017 U.S. Dist. LEXIS 172491 at *14.

      Perhaps most significantly, consider whether "ordinary people" would have had "fair

notice" of the government's interpretation of "official proceeding" prior to January 6 in light of

the following.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).  About two years before the

January 6 events, in October 2018, Congress held confirmation hearings for now Justice

Kavanaugh.   Of course, confirmation hearings are not ceremonial functions like the Electoral

College vote count but are rather inquiries held pursuant to Congress's investigatory power.

Subpoenas are issued, sworn testimony is given.  *See*, *e.g.*, *United States v. Cisneros*, 26 F. Supp.

2d 24, 38 (D.D.C. 1998).  As on January 6, Vice President Mike Pence was present and presiding

---

[3] It is binding law on the Court that "proceeding" in § 1505 means a hearing held pursuant to
Congress's power of investigation.  *United States v. Poindexter*, 951 F.2d 369, 380-81 (D.C. Cir.
1991).

over the confirmation vote.[4]  Hundreds of protestors broke through Capitol Police barricades.[5]

They burst through Capitol doors and "stormed" the Senate chamber.  N.Y.Times, Oct. 6, 2018.

There, they disrupted and delayed the Senate proceedings by screaming and lunging toward the

Vice President and other people.  As a report described the day,

> Saturday's vote reflected that fury, with the Capitol Police dragging screaming
> demonstrators out of the gallery as Vice President Mike Pence, presiding in his role as
> president of the Senate, calmly tried to restore order. "This is a stain on American
> history!" one woman cried, as the vote wrapped up.  "Do you understand that?"

N.Y. Times, Oct. 6, 2018.

Here are some of the images of protestors who broke through Capitol Police barricades

and entered Congress that day, about 26 months before January 6:



Roll Call, Oct. 6, 2018 (VP Pence presiding in Capitol Building)

---

[4] *Kavanaugh is sworn in after close confirmation vote in Senate*, N.Y. Times, Oct. 6, 2018,
available at: https://www.nytimes.com/2018/10/06/us/politics/brett-kavanaugh-supreme-
court.html.

[5] *See*, e.g., *Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote*, Roll Call,
Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-
capitol-barricades-ahead-of-saturday-vote/.



NBC News, Oct. 6, 2018 (VP Pence presiding in Capitol Building)

Though they intentionally delayed the congressional proceedings, these protestors, numbering in the hundreds, were not charged with "obstruction of Congress" under § 1512(c)(2). Certainly, if the lack of case law supporting the government's interpretation of "official proceeding," the absence of any legislative history pointing towards that interpretation, and the DOJ's own internal inconsistent position do nothing to provide "fair notice" to an "ordinary person" that such political protests constitute "obstruction of official proceedings," the fact that hundreds of protestors were charged with no offense at all for conduct for which the indictment here charges Nordean does not provide that notice either.  Moreover, the naked charging disparity between the episodes—legally similar, according to the government here—also implicates the vagueness doctrine's concern for arbitrary and discriminatory law enforcement enabled by vague, shifting standards that allow "prosecutors and courts to make it up," particularly in the context of the rights of free speech, assembly and petitioning of the government.  *Dimaya*, 138 S. Ct. at 1212 (Gorsuch, J., concurring); *United States v. Davis*, 139 S. Ct. 2319 (2019) (Gorsuch, J.) (residual clause of § 924(c) unconstitutionally vague); *Johnson v. United States*, 576 U.S. 591 (2015) (residual clause of Armed Career Criminal Act unconstitutionally vague).

As indicated above, the § 1512 charges here also depend on the statute's "catch-all," or "residual," clause in subsection (c)(2). Here, too, the FSI crosses into a constitutional no-fly zone set by the Supreme Court's most recent vagueness jurisprudence. In the last five years the Court has found vagueness in catch-all provisions featured in the Armed Career Criminal Act, *Johnson*, 576 U.S. at 591; Section 924(c), *Davis*, 139 at 2319; and in the Immigration and Nationality Act, *Dimaya*, 138 S. Ct. at 1212. Just as the open-ended and imprecise language intrinsic in these criminal residual clauses is what rendered them unconstitutionally vague, the same problem inheres in a "catch-all" construction of § 1512(c)(2)'s "or otherwise obstructs" that floats miles above the types of obstruction enumerated in § 1512(c)(1) and indeed renders the rest of Chapter 73 superfluous.

2. *The FSI's interpretation of "corruptly" fails the Poindexter test*

In *Poindexter*, the D.C. Circuit held that an interpretation of § 1505's adverb "corruptly" to mean acting with any "improper purpose" was unconstitutionally vague. 951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific— indeed they may be less specific—than 'corrupt.'"). It also held that the adverb should therefore be read "transitively," i.e., to require that the defendant "corrupt" another into committing the obstructive acts against that person's legal duty. *Id.* Here, by contrast, the government's theory appears to charge that Nordean "corruptly" obstructed an official proceeding because his independent "actions" on January 6 constituted an "improper" or "immoral" purpose. Gov't Opp., p. 23. *Poindexter* is binding law on this Court and requires dismissal of the § 1512(c)(2) charges which allege no cognizable theory of the "corruptly" element.

None of the government's attempts to distinguish *Poindexter* succeed. First, it claims *Poindexter*'s analysis was "confined to § 1505." Gov't Opp., p. 23. Not so. It is still good law in

this Circuit—and in the context of § 1512.  Contrary to the government's suggestion, the D.C.

Circuit did not decline to extend *Poindexter*'s reasoning to § 1512 in *United States v. Morrison*,

98 F.3d 619, 630 (D.C. Cir. 1996).  To the contrary, in *Morrison* the court of appeals upheld the

§ 1512 conviction precisely because the defendant had committed "transitive" corruption in the

*Poindexter* sense by persuading a witness to violate their legal duty to testify truthfully in court.

98 F.3d at 630; see also *United States v. Kanchanalak*, 37 F. Supp. 2d 1, 4 (D.D.C. 1999)

(Friedman, J.) (finding that even after Congress amended § 1515 in the wake of *Poindexter* to

define "corruptly" for purposes of § 1505, § 1515's definition of "corruptly" to mean acting with

an "improper purpose" is still unconstitutionally vague under *Poindexter*).  By contrast the FSI

does not allege Nordean "corrupted" any person to violate their legal duty in a manner that

obstructed an official proceeding.

      Second, the government contends that the Supreme Court's decision in *Arthur Andersen*

somehow renders *Poindexter* bad law.  Gov't Opp., p. 23.  The government misreads *Arthur*

*Andersen*.  There, the Court reversed a conviction under § 1512(b)), which makes it a crime to

"'knowingly . . . corruptly persuade another person . . .with intent to . . . cause' that person to

'withhold' documents from, or 'alter' documents for use in, an 'official proceeding.'" 544 U.S.

at 698 (quoting § 1512(b)(2)(A) and (B)).  The Court held that the jury instructions "failed to

convey the requisite consciousness of wrongdoing," for they instructed that "even if [defendant]

honestly and sincerely believed that the conduct was lawful, you may find [defendant] guilty."

*Id*. at 706.[6]  Contrary to the government's suggestion, that holding is not inconsistent with the

---

[6] *Arthur Andersen* offers no help to the government for another reason.  Even the *deficient* jury
instruction in that case required the government to prove that the defendant obstructed "with
a hope or expectation of either financial gain or other benefit to oneself or a benefit of another
person." 515 U.S. at 516 (Scalia, J., dissenting) (endorsing that instruction's definition of

D.C. Circuit's holding in *Poindexter* that a bare "improper purpose" interpretation of "corruptly"

is unconstitutionally vague.  For the Court in *Arthur Andersen* explicitly stated its decision did

not define "the outer limits of th[e] ["knowingly . . . corruptly"] element . . . because the jury

instructions at issue simply failed to convey the requisite consciousness of wrongdoing." 544

U.S. at 706.  The "requisite consciousness" to which the Court referred was linked uniquely in

that case to the § 1512(b) mens rea term "knowingly." *Id*.  By contrast, like § 1505 in

*Poindexter*, § 1512(c) is not modified by the mens rea element "knowingly." §§ 1505, 1512(c).

Accordingly, lacking the scienter element analyzed in *Arthur Andersen*, § 1512(c)'s "corruptly"

is scrutinized more closely than "corruptly" in § 1512(b) under the vagueness doctrine.  *See, e.g.*,

*United States v. Class*, 930 F.3d 460, 469 (D.C. Cir. 2019) (determination that a statute "lacks a

scienter requirement means 'that the Constitution tolerates' a lesser 'degree of vagueness' than

would be permissible had the court reached the contrary conclusion) (quoting *Village of Hoffman*

*Estates v. Flipside, Hoffman Estates*, *Inc*., 455 U.S. 489, 498 (1982)).

Finally, the government's interpretation of "corruptly" suffers from an additional

vagueness here.  The government explicitly argues that the corruptly element of § 1512(c) is

satisfied here on account of "Defendant's *actions* to obstruct the [Electoral Count] proceeding,"

to wit, "the unlawful invasion of the Capitol and its grounds and interference with federal law

enforcement deployed to protect the Capitol and its occupants. . ." Gov't Opp., p. 23 (emphasis

added).  The Court will notice several problems with this interpretation.  First, each of the

"actions" described by the government is an actus reus of the FSI's obstruction charges.  But

Section 1512(c)(2)'s "corruptly" element is independent of the criminal acts in the statute, which

---

"corruptly").  Here, the government fails even to allege that Nordean acted with that hope or
expectation.

are "obstruct[ing], influenc[ing], or imped[ing]." § 1512(c)(2).  That is, the government does not

even describe an "improper *purpose*"; it describes *obstructive acts*.  *United States v. North*, 910

F.2d 843, 882, 285 U.S. App. D.C. 343 (D.C. Cir. 1990), *opinion withdrawn and superseded in*

*other part on reh'g*, 920 F.2d 940, 287 U.S. App. D.C. 146 (D.C. Cir. 1990) (rejecting

government argument that "'corruptly' means "nothing more than an intent to obstruct [a]

proceeding," which would "read the corrupt intent requirement out of the statute").

Second, even if the government had alleged an "improper *purpose*" as opposed to

obstructive acts, not all political or personal motivations inspiring obstruction of Congress may

be considered "corrupt" consistent with vagueness doctrine, as the D.C. Circuit observed in

*Poindexter*, 951 F.2d at 386 (citing the example of a person who obstructs Congress "to protect

the historical reputation of some historical figure that has been dead for 20 years and [the

defendant obstructs to avoid] mar[ring] that person's reputation"); *North*, 910 F.2d at 882

(holding that a "corrupt" intent means "the intent to obtain an improper advantage for oneself or

someone else. . ."); *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) ("[A] well-accepted

definition of corruptly" is "to act with the intent to secure an unlawful advantage or benefit either

for one's self or for another"); *United States v. Dorri*, 15 F.3d 888, 895 (9th Cir. 1994) (holding

that "corruptly" element was satisfied by evidence that defendant acted "with a hope or

expectation of [a] benefit to one's self"); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir.

1991) ("Corruptly" means "done with the intent to secure an unlawful benefit either for oneself

or another"); *United States v. Reeves*, 752 F2d 995, 1001 (5th Cir. 1985) ("To interpret

'corruptly' [in obstruction statute] as meaning 'with an improper motive or bad or evil purpose'

would raise the potential of overbreadth' in this statute because of the chilling effect on protected

activities. . . Where 'corruptly' is taken to require an intent to secure an unlawful advantage or

19

benefit, the statute does not infringe on first amendment guarantees and is not 'overbroad.'");

CORRUPTLY, Black's Law Dictionary 345 (6th ed. 1990) (acting with "a wrongful design to

acquire some pecuniary or other advantage"); CORRUPTLY, Ballentine's Law Dictionary 276

(3d ed. 1969) (acting with the "intent to obtain an improper advantage for oneself or someone

else, inconsistent with official duty and the rights of others). *Poindexter* also held that a

disinterested but misguided purpose may not be "corrupt." 951 F.2d at 386.

The FSI's failure to identify Nordean's alleged "corrupt" purpose is unconstitutionally

vague, as it leaves to courts and the government to decide which political motivations are

"immoral" or "improper." *Dimaya*, 138 S. Ct. at 1212.  The FSI does not allege Nordean's

actions were taken with the intent to obtain an improper advantage for himself or someone else.

Rather, it alleges that Nordean was motivated by a sincere but mistaken belief that the 2020

election was unfairly decided.  FSI, ¶ 32.  That is unconstitutionally vague.  951 F.2d at 386.

Third, by identifying Nordean's "illegal" entry into the Capitol, as alleged in the FSI's §

1752 charges, as the fact satisfying the "corruptly" element, the government is simply attempting

to alchemize virtually every "restricted area" misdemeanor offense concerning protest near

Congress into an obstruction felony under § 1512(c)(2).  By definition, if a person is guilty of

illegally entering a restricted area under § 1752, they do so "knowingly." § 1752(a).[7]  At that

point, according to the government, if the defendant entered the restricted area to protest an

action of Congress, he is also guilty of a felony under § 1512(c)(2) because he attempted to

"impede" some act of Congress—and did so "corruptly" by virtue of entering a restricted area.

Again, *Poindexter* plainly bars the argument.  Recall: the D.C. Circuit affirmed Poindexter's

---

[7] An offense under § 1752 lies only if the defendant entered the "restricted area" without "lawful authority." § 1752(a)(1).  Last week, the government produced for the first time a Capitol video showing a Capitol Police officer authorizing Nordean's entry into the Capitol Building.

convictions for false statements to Congress under § 1001 but reversed his obstruction conviction under § 1505. But both charges were based on the same lies to Congress. *Poindexter*, 951 F.2d at 380. If the simultaneous commission of some other crime were sufficient to satisfy the "corruptly" element, then Poindexter's obstruction conviction would have been affirmed.

C.      **The rule of lenity plainly applies**

The government contends that the rule of lenity does not require dismissal of the § 1512(c)(2) charges because there is no "uncertainty in the statute." Gov't Opp., p. 23.

The argument borders on the frivolous. The government has cited no case law supporting its interpretation of § 1505's "official proceeding." It offers no legislative history backing that construction. It fails to distinguish precedent from multiple circuits rejecting the very argument it makes here, which were decided by reference to the plain meaning of "official proceeding." The government itself advanced Nordean's interpretation before January 6. With regard to the *ejusdem generis* issue, the Supreme Court's decision in *Yates* bars a "catch-all" interpretation of § 1512(c)(2) that covers acts of political protest. *Poindexter* has rejected the government's interpretation of § 1512(c)'s "corruptly" element. It is one thing for the government to argue that its position is still somehow formally correct. It is nakedly outcome-oriented, however, to find that its position is "unambiguously correct." *United States v. Granderson*, 511 U.S. 39, 54 (1994); *United States v. Santos*, 553 U.S. 507, 515 (2008) (Scalia, J.) ("When interpreting a criminal statute, we do not play the part of [Congress's] mindreader.").

D.      **The novel construction principle forbids retroactive application of new constructions of § 1512(c)(2)**

The government concedes that "no court" has adopted its interpretation of "official proceeding." Gov't Opp., p. 24. However, it argues that there is no Due Process Clause violation

if the Court places that gloss on § 1512(c)(2) for the first time and then retroactively applies it to Nordean for conduct that took place before any court had construed the statute that way. *Id.*

The government is wrong.  Even if the Court adopts the government's interpretation of "official proceeding," even if it decides that such a construction is not unconstitutionally vague, and even if it somehow finds the interpretation "unambiguously correct," it is still a due process violation to apply that novel reading retroactively in a manner similar to an ex post facto law. *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) ("[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids.").  The government does not address *Bouie* or the novel construction principle.  Gov't Opp., p. 24.[8]  Accordingly, the argument is forfeited.  *Alvarez*, 828 F.3d at 295.

### E.   The § 1512(c)(2) counts criminalize protected expression

The government characterizes Nordean's First Amendment argument as contending that free speech protects "storming the Capitol Building and grounds and interfering with law enforcement's efforts to stop him." Gov't Opp., p. 25.  The government's straw man does not save its dangerously overbroad § 1512(c)(2) charges.

---

[8] The government quotes *Bostock v. Clayton Cnty., Georgia* for the proposition that "even if" its interpretation of "official proceeding" was "'not expressly anticipated by Congress' . . . that alone 'does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command.'" Gov't Opp., p. 24 (quoting 140 S. Ct. 1731, 1749 (2020)).  The government is mistaken.  There was no novel construction principle issue in *Bostock*.  To the contrary, *Bostock*'s point was that the statute at issue, unlike § 1512(c)(2) here, "ha[d] [already] been applied in situations not expressly anticipated by Congress." 140 S. Ct. at 1749 (emphasis added).

Contrary to the government's suggestion, Nordean's alleged illegal entry into the Capitol is covered by the FSI's § 1752 "restricted area" charges, not the obstruction counts.[9]  Similarly, Nordean's alleged "interference with law enforcement's efforts to stop him" is covered by the FSI's § 231(a)(3) charges.  Accordingly, if the § 1512(c)(2) counts do any work at all in the indictment, they must criminalize something beyond those actions.  Nor does the government deny that the obstruction counts are not limited to Nordean's entry into the Capitol Building.  Gov't Opp., p. 25.  By definition, the § 1512(c)(2) counts do not allege Nordean's use of "threats or force" to obstruct Congress, for then he would be charged under § 1505.  Nor do the § 1512(c)(2) counts allege Nordean's impairment of evidence or testimony.

If the FSI does not cabin its § 1512(c)(2) charges to those types of actions, they necessarily criminalize protest of acts of Congress per se.  As Judge Wilkinson presciently observed in a 2019 decision, "an obstruction statute encroaching too aggressively on innocent citizen/[government] interactions would infringe the basic right to petition guaranteed by the First Amendment of our Constitution. . . Then, too, a statute that chills or burdens excessively the right of persons to protest . . . would run counter to the operation of criminal justice as we have known it." *Sutherland*, 921 F.3d at 426.  Obstruction convictions have been reversed, and obstruction statutes have been invalidated, for infringing on protected expression.  *City of Houston v. Hill*, 482 U.S. 451, 482 (1987) (invalidating police obstruction ordinance criminalizing "opposing" law enforcement); *Lewis v. City of New Orleans*, 415 U.S. 130 (1974) (invalidating ordinance prohibiting people from cursing or reviling police officers while in the performance of their duties); *Wilson v. Kittoe*, 229 F. Supp. 2d 520, 534 (W.D. Va. 2002)

---

[9] The government recently produced Capitol video showing law enforcement permitting Nordean's entry into the building.

23

(holding that arrest for disobeying police orders under obstruction statute violated defendant's protected expression); *Brooks v. NC Dep't of Correction*, 984 F. Supp. 940, 955 (E.D.N.C. 1997) (vacating obstruction conviction where defendant protested the treatment by the police of a boy).

Nordean's challenge to § 1512(c)(2)'s application to his protected political expression is best analyzed through the Supreme Court's picketing and parading jurisprudence.  Directly on point is *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).  That case concerned a group of black Mississippians whose concerted protest and boycott of white merchants included both protected First Amendment activity and violence.  Besides an economic boycott, the protest activity included picketing, marching and demonstrating near public offices and businesses. However, the leaders of the boycott also published the names of boycott violators; shots were fired into their homes and bricks thrown through their windows.  458 U.S. at 904.  Violators were assaulted.  *Id.*  Business owners sued all of the boycotters, whether or not evidence showed they committed violence or property destruction, for an illegal boycott conspiracy.  The Mississippi Supreme Court held that the boycotters were jointly and severally liable for *all* damages, regardless of whether a particular defendant committed an act of violence or threatened violence.  *Id.* at 921.

The Supreme Court reversed, holding that "evidence that violence occurred or even that violence contributed to the success of the boycott" was not sufficient to hold liable members of the group who only engaged in First Amendment-protected "speeches, marches, and threats of social ostracism." *Id.* at 934.  Writing for a unanimous Court, Justice Stevens began by observing that concerted action often "encompasses [both] unlawful conspiracies and constitutionally protected assemblies." *Id.* at 889.  And, as Justice Jackson once noted, the "'looseness and pliability'" of conspiracy law meant that "certain joint activities have a 'chameleon-like

character." *Id.* (quoting *Krulewitch v. United States*, 336 U.S. 440, 447-449 (1949) (Jackson, J.,

concurring)).[10]  On the one hand, "The First Amendment does not protect violence." *Id.* at 917.

And while it does protect advocacy of the use of violence, it stops short of advocacy that is

"directed to inciting or producing imminent lawless action and is likely to incite or produce such

action.  *Id.* (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)).  On the other hand, the First

Amendment bars a "'blanket prohibition of association with a group having both legal and illegal

aims.'" *Id.* (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)).  "[T]o punish association

with such a group, there must be 'clear proof that a defendant specifically intends to accomplish

the aims of the organization by resort to violence.'" *Id.* (quoting *Scales*, 367 U.S. at 229)

(cleaned up).  And that "intent must be judged 'according to the strictest law,' for 'otherwise

there is danger that one in sympathy with the legitimate aims of such an organization, but not

specifically intending to accomplish them by resort to violence, might be punished for his

adherence to lawful and constitutionally protected purposes, because of other and unprotected

purposes which he does not necessarily share.'" *Id.* (quoting *Noto v. United States*, 367 U.S. 290,

299 (1961)).  On balance, then, liability in the "chameleon-like" area of group assembly, some of

whose members are violent, must be based on evidence specifying for each defendant how the

criminalized activity of that particular individual fell short of the protections in *Brandenburg*.

*Claiborne Hardware Co.*, 458 U.S. at 934. *See also Street v. New York*, 394 U.S. 576, 578

(1969) (reversal of general verdict required where charge encompasses both protected expression

and unprotected activity).

---

[10] The former Nuremberg prosecutor nurtured a longstanding wariness of prosecutorial abuse of
conspiracy law.  In *Krulewitch*, for example, he lamented the "long evolution of that elastic,
sprawling and pervasive offense" whose "history exemplifies the tendency of a principle to
expand itself to the limit of its logic." 336 U.S. at 446.  "The modern crime of conspiracy is so
vague that it almost defies definition." *Id.*

Nordean does not contend that illegally entering the Capitol or violent interference with law enforcement is protected expression. But the standard is whether the use of *§ 1512(c)(2)*, and in a manner *not limited to* entry into the Capitol Building, the use of threats or force, and the impairment of evidence or testimony, is "greater than is *essential* to the furtherance of" the government's interest in the undisrupted operations of Congress. *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (emphasis added). The government's opposition does nothing to explain why the trespass and law enforcement interference charges, and § 1505, do not sufficiently protect that interest. The government is attempting to turn § 1512(c)(2) into a tool to curb acts in protest of Congress which do not involve threats or force. But it offers no articulable standard that would not also criminalize everyday protest of any controversial piece of legislation, which would constitute "obstruction of Congress."

Therefore, the § 1512(c)(2) charges here, which indisputably encompass at least some protected expression, violate Nordean's rights to free speech, assembly, and to petition the government, which he was exercising on January 6. *O'Brien*, 391 U.S. at 377.

## II.     The Section 231(a)(3) charges should be dismissed

### A.     Congress does not satisfy § 231(a)(3)'s "federally protected function" element

Charges brought under § 231(a)(3) must prove, as an element of the offense, that a "civil disorder . . . in any way or degree obstructs, delays or adversely affects" either (a) "commerce or the movement of any article or commodity in commerce" or (b) "the conduct or performance of any federally protected function." § 231(a)(3). In response to Nordean's Commerce Clause challenge to the § 231(a)(3) charges, the government explicitly waives any reliance on the charged civil disorder's impact on interstate commerce. Gov't Opp., p. 27 n. 6 (The FSI "did not rely on . . . impacting interstate commerce. . .").

The § 231(a)(3) counts must therefore be dismissed.  The government asserts that the § 231(a)(3) counts charge that the alleged civil disorder on January 6 adversely affected "the conduct or performance of any federally protected function." Gov't Opp., p. 27.  The Court will notice that, although the statute formally defines "federally protected function," the government does not disclose that.  *Id.*  There is a reason.  "Federally protected function" means,

> [A]ny function, operation, or action carried out, under the laws of the United States, by any *department, agency or instrumentality of the United States* or by an officer or employee thereof; and such term shall include, but not be limited to, the collection and distribution of the United States mails.

§ 232(3) (emphasis added).

As the Court knows, Title 18 defines "department" and "agency" for every reference to those terms throughout the title.  Section 6 provides,

> The term "department" means one of the executive departments enumerated in section 1 of Title 5,[11] unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.

> The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

18 U.S.C. § 6.

The Supreme Court has held that Section 6's definition of "department" as "one of the executive departments enumerated in section 1 of Title 5" presumptively controls any Title 18 statute's use of that term unless the government makes a "fairly powerful" "showing" that

---

[11] The Executive Departments enumerated in section 1 of Title 5 are: The Department of State; The Department of Treasury; The Department of Defense; The Department of Justice; The Department of the Interior; The Department of Agriculture; The Department of Commerce; The Department of Labor; The Department of Health and Human Services; The Department of Housing and Urban Development; The Department of Transportation; The Department of Energy; The Department of Education; The Department of Veterans Affairs; and The Department of Homeland Security.  5 U.S.C. § 101.

Congress intended, *in the statute at issue*, that "department" refer to the "legislative, or judicial branches of government," which the Court held was the "unusual sense" of the term.  *Hubbard v. United States*, 514 U.S. 695, 700 (1995).

In *Hubbard*, a man was convicted under a now-superseded version of § 1001 that punished "'Whoever, in any matter within the jurisdiction of *any department or agency of the United States* knowingly and willfully . . . makes any false, fictitious or fraudulent statements. . .'" 514 U.S. at 698 (quoting § 1001) (emphasis added).  The man had filed false records in a bankruptcy court.  The lower courts upheld his conviction on the ground that such a court was a "department . . .of the United States," in the sense that the executive, legislative and judicial branches of government were sometimes referred to as "departments" in the 18th century.  *Id.* Not only did the Supreme Court reverse his conviction on the ground that this interpretation of "department" was inconsistent with § 6, it overruled its own prior contrary precedent notwithstanding the gauntlet of *stare decisis.*  514 U.S. at 701.

The Court's interpretation of "department" in *Hubbard* shows there is no permutation of facts alleged in the FSI that could meet the "department, agency or instrumentality of the United States" standard in § 232(3) and § 6.  Examining the old § 1001, *Hubbard* found that it merely referred to "the jurisdiction of any department or agency of the United States" without statutorily defining "department" or "agency." 514 U.S. at 704-705.  On its own, that meant the government did not make the requisite "fairly powerful showing" that Congress intended the "unusual sense" of "department" to mean the judicial or legislative branches of government.  *Id.*

Identically, Section 232(3) does not define "department" or "agency." Accordingly, the default definitions in Section 6 apply.  *Hubbard*, 514 U.S. at 701.  No theory of the Section 231(a)(3) charges here satisfies Section 6.  The most natural reading of the FSI is that the

"federally protected function" adversely affected by the alleged civil disorder was Congress's

joint session on January 6.  However, Congress is neither a "department" nor an "agency" under

Section 6, as it is not an executive department.  18 U.S.C. § 6.  *See*, *e.g.*, *Trump v. Deutsche*

*Bank AG*, 943 F.3d 627, 645 (2d Cir. 2019) (applying *Hubbard* and § 6 and holding that the

Right to Financial Privacy Act's reference to a "department or agency" does not apply to

Congress) *rev'd and remanded on other grounds sub. nom. Trump v. Mazars USA LLP*, 140 S.

Ct. 2019 (2020); *United States v. Oakar*, 111 F.3d 146, 155 (D.C. Cir. 1997) (After *Hubbard*, a

statute's reference to "department" does not refer to Congress); *United States v. Perraud*, 672 F.

Supp. 2d 1328, 1344 n. 4 (S.D. Fla. 2009) (Congress neither a "department" nor an "agency").

Nor does the legislative history of Section 231(a)(3) make a "fairly powerful showing" to

overcome § 6.  As noted in Nordean's motion, the legislation's sponsor, Senator Long, was clear

that the purpose of the statute was the "unwitting stumbling block" that a 1968 hate crime law

would "place before *State and local officials* in their honest attempts to detain and prosecute

incendiary rabble rousers." 114 Cong. Rec. 1289 (Jan. 29, 1968) (emphasis added).  In addition,

the statute that would be codified at Section 231(a)(3) was needed specifically so that there

would be no defense "available to [civil rights leaders like] Rap Brown or Stokely Carmichael . .

. that they did not cross the *State boundary* with the intent to create a riot." 114 Cong. Rec. 5533

(emphasis added).  That congressional focus on federal support for state authorities does nothing

to overcome the presumption in § 6 that Congress is not a "department" or "agency." *Hubbard*,

514 U.S. at 701.

In light of Section 6, *Hubbard*, and the government's position revealed in opposition that

the Section 231(a)(3) charges do not rely *even alternatively* on interstate commerce, counsel

asked the government to explain on which "department, agency or instrumentality of the United

29

States" those charges rest.  The government did not respond.  Out of an abundance of caution,

Nordean will address any other conceivable set of facts bearing on this issue discernable in the

FSI.  If the charges rest on the theory that the "federally protected function" is not Congress's

session but somehow the U.S. Capitol Police, the Section 231(a)(3) counts would fail.  First,

such a claim would be incoherent under the terms of § 231(a)(3), as the "law enforcement

officers" referenced in the statute would constitute both the entities *protecting* the "function"

adversely affected by the civil disorder and also the "federally *protected* function" at the same

time.  Such a reading would render the element requiring proof of the civil disorder's adverse

effect on the "federally protected function" redundant, as another element already requires that

"law enforcement officers" be obstructed, impeded, or interfered with.  § 231(a)(3).  Section

232(3) provides a specific example of a "federally protected function": "collection and

distribution of the United States mails." That only confirms the statute's plain meaning that the

"function" being protected by law enforcement is not also law enforcement itself.  Second, the

U.S. Capitol Police are not a "department" under § 6, as they are not listed in section 1 of Title 5.

18 U.S.C. § 6; 5 U.S.C. § 101.  Accordingly, the Section 231(a)(3) charges must be dismissed.[12]

### B.      Section 231(a)(3) is unconstitutionally vague

Although Section 231(a)(3) criminalizes "*any* act" that "obstruct[s], impede[s], or

interfere[s] with any fireman or law enforcement officer," the government claims that the statute

---

[12] Even if the government changes its stated position that the FSI does not rely on the alleged
civil disorder's impact on interstate commerce, the Section 231(a)(3) charges would still require
dismissal, as the government counters none of the Commerce Clause arguments made by
Nordean under *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529
U.S. 598 (2000).  By waiving interstate commerce reliance, the issue is plainly forfeited.
*Alvarez*, 828 F.3d at 295.

provides "fair notice" to the "ordinary person" of what "acts" are felonies and which are not

crimes at all.  Gov't Opp., p. 28.  Its arguments are internally inconsistent and flawed.

First, the government concedes that the "statute's scope" actually encompasses *protected*

speech.  Gov't Opp., p. 29 (The statute "primarily" covers "conduct or unprotected speech").

Yet it does not explain which "acts" of Nordean's constitute the violations of the FSI's Section

231(a)(3) charges.  Were the "acts" Nordean's speech? Protected speech? His protest outside the

Capitol Building? His presence there? Some "act" he took inside the building? This complete

pleading ambiguity only underscores the vagueness inherent in criminalizing any "act" that

"interferes with" law enforcement.  *Dimaya*, 138 S. Ct. at 1212; *Davis*, 139 S. Ct. at 2319;

*Johnson*, 576 U.S. at 591.

Second, the sole § 231(a)(3) precedent it cites in support is *United States v. Mechanic*,

454 F.2d 849 (8th Cir. 1971).  The government asserts that *Mechanic* held that the statute's

vagueness could be saved by construction.  But *Mechanic* has long since been superseded by

Supreme Court authority limiting judicial ability to "rewrite" statutes and requiring certainty to

protect against the evils of vagueness.  After *Mechanic*, the Supreme Court has embraced

vagueness challenges that may not apply to the specific case.  *See Johnson*, 576 U.S. at 603

(rejecting proposition that "a statute is void for vagueness only if it is vague in all its

applications"); *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) ("*Johnson* and [*Dimaya*]

expressly rejected the notion that a statutory provision survives a facial vagueness challenge

merely because some conduct clearly falls within the statute's scope.").  *Mechanic* is also at odds

with the Supreme Court's later recognition of a "personal right not to be convicted under a

constitutionally invalid law." *Bond v. United States*, 544 U.S. 211, 226 (2011).

Third, if this Court relies on *Mechanic* to avoid the vagueness in § 231(a)(3), the FSI's charges under that statute must be dismissed for a separate reason. To avoid vagueness and First Amendment challenges, the Eighth Circuit held that that "§ 231(a)(3) has no application to speech, but applies *only to violent physical acts*." 454 F.2d at 852 (emphasis added). According to precedent relied on by the government, then, the Section 231(a)(3) counts must be dismissed. They do not charge Nordean with "violent" physical acts toward law enforcement officers. FSI, ¶¶ 18, 21, 22, 26, 27, 28, 30, 39, 57, 60, 61, 64 (every reference to law enforcement). We also know that the Section 231(a)(3) counts do not charge violence because the government did not, and does not, rely on them to detain Nordean under the "crime of violence" provision in the Bail Reform Act. 18 U.S.C. § 3142(f)(1)(A).

Fourth, the government does nothing to distinguish *City of Houston v. Hill*, 482 U.S. 451 (1987), where the Supreme Court struck down as unconstitutionally overbroad an ordinance that was remarkably similar to § 231(a)(3). Entitled "Assaulting or interfering with policemen," it made it "unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." *City of Houston*, 482 U.S. at 461. The Court focused in particular on the ordinance's phrase "in any manner . . . interrupt[s] any policeman." It held that the ordinance swept too broadly and was not "narrowly tailored to prohibit disorderly conduct or fighting words." *Id.* at 462-63. The ordinance was "susceptible of regular application to protected expression" because only those individuals "chosen by the police in their unguided discretion" are arrested. *Id.* at 466-67. *See also McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (finding law unconstitutionally vague under *City of Houston* because it criminalized "interfering with or molesting" law enforcement).

The government offers no distinction, much less a credible one, between the unconstitutionally vague laws in *City of Houston* and *City of Columbia* and § 231(a)(3)'s criminalization of any "act" that "impedes" a law enforcement officer—speech and nonviolent protest included. Accordingly, the § 231(a)(3) counts should be dismissed.

## III.    The Section 1752 counts should be dismissed

### A.    The FSI fails to state an offense because only the USSS sets restricted areas under § 1752

Nordean's argument for dismissal of the FSI's § 1752 charges was recently rejected in *United States v. Griffin*, 21-cr-92, ECF No. 41, 2021 U.S. Dist. LEXIS 123952 (D.D.C. July 2, 2021) (McFadden, J.). Nordean disagrees with the decision in that case, but it is reasonable and thoughtful. Accordingly, he will direct this reply to the *Griffin* decision rather than to the government's opposition.

Section 1752 defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" in any of three scenarios set forth in the statute. § 1752(c)(1). The *Griffin* Court acknowledged that the "relevant phrase" in § 1752(c)(1) "appears in the passive voice, implying that someone must do the physical posting, cordoning off, or restricting." ECF No. 41, p. 7. However, the Court determined that this "open-ended[ness]" of the statute "does not mean any word or phrase is ambiguous." *Id.* Because "Section 1752 says nothing about who must do the restricting," interpreting § 1752(c)(1) to require that the Secret Service set the restricted area would be to "read in" a "limitation . . . not required by the text." *Id.* at 10. Because this was the Court's understanding of the plain meaning of the text, it did not address the statute's legislative history, which strongly indicates that § 1752 was enacted in order to give the Secret Service specifically the authority to restrict areas for the protection of Secret Service protectees, a power that no other federal agency possesses. *Id.*

Nordean argues that the *Griffin* Court is mistaken about the text's plain meaning, but even if his understanding is not plainly correct, the question is at least ambiguous, calling for an examination of the legislative history that the Court did not undertake. *See*, *e.g.*, *BedRock Ltd., LLC v. United States*, 541 U.S. 176, 124 S. Ct. 1587, 1595 (2004) ("Because we have held that the text of the statutory reservation clearly excludes sand and gravel, we have no occasion to resort to legislative history."). Reading § 1752(c)(1) to require that the Secret Service set any "restricted area" is not to "import" an "extratextual limitation." This is simply demonstrated.

As the *Griffin* Court noted, the "relevant phrase" is "passive": "any posted, cordoned off, or otherwise restricted area." Notice that although the phrase "says nothing about who must do the restricting," *Griffin*, p. 7, the *Griffin* Court implicitly held that it *does* limit "who must do the restricting." Because § 1752(c)(1) is passively phrased, a literal reading of the subsection would imply that the statute criminalizes, for example, entry into an area "cordoned off" around the White House with traffic cones by any passerby. § 1752(c)(1)(A). Yet the Court limited the power to set restricted areas to "other law enforcement agencies"—a phrase found nowhere in the statute. *Griffin*, p. 6. In doing so, the Court was either (a) "import[ing]" an "extratextual limitation" into § 1752(c)(1) or (and this is what Nordean thinks) (b) reasonably deriving that limitation from within the text but by reference to the subparts that follow the passive phrase. § 1752(c)(1)(A)-(C). Either way, the reasoning that led the Court to read its own preferred limitation "into" § 1752(c)(1) invariably leads to refining the limitation to the Secret Service. All three definitions of "restricted buildings or grounds" concern areas and Secret Service protectees guarded by the Secret Service and no other law enforcement agency. § 3056(a)(1). No other law enforcement agency is referenced in § 1752. To permit any law enforcement agency to unilaterally set restricted areas under the statute leads to a basic absurdity the Court

34

omitted from its opinion.  Consider a Secret Service protectee who is "temporarily visiting" a place.  § 1752(c)(1)(B).  The Secret Service sets a "restricted area" of one block around the protectee's presence.  Under the *Griffin* Court's interpretation, any local police unit could decide to extend the "restricted area" to 20 blocks, without authorization from the Secret Service: the agency charged with protecting the person for whose sake the area is restricted in the first place. If any person were to enter the expanded area without "lawful authority" (from the local police? The Secret Service?) the same government that deemed the area limited to one block could also prosecute a person for entering block 20.[13]

There is a reason that, before January 6, the government had never prosecuted a § 1752 case concerning a "restricted area" not set by the Secret Service.  Congress never contemplated such an outcome.

But even if Nordean is not plainly correct, the *Griffin* Court was surely right that § 1752(c)(1)'s passive phrase is "open-ended." ECF No. 41, p. 7.  Only, there is no legal distinction between a text's "open-endedness" and its ambiguity or vagueness.  *See*, *e.g.*, *Bd. of Airport Comm'Rs v. Jews for Jesus*, 482 U.S. 569, 576 (1987) (equating statutory "open-ended[ness]" with vagueness and ambiguity).  And the lack of any case law supporting the government's interpretation of § 1752(c)(1) means, at the least, that the government's

---

[13] The Court said it was *Griffin's* reading of § 1752 that created absurdity: "Consider when the President visits Camp David, situated on a military base. Griffin's reading of the statute would not permit reliance on the preexisting fortifications of a heavily guarded military installation." ECF No. 41, p. 11.  The Court misapprehended Griffin's position.  As he noted, just as the Secret Service does not have to rebuild the walls of a building occupied by a Secret Service protectee in order to "restrict" the building, it does not have to build new fortifications at Camp David to restrict the retreat.  Section 1752 does not require the Secret Service's *physical labor*—it requires the agency to *designate* the restricted area.  The government concedes that did not happen on January 6.  In any case, § 1752 is not the relevant statute for intruders on military installations; another part of title 18 covers that offense.  18 U.S.C. § 1382.

interpretation is not unambiguously correct. *See*, *e.g.*, *Ramos*, 537 F.3d at 464 (ambiguity in text exacerbated by "absence of binding case law"). Accordingly, the Court should have turned to the statute's legislative history, large portions of which Griffin brought to the Court's attention. *BedRock Ltd., LLC*, 124 S. Ct. at 1595. The Court described this material as the unilluminating stuff of "scattered floor statements" but did not explain what it consisted of. ECF No. 41, p. 7 n. 4.

Section 1752's legislative history does not merely consist of floor statements, though the sponsors of the bill did make clear repeatedly on the floor that the purpose of the statute was to vest the Secret Service with the power to restrict areas, a power no federal agency possessed, so that the USSS would not have to "rely upon a patchwork of State laws and local ordinances and local officers" to restrict areas. 116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added); 116 Cong. Rec. 35,653 (statement of Sen. Hruska) (USSS does not "presently possess adequate Federal authority" to restrict areas). It also consists of a Senate Judicial Committee report that explicitly states that the purpose of § 1752 was to vest the Secret Service specifically with the power to set federal restricted areas. S. Rep. No. 91-1252 (1970), at 7 ("[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices.") (emphasis added).

The *Griffin* Court did examine the "*statutory* history" of § 1752, as opposed to its legislative history. ECF No 41, p. 8 (emphasis original). The Court correctly observed that "[f]rom its enactment in 1970 to 2006, Section 1752 contained a provision that authorized the Treasury Department (of which, until 2003, the Secret Service was a component) to 'designate

by regulations the buildings and grounds which constitute the' protected residences or offices of Secret Service protectees and 'prescribe regulations governing ingress or egress to . . . posted, cordoned off, or otherwise restricted areas where' protectees were present." *Id.* (citing 18 U.S.C. § 1752(d) (1970)). However, the Court found that the 1970 statute, "as well the current statute[,] . . . did not say *who* must restrict an area of a building or grounds." *Id.* (emphasis original). Nordean respectfully contends that interpretation is mistaken. Subsection (a) of the 1970 statute plainly linked the "posted, cordoned off, or otherwise restricted area" to "the regulations governing ingress or egress thereto" that the Treasury Department (and thus Secret Service) was statutorily "authorized" to make in subsection (d). § 1752(a)(1)(ii) (1970).

But that is not just Nordean's view. It is also the view of the Office of Legal Counsel of the Department of Justice. *See Citizens for Responsibility & Ethics in Wash. v. United States*, 922 F.3d 480, 483 (D.C. Cir. 2019) ("The authority of the OLC is nearly as old as the Republic itself."). In May 1995, the Secretary of the Treasury requested a legal opinion from the OLC on whether the Secretary had authority to order the closing to traffic of a segment of Pennsylvania Avenue in order to protect the President. *Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995). In crafting this opinion, OLC painstakingly examined the text of § 1752 and its legislative history. *Id.* at 109-122. OLC determined that § 1752 did, in fact, specify which government entity restricts areas under that statute. It is the Secret Service *via* the Treasury Department:

> Section 1752 plainly grants *the [Treasury] Secretary* authority to limit ingress and egress to an area where the President will be visiting *to create a security perimeter*, even when creating such a perimeter will require the closing of a public street to vehicular traffic.

Op. Off. Legal Counsel, p. 113 (emphasis added).

Indeed, the OLC's entire analysis of the question whether the Treasury Department specifically may lawfully restrict a segment of Pennsylvania Avenue makes little sense if, as the *Griffin* Court held, any government entity, state or federal, may do so at any time assuming the presence of a Secret Service protectee.  Op. Off. Legal Counsel, pp. 109-116.

However, the *Griffin* Court further held that "even if Griffin were correct that [the 1970-2006] version required Secret Service authorizations of restrictions,"[14] amendments in 2006 and 2012 to § 1752 reveal that Congress's intent evolved.  ECF No 41, pp. 8-9.  Nordean respectfully disagrees.  The Court noted that in 2006, Congress eliminated the reference in § 1752 to "regulations."  *Id.* at 8 (citing 18 U.S.C. § 1752 (2006)).  But the 1970 statute explicitly vested the Treasury Department with that regulatory power.  § 1752(d) (1970).  And, just three years before the 2006 amendment, in March 2003 the USSS was transferred from the Treasury Department to the Department of Homeland Security.  Homeland Security Act of 2002, 6 U.S.C. § 101 *et seq.*, Public Law 107-296.  Therefore, it is only natural that the 2006 amendment would eliminate § 1752's references to *Treasury Department* regulations.  The Court did not explain how the perceived shift from vesting one agency (the Secret Service) with the authority to federally criminalize a person's movements to *any* government entity—a large expansion of authority—can be inferred from a ministerial amendment concerning the USSS' bureaucratic home.  The Court also noted that unlike the 1970 statute, the 2006 version criminalized merely entering or remaining in a restricted area and that the 2012 amendment struck the 1970 requirement that a defendant act "willfully." ECF No. 41, p. 9.  But the Court did not explain how any of these changes, however significant they might be in other respects, show that Congress's original intent in enacting § 1752—giving one federal agency, the USSS, power to

---

[14] The government *stipulated* this point in its opposition to Griffin's motion to dismiss.

restrict areas under federal law—had somehow evolved on *that* point.  Indeed, the Court itself observed that "not much" was gained from a foray into the amendments to § 1752 from 2006 and on.  *Id.*  Nordean agrees.  That being the case, the Court erred in finding that the original intent in enacting the statute had somehow changed by virtue of unrelated amendments.

### B.    The government's interpretation of § 1752 is unconstitutionally vague

The *Griffin* Court also determined that § 1752 provided "fair notice" that a defendant might be prosecuted for entering an area restricted by some government entity other than the Secret Service, provided the government alleges the defendant "breached clearly posted security barriers manned by uniformed federal officers." ECF No. 41, p. 12.  The Court also held that the government's interpretation "does not invite arbitrary enforcement by criminalizing common activities or giving law enforcement undue discretion." *Id.*

The Court was mistaken.  Section 1752 did not provide fair notice of the government's theory in this case because, among other reasons, before January 6 the government had never before charged a person for illegally entering an area restricted by some agency other than the Secret Service.  Therefore, Nordean had no reason to know that crossing a barrier "manned by a uniformed federal officer" was a § 1752 offense.  It did not provide fair notice because, as seen above, even if the Court's interpretation were formally correct, the conflicting evidence in the text, legislative history, case law, and an OLC opinion hardly provided clear notice of the *government's theory* to the "ordinary person." *Dimaya*, 138 S. Ct. at 1212; *Davis*, 139 S. Ct. at 2319; *Johnson*, 576 U.S. at 591.

The *Griffin* Court was mistaken that the government's novel interpretation of § 1752 would not result in arbitrary and discriminatory law enforcement action.  *Dimaya*, 138 S. Ct. at 1212.  It already has.  As noted above, hundreds of protestors in October 2018 (a) broke through

Capitol Police barricades, (b) entered a "restricted area" of the Capitol Building and rushed into the Senate chamber, (c) while a Secret Service protectee was present, and (d) were charged with *no offense*, much less an offense under § 1752.  *Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote*, Roll Call, Oct. 6, 2018, available at:

https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/.  The simple fact of the matter is the government created this interpretation of § 1752 for January 6 defendants alone, as every observer of this case instinctively understands. That is arbitrary and discriminatory enforcement par excellence.

### C. The rule of lenity plainly applies in this case

The *Griffin* Court held that the rule of lenity did not apply because it "comes into frame only when a court has exhausted all canons of statutory construction and is left with only a coin flip to resolve a 'grievous ambiguity.'" ECF No. 41, p. 12 (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).

However, "contrary to [that] miserly approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, '*a reasonable doubt persists*' regarding whether Congress has made the defendant's conduct a federal crime . . . [I]n other words, whenever those tools do not *decisively dispel* the statute's ambiguity." *Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)) (emphasis added).  Again, as with the vagueness doctrine analysis, it is impossible to say that no "reasonable doubt persists" about the government's interpretation of § 1752 when the government has never brought such a charge before, no case law supports that position, the original statute was explicitly contrary to the government's interpretation, and no subsequent relevant changes to the statute have been made.

D.     **The novel construction principle bars the Court from applying the government's interpretation**

The *Griffin* Court held that the novel construction principle, which bars the retroactive application of an unprecedented judicial construction of a criminal statute, *Bouie*, 378 U.S. at 353, did not apply because, before January 6, "[t]here was no prevailing practice of courts forgoing or rejecting the interpretation [of § 1752] that the government now advances." ECF No. 41, p. 12.

The Court stated the *Bouie* standard backward.  The novel construction principle question is not whether the defendant can point to prior decisions "rejecting" the government's novel construction of a criminal statute.  Instead, it is whether the government can cite to "*support* in prior . . . decisions" construing the statute at issue.  *Bouie*, 378 U.S. at 356 (emphasis added). Here, the Due Process Clause requires dismissal of the § 1752 charges because the government admits there is "not the slightest *support* in . . . prior [§ 1752] decisions" for its interpretation. *Id.* (emphasis added).

IV.    **The FSI should be dismissed because it does not provide adequate notice and does not ensure the grand jury made determinations required by the Fifth Amendment**

"Under the Federal Constitution, 'the accused' has the right (1) 'to be informed of the nature and cause of the accusation' (that is, the basis on which he is accused of a crime), (2) to be 'held to answer for a capital, or otherwise infamous crime' only on an indictment or presentment of a grand jury, and (3) to be tried by 'an impartial jury of the State and district wherein the crime shall have been committed.' Amdts. 5 and 6." *Apprendi v. New Jersey*, 530 U.S. 466, 500 (2000) (Thomas, J., concurring).  "All of these constitutional protections turn on determining *which facts* constitute the 'crime'—that is, which facts are the 'elements' or the 'ingredients' of a crime." *Id*. (emphasis added).  "In order for an accusation of a crime . . . to be proper under the

41

codification of common-law rights in the Fifth and Sixth Amendments, it must *allege* all

elements of that crime." *Id.* (emphasis added). "Thus, it is critical to know *which facts* are

elements." *Id*. (emphasis added).  The FSI's property destruction and civil disorder charges fail

these tests because what is not charged concretely is not charged constitutionally.

### A.    The property destruction charges are incompletely pleaded

The FSI charges that Nordean attempted to, and did, deprecate federal property on

January 6 and "thereby caused damage to the building in an amount more than $1,000." It also

charges that he aided and abetted that offense.   FSI, ¶ 74.  However, the FSI does not contain a

single paragraph alleging "*which facts* constitute the crime." *Apprendi*, 530 U.S. at 500

(emphasis added).  It does not allege *what* property was destroyed, by *whom* and *when*.

The government responds that the FSI pleads that Dominic Pezzola broke a window on

January 6 and alleges that he is a Proud Boy.  Gov't Opp., p. 39 (citing FSI, ¶ 62).  That response

is frivolous.  To satisfy the Fifth and Sixth Amendments, the indictment "must *allege* all

elements of the crime." *Apprendi*, 530 U.S. at 500 (emphasis added).  The FSI does not *allege* a

criminal agreement between Pezzola and Nordean to commit any crime, much less property

destruction.  Indeed, neither of the two criminal objects of the charged conspiracy concerns

property destruction.  FSI, ¶ 27.[15] *Kanchanalak*, 37 F. Supp. 2d at 4 (dismissing obstruction

charge because indictment did not allege facts satisfying all elements of § 1505 offense, contrary

to Fifth Amendment right to have a grand jury find all elements of an offense).  To the extent the

---

[15] In a footnote, the government says that although it did not *allege* a conspiracy between
Pezzola and Nordean *in the indictment*, it has "specifically set forth its theory of liability in
several pleadings." Gov't Opp., p. 39 n. 7.  First, there is no precedent holding that the
government's presentment and notice failure under the Fifth and Sixth Amendments is somehow
cured by the government making *unalleged* factual proffers in bail briefs.  Second, the
government omits that its "identification" of Pezzola as a "co-conspirator" is based on no
evidence whatsoever.  Yet the government continues to represent that claim as true in court.

government is contending that Nordean may be held liable for Pezzola's criminal acts by virtue of belong to the same political organization, the Supreme Court held that was a violation of Nordean's First Amendment rights over 50 years ago. *Scales*, 367 U.S. at 229; *Noto*, 367 U.S. at 299.

The government adds, "[t]o be sure, there is other evidence in this case that the government believes is relevant to the destruction of property charge." Gov't Opp., p. 6. First, the government continues to repeat this representation in Court without citing evidence. None exists. That is a disgrace the Court should not countenance.[16] Second, the existence of other unalleged and undisclosed evidence does not cure the Fifth and Sixth Amendment notice and presentment defects in the FSI and the government cites no authority holding otherwise.

**B.     The civil disorder charges are incompletely pleaded**

The FSI does not contain a single allegation showing how or when Nordean "interfered" with a law enforcement officer on January 6, pursuant to the FSI's § 231(a)(3) charges.

The government offers one response. It says Nordean has overlooked Paragraphs 16, 18, 19, 20, 24, 55-58, 61-67 of the FSI. Gov't Opp., p. 39. None of those paragraphs concerns the FSI's § 231(a)(3) charges.

**Para. 16** alleges Nordean "followed" a "crowd" past trampled police barriers. That does not constitute a § 231(a)(3) fact because (1) that is true in every § 1752 case the government has charged but in cases where the government does not also charge § 231(a)(3); and (2) the government relies on the § 231(a)(3) decision in *Mechanic* to avoid Nordean's vagueness challenge. It contends *Mechanic* was correctly decided. Gov't Opp., pp. 28-30, 32. *Mechanic*

---

[16] The D.C. Rules of Professional Conduct state that it is misconduct for a prosecutor in a criminal case to "maintain a charge that the prosecutor knows is not supported by probable cause." D.C. Rule of Professional Conduct 3.8(b).

avoided the statute's conceded vagueness by holding that a § 231(a)(3) offense is not satisfied by nonviolent acts. 454 F.2d at 852. Thus, if the Court does not dismiss the § 231(a)(3) charges for vagueness, the nonviolent fact in paragraph 16 does not constitute an actus reus under that statute.

**Para. 18** alleges that Capitol Police struggled to maintain control of a crowd. That does not allege a fact showing Nordean committed a § 231(a)(3) offense.

**Para. 19** does not reference Nordean at all.

**Para. 20** alleges Nordean entered the Capitol Building. That is neither a fact showing Nordean committed a § 231(a)(3) offense nor an act of violence under *Mechanic*. Capitol video shows a law enforcement officer authorizing Nordean's entrance into the building.

**Para. 24** alleges Nordean "celebrated" January 6 in communications. That does not allege a fact showing Nordean committed a § 231(a)(3) offense.

**Para. 55** again alleges Nordean "followed" a "crowd" past trampled police barriers. Again, that does not constitute a § 231(a)(3) fact because (1) that is true in every § 1752 case the government has charged but in cases where the government does not also charge § 231(a)(3); and (2) it is not an act of violence under *Mechanic*.

**Para. 56** alleges Nordean "positioned himself in a crowd." That is not a § 231(a)(3) fact because it is protected expression and does not concern any interaction with law enforcement. It is not an act of violence under *Mechanic*.

**Paras. 57-58** allege Nordean "shook a metal barricade." That is not an act of violence under *Mechanic*, nor does the government contend otherwise.

**Paras. 61-67** allege nothing about Nordean except that he "entered and remained in the Capitol" and then exited. FSI, ¶ 66. That does not constitute a § 231(a)(3) fact because (1) that

is true in every § 1752 case concern Capitol entry the government has charged but in cases where the government does not also charge § 231(a)(3); and (2) it is not an act of violence under *Mechanic*.  Capitol video shows a law enforcement officer authorizing Nordean's entrance into the building.

Because those paragraphs do not concern or satisfy the § 231(a)(3) offenses, and because the government cites no other facts in the FSI supporting those charges, those counts fail to satisfy the notice and presentment requirements of the Fifth and Sixth Amendments.

**Conclusion**

For all the foregoing reasons, Nordean respectfully requests that the Court dismiss the FSI with prejudice.

Dated: July 11, 2021                    Respectfully submitted,

                                        DAVID B. SMITH, PLLC

                                        */s/ David B. Smith*
                                        David B. Smith (D.C. Bar No. 403068)
                                        108 N. Alfred St.
                                        Alexandria, VA 22314
                                        Phone:(703)548-8911
                                        Fax:(703)548-8935
                                        dbs@davidbsmithpllc.com

                                        Nicholas D. Smith (D.C. Bar No. 1029802)
                                        7 East 20th Street
                                        New York, NY 10003
                                        Phone: (917) 722-1096
                                        nds@davidbsmithpllc.com

                                        *Attorneys for Ethan Nordean*

## <u>Certificate of Service</u>

I hereby certify that on the 11th day of July, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Jim Nelson
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, VA Bar No. 25930
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com
>
> *Attorneys for Ethan Nordean*