### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

       **v.**                           **Case No.  21-CR-175-2 (TJK)**

**JOSEPH RANDALL BIGGS,**

       **Defendant.**                       **<u>Oral Hearing Requested</u>**

### <u>MOTION TO REOPEN HEARING AND FOR RELEASE FROM DETENTION</u>

Defendant Biggs, by undersigned counsel, moves to reopen his detention hearing and for his release, pursuant to the Bail Reform Act, 18 U.S.C. Section 3142(f).  Given the size and complexity of the information still surging from DOJ's January 6 investigation, and Biggs' alleged outsized leadership role at the Capitol that day, no circumstances exist or can exist in the near term in which Biggs can participate in his own defense so long as he is detained pending trial based on "future dangerousness" grounds under section 3142. His current detention, now in its fourth month, is well past the point of being on a collision course with his Sixth Amendment rights to prepare for trial with his lawyer. His release to begin the lengthy process of preparing for his trial is particularly warranted when there is no indication that Biggs and others are likely to plan and lead a "second insurrection" against the United States. Biggs' detention at this point is pure coercion to pry false histories from him about a January 6 Proud Boy conspiracy where none existed. Biggs should be restored to his previous status of home detention so he can prepare for trial.

### <u>Additional Background: Defendant Biggs</u>

Joseph Randall Biggs, 37, is a retired United States Army Staff Sergeant and Purple Heart earner. He served two year-long deployments abroad: Iraq (2005-2006) and Afghanistan (2007-2009). In 2009, Biggs was featured in "The Commander," an on-air *Dan Rather Reports* story about the American-led NATO coalition fighting the Taliban insurgency in Afghanistan. While the hour-

long documentary's namesake is American Armed Forces commander General David McKiernan, its second 20-minute segment begins and ends with Biggs and his role in an all-volunteer "maneuver team" of sixteen soldiers, stationed near the Afghan-Pakistan border, formed from three artillery units. Biggs is interviewed in the segment along with other officers but is central to the segment as a reflection of how the maneuver team functioned.  The year-long assignment of Biggs' platoon ranged from engaging Taliban combatants and suicide bombers to helping local villagers build wells, roads and schools for villages in a 350 square mile area. *See, Dan Rather Reports, "*The Commander, an Interview with General David McKiernan," Jan. 6, 2009, Rather (Dan) Papers, e_rather_00080, Briscoe Center for American History, Austin, Texas.

https://danratherjournalist.org/ground/crises-and-conflicts/war-afghanistan/compilation-war-afghanistan-stories-videos/video)

"The Commander" was produced by Michael Hastings, the late war correspondent and *Rolling Stone* writer. Hastings and Biggs became friends in Afghanistan. Hastings would later interview and write about Biggs two more times and use Biggs as a major source in third article. In "Kiowa Helicopters: America's New Cavalry," *MEN'S JOURNAL* (Sep. 2010 issue), Hastings highlighted the ascendancy of the use of the smallish, nimble Kiowa helicopters as air support to help Biggs' platoon and other U.S. infantry fight the Taliban on the ground. In "Obama's War," discussing a late 2008 incident involving Biggs that was also covered in *Dan Rather Reports* "The Commander" documentary, Hastings touched on a suicide bomber who wounded a 9-year-old child that Biggs and a medic managed to keep alive after the bomber had killed himself and two adults. *See,* M. Hastings and L. Read, "Obama's War," GQ (March 31, 2009).  Finally, Hastings used Biggs, due to Biggs' concern for the safety and morale of American Army ground troops in Afghanistan, as a source for his article "The Runaway General", a profile about U.S. General Stanley McChrystal,

General McKiernan's successor in Afghanistan, in *Rolling Stone*'s July 8, 2010 issue.

Hastings' work underscores that Biggs is by upbringing and training both safety conscious and community service oriented. *See,* Biggs' Supplemental Memorandum in Opposition to Motion to Revoke Pretrial Release, 3, April 6, 2021 (ECF 53). He descends from a family of both soldiers (father's side) and news reporters (mother's side). He was raised to participate in the world around him, to serve, to help others and generally to be "in the thick of things." Biggs' father is a retired Vietnam War-era U.S. Marine Corps sergeant and tunnel rat, who earned a military specialization as an Emergency Medical Technician ("EMT") in Combat Lifesaving as an Emergency Medical Technician ("EMT") before he was deployed to Vietnam in the 1960s.

The elder Biggs received more EMT training in Vietnam and had countless opportunities to use it. He continued that service in civilian life after his retirement from the Marine Corps. Growing up in the Carolinas, Joseph Biggs accompanied his father on first responder calls as a volunteer in both urban and rural settings. In 2004, Biggs, now 21, joined the military himself. He was stationed at Fort Bragg, North Carolina through 2009. In October 2005 he completed his own EMT training in combat lifesaving at a nearby college before being deployed to Iraq. Biggs was recertified by his battalion as an Emergency Medical Technician in August 2006 while still in Iraq. *See,* EMT certificates of training awarded to Joseph Biggs from 3rd Battalion, 321st Field Artillery Regiment dated October 15, 2005 (Fort Bragg, NC) (attached as Exhibit 1) and August 10, 2006 (Balad, Iraq) (attached as Exhibit 2). In Afghanistan in particular, Biggs was able to put his EMT training and experience to use in ways that were even publicly documented as they occurred. (The "Obama's War" piece by Hastings even touches on this in a description of the aftermath of a suicide bombing in late 2008. ("The [local Afghan village] kid's lying there naked and bleeding on a slab of concrete outside the motor pool. Outside the gate, Sergeant Joseph Biggs is making sure no one

3

else is hit. Biggs is a 24-year old from Florida." id. at 6-7).

Between 2009 and 2013, Biggs was based at Fort Bliss military base, El Paso, Texas. In 2012, his health and safety orientation came into view again when the base command asked his help to train actors in a widely distributed training film governing language and conduct between men and women in the increasingly sexually-integrated U.S. Army. He also continued to use his EMT training and community service orientation for the benefit of several disaster areas or stressed regions in and out of America. In January 2010, he thought up, planned and carried out a rescue mission near Leogane, Haiti after the earthquake there.  In 2017, while living in Austin, Texas after returning to civilian life, he devised a similar mission near Houston after hurricane Harvey's landfall flooded and killed hundreds of people in Texas and Louisiana.

 As the Court knows (ECF 42), the following year, late 2018, Biggs moved from Austin with his infant daughter to the Daytona Beach area to help care for his mother, a cancer patient on and off in remission. Shortly after the move, he hooked up with the Proud Boys, a fraternity started by comedian, internet personality and VICE Media founder Gavin McInnes two years earlier during the height of the 2016 Hillary Clinton-Donald Trump presidential contest. Biggs joined the Proud Boys organization after moving to central Florida partly to meet people. He never sought a formal leadership position (like chapter president) but did use his planning and leadership roles honed in the military to plan several Proud Boys events in and out of Florida. The two biggest events he planned were the national march and counter-rally to the "Rose City" Antifa demonstrations held in Portland, Oregon late 2019 and 2020. In planning these two events, Biggs frequently interacted with local, state and federal law enforcement, including special agents of the FBI in several FBI field offices.  In July 2020, he met in person with two Daytona Beach-area FBI special agents interested in tapping his knowledge about specific Antifa persons and activities Biggs and other Proud Boys

were seeing "on the ground." *See also,* Opposition to Motion to Revoke (ECF 42)

       *The Proud Boys.* Founded in July 2016 by comedian and satirist Gavin McInnes, Proud Boys is a men's fraternal organization. It is "pro-Western" civilization. It is pro-family and pro-religion (any religion). It has rules. It has by-laws. *See, The Constitution and Bylaws of Proud Boys International L.L.C.* (revised November 24, 2018) (attached as Exhibit 3). It is not and has never been far-right, white nationalist, white supremacist, racist, misogynistic or homophobic. It has resisted and fought back at such labeling. *See,* e.g., Keith McMillan, "FBI says Proud Boys are not an extremist group," *THE WASHINGTON POST*, Dec. 7, 2018, at B1 (Ranking Oregon Special Agent tells reporters that "the FBI had not intended to designate the group as extremist during a slide show with the Clark County Sheriff's Office."). Proud Boy founder and ex-chairman McInnes has sued the Southern Poverty Law Center (SPLC) in an Alabama federal district court for defamation and several other theories of recovery after designating Proud Boys as a "hate group" and engaging in a de-platforming and defunding campaign against McInnes and his media enterprises. The SPLC's motion to dismiss filed two years ago was met with a contentious if scholarly opposition by McInnes's lawyers and so far has failed in every respect. That litigation persists. *See Gavin McInnes* v. SPLC, 2:19-cv-98-MHT-GMB Doc. 32 filed 05/14/19 (M.D Ala. N.D.) Finally, Enrique Tarrio, Proud Boy chairman since November 2018, is past Florida state director of Latinos for Trump. Like his predecessor McInnes, Tarrio is an accomplished political satirist. He grew up in the Little Havana section of Miami. Tarrio is of Cuban and Afro-American descent.

    Like any new group, especially a decentralized one, the Proud Boys have unique challenges, including unique vetting and membership challenges. Since its start in 2016, clearly unacceptable

candidates have been turned away from Proud Boy membership after vetting in scores of local

chapters nationally. Members have also been ejected from Proud Boys based on their actions, words

or later-discovered falsehoods or omissions made during the vetting process. And like every political

or cultural organization, especially a fledgling, decentralized one, it attracts eccentrics, malcontents,

wannabes, straight-up dorks and some bad actors. The Proud Boy idea, however, is to maintain and

promote what members see as positive, traditional American values which they believe have served

their own families and other Americans well. Twelve group tenets written five years ago still hold

true for the group.

1. Minimal Government
2. Maximum Freedom
3. Anti-Political Correctness
4. Reinstating a Spirit of Western Chauvinism
5. Anti-Racial Guilt (No shame "for the deeds of ancestors.")
6. Pro-Free Speech
7. Anti-Drug War ("An endless war that enacts policies that bury the addicted.")
8. Anti-Racism
9. Closed Borders
10. Pro-Gun Rights
11. Glorifying the Entrepreneur
12. Venerating the Housewife

Gavin McInnes, Founder, Former Chairman, The Proud Boys, "The Proud Boy Tenets" (January

28, 2021).

### Procedural History of This Motion

Between January 20 and April 22, Biggs awaited trial at his home in Ormond Beach, Florida

under strict conditions of release: GPS location monitoring device, weekly drug testing, psychiatric

evaluation and medical check-ups, DNA sampling, firearm surrender, passport surrender and highly

restricted travel. He *daily* spoke on the phone with his Pretrial Services Agency (PSA) officer Charles

Sweatt in Orlando. Sweatt found Biggs's level of compliance exemplary. On March 22, 2021, he

wrote that Biggs "presented no concerns regarding compliance since his release from custody in our district. He has maintained compliance regarding his conditions of release and location monitoring and maintained regular communication with me." (ECF 42-1). A week later, on March 29, Sweatt even told the PSA Supervisor in Washington, D.C., Ms. Christine Shuck, that Biggs had "super compliant" since January 20. (ECF 40).

On Saturday, March 20, Biggs had just completed his second month on home detention when he was served unexpectedly with the Government's Motion to Revoke Pretrial Release (ECF 31).  A newly unsealed six-count First Superseding Indictment ("FSI") (ECF 26) charged that on January 6, Biggs, Ethan Nordean, Charles Donohoe  and Zachary Rehl conspired, attempted to, did violate, and aided and abetted in the violation of 18 U.S.C. sections 1512(c)(2) and 231(a)(3). Counts 1, 2 and 3. FSI Count 4 charges "depredation" of federal property in over $1,000 of damage. Finally, FSI Counts 5 and 6 charge violations of 18 U.S.C. section 1752 by entering, remaining on and being "disorderly" on a "restricted building and grounds."  After a two-part detention hearing starting on April 6 and concluding April 19 (ECF 59, 72), and issuance of a Detention Order on April 20 (ECF 66), Biggs on April 22 reported as ordered to federal marshals in the Middle District of Florida in Orlando who transported him to a federal lock-up unit the Seminole County Jail in Sanford, Florida.

## Bail Reform Act Standard For Reopening Hearing

Under the Bail Reform Act (BRA), a district court may reopen a detention hearing at any time before trial if it finds that information exists that was not known to the movant that the time of the hearing and that has a material bearing on the issue "whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. Section 3142(f). The hearing and oral ruling on the government's

motion to revoke the Biggs' home detention occurred, respectively on April 6 and April 19. It

culminated as required under BRA in a written order of April 20. (ECF 66). In the April 20 order

Biggs is not found to be a flight risk ("assure the appearance of such person as required").  Rather,

his detention in a Florida jail pending trial on the six counts against him is on the basis of future

dangerousness ("the safety of…the community").  The question now before the Court under

Section 3142 is whether there is any new information or evidence that has a material bearing on the

likelihood of Biggs posing future threat to the peace and stability of the United States. Below Biggs

proffers new information which he believes affects the pretrial detention inquiry the Court made on

April 6 and 19 in a number of respects.

## ARGUMENT

### A. Conditions of Detention for Biggs at Seminole County Jail

Biggs has been held at the Seminole County Jail (aka John E. Polk Correctional Facility), a

medium security jail in Sanford, Florida ("Seminole") since April 22.  Seminole has a capacity of about

1200 inmates. Seminole in not a federal facility run by the U.S. Bureau of Prisons but has a good

reputation. Biggs is housed in a federal prisoner section with a capacity of about 80. The Seminole

federal unit functions as staging area and "transfer station". Federal prisoners are temporarily housed

there until transferred to permanent housing elsewhere. Although not large, the unit housing Biggs is

a throughfare of news, gossip and scuttlebutt due to the constant flow of people. It's a busy, fluid part

of Seminole.

#### 1. Biggs' safety and health issues

As reported at the status conference of July 15, Biggs has experienced two significant safety

and health events at Seminole. National media coverage of the Proud Boys, coupled with a relatively

high profile status as a leader and activist during most of his adult life, has made Biggs a "known

man" at Seminole County Jail. When he arrived at Seminole on April 22, most inmates quickly knew his name and presence there. Within a week of his incarceration there, even new prisoners knew of Biggs' presence there immediately--and some apparently knew before arriving.  Most prisoners treat Biggs with at least a modicum of respect. But some do not. On May 21-22, a small gang of Hispanic prisoners suddenly started to threaten Biggs verbally and aggressively due to his affiliation with the Proud Boys. The Seminole Classifications Department, which also controls lawyer-client meetings and phone calls at the jail, immediately and deftly transferred Biggs to another nearby but separate section of the federal lockup where he remains. The threats subsided and ceased when those prisoners left. New inmates, however, come and go constantly.

As also mentioned to the Court during the status conference on July 15, Biggs in June experienced two weeks of a painful flareup and swelling of a knee operated on in February 2020. The knee operation involved insertion of a prosthetic device behind the kneecap to correct damage caused over time by explosions in Iraq and Afghanistan. The knee flareup at Seminole in June was unexpected and the first problem of any kind since the 2020 operation. Although the pain and swelling has subsided, x-rays taken at Seminole strongly suggest that another operation will be needed to replace the current underlying prosthetic. Obviously, such an operation would have to take place at a hospital or clinic outside the Seminole Jail, preferably at the same Veterans Affairs clinic in Daytona Beach where the 2020 operation was performed. Convalescence for several weeks if not months would be needed at a venue outside Seminole.

### 2. Inability to Prepare for Trial: The Mother of All Client Preparation Bottlenecks

While the threats to Biggs in jail and the need for a new knee operation and convalescence period are by themselves enough to justify Biggs' release and restoration to his previous home

9

detention status in Ormond Beach, neither is more pressing than the problem of Biggs' pretrial preparation limitations. And that problem is becoming difficult to overstate. Little if any substantial, meaningful pretrial preparation between Biggs and his counsel can occur as long as he is confined in any correctional facility, even one as well-managed and as reputable as Seminole.  Little trial preparation has occurred so far. That is now a simple fact of life for every January 6 defendant currently detained and his counsel. Few if any--and probably not one--American jails, prisons or correctional facilities (of any security grade) is currently constituted or equipped to permit a January 6 defendant to prepare for trial or a non-trial resolution. That is especially true of defendants like Biggs and his codefendants (with no criminal records and engaging in no violence or property damage on January 6) who the Government has designated as "leaders" in "conspiracies." The discovery from DOJ they must review is both "defendant-specific" and "general" in the January 6 discovery cache. Those defendants must be presented with a specially-designed teleconferencing solution they can use most hours of the day with their counsel or be released to home detention so they can properly prepare for trial.

>        a. **The Client Preparation Problem**

The trial preparation problem is of course most acute for defendants Biggs, Nordean, Donohoe and Rehl, all alleged to be major "players" at the Capitol on January 6. The amount of discovery, much of it hundreds of hours of video, is simply too much for any counsel to efficiently share and discuss with any January 6 defendant. *See,* discussions below, at Sections B (growing discovery) and C. (growing Sixth Amendment issues). Seminole management understands the magnitude of the problem in Biggs' case. Government counsel seems well-aware of the problem. Undersigned counsel first addressed the client preparation problem with Seminole officials in May. These discussions will continue and will soon include DOJ attorneys assigned to this case. Presently,

counsel speaking with or writing to three management level officials, including two captains at Seminole's Operations Division, about crafting a new system for regular preparation sessions which permit sharing of videos and documents. However, nothing short of building a completely new, secure two-way real-time system of teleconferencing (equipment and software) that can be used by a prisoner and his counsel several hours a day will permit preparation of January 6 clients like Biggs.

   b. **A Note on Communications Currently Offered at Seminole**.

   Since the first week of his detention, Biggs and his counsel have utilized every communication app or system offered by Seminole, and are of course exploring others. Here's a summary:

   1. Regular mail, it should first be noted, cannot be sent to inmates. No packages or books can be sent by a publisher, Amazon, USPS or any other delivery service.

   2. **Securas phone calls.** Biggs and his counsel do speak by telephone two or three times daily on a system operated by Securus Technologies, a longtime Seminole vendor. Each Securas call is 15 minutes long, relatively expensive and non-private. However, the quality of the connection is good. A few things can be accomplished. Of course, no preliminary discovery can be reviewed. No strategy can be discussed.

   3. **Seminole attorney-client calls**. Seminole also makes available a 30-minute confidential client-attorney telephone after a request on "law firm letterhead." However, the quality of the connection calls is erratic. Calls cannot be scheduled every day. Biggs and his counsel have stopped using it.

   4. **Smart Communications email**. Biggs and counsel can securely email using Seminole vendor Smart Communications; however, no documents or videos can be transmitted.

   5. **In person meetings at Seminole**.  Counsel may meet in-person with an inmate. A meeting has been set up for August 18. For that meeting, it's still unclear whether counsel can bring

a laptop.

    6. Finally, Seminole and Biggs' counsel are also currently exploring review of documents by Biggs for a couple of hours a day at the prison library. However, this would not of course permit a real time conversation with counsel as documents or videos are reviewed even if the laptop there could download the hundreds of files produced by DOJ. Moreover, it's not clear at this point how digital materials could be securely forwarded for review and what form they would take.

## B.  Expanding Discovery in January 6 Cases: The Single Most Compelling Reason to Reopen Detention Proceedings

    Increasingly, January 6 case discovery and related information management issues have earned descriptors like "novel," "difficult," "problematic," and "extraordinary". Such terms are not routinely heard in can-do American litigation legal circles, civil or criminal. The events of January 6, 2021 at the Capitol quickly changed that. From hundreds of defendants, witnesses, informants, law enforcement officers and other security personnel came massive flows of video (body-worn, closed circuit, fixed-point surveillance, seized), photos, reports and other data routinely available to prosecutors and which defense counsel are often entitled to see and process together with their clients. But the challenge for anyone stepping into January 6 discovery universe is simply apprehending its colossal size fully. Each new arrest and case generates additional mass, variety and flow to the overall discovery "pool." On June 3, during a status conference in this case, lawyers for the government commented on "the complexity of the case," "the number of defendants," "the scope of the crime scene—thousands of people unlawfully on the Capitol grounds, more than 15,000 hours of surveillance footage and body-worn camera," the over 1,600 electronic devices seized and "over 20 responding law enforcement agencies." The comments were made to toll the Speedy Trial Act or "to allow for both defense counsel and Government counsel alike to engage in

due diligence in their effective preparation for trial." Hr'g Tr. at 8-9 (ECF 117).

To put just some of the January 6 trial preparation into perspective for a defendant like Biggs, consider the "15,000 hours of surveillance footage and body-worn camera" mentioned by the Government at the June 3 status conference. To review one-quarter of that footage, which some defendants (i.e., charged as a leader in a conspiracy) may need or choose to do, the time required to review the footage once through would the equivalent of 155 days of non-stop video watching. It's a daunting task under any circumstances but highly unlikely that any January 6 defendant could accomplish that in prison even assuming a prison permitted it.

To its credit, the government early on sought expert help to manage January 6 case information. In July, DOJ contracted with Deloitte for $6 million to build a central repository for the discovery surge, and the contract price is expected to quickly quadruple to nearly $25 million. *See,* Josh Gerstein and Kyle Cheney, "Feds agree to pay $6.11 to create database for Capitol Riot prosecutions," POLITICO, July 9, 2021.  The government did not however contract for the designing of a teleconferencing tool or other secure two-way communication device which would permit a detained defendant and his counsel to share and discuss large flows of discovery as they are produced.  DOJ and detained defendants share an interest in fair outcomes at trial or flowing from pre-trial discussions.  For that, however, there needs to a level playing field for information flow.

## C. <u>Sixth Amendment Concerns Alone Favor Immediate Release from Custody</u>

The Sixth Amendment to the Constitution states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

13

U.S. Const. amend. VI. While the Sixth Amendment has long guaranteed criminal defendants a variety of rights in criminal prosecution, two are notably threatened here by Biggs' current detention conditions important: (a) to know what the evidence is against him or her, and (b) to have the effective assistance of counsel. For reasons of size, complexity, sheer novelty and the utter and complete lack of any known technology adequate to the task for January 6 cases, neither of these overarching rights is possible in the government's prosecution of Biggs so long as Biggs is incarcerated. Case preparation needs *alone* favor the release of Biggs to prepare for trial or for non-trial resolutions. As of April 6—the date of Biggs' detention hearing—about 400 defendants had been charged in the January 6 cases. There are now 570 defendants. Additional defendants continue to be arrested and charged. Each new defendant, moreover, generates its own defendant-specific discovery cache of videos, photos, reports and attachments to reports still photography and documentation *plus* adds to the overall general discovery wave of information to which arguably every existing defendant is entitled.

The Court is reminded that the events and timeline of Wednesday, January 6 occurred physically on roughly one-half acre inside and just outside the Capitol with over 1000 "players." While all defense counsel applaud and appreciate the government's efforts to obtain, organize, manage and produce the gargantuan and growing amounts of amount of information generated by each new arrest, more than one defense counsel has likened the receipt of discovery in this case like "drinking out of a firehose." To be sure, due to the prominent January 6 roles the government has crafted for Biggs and his codefendants Nordean, Donohoe and Zehl, these defendants are entitled to all such discovery. All of it relates to each of them. There is no end to the surge of information. Keeping Biggs and other non-violent "leader" defendants in jail indefinitely with this much discovery accumulated means effective trial preparation is not likely.

14

**D. BRA Did Not Envision "Future Dangerousness" Detainees Like Biggs**

The Bail Reform Act of 1984 was more than a decade in the making. It changed the federal pretrial detention and bail system in a significant and groundbreaking way. In enacting it, however, Congress envisioned specific types of crimes for which repeat offenses were common, frequent and well-known. The goal was to address the "pressing societal problem" (United States v. *Salerno*, at 747) of defendants who remained dangerous to public safety after pretrial release. *See*, S. Rep. No. 98-225 at 4-8 (1984).  As this Court noted in *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999):

> [T]he Supreme Court has already recognized that Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are "the most serious" compared to other federal offenses. United States v. Salerno, 481 U.S. 739, 747 (1987) This construction is consistent with the Senate Report, which states that pretrial detention is necessary for only a "small but identifiable group of particularly dangerous defendants."

*Id.* (quoting S. Rep. No. 98-225, at 6).  When the BRA was passed, Congress was concerned with a discrete group of offenses based a number of studies conducted nationally, including in the District of Columbia. It also narrowed its focus to primarily repeat offenders with criminal records. Another integral part of the Act's legislative history, S. Rep. No. 98-147 (1983), stated:

> Several studies indicated that the length of pretrial release plays a significant role in determining whether or not a subsequent crime will be committed. Moreover those with prior records are more prone to commit crime while on pretrial release. In addition, the GAO Study indicated that persons on bail tended to commit more felonies than misdemeanors.
>
> A study in Memphis found that 23 percent of bail crime is committed against property, rather than against persons. Two studies bear this out. In Washington, D.C. it was found that 65 percent of auto theft defendants on pretrial release were rearrested for another auto theft. An Attorney General's report on crime in the District of Columbia showed that 70 percent of release robbery defendants were rearrested for another crime.

*Id.* at 30.

15

In addition to auto theft and robbery, other crimes of focus committed by defendants on some kind of conditional release Congress looked at were:  murder, rape, burglary and assault. *Id.* at 26-27. In 1981, Senate Judiciary Chairman Edward Kennedy even underscored the prevalence of these same offenses by defendants "free on bail" in terms of percentage based on the same or similar studies: 65% (auto theft); 40% (forgery); 33% (robbery); 27% (burglary).  Edward M. Kennedy, *A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform*, 49 Fordham L. Rev. 423, 423-424 (1981). Finally, it is noteworthy that the pretrial detainees in *Salerno*--which in 1987 upheld a facial challenge to the BRA--were defendants with significant criminal records and charged with thirty-five counts of racketeering, including conspiracy to commit murder.

        As reflected above, Congress in enacting the Bail Reform Act of 1984 believed future dangerousness concerned primarily (a) discrete set of crimes committed (b) by those with significant criminal backgrounds. While Biggs appreciates that he is detained under the argument that one of Act's enumerated crimes is 18 U.S.C. section 1361 (destruction of property over $1000 in value), the thrust of the Act is to incarcerate pretrial defendants for common, recognizable crimes that they are likely to repeat. It is submitted that "obstruction" of a ministerial Congressional proceeding is not among the crimes Congress envisioned.

### E. <u>New January 6 Conspiracies</u>

        The six-count First Superseding Indictment in March against Proud Boys Biggs, Nordean, Donohoe and Rehl (ECF 26) represented the first January 6 leaders "conspiracy" (18 U.S.C. section 1512 obstruction) brought by the Government. Now there are at least two other major section 1512 conspiracy indictments against "extremist" groups.  In May, the Government charged sixteen "Oathkeeper" defendants under an almost identical legal framework in another alleged obstruction

conspiracy that was highly elaborate and different than the conspiracy in Bigg's case. *See*, *United States v. Caldwell*, 21-cr-00028-APM (5/30/21). In June, and using the same legal architecture, the Government indicted six of Southern California's "Three Percenters" and alleged a third and entirely different obstruction theory. *See, United States v Hostetter*, 21-cr-00392-RCL (6/9/21).

Biggs and his counsel find it highly improbable that all three conspiracies to storm the Capitol on the same day for same purposes could exist. At a minimum, no defendant in any of them should be in pretrial detention as long as the Government has "competing" obstruction conspiracy theories about groups involved in the events of January 6.

## CONCLUSION

Biggs' detention hearing should be reopened to consider arguments on his release. January 6 case management challenges are mounting for all litigants. The continuing surge in discovery production make it difficult to prepare detained clients in the January 6 cases.  But this is especially true in the case of a defendant like Biggs who the Government has assigned a prominent role in the events of that day. Biggs believes he should be restored to his previous status of home detention so he can prepare for trial. At a minimum, however, the Court should hear argument on current difficulties in trial preparation and how those difficulties can be timely addressed.

.                              Respectfully submitted,

                               JOHN DANIEL HULL
                               COUNSEL FOR DEFENDANT JOSEPH BIGGS

                               By: */s/ John Daniel Hull*
                               JOHN DANIEL HULL
                               DC Bar No. 323006; California Bar No. 222862
                               Hull McGuire PC
                               1420 N Street, N.W.
                               Washington, D.C.  20005
                               619-895-8336
                               jdhull@hullmcguire.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 8, 2021, he served a true and correct copy of the foregoing Motion to Reopen Hearing and for Release from Pretrial Detention via Electronic Case Filing (ECF) system upon counsel for the government.

By: _/s/ John Daniel Hull_
JOHN DANIEL HULL
DC Bar No. 323006; California Bar No. 222862
Hull McGuire PC
1420 N Street, N.W.
Washington, D.C.  20005
619-895-8336
jdhull@hullmcguire.com