**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

```
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00175-TJK-3

          v.                      Washington, D.C.
                                  Wednesday, June 30, 2021
ZACHARY REHL,                     12:00 p.m.

               Defendant.
- - - - - - - - - - - - - - - - x
```

─────────────────────────────────────────────

**TRANSCRIPT OF STATUS CONFERENCE**
**HELD BEFORE THE HONORABLE TIMOTHY J. KELLY**
**UNITED STATES DISTRICT JUDGE**

─────────────────────────────────────────────

**APPEARANCES VIA VIDEOCONFERENCE:**

```
For the United States:    Luke M. Jones, Esq.
                          Jason B. A. McCullough, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233


For the Defendant:        Shaka Johnson, Esq.
                          LAW OFFICE OF SHAKA JOHNSON, LLC
                          1333 Christian Street
                          Philadelphia, PA 19147
                          (215) 732-7900


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111
```

**Proceedings recorded by machine shorthand; transcript**
**produced by computer-aided transcription.**

<u>**P R O C E E D I N G S**</u>

1

2          THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-175, Defendant 3, United States of

4    America v. Zachary Rehl.

5          Present for the Government are Jason McCullough

6    and Luke Jones; present from Pretrial Services is Christine

7    Schuck; present for the defendant is Shaka Johnson; also

8    present is the defendant, Mr. Rehl.

9          THE COURT:  All right.  Before I say any more,

10   Mr. Johnson, can you go ahead and mute your speaker, because

11   we're getting a very loud, sort of -- we're getting very

12   loud sound from you shuffling papers and so forth.

13          MR. JOHNSON:  Very sorry, Judge.  Let me do that.

14          THE COURT:  That's all right.  I -- that's all

15   right.

16          (Brief pause.)

17          I think that's -- okay.  I think -- all right.

18          Before we begin, let me just say we are here to

19   hear argument on the Government's motion to revoke

20   Mr. Rehl's conditions of release -- for its motion to revoke

21   -- release.  I'll put a few things on the record about how

22   we got here and why this has taken so long.  First -- and in

23   part, I'm doing this because I do want to underscore to you,

24   Mr. Johnson, that we really need better communication

25   between the Court and you about availability and to make

1      sure that we're able to schedule proceedings with regard to

2      Mr. Rehl in an efficient manner.  And I say that because in

3      our --

4              And actually, let me just also say, I'm now

5      hearing myself -- I'm hearing my own voice reverberating.

6      So if there's anyone who doesn't have your microphone muted

7      that's on the line, if you could go ahead and mute it right

8      now, I'd appreciate it.

9              Well, I'm being -- well, I was going to talk more

10     about how we got here, but I'm being told that the facility

11     here Mr. Rehl is at has a hard stop at 1:00 o'clock.  One of

12     the things that's very frustrating for me here is that we

13     have -- we've had a very difficult time finding time to

14     coordinate and to -- for me to -- the Government's motion.

15     I'm not going to belabor -- spend any more time talking

16     about the delays, but suffice it to say we've tried to

17     schedule this at various times between -- since now over the

18     past few months and it's just been very difficult.  There

19     are problems -- obviously, technical problems with the time

20     -- the facility.

21              Ms. Harris, is there no -- why do we have a hard

22     --

23              And I -- again, we scheduled this for 12:00

24     o'clock today.

25              Ms. Harris, why do we have -- is there no other

 1    time that we could pick this up later today at this facility

 2    if we have a hard stop at 1:00 o'clock?

 3              THE DEPUTY CLERK:  No, Your Honor, if you recall

 4    the procedure that they use for scheduling, and they only

 5    schedule on one-hour slots --

 6              THE COURT:  All right.

 7              THE DEPUTY CLERK:  -- and I believe in the

 8    afternoon is when she had told me that they handle their

 9    District of Pennsylvania cases through their --

10              THE COURT:  All right.

11              THE DEPUTY CLERK:  -- clerk's office.  So --

12              THE COURT:  All right.

13              THE DEPUTY CLERK:  -- this is the last slot for

14    today.

15              THE COURT:  All right.  Very well.

16              Here's what I'm going to do, then, in light of

17    that.  Why don't I hear argument from -- it's the

18    Government's motion.  So why don't I hear argument from the

19    Government, I'll hear argument from Mr. Johnson, and what

20    I'll do -- what I have done in these cases is ruled orally

21    from the bench just because that was the -- seemed the most

22    efficient way to go about things.  What I'll probably do

23    here today is not put on the record my full reasoning.

24              Mr. Johnson, do you think your client would be --

25    and what I'd like to do is, then, simply circle back and

 1   only -- we'll only have the lawyers on the call.  We won't

 2   be able to have Mr. Rehl present.  And I will just put on

 3   the record the reasons for my decision at some future time.

 4   And, obviously, there will be a transcript of that made and

 5   that can be provided to Mr. Rehl so we -- he will have

 6   access to the full reasoning behind my -- but I'm not going

 7   to be able to put it on the record here today, and I don't

 8   want this to go any further without me getting that -- all

 9   that on the record.

10          Let me ask, Mr. Jones, does that seem a reasonable

11   way to go forward to you?

12          MR. JONES:  That's fine with the Government, Your

13   Honor.

14          THE COURT:  All right.  Mr. Johnson, same thing

15   for you.  Would your -- does that seem like a reasonable way

16   to go forward?  We only have Mr. Rehl here for a brief

17   period.  I'll hear both of you on the motion, I'll rule, and

18   we'll set a time -- if we can do it today, great; if we

19   can't, we'll do it some other way -- for us to just -- just

20   the lawyers to be on a Zoom call without Mr. Rehl because

21   the time to the facility is so limited and I will expand

22   upon the reasoning that I give for the ruling that I will

23   give at that time.  Is that acceptable?

24          MR. JOHNSON:  Yes, sir, it is.  And if I could --

25          Mr. Rehl, did you hear everything that Judge Kelly

1    just indicated?  And are you also okay with me receiving the

2    Court's findings based on his ruling?  And then, obviously,

3    there will be a transcript made and, of course, you and I

4    can correspond based on what the judge decides.

5             THE DEFENDANT:  (Indicates affirmatively.)

6             MR. JOHNSON:  Okay.  Thank you, Judge.  He's

7    nodding yes.  For your record, he's nodding yes.  So we're

8    perfectly okay with that.

9             THE COURT:  Yeah.  For the record, Mr. Rehl is

10   nodding.

11            Thank you, Mr. Rehl.  We're trying our best here

12   to do this with all the technological limitations --

13   practical limitations we have.

14            So Mr. Jones, without further ado, why don't I

15   hear -- go ahead and hear from you.

16            MR. JONES:  Certainly, Your Honor, and let me know

17   if you have any difficulty hearing me.  I'll try to keep

18   this brief, given our limitations.

19            As Your Honor knows, as we've laid out in our

20   filings, Mr. Rehl was one of the most significant leaders

21   and organizers of the group of Proud Boys that attacked the

22   Capitol on January 6th and he in particular presents a

23   significant ongoing threat to public safety that

24   necessitates pretrial detention.

25            The same basic facts and legal analysis that this

1     Court has applied with respect to Mr. Rehl's co-defendants

2     applies here specifically to Mr. Rehl.  I will note that in

3     addition to our filings, the Government submitted a

4     PowerPoint to the Court and provided a copy to defense.  I'd

5     ask the Court to make that as part of the record in this

6     case as Exhibit-A.  And if the Court's amenable, I will walk

7     through that briefly, but I won't attempt -- won't tempt

8     fate by trying to share my screen, and then the Government

9     can file a copy of it on the docket after this hearing, if

10    that's amenable to the Court.

11              THE COURT:  Very well.

12              MR. JONES:  All right.

13              So the Government's seeking Mr. Rehl's continued

14    detention under 18 U.S.C. 3142(f)(1) and 3142(e)(3)(C) which

15    give rise to the rebuttable presumption in favor of

16    detention.  As the Court is aware, each of the defendants in

17    this case, including Mr. Rehl, are charged with an offense

18    listed under Section 2332b(g)(5)(B) carrying a maximum term

19    of imprisonment of 10 years or more.  Even if the Court were

20    to determine that Mr. Rehl rebutted that presumption, there

21    is clear and convincing evidence that no condition or

22    combination of conditions will reasonably assure the safety

23    of any person and the community.

24              Turning, again, briefly to the (g) factors under

25    3142, the nature and circumstances of the offense, Defendant

1    Rehl is charged with multiple felony offenses, including a

2    federal crime of terrorism and a violation -- conspiracy and

3    a substantive offense of 18 U.S.C. 1512 which carries a

4    20-year sentence.  This Court is aware of the seriousness of

5    the charged crimes which the Government submits cannot be

6    overstated.

7              Particularly relevant here are the allegations

8    that Mr. Rehl was involved in planning for the 6th, actions

9    that were clearly motivated by a view that the election was

10   stolen and that something drastic needed to happen.  The

11   indictment alleges, and the evidence shows, that Mr. Rehl

12   was involved with -- in coordination with others,

13   particularly those like himself in leadership positions, a

14   member of the small national leadership group that was

15   formed in late December leading up to January 6th identified

16   as the Ministry of Self-Defense.  Mr. Rehl in particular

17   raised funds for the 6th.  He took a primary role in

18   ensuring there were radios available for those attending.

19   And, as multiple videos and photos show on January 6th, it

20   was Defendant Rehl who led the large group from their

21   morning meeting spot at the Washington Monument to the east

22   side of the Capitol and then back to the First Street gate

23   where the breach occurred.  And I'll note, as the Court may

24   recall from litigation regarding Co-Defendant Donohoe's

25   detention, it was Defendant Donohoe who indicated to others

1    that he, quote, had the keys until Nordean and Mr. Rehl

2    showed up, indicating some deference even from Mr. Donohoe

3    to Zach Rehl.

4              With reference to the PowerPoint slides, you'll

5    see -- the Court will see images on Slide 2 of Rehl walking

6    with Co-Defendants Nordean and Biggs from the Washington

7    Monument toward the Capitol.

8              On Slide 3, again, Zach Rehl with Biggs in front

9    of the large group of Proud Boys on the east side of the

10   Capitol after they had marched there.

11             Slide 4 shows Rehl, again, with Nordean and Joe

12   Biggs.  And the Court can see in that photograph the visible

13   radio on Zach Rehl's shoulder, consistent with his

14   statements about providing radios to the group.

15             In Slide 5, the Court is familiar with this video

16   -- I'm not going to play it -- from the east side of the

17   Capitol which a member of the group makes a comment about

18   taking the Capitol building.  There's another individual who

19   says, Let's not fucking yell that.  If the Court re-watches

20   the video, it will see standing right next to Joe Biggs and

21   speaking with Joe Biggs in that video is Defendant Rehl,

22   again, in a leadership position within this group.

23             I would like to highlight the video that is on

24   Slide 6.  This is a video taken by Zach Rehl recovered from

25   his cell phone, and it's confirmed it's taken by Rehl based

1    on other video show- -- that show him holding up his phone

2    to record what is the large group of individuals at the

3    First Street breach moving up the pedestrian walkway and

4    overtaking Capitol Police.  To be sure, Rehl is not up

5    against the fence himself, but he's quite close, and in the

6    context of earlier events -- that is, him having led the

7    group up to this point -- it's clear that his role was

8    central, and that is what makes him dangerous going forward.

9            Slide 7 shows a photograph of Zach Rehl beside

10   Senator Merkley's office smoking a cigarette.  Notable in

11   that photograph are the goggles and the mask or gaiter that

12   Zach Rehl wore when he entered the Capitol.

13           And Slide 8, additional audio file of Joseph Biggs

14   that had been provided to the Court earlier and Telegram

15   messages from other Proud Boys during the course of the

16   attack on the Capitol.

17           On Slides 9 and 10, the Government's provided

18   excerpts of -- first, on Slide 9 -- Parler posts by Zach

19   Rehl which speak to a few important issues.  One, his

20   motivation; that is, his belief about the stolen election

21   and traitors.  Also, his references to violence.

22   Specifically, firing squads and tarring and feathering

23   police officers.  There's evidence -- indication there of

24   his fundraising for January 6th and his statement that --

25   after the fact that, This -- referencing the riot -- is what

1    patriotism looks like.

2              On Slide 10, additional Telegram messages

3    referenced in our briefing that speak to his concealment of

4    evidence in the wake of the Proud Boys chairman's arrest,

5    speak to his provision of radios and, again, his celebration

6    and pride after the riot.

7              And I'll just pause here to say the defense, in

8    its filing, makes much of Mr. Rehl's military service and

9    patriotism.  And, no doubt, that public service should be

10   commended, but the problem here is that Mr. Rehl's view of

11   patriotism is not something that should be celebrated or

12   rewarded.  Rather, it is a distorted view of patriotism that

13   led to his offenses and others' offenses on January 6th and

14   would very likely lead to further violence in the future.

15   As with his co-defendants, there's been no sign of remorse

16   or regret from Zach Rehl, all suggesting that, like his

17   co-defendants, he is capable and willing to commit similar

18   politically-motivated violence in the future.

19             I won't dwell on the weight of the evidence except

20   to submit it --

21             (Technological interruption.)

22             THE COURT REPORTER:  Judge Kelly?  Oh, boy.

23             MR. JONES:  Service --

24             THE COURT REPORTER:  Oh, Mr. Jones --

25             MR. JONES:  Yes?

 1              THE COURT REPORTER:  I'm sorry.  You cut out there

 2      for a moment.  I didn't hear what you said.

 3              MR. JONES:  Okay.  Can you -- do you have what I

 4      last -- the last thing I said?

 5              THE COURT REPORTER:  Yes, sir.  You were saying

 6      you won't dwell on the weight of the evidence except to

 7      submit it --

 8              (Brief pause.)

 9              I'm sorry, you were saying --

10              MR. JONES:  You know, if anyone has trouble

11      hearing me, I was turning to his history and characteristics

12      and saying that he -- I had addressed his military

13      background and just also to indicate that, like his

14      co-defendants, Mr. Rehl has a family.

15              One fact I'd note here as to his history, Zach

16      Rehl did not take up a leadership role within the Proud Boys

17      on January 6th.  He came to Washington as a leader within

18      the organization as the president of the Philadelphia Proud

19      Boys, an active chapter that he had led in advance of that

20      date, and by the time January 6th came around Zach Rehl was

21      someone that everyone else already deferred to and looked to

22      for leadership, and the evidence makes clear what -- where

23      Zach Rehl led those individuals.

24              As to the danger posed by Zach Rehl going forward,

25      again, based on his role in a -- as a leader and an

1    organizer of this group, his clear intent and experience in

2    planning, his willingness to engage in criminal behavior and

3    to conceal evidence of others' crimes, his utter lack of

4    remorse and regret for January 6th, the Court should

5    conclude that he possesses an identifiable and articulable

6    threat to public safety that is both concrete and

7    prospective and cannot be mitigated by any conditions short

8    of detention.

9            For those reasons, the Court should grant the

10   Government's motion to revoke the order of home confinement

11   and order Zach Rehl detained pending trial.

12           THE COURT:  I thank you --

13           MR. JONES:  Thank you.

14           THE COURT:  -- Mr. Jones.

15           I'll turn it over to you, Mr. Johnson.  And,

16   obviously, I have to make a particularized assessment of

17   Mr. Rehl, but I -- and so -- and I will do that.  But much

18   of the evidence -- a lot of the evidence is either identical

19   or very similar to the kinds of evidence that the Government

20   has argued to me means that Mr. Rehl's co-defendants should

21   be detained pending trial, and I have granted those motions

22   and agreed with them and the D.C. Circuit now, at least as

23   to Mr. Biggs and Mr. Nordean, affirmed that decision.  So --

24   as of late last week.  So tell me what -- and, again, I will

25   make an individualized determination as to Mr. Rehl.  But

 1   given that overlap in the evidence, tell me what's different

 2   about Mr. Rehl that suggests that I should come out

 3   differently as to him.

 4          MR. JOHNSON:  Yes, sir.

 5          So Your Honor, I understand what the Court is

 6   asking, and I suppose superficially on the surface it would

 7   appear that the evidence, you're correct, Judge, is very

 8   similar in nature.  Obviously, the conduct is all alleged to

 9   have happened at the same time, same place.  They're alleged

10   to be members of the same organization.  So I understand

11   what the Court is saying with respect to that.  But I would

12   say that the Government, for starters, seriously and

13   severely overstates Mr. Rehl's role as some sort of member

14   of the Proud Boys who people defer to.  As a matter of fact,

15   on that particular slide that Mr. Jones turned the Court's

16   attention to, it appeared to me that Donohoe was deferring

17   to Nordean and Biggs and, certainly, not Mr. Rehl.  My

18   assessment of all of the discovery that has been submitted

19   -- and it has been voluminous, to say the least -- is that a

20   lot of the material is overlapping.  And I don't mean to,

21   you know, make this a crucifixion against any of the

22   co-defendants, but it certainly appears to me -- my

23   assessment is that Mr. Biggs is, in fact, the national

24   recognized leader of this organization -- yes, of the local

25   chapter -- of this organization.

1           And the further difference is this, Judge.  The

2      way in which -- for example, the FBI reached out to

3      Mr. Biggs prior to January 6th.  So when the Court is

4      asking, like, what are some differences about Mr. Rehl

5      versus -- all against -- so the evidence is what it is.

6      They reached out to him prior to this with a, sort of,

7      cautionary tale, you know?  You're being observed.  You're

8      being watched.  The FBI is, obviously, intercepting certain

9      things.  And, you know, they -- there were cautionary phone

10     calls that were given.  He totally disregarded those; kept

11     his positioning as leader of this organization; kept

12     organizing; kept doing things to make the 6th what would --

13     what he would determine to be a success.

14           Mr. Biggs -- Mr. Rehl wasn't contacted by any

15     government agency, spoken to by the FBI.  And further to

16     that point, when Mr. Biggs spoke to the FBI he lied after

17     the fact.  He lied to the FBI about having entered the

18     Capitol.  And, of course, once the material started to

19     unveil itself, it was obvious that he had made it inside.

20     And so you have that level of deception and dishonesty with

21     government agents.  Mr. Rehl -- that never took place with

22     Mr. Rehl.  Mr. Rehl has been nothing but compliant with the

23     investigations.  He gave passwords to his phone.  He did

24     everything that one could do in his circumstance in terms of

25     a person having been arrested.  So those are two -- I think,

1    just for starters, Judge, those are two very large areas

2    where Mr. Rehl has comported himself very differently than

3    one of the co-defendants who he shares large amounts of

4    overlapping discovery.

5            With respect to -- I mean, sure.  There are some

6    differences in terms of these men's backgrounds as far as

7    prior military experience; as far as a lack of a robust

8    criminal history, you know?  They share -- having family

9    support, etcetera.  They share those similarities.  And so,

10   you know, that is probably what got -- which is why, Judge,

11   the federal magistrate here decided to release him with a

12   set of conditions.  So I understand the Court's questioning,

13   and I definitely am glad that we're getting right to the

14   heart of the matter right out the gate saying that these two

15   people similarly situated in those respects, you still found

16   their detention appropriate.  Well, I've already highlighted

17   two very particular areas, Judge, and I'll keep going

18   because I know time is short.

19           The level of planning experience --

20           THE COURT:  Well, Mr. Johnson, let me interrupt

21   you.  I'm not going to cut you off here.  If we come back --

22   what I'd like to do, if Government counsel and you are

23   available, is even see if we can set up a call, you know --

24   a Zoom meeting as quickly as 1:30.  And if you -- I'm -- so

25   I don't want to -- with -- if this is acceptable to

1    Mr. Rehl, I'm not going to -- I'm -- I think -- I want to

2    give you more of an opportunity to continue to address the

3    points you're addressing.

4            Mr. Rehl, is that fine if we -- I mean, I could

5    just say, well, it's 1:00 o'clock and I'm not going to hear

6    from your attorney any more, but I don't want to do that and

7    I want to give him more of an opportunity to respond even if

8    you can't be present.  So Mr. Rehl, can you let us know

9    whether that's acceptable to you.

10           THE DEFENDANT:  That's acceptable, Your Honor.

11           THE COURT:  All right.  So with that, Mr. Johnson,

12   continue, but I'm going to give you a little bit more time

13   when we come back to pick up any other points you want to.

14           And let me just ask, Mr. Johnson and Mr. Jones --

15   let's try to get this done today -- are we -- are both of

16   you available at 1:30 to pick this up?

17           MR. JONES:  Yes, Your Honor.

18           MR. JOHNSON:  Yes.

19           THE COURT:  All right.  Continue, Mr. Johnson.

20   We'll keep going until they cut us off.

21           MR. JOHNSON:  Okay.

22           Your Honor, so I obviously, you know, started to

23   dissect the differences between Mr. Nordean, Mr. Biggs and,

24   of course, Mr. Rehl because I thought that would be, you

25   know, compelling to the Court with respect to going through

 1    those (g) factors.

 2              I'll start with -- or I'll continue with the fact

 3    that Mr. Biggs was a -- organizer.  He had all sorts of

 4    planning experience.  There was -- there were various

 5    attempts at concealing the communications that they were

 6    having from law enforcement.  That goes further than lying

 7    to the FBI.  I'm talking about actually methods and measures

 8    to conceal the communication between members of the group

 9    and getting the word out to the mass public who are

10    interested in what they were doing.  Mr. Rehl didn't do any

11    of that.  He didn't do any of those things.  And so the fact

12    that the Government would suggest that he bought some radios

13    -- bought some two-way radios and outfitted members of the

14    group with two-way radios, I don't know that that, in and of

15    itself, you know, is a meritorious reason to give the Court

16    with respect to detention.  If, in fact, taken as for --

17    true for the moment that he did outfit the organization --

18    the members of the organization with radios, okay, I suppose

19    that could go under the umbrella of some form of planning,

20    but that does not make him, you know, Ulysses S. Grant.

21    That does not make him someone who has really put together a

22    -- this is -- the planning that was required to put this

23    level of infraction together which would have taken

24    national-level planning, by the way.  That's what it would

25    have taken.  Outfitting 8 to 10 radios, Judge, that doesn't

1    do it.

2            And, sure, under that rubric of -- that legal

3    construct of conspiracy, I understand how he's charged that

4    way, but I -- in terms of whether he should be detained and

5    whether there are absolutely no conditions available to this

6    Court that could support the fact that the community at

7    large, society is protected while he awaits his date in

8    court, I don't think that factor by itself does anything.

9    And if you take these factors into consideration in tandem,

10   you've got -- he talks about the -- tarring and feathering

11   members of the Capitol Police who are blocking the way in,

12   etcetera.  Okay.  Well, that's what the Government points to

13   with respect to violence.  Judge, he has a very benign --

14   all of that criminal -- none of which contains violence.

15   There are no allegations by the Government that Mr. Rehl has

16   unindicted matters, matters that he is suspected of being a

17   part of that have not made their way to court for which

18   violence, you know -- that contain violence whatsoever.

19           And so when Mr. Jones says, you know, we made a

20   lot in our motion, you know, about his prior experience with

21   the military and his service, I don't believe I overstated

22   his role, but I certainly wanted to give it the credit that

23   it was due, and not just that he was a serviceman, not just

24   that, but I also wanted the Court to know that he was

25   disabled; that he -- a certain level of disability with

1    respect to his discharge.  So where Mr. Jones is saying we

2    made a lot of it, I wanted to unpack it and not just paint

3    with broad strokes and say that he has served in the United

4    States Marine Corps and, you know, this is what's going on.

5    I wanted the Court to know exactly what that meant post

6    military service and how that has affected his civilian life

7    going forward, the fact that he pays his bills right now in

8    large part due to his disability, you know?  I think that's

9    why we spent some time on it in unpacking it for the Court.

10          I wasn't playing a small violin when we talked

11   about his wife being pregnant and having preeclampsia and

12   having a very hard time with her pregnancy without her

13   husband.  That child has since been born.  She is now a

14   week-and-some-days old and having never met her father to

15   this point and Mr. Rehl having never had the opportunity to

16   hold or meet his daughter or be there for his wife who is,

17   obviously, recovering from a difficult pregnancy and in need

18   of support.  And, again, this is just to inform the Court of

19   what I think -- these are the sorts of things that will help

20   aid the Court in its decision as to whether Mr. Rehl will

21   be -- can be homebound in addition to the Court's, you know,

22   determination that you --

23          THE CORRECTIONS OFFICER:  Your Honor -- excuse me,

24   Your Honor.  FDC Philadelphia is going to have to log out

25   now.

```
1              THE COURT:  All right.  Very well.

2              Mr. Johnson, we're going to be in -- we're going

3    to go ahead and be in touch with -- for you to continue your

4    argument in -- at -- my goal is to be able to do that at

5    1:30.

6              MR. JOHNSON:  Via Zoom, Your Honor, or this

7    platform here?

8              THE COURT:  It won't be via this platform.  It

9    will be via Zoom.

10             THE DEPUTY CLERK:  I will be --

11             MR. JOHNSON:  Okay.  Thank you.

12             THE DEPUTY CLERK:  -- sending the --

13             THE COURT:  All right.

14             THE DEPUTY CLERK:  -- Zoom link shortly.

15             MR. JOHNSON:  Thank you, ma'am.

16             MR. JONES:  Thank you.

17             (Proceedings recessed at 1:03 p.m. and resumed at

18   1:32 p.m.)

19             THE DEPUTY CLERK:  We are back on the record in

20   criminal matter 21-175, Defendant 3, United States of

21   America v. Zachary Rehl.

22             The defendant's presence has been waived for this

23   portion of the hearing.

24             THE COURT:  All right.  Very well.  And, as you

25   indicated, Ms. Harris, Mr. Rehl consented to my giving
```

1    Mr. Johnson permission to finish his argument while he is

2    not present.

3              Mr. Johnson, please proceed.

4              MR. JOHNSON:  Thank you, Your Honor.  Is my volume

5    okay?

6              THE COURT:  Yes.

7              MR. JOHNSON:  Thank you.

8              So Judge, I think I was at the portion of my

9    remarks where I was just, sort of, putting -- drawing a line

10   between some of the other defendants, quite frankly; namely,

11   Mr. Biggs -- Nordean and Biggs, but specifically to

12   Mr. Biggs, and Mr. Rehl and what Mr. Rehl's conduct was and

13   what it was not, not only on January the 6th but in the days

14   and weeks leading up until, you know?  I'm looking at some

15   of the remarks made by Co-Defendant Biggs wherein he talks

16   about this as a -- let me just get some of his remarks here

17   -- referring to this as a second Civil War.  Also, November,

18   leading up to this particular moment, this is when, of

19   course, the FBI reached out to Mr. Biggs and let him know

20   that -- it was a cautionary contact, letting him know that

21   he was being monitored, and in November of 2020 he -- It's

22   time for fucking war, is a post of Mr. Biggs.  Again, pardon

23   the expletives, Judge, but, No, bitch, this is war.  This is

24   all from Mr. Biggs.

25             When the Government makes reference to violence,

1    we're talking about someone who's talking about ripping

2    people from their offices, ripping them off their high horse

3    and putting in their place conservative Christian warriors,

4    quite frankly.  This sort of rhetoric, quite frankly, cannot

5    be attributed to Mr. Rehl.  It just can't.  And while we

6    could never -- I wouldn't attempt to, and if I did I could

7    never distance Mr. Rehl from being in the company and in the

8    -- in the company of Mr. Nordean and Mr. Biggs, I certainly

9    would like here to draw a distinction between the parties'

10   involvements and what they were, in fact, doing; and

11   remembering I'm not asking the Court to find him, you know,

12   not guilty of conspiracy on -- today.  I'm asking the Court

13   to find a set of conditions, quite frankly, that I do

14   believe exist that supports he will not only attend every

15   single hearing, but he will do so without being a threat to

16   public safety.

17          The Court has already made mention, as has

18   Mr. Jones, of his criminal history, and it is benign at

19   best.  There is -- I think Mr. Jones referred to it as a

20   small criminal history, but it is nothing significant by

21   anyone's measure.  Participation in criminal activity while

22   on probation or parole, he did not.  He's never -- he has

23   been on supervision before, Your Honor.  He has not violated

24   in any way.  And so that, to me, shows that he will be a

25   good candidate for this Court's supervision which I would

1    submit is a more strict and stern supervision than what he

2    was on.  He has no history of violence, and particularly

3    because that can be subjective -- sometimes folks take

4    liberties in terms of what violence is or isn't -- there's

5    no use of weapons.  That level of violence is what I'm

6    referring to.  He does have a small history that includes

7    some substance abuse which is why it dovetails to his prior

8    military experience and how he came out of the service and

9    the issues he departed from the service with and he got

10   those issues under control.

11            With respect to employment, I mentioned before,

12   Your Honor, that he has -- now receives 100 percent

13   benefits.  So he is receiving money in -- by which to take

14   care of himself and his family.  So he has stable income.

15   So if the Court were to put him on home detention, he would

16   not need to go out and find employment or get employment or

17   he wouldn't be one of the folks asking this Court for leave

18   to leave the house to go get a job or work, for that matter.

19            He has a stable residence.  I believe the Court

20   was made aware previously that Mr. Rehl -- that the family

21   home was for sale.  There was, in fact, someone who wanted

22   to put that under contract, but Mr. Rehl was incarcerated.

23   So that fell through.  So that's still available.  And we've

24   also provided to the Court a secondary location which would

25   be with his wife's parents, his in-laws, in Bucks County

1   where he would reside and that would be the three

2   generations together.  That would be -- her parents,

3   Mr. Rehl and his wife, and then their children -- their

4   daughter now would all be in the same property together.

5          I will submit to you, as a homeowner and a person

6   in his current position, he is financially responsible.  He

7   does not have -- and I checked into this -- he doesn't have

8   an overwhelming amount of debt, you know, for whether

9   that -- however that impresses the Court.  He does have

10  significant community and family ties to this particular

11  District.  As I indicated before, prior to him going into

12  the service, he was from this area.  He went to the service

13  and then returned to this area at the completion of his

14  time.  So he has significant ties to this area, not to

15  mention that his family -- the woman he married and her

16  family are all from this particular District.

17         There are -- I think I said this before, Judge.

18  There are no previous violations of parole or probation

19  while he was on supervision.  And I -- and then on the issue

20  of a passport, if my memory serves me well, he does not own

21  a passport.  And so -- because if he had, we would have

22  submitted that straightaway when his release was granted the

23  first time around.

24         And so I'm going through some of the factors.  I'm

25  trying to dovetail them with the facts of this particular

1    case and really stay on task because it's easy to start

2    trying the case, you know, sort of, in these sorts of

3    motions in responding to everything the Government says.

4    And some things -- and Mr. Jones, whom I have great respect

5    for, really didn't say anything incorrect with the exception

6    of, I think, there was some overstatement of some of

7    Mr. Rehl's involvement in some of these things.

8            I think it's important to know that once inside

9    the Capitol, Mr. Rehl did not damage -- and there was --

10   there's thousands of hours of footage from different vantage

11   points that we have to go through.  What was -- been

12   submitted to me and in the Government's motion for

13   detention, I don't believe they're alleging that Mr. Rehl

14   damaged any property, caused any property to be damaged,

15   unlike some of the other -- or stole any property which we

16   know that some people who were inside the Capitol did, in

17   fact, all of those things.  Mr. Rehl did none of those

18   things.  He -- and so in some respects, like, when the

19   Government identifies him as the gentleman with the goggles

20   on and the gaiter, I'm, you know -- I look at that as a

21   positive because at least we know who we're looking at, who

22   we're looking for.  And so instead of living in a universe

23   where we'll say we don't know what he did inside the

24   Capitol, we do know because we have identified Mr. Rehl.  We

25   know which person he was.  And I believe the Government

1    would have taken delight in telling you if he were

2    responsible for damaging our nation's Capitol with respect

3    to items inside of -- stealing from it.  And so his major

4    crime is, obviously, entering and staying inside the Capitol

5    and, of course, the Government, you know, their position is

6    orchestrating this whole ordeal which I, again, submit,

7    Judge, is being overstated.

8             So I'm going to ask the Court to find that there

9    are a -- conditions that exist that, A, provide for the

10   public safety while he awaits trial; B, takes into

11   contemplation the difference in his role versus that of some

12   of the co-defendants where this Court has made previous

13   determinations that detention were appropriate -- was

14   appropriate; and, C, Judge -- and I want to say one last

15   thing.  When I indicated earlier about Mr. Rehl having a

16   daughter that he's not held or seen, that wasn't playing a

17   small violin for the Court.  I do believe that the family is

18   oftentimes an extension of the Court and assists the Court

19   in managing a defendant with respect to their desire to come

20   to court and desire to offend while on supervision,

21   etcetera, and I think that a person who has stability and

22   who has family is just postured differently than a person

23   who does not.  And so that's why I gave that to this Court

24   for no other reason but that.  And if he were inside the

25   house with his mother-in-law and father-in-law, his wife and

1    his new child -- but because of his infirmity, he had no

2    reason to be outside the house, quite frankly.  And I'm even

3    willing, Judge, to stipulate to some sort of computer

4    sanction where he cannot operate a computer if the

5    Government were so, you know -- if they thought that he was,

6    you know -- if the computer somehow was a problem or

7    technology or electronics, I'd be willing to stipulate that

8    he be precluded from doing any of those things and using any

9    of those items for the time in which he were awaiting his

10   trial.  With the exception of coming into my office to meet

11   with me, there's no reason for him to be on the computer

12   because he doesn't work.

13            So for those reasons, Judge, I'm going to ask --

14   and everything, obviously, that was submitted in writing to

15   you -- I'm going to ask that you find that there's a

16   difference between he and some of the other co-defendants --

17   namely, Mr. Biggs, because that was the one that -- I think

18   that was released most recently -- and that he be released

19   on the previous home confinement by the magistrate here in

20   this District.

21            THE COURT:  All right.  Mr. Jones, it's your

22   motion.  So I'm going to give you the last word responding

23   to anything Mr. Johnson said that you want to.

24            MR. JONES:  Thank you, Your Honor.  Briefly, a few

25   points to clarify.

1        When the group gathered at the Washington Monument

2    at 10:00 a.m. and Donohoe communicated to others that he had

3    the keys, he said -- he made it clear that he had the keys

4    until Nordean and Rehl showed up, not Biggs.

5        Mr. Johnson stated that Zach Rehl provided his

6    phone password to law enforcement when he was arrested.

7    That's not true to the Government's understanding, and I

8    confirmed that between our hearing earlier and this hearing

9    now.  He had no obligation to do that, but he didn't do it.

10       As to culpability for destruction of property,

11   interference with law enforcement, under the law Zach Rehl

12   is responsible substantively for those offenses committed by

13   his co-conspirators and those that he aided and abetted.

14   And all of this occurred while Mr. Rehl and his wife were

15   expecting their first child together.  There's no reason to

16   think that the birth of his child is going to change that

17   calculus.

18       Mr. Johnson referenced his -- Mr. Rehl's

19   infirmity.  He certainly did not appear infirm when he said

20   what he said and did what he did on January 6th, the days

21   before and the days after.

22       Mr. Johnson referenced some rhetoric by Mr. Biggs,

23   attempted to distinguish Mr. Rehl from Mr. Biggs, you know?

24   Generally speaking, this is all the rhetoric of his

25   co-defendants.  Those are the people that he associated

1    with.  The Government's not associating Zach Rehl with Joe

2    Biggs or Ethan Nordean or Charles Donohoe.  Zach Rehl

3    associated himself with those people.  Those are the people

4    that he was bringing radios for.  Those are the people that

5    he chose to meet up with in Washington, D.C., to protest

6    this election that he viewed as stolen and ultimately to

7    attack the Capitol.

8              And, you know, as for his own rhetoric, I would --

9    I, again, point the Court -- and I think this goes to the

10   heart of the matter, you know -- back in November of 2020 on

11   Parler, you hear Zach Rehl saying, Hopeful- -- quote,

12   Hopefully, the firing squads are for the traitors that are

13   trying to steal the election from the American people.  And

14   this type of stolen election rhetoric -- I mean, this is not

15   an issue that is in the past, still very much a public topic

16   today.  And you look at his rhetoric after the riots on

17   January 6th.  On January 7th, quote, I'm proud as fuck of

18   what we accomplished yesterday, but we need to start

19   planning, and we are starting planning, for a Biden

20   presidency.

21             This goes directly to the matter of the ongoing

22   threat that Zach Rehl poses and directly to the basis upon

23   which the Court should order his continued detention.

24             THE COURT:  All right.  Very well.  I'm ready to

25   rule.

1          Pending before me is the Government's motion to

2     revoke pretrial release as to Mr. Rehl.  That's ECF No. 37.

3     I am going to grant the motion and order the defendant

4     detained until trial for the reasons I'll explain which are

5     substantially the same -- despite Mr. Johnson's able

6     arguments -- which are substantially the same as those I

7     relied on in detaining his co-defendants, Mr. Nordean and

8     Mr. Biggs -- which ruling the Circuit affirmed last week --

9     and Mr. Donohoe.

10          I want to briefly put a few things on the record

11     and, sort of, summarize the procedural history of how we get

12     here -- how we got here.

13          And in a few -- and I want to -- and I'm going to

14     press pause and -- in a moment to talk to Mr. Johnson about

15     how we go forward.

16          First, I'll briefly summarize the procedural

17     history.  On March 10th, the grand jury returned a

18     superseding indictment against Rehl and three other

19     defendants -- his three co-defendants; charged them with a

20     series of offenses, including conspiracy under 18 United

21     States Code 371.  Rehl was arrested shortly thereafter in

22     his home state of Pennsylvania.  He appeared there before a

23     magistrate judge who ordered him released on conditions,

24     including home confinement.  The Government orally moved for

25     a stay of the release order pending review by me which was

1    granted.

2              We've had a number of delays that I just want to

3    talk for a moment about.  We had a status in this case --

4    our first status on April 14th.  I had asked Mr. Johnson to

5    respond to the motion at that time by April 28th, but

6    through some sort of confusion no response was filed, and

7    when we had our next status on May 5th I wasn't able to

8    address the issue because there was no response on the

9    docket.  I then asked Mr. Johnson to respond by May 17th,

10   which he did, and we set a hearing for June 9th.  On June

11   9th, just to put this on the record, I was -- as I've

12   explained in another case, I was sick and could not -- had

13   no voice, and so we had to search for another date.  We --

14   the first available date was June 21st.  And now, I'll just

15   mention, again, Mr. Johnson, there was some confusion with

16   you.  My understanding is the, you know -- the courtroom

17   deputy reached out to the parties to try to reschedule.  You

18   had said you were not available on the 25th -- on the 21st,

19   I think, and so even though we had scheduled it that day we

20   vacated -- I think it was right beforehand -- we vacated the

21   hearing because we didn't want to waste the Government's

22   time; we didn't want to waste my time; and then that

23   morning, I think you had reached out to try to call in.  So

24   you were, maybe, available after all.

25              In any event, there was a -- it sounds like there

1    was a miscommunication between the courtroom deputy and you,

2    Mr. Johnson, about your availability on that day.  If we

3    were able to do it on the 21st, we could have addressed this

4    even earlier, but we vacated the hearing believing that you

5    were unavailable because you had told us that.  And then,

6    again, here we are today, and I know this dovetails with the

7    problems with the facility up in Philadelphia, but,

8    Mr. Johnson, I think the reason we were late is -- my

9    understanding is that you were late joining us either

10   because your schedule was -- didn't permit it or because

11   perhaps some technical problem.  But I would just say,

12   Mr. Johnson, in -- and I think there have been other times,

13   frankly, when we've had statuses in this case where we have

14   had to wait for you.

15            So I mean, in terms of responding to the motion;

16   in terms of communication to try to set a new date; and then

17   in terms of being on time for our hearings in this case,

18   Mr. Johnson, I'm going to have to ask you to be more

19   attentive and to be clearer in your communication with the

20   courtroom deputy in terms of scheduling so that we can make

21   sure we address things as quickly as we can.  Does all of

22   that make sense to you, sir?

23            MR. JOHNSON:  Yes.

24            THE COURT:  All right.

25            So that's where we are here.  And, of course, in

1    the interim, I was able to address the motions -- the

2    various motions that addressed the pretrial release status

3    of Mr. Nordean, Mr. Biggs, and Mr. Donohoe, all of whom I've

4    ordered detained pending trial and, as I said earlier, the

5    ruling regarding Nordean and Biggs was affirmed by the

6    Circuit late last week.

7            So let me just -- I won't -- I'll try to do as

8    much as I can here referring to the record that was made in

9    those other cases, but I do want to make a particularized

10   determination as to Mr. Rehl.  So let me go ahead and do

11   that.

12           First, I'll just set out the basic legal framework

13   we're operating under.  I laid out the standards in my prior

14   rulings of April 19th regarding Mr. Nordean and Mr. Biggs

15   and on June 23rd regarding Mr. Donohoe.  I won't repeat them

16   all here, but let me try to summarize.

17           The Government mainly seeks to detain Mr. Rehl

18   under 18 United States Code 3142(e)(3)(C) which provides a

19   rebuttable presumption of detention if there is probable

20   cause to believe that the person committed an offense listed

21   in Section 2332b(g)(5)(B) of Title 18 for which a maximum

22   term of imprisonment of 10 years or more is prescribed.  The

23   grand jury found probable cause to believe that Mr. Rehl

24   committed such an offense.  18 United States Code Section

25   1361, destruction of government property, is -- the offense

1    charged in Count 4 of the superseding indictment, is

2    specifically enumerated in 18 United States Code Section

3    2332b(g)(5)(B)(i).  Count 4 charges Mr. Rehl with the felony

4    variety of that offense, as it alleges that he, together

5    with those known and unknown, aided and abetted others known

6    and unknown to forcibly enter the Capitol and thereby caused

7    damage to the building in an amount more than $1,000.  That

8    felony offense carries a maximum sentence of 10 years in

9    prison.  And under Circuit precedent, the return of that

10   indictment, quote, Makes conclusive the existence of

11   probable cause to hold the accused for further prosecution.

12   That's United States v. King, 482 F.2d 768 at 776, a D.C.

13   Circuit case from 1973.  Thus, the defendant is eligible for

14   detention and the rebuttable presumption applies.

15          The Bail Reform Act provides that a judicial

16   officer shall order the detention of the defendant before

17   trial if, after a detention hearing held under 18 United

18   States Code 3142(f), and upon consideration of the available

19   information concerning the enumerated factors in 3142(g),

20   the judicial officer finds that no condition or combination

21   of conditions will reasonably assure the appearance of the

22   person as required and the safety of any other person and

23   the community.  That's 3142(e)(1).  And in assessing whether

24   pretrial detention or release is warranted, I must evaluate

25   four factors: the nature and circumstance of the offense

1    charged, including whether the offense is a crime of

2    violence; two, the weight of the evidence against the

3    person; three, the history and characteristics of the

4    person; and, four, the nature and seriousness of the danger

5    to any person or the community that would be posed by the

6    person's release.  That's 18 United States Code Section

7    3142(g).

8           So moving on to those factors, the first statutory

9    factor requires me to consider the nature and circumstances

10    of the offense charged.

11           Rehl and his three co-defendants are charged with

12    six offenses.  And the felonies they are charged with

13    include conspiracy, felony destruction of property, as I

14    mentioned, in violation of 18 United States Code Section

15    1361; obstruction of law enforcement during a civil

16    disorder, in violation of 18 United States Code Section

17    231(a)(3); and obstruction of an official proceeding, in

18    violation of 18 United States Code Section 1512(c)(2).  The

19    three substantive felonies are charged under an aiding and

20    abetting theory, as well.

21           The 1512(c)(2) offense is one for which the

22    maximum term of imprisonment is 20 years.  So it is plainly

23    a serious offense at least from that perspective, the amount

24    of time that the defendant is exposed to.  And in addition,

25    as part of this factor, I must also consider whether the

1    offense is a crime of violence, a violation of Section 1591,

2    a federal crime of terrorism, or involves a minor victim or

3    a controlled substance, firearm, explosive, or destructive

4    device.  That's 18 United States Code 3142(g)(1).  The

5    Government argues, and Defendant Rehl does not contest, that

6    Congress has characterized one of the offenses, felony

7    destruction of property, as a federal crime of terrorism

8    under the facts proffered by the Government.  And 18 United

9    States Code 2332b(g)(5) defines "federal crime of terrorism"

10   as an offense that, quote, Is calculated to influence or

11   affect the conduct of government by intimidation or

12   coercion, or to retaliate against government conduct, closed

13   quote, and is included in the enumerated list of statutes

14   which includes Section 1361.

15            But in addition to the maximum sentence Congress

16   has established for one of the offenses and the

17   characterization of one of these offenses as a federal crime

18   of terrorism, it's the broader circumstances of the alleged

19   conspiracy that underscore the seriousness of the charges

20   against Mr. Rehl.  The grand jury has charged that he

21   conspired with his co-defendants and others, one, to stop,

22   delay, or hinder Congress's certification of the Electoral

23   College vote, in violation of 18 United States Code

24   1512(c)(2); and, two, to obstruct or interfere with law

25   enforcement officers engaged in their official duties to

1    protect the Capitol and its occupants while that was

2    happening, in violation of 18 United States Code 231(a)(3).

3    In other words, as I have said on numerous occasions now,

4    Mr. Rehl stands charged with interfering with our nation's

5    peaceful transfer of power, which is a grave matter to say

6    the very least.

7              And although I have mentioned in the past that

8    pretrial -- the allegations the Government's relying on here

9    are not, in some ways, typical of those that courts in this

10   District have relied on to detain some of the January 6th

11   defendants before trial, now the Circuit has affirmed the

12   basic propriety of detaining similarly-postured defendants

13   who might not have used a weapon or fought with police

14   officers directly but instead nonetheless revealed

15   themselves to be -- nonetheless, that courts found detention

16   was warranted.  So what are the allegations here if they

17   don't involve necessarily direct physical violence?

18             As with the case of his co-defendants, Rehl is

19   alleged to be a leader in an organization known as the Proud

20   Boys.  And the grand jury charges that he's president of his

21   local chapter in Philadelphia.  His -- and the Government's

22   PowerPoint reflects that on -- his bio on Parler listed him

23   as president of the Philadelphia Proud Boys, 4th degree, and

24   had other invocations to join the Proud Boys.  Again, that's

25   the Government's PowerPoint at Page 9.  The three other

1    co-defendant- -- co-conspirators are alleged to be leaders

2    as well, as I've detailed in their cases.  These allegations

3    about the defendants are relevant to the nature and

4    circumstances of their offense insofar as they explain and

5    show that they were leaders -- albeit perhaps not all -- as

6    Mr. Johnson has indicated, not leaders at the same -- quite

7    the same level, but leaders nonetheless -- that they were

8    leaders and shared a pre-existing common bond which provides

9    context to explain how these individuals, from disparate

10   parts of the country, wound up together and acting in

11   concert together on -- in Washington, D.C., on January 6th.

12              In addition -- and we'll go through some of this

13   evidence -- Mr. Rehl's alleged co-conspirators and Mr. Rehl

14   have -- are alleged to have made statements well in advance

15   of January 6th that they considered the election stolen and

16   that it was important that something be done about it.  Of

17   course, as I've emphasized in the past, there's no

18   allegation that these statements are crimes in and of

19   themselves, but they do shed light on the nature and

20   circumstances of the offense.  And while I certainly weigh

21   what each co-conspirator said against that specific person

22   more heavily than I do the statements of the person's

23   co-conspirators, I do think that I can consider what one

24   co-conspirator is alleged to have said against all the

25   co-conspirators at least to some degree when I consider the

1    nature and circumstances of the offense.  As the Government

2    argued, while these statements are -- were not -- while the

3    statements of Mr. Nordean, Mr. Biggs, and Mr. Donohoe are

4    not statements made by Mr. Rehl -- that's for sure -- they

5    are statements of individuals that Mr. Rehl voluntarily

6    associated himself with and indeed is charged to have been

7    co-conspirators with.  So I weigh them less, but I think

8    it's fair that I do -- I can weigh them all.

9           And given that, I'll refer back to, and

10    incorporate here, the facts that I set forth in my prior

11    ruling on April 19th, 2021, ordering Defendants Nordean and

12    Biggs detained pretrial, and my prior ruling on June 23rd

13    ordering Defendant Donohoe detained pretrial.  Those are

14    laid out on Pages 17 to 40 of the April 19th hearing

15    transcript, which is ECF No. 71, and Pages 52 to 60 of the

16    June 23rd hearing transcript which I'm not sure has been --

17    yet been pended -- been posted on the docket.  It did take

18    me a long time to put all those facts on the record.  I'm

19    not going to do -- I'm not going to repeat all of that again

20    here.  But I do want to highlight a few of the allegations

21    and evidence that the Government has proffered relating --

22    specifically regarding Mr. Rehl.

23           On November 14th, 2020, Mr. Rehl is alleged to

24    have posted, quote, We've known everything [sic] about

25    democratic [sic] election fraud for decades in

1    Democrat-controlled cities and no one did anything about it

2    until now.  This election is crucial to how we deal with

3    fraud moving forward so we can level the playing field,

4    #DoubleDown, #StopTheSeal, #Trump2020, #ElectionFraud,

5    closed quote.  That's from the Government's PowerPoint at

6    Page 9.

7            A few weeks later on November 28th, 2020, Mr. Rehl

8    posted, Hopefully -- quote, Hopefully, the firing squads are

9    for the traitors that are trying to steal the election from

10   the American people, closed quote.  Certainly, that's an

11   important piece of evidence here in assessing Mr. Rehl's

12   intentions.  It's ECF No. 37 at 3 and the Government's

13   PowerPoint at Page 9.

14           A few weeks later on December 7th, Mr. Rehl

15   posted, quote, Getting these RINOs to do their jobs [sic]

16   based on the Constitution and appoint electors is apparently

17   too much to ask.  The Trump team needs to do something

18   drastic since Dems were drastic when they tried stealing the

19   election in plain sight.  It's time to step up to the plate

20   and actually do something.  #dosomething, #stopwaiting,

21   #dropthehammer, #firebarr, #stopthesteal, #fbisucks,

22   #lockthemup, #thisistreason, closed quote.  That's from the

23   Government's PowerPoint at Page 9.

24           As we get closer to January 6th, at ECF No. 91 at

25   2, the Government proffers that on December 29th, Donohoe

1    posted about a -- Donohoe, again, Mr. Rehl's co-defendant --

2    posted about a special chapter which the Government

3    represented reflected the creation of a new Proud Boys

4    chapter, the Ministry of Self-Defense, that would have a

5    role on January 6th.  The Government proffers that in a

6    video call with prospective members of the MOSD, a member of

7    the leadership explained, Direct- -- quote, Directions could

8    come from any single person [sic] you see on your screen

9    right now, dot, dot, dot, but the one thing that everyone

10   has to understand is, yes, you might be getting told things

11   from different people, but it's all information from the

12   same plan.  Biggs is not going to tell you something

13   different than I'm going to tell you.  The Proud Boys

14   chairman -- although referred to by -- in the nickname -- is

15   not going to tell you something different than Zach is going

16   to tell you.  It's all one operational plan.  So don't get

17   hung up on the delivery.  The information all -- is all the

18   same, closed quote.  That's ECF No. 91 at 2.  And that is

19   significant because it places the defendant in -- really, in

20   the company of other people with a leadership role here.

21              On December 30th, 2020, Mr. Rehl posted a link to

22   an online fundraiser with the campaign name of Travel

23   Expenses for Upcoming Patriot Events.  The campaign

24   generated over $5,500 in donations between that date and

25   January 4th.  That's ECF No. 26 at Paragraph 38.  On

1    December 30th, he posted, quote, I just want to, again,

2    thank you all for your help in donating and your support.

3    We all love you [sic], appreciate your support, and there --

4    and will be there in force on January 6th and many more.

5    ECF No. 37 at 3-4; and the Government's PowerPoint, again,

6    at Page 9.

7              And on January 6th -- on January 4th, shortly

8    after the Proud Boy chairman was arrested pursuant to a

9    warrant issued by D.C. Superior Court, there was discussion

10   from some of the co-defendants about encrypted

11   communications and how they could be compromised when law

12   enforcement examined the chairman's phone.  One of his

13   co-defendants set up a new channel on the encrypted -- on an

14   encrypted messaging application entitled New MOSD and took

15   steps to destroy the earlier channel.  And after its

16   creation, the New MOSD channel included, among other people,

17   Mr. Rehl and a handful of other members.  That's ECF No. 26,

18   Paragraph 39.  And during these discussions, Mr. Rehl

19   stated, quote, You gotta manually delete each message from

20   each chat for everyone.  Deleting all will only clear it for

21   you.  Only the owner can nuke the chat, closed quote.  And

22   as to the chairman and likely seizure of his phone by law

23   enforcement, he noted, quote, Hopefully, he logged outta

24   Telegram.  ECF No. 91 at 2 through 3.  He also stated,

25   quote, Too late now, but just for future reference, won't be

1      the last time one of our people get arrested.  That's the

2      Government's PowerPoint at 10.

3            And then in the lead-up to January 6th, just the

4      day before in -- a new encrypted messaging channel was

5      created -- entitled Boots on the Ground was created for

6      communications by Proud Boy members in Washington, D.C.  And

7      in addition to numerous other people that participated in

8      that channel, Mr. Rehl was among those who did.

9            And, again, that same day on January 5th, Rehl was

10     -- who was traveling to Washington, D.C., stated that he was

11     bringing multiple radios with him and that there was a

12     person who was going to -- who was planning to program those

13     radios later that evening.  That's ECF No. 26 at 44.

14     Specifically -- again, according to the Government's

15     PowerPoint at 10 -- he said, quote, Yeah, I think I have

16     five on me.  We had a guy who is supposed to be programming

17     them tonight, and, I just got here with the [sic] radios,

18     shouldn't be any reason we don't use them.

19            On the day of January 6th [sic], Mr. Rehl

20     notified, among others, Nordean, Biggs, and Donohoe that he

21     had arrived in Washington, D.C.  And Donohoe responded by

22     requesting one of the radios that Rehl had brought.  That's

23     ECF No. 26 at Paragraph 46.

24            (Brief pause.)

25            An unindicted co-conspirator later provided -- on

1   the message board New MOSD and the Boots on the Ground

2   channels, later provided a specific radio frequency to be

3   used with the radios that Mr. Rehl had brought.  That's ECF

4   No. 26 at Paragraph 47.  And -- I'm sorry, and that's 9- --

5   that -- those two things happened at 9:09 p.m. on January

6   5th.  January 5th, the last two things I mentioned.

7           On the morning of January 6th, though,

8   Mr. Donohoe, his co-defendant, communicated to others that

9   he was on his way to the Washington Monument.  And he added,

10  I have the keys until Rufio -- meaning, Mr. Ordean [sic] --

11  and Zach show up.  ECF No. 26 at Paragraph 50.  Again, that

12  places Mr. Rehl right there in a leadership position.  The

13  Government has submitted a photo of Mr. Rehl walking with

14  Mr. Nordean, who appears to be speaking into a microphone

15  [sic], and Mr. Biggs in front of a large crowd away from the

16  Washington Monument towards the Capitol.  ECF No. 37 at 4;

17  and also, the Government's PowerPoint at Page 2.  He can

18  also be seen wearing a radio and standing near Mr. Biggs,

19  who is also wearing one, in two photos taken near the

20  Capitol, one of which also includes Mr. Ordean [sic] --

21  Mr. Nordean.  That's the Government's PowerPoint at Pages 3

22  and 4.

23          On January 6th, Mr. Rehl is alleged to have

24  entered the Capitol at about 2:53 p.m. through the same door

25  first entered by Mr. Biggs on the west side of the building.

1       That's ECF No. 26 at Paragraph 67.  And the Government has

2       provided a photo of him later smoking and wearing goggles in

3       what it represents is a senator's office.  ECF No. 37 at 5;

4       ECF No. 91 at 3.

5              Later, Rehl shared on social media a video that

6       the Government represents depicts the breach near the First

7       Street pedestrian gate with the caption, How it all started.

8       ECF No. 91 at 3.

9              And then just to wrap up, at some point after the

10      attack, Mr. Rehl -- again, according to the Government's

11      Power- -- the evidence laid out on Page 10 of the

12      Government's PowerPoint presentation -- Rehl wrote on

13      Telegram, Ah, shit, forgot you [Biggs] had to roll.  Was

14      hoping to have some celebratory beers with y'all after this

15      epic fuckin' day.  I'll drink one for ya.  Biggs then said,

16      We will one day.  This day lives in infamy or the ages, and

17      Donohoe replied, Yeah, I feel like a complete warrior.

18              Let me just make sure of one thing.  Yes.

19              In another Telegram message after the attack, Rehl

20      stated, That was not what I expected to happen today.  All

21      of us -- all from us showing up and starting some chants and

22      getting the normies all riled up, closed quote.  Rehl

23      further celebrated the attack in a public social media post

24      on Parler:  Quote, This is what patriotism looks like.

25      Today was indeed a historical day, for sure.  I will never

1   forget this [sic] as long as I live.  Keep the fight up,

2   America.  When the [sic] government fears its people, you

3   have freedom.  When people fear the [sic] government, you

4   have tyranny, closed quote.  The following day, he continued

5   to express pride in what he and others had achieved while

6   referencing unspecified plans for the future:  Quote, I find

7   this hard to believe now.  I'm proud as fuck what we

8   accomplished yesterday, but we need to start planning, and

9   we are starting planning, for a Biden presidency.  ECF

10  No. 37 at 6 and the Government's PowerPoint at Pages 9 and

11  10.  He also posted, It -- quote, It all started over a USA

12  chant.  I love this country.  The silent majority is no

13  longer silent.  The Government's PowerPoint at 9.  And on

14  January 8th, he posted, referring to law enforcement

15  officers who defended the Capitol, quote, They deserve to be

16  tarred and feathered.  These cops are turning on us --

17  turning on us also -- are also what they call turncoats.

18  Just saying.  ECF No. 37 at 1; the Government's PowerPoint

19  at 9.

20          So looking at all of this evidence, I do conclude,

21  as I did for his three co-defendants -- three of his

22  co-defendants -- I conclude that the nature and

23  circumstances of the offense weigh strongly in favor of

24  detention.

25          Chief Judge Howell had set forth a number of

1 considerations, which this Court finds helpful, to

2 differentiate the severity of the conduct for many of the

3 Capitol breach defendants.  These considerations -- and she

4 did so in United States v. Chrestman, F. Supp. 3d -- well,

5 at 2021 WL 765662 at 7, a ruling from January [sic] 26th of

6 this year.  These considerations include whether a defendant

7 has been charged with felony or misdemeanor offenses, one;

8 two, whether the person engaged in prior planning before

9 arriving at the Capitol; three, whether the person carried

10 or used a dangerous weapon during the riot; four, whether

11 the person coordinated with other participants before,

12 during, or after the riot; and, five, whether the person

13 assumed either a formal or de facto leadership role in the

14 assault by encouraging other rioters' misconduct; and, six,

15 the nature of the defendant's words and movements during the

16 riot, including whether he damaged federal property,

17 threatened or confronted federal officials or law

18 enforcement, or otherwise promoted or celebrated efforts to

19 disrupt the certification of the electoral vote count during

20 the riot.

21   Most, if not all, of these considerations weigh in

22 favor of detention.

23   On the first, Mr. Rehl is charged with multiple

24 felony offenses, including one Congress characterized under

25 these circumstances as a federal crime of terrorism and

1      another that exposes him to a 20-year sentence.  The grand

2      jury has charged that he conspired with his co-defendants

3      and others to stop, delay, or hinder Congress's

4      certification of the vote; and, two, to obstruct or

5      interfere with law enforcement officers engaged this their

6      official duties to protect the Capitol and its occupants

7      while that was happening.  As I mentioned before, this is a

8      gravely serious matter and it weighs in favor of detention.

9              On the third [sic], fourth, and fifth

10     considerations, the allegations include extensive

11     involvement in planning for January 6th, coordination with

12     other participants before, during, and after the riot, and a

13     leadership role.  I do credit Mr. Johnson's argument that

14     the leadership role here for Mr. Rehl may not have been as

15     prominent as the leadership role that Mr. Nordean or

16     Mr. Biggs had that day, but more like as in the case of

17     Mr. Donahue [sic], the evidence -- or Donohoe, the evidence

18     strongly suggests that he was, at a minimum, a trusted

19     lieutenant -- as, I believe, in the words of Judge Harvey --

20     a trusted lieutenant of those perhaps higher leaders.  He

21     was, after all -- he did, after all, have a key role in

22     bringing programmable radios to Washington, D.C., for others

23     to use on January 6th while programmed to a specific

24     frequency and that would allow those who had the radios to

25     coordinate and to conceal their communications from law

1    enforcement.  He also engaged -- that is, Mr. Rehl -- in

2    fundraising in advance of January 6th and was named, again,

3    in a group chat including Proud Boys leadership as a person

4    from whom instructions might come from on that day.  And

5    finally, he is alleged to have made alarming and violent

6    statements in the wake of the 2020 presidential election

7    that he believed it had been stolen or -- and that something

8    had to be done about it.  Again, for example, in a post on

9    November 27, 2020, he posted, quote, Hopefully, the firing

10   squads are for the traitors that are trying to steal the

11   election from the American people, underscoring the -- his

12   strong feelings and the stakes, at least in his view, for

13   what was going on on January 6th in terms of counting the

14   electoral votes.

15           Considerations three and six are a mixed bag, but

16   they also weigh in favor of detention.  As I mentioned

17   before, there's no evidence that Rehl himself, like

18   Mr. Biggs and Mr. Nordean, laid his hands on anyone or

19   fought with anyone, including law enforcement, or used or

20   carried a weapon on that day.  But I do have video and photo

21   evidence proffered by the Government that puts him near

22   Mr. Nordean and Mr. Biggs at the front of a crowd heading

23   toward the Capitol; near Mr. Nordean, near Mr. Biggs at the

24   -- adjacent to at least a line of folks confronting police

25   on one of the Capitol terraces; and smoking what might be a

1    victory smoke in a senator's office while wearing protective

2    goggles.  As I mentioned earlier, he celebrated what

3    happened that day.  There's no question.  He said he was

4    proud of what happened and that they needed to, and were,

5    starting planning for a Biden presidency.  So in light of

6    all of that evidence, again, I think considerations three

7    and six weigh in favor of detention.

8              And given all the above, consistent with my prior

9    rulings relating to Nordean, Biggs, and Donohoe, I do find

10   that the nature and circumstances of the offenses weigh

11   strongly in favor of detention.

12             The second factor I have to consider is the weight

13   of evidence against the person.  And although much of the

14   evidence is uncontroverted insofar as it is Telegram chats,

15   photos, and video, it is also true that much of the

16   Government's evidence is circumstantial about the details of

17   the alleged conspiracy.  Rehl, like his co-defendants before

18   him, essentially puts his own spin on the evidence and

19   arguing -- tries to minimize and put his conduct -- and

20   tries to put the most positive interpretation of what

21   happened forward.  And it is fair that he does seem to -- he

22   did seem to express some surprise at exactly how January 6th

23   transpired.  But in the end, despite his explanation for

24   this or that piece of evidence, the evidence taken as a

25   whole against Rehl and his co-defendants is clearly strong

1    enough, in my view, to weigh in favor of detention.  As

2    Judge Harvey observed in detaining Co-Defendant Donohoe, the

3    best evidence of the conspiracy is what the conspirators

4    acted in concert to do, what happened from their coordinated

5    actions, and here that includes the interference with the

6    certification of the Electoral College vote.  Although

7    may -- Mr. Rehl may have been somewhat surprised by exactly

8    how that came about or the group's degree of success, I

9    don't think that undermines the evidence of prior planning

10   and coordination, including through the use of radios and

11   encrypted messaging apps, for some -- for unlawful activity.

12   And in addition, the use of encrypted Telegram chats and

13   radios to a preset frequency suggested that -- suggests to

14   me that Rehl and his co-conspirators were trying to evade

15   law enforcement.  And, again, there's other evidence that I

16   haven't gone into here that doesn't directly relate to

17   Mr. Rehl that suggests that the co-conspirators knew what

18   they were doing was unlawful.  Thus, consistent with my

19   prior rulings with -- of -- with Nordean, Biggs, and

20   Donohoe, I think the weight of the evidence is strong enough

21   to weigh in favor of detention, even if, as in most

22   conspiracy cases, I don't have in front of me any

23   evidence -- or a document or a specific conversation that

24   lays out every little aspect of the conspiracy.

25              And finally, I have to consider the history and

1    characteristics of the person, including the person's

2    character, physical and mental condition, family ties,

3    employment, financial resources, length of residence in the

4    community, community ties, past conduct, history relating to

5    drug or alcohol abuse, criminal history, and record

6    concerning appearance at court proceedings.

7            Much of this -- the evidence relating to this

8    factor, as Mr. Johnson laid out very clearly, favors

9    release.

10            Mr. Rehl appears to have very strong ties to the

11   area where he lives.  He was born and raised there and now

12   lives there with his wife of a number of years and has a

13   newborn child as well as an older teenaged daughter.  He

14   served in the U.S. Marines, returned to school to get a

15   college degree after his military career ended, and only has

16   a really minimal criminal history and certainly not one that

17   would relate necessarily to violence, as Mr. Johnson

18   mentioned.  His wife has expressed her intention to support

19   him throughout these proceedings and to ensure his

20   compliance with conditions of release.  And Mr. Johnson has

21   made the argument that that kind of stability from a newborn

22   daughter is something I should weigh as well, as well as the

23   infirmity that he proffers that Mr. Rehl suffers from.  I

24   think there's no question these facts are enough to rebut

25   the presumption of -- the presumption -- the rebuttable

1  presumption of detention, as I found, again, with the other

2  co-defendants, but they are undercut by other

3  considerations; namely, that these family ties, even a wife

4  who would have been pregnant with a child, did not stop him

5  from taking the actions he did related to January 6th, nor

6  did his -- any infirmity that he might suffer from affect

7  his conduct on that day that I can tell.  In addition, he

8  did celebrate the events of the 6th, discussed the need to

9  continue planning for a Biden presidency, and condemned law

10  enforcement officers who defended the Capitol on that day.

11  So I do believe that this factor weighs in favor

12  of release, but I don't think it does so in an overwhelming

13  fashion.

14  And the final factor I have to look at is the

15  nature and circumstance -- nature and seriousness of the

16  danger to any person or the community that would be posed by

17  the person's release.  That's 18 United States Code 3142(g).

18  As the Circuit found -- and then, as the Circuit

19  found in its Munchel decision, I have to justify detention

20  on the basis -- to justify detention on the basis of

21  dangerousness -- which is really the only basis here -- I

22  must find, Clearing [sic] and convincing evidence, closed

23  quote, that, quote, No condition or combination of

24  conditions will reasonably assure the safety of any other

25  person and the community.  That's 18 United States Code

1    3142(f).  And, as the Circuit held in Munchel, quote, A

2    defendant's detention based on dangerousness accords with

3    due process only insofar as the District Court determines

4    that the defendant's history, characteristics, and alleged

5    criminal conduct make clear that he or she poses a concrete,

6    prospective threat to public safety, or as the Supreme Court

7    articulated in Salerno, quote, An identified and articulable

8    threat to an individual or the community.

9         I believe that this factor weighs in favor of

10   detention, as I did with the other defendants I ordered

11   detained, and this ultimate standard is met when all the

12   factors are considered here, including this last one.  So

13   let me walk through why.

14        First, I think it's worth repeating that the

15   detention presumption, although it has been rebutted,

16   remains in the case and weighs in favor of detention.

17        Second, Mr. Rehl is alleged, by his leadership and

18   by his planning, to have facilitated the political violence

19   on January 6th, even if he himself did not use a weapon and

20   did not strike anyone.  Thus, a finding that he poses a

21   threat accords with the Circuit's view in Munchel that,

22   quote, Those who actually assaulted police officers and

23   broke through windows, doors, and barricades -- and here's

24   the important language -- and those who aided, conspired

25   with, planned, or coordinated such actions, are in a

1    different category of dangerousness than those who cheered

2    on the violence or entered the Capitol after others cleared

3    the way.  And it's exactly that passage from Munchel that

4    the Circuit relied on in affirming the detention of

5    Mr. Nordean and Mr. Biggs.

6            Third, on this record, there is no reason for me

7    to believe that Mr. Rehl's -- for me to conclude that

8    Mr. Rehl's demonstrated willingness and intention to

9    facilitate violence is in the past.  He has expressed strong

10   views that the President -- that the 2020 presidential

11   election was stolen and that violence is -- was justified in

12   response, stating, Hopefully, the firing squads are for the

13   traitors that are trying to steal the election from the

14   American people, closed quote.  His co-conspirators

15   expressed similar views.  And I went through those

16   statements in my other rulings, but certainly many of them

17   spoke of revolution and war, and I do weigh them here, even

18   if I weigh them less -- to a lesser extent than I weigh the

19   statements that Mr. Rehl stated himself -- made himself.

20   Even if the election has passed, the idea that the election

21   was stolen remains very much a live issue in our politics.

22   And the evidence here regarding Mr. Rehl's decision to

23   continue the fight after January 6th bears that out.  He has

24   not shown any remorse for what he did or what happened on

25   January 6th.  And he has said and done things that, taken

1   together, suggest that the violence should continue.  Again,

2   on [sic] January 6th, he wrote, I find this hard to believe

3   now.  I'm proud as fuck what we accomplished yesterday, but

4   we need to start planning, and we are starting planning, for

5   a Biden presidency, and, referring to law enforcement

6   officers who defended the Capitol, quote, They need -- they

7   deserve to be tarred and feathered.  These cops turning on

8   us are also what they call turncoats.  Just saying.  His

9   co-conspirators also -- again, I won't go through it here --

10  have also made statements and have -- well, in particular,

11  have made statements suggesting that, absolutely for them,

12  the election is not settled and the fight is not over.  So

13  again, on all of this record, I don't find that, for

14  Mr. Rehl, he's someone -- I cannot conclude that he's

15  someone for whom the election is settled and the fight is

16  over.

17           Fourth, and as this court noted in Munchel, the

18  threat must be considered in context, and whether a

19  defendant poses a particular threat depends on the nature of

20  the threat identified and the resources and capabilities of

21  the defendant.  In this case, through his leadership,

22  through his involvement in a network of individuals, as well

23  as his role providing radios and engaging in other sorts of

24  planning, Rehl, along with his co-defendants, has the

25  capability to assist in producing events that draw large

1    numbers of people, including the Proud Boys, others similar

2    -- sympathetic to their views, and even perhaps others who

3    are there to protest against them and don't share those

4    views.  And through all the evidence here, he has -- he and

5    his co-defendants have shown the capability to facilitate

6    violence, either against civilians or law enforcement, at

7    those events.  Even if there is some evidence that some

8    Proud Boys did not want to rally in the wake of January 6th

9    afterwards, these capabilities remain.

10            Fifth, I looked closely at the type of conditions

11   I could impose on Mr. Rehl, including what Mr. Johnson

12   suggests -- suggested in terms of how I could place him in

13   the custody of his in-laws with having multi-generation --

14   having a number of different generations at home under the

15   same roof and how I could impose restrictions such as

16   prohibiting Internet access and subjecting all mobile and

17   electronic devices in the home to search.  And at the end of

18   the day, I don't think these conditions suffice.  And that

19   is so because even these conditions could not, in my view,

20   prevent him from organizing or providing a leadership role

21   for others who believe that violence is justified because

22   the election was stolen.  The reality is he could evade

23   conditions like requiring, for example, no contact with

24   certain other people or even being prohibited from using a

25   computer simply by having a confidant lend him a smartphone

1    or other device.  I think that would be relatively easy to

2    do.  I don't think there's any real way to prevent that from

3    happening.  And so I wouldn't -- and I wouldn't ever

4    necessarily know if it did.

5            Now, I also want to explain why I don't have

6    confidence that Mr. Rehl would abide by the conditions and

7    why I find that those proposed conditions do not reasonably

8    ensure the safety of the community.  First, the allegations

9    here involve taking steps to conceal communications from

10   others, including law enforcement, by using Telegram and

11   using radios that Mr. Rehl himself specifically procured and

12   brought to Washington on January 6th and that were turned

13   [sic] to a specific radio frequency on that day.  Second,

14   Mr. Rehl was involved in discussions about destroying

15   messages and even provided instructions for how to entirely,

16   Nuke, quote-unquote, a chat.  So his prior activity

17   communicating his -- concealing his communications from law

18   enforcement, participating allegedly in destroying evidence

19   of his communications, in addition to his above-described

20   ongoing intentions and capabilities, suggest to me that he

21   would not abide by the conditions I impose.  That's why,

22   even though no conditions can give 100 percent assurance, I

23   don't think that the conditions that have been proposed can

24   reasonably assure the safety of the community.

25            So I do find that this last factor weighs in favor

1    of detention and, upon review of all the factors, I do find

2    by, quote, Clear and convincing evidence, closed quote, that

3    because of the prospective danger Rehl presents, quote, No

4    condition or combination of conditions will reasonably

5    assure the safety of any other person and the community,

6    closed quote.  That's 18 United States Code Section 3142(f).

7    And I will enter an order to that effect.

8              All right.  Mr. Jones and Mr. Johnson, what do the

9    parties want to do with a next date?

10             Mr. Jones, perhaps you'll remind me when we have

11   the -- well, it may be difficult to coordinate, but we'll do

12   our best.  We have Mr. -- we have at least -- well, it looks

13   like -- do we have all three defendants lined up for the

14   15th?  That's what my calendar --

15             MR. JONES:  Yes.

16             THE COURT:  -- suggests.  All right.

17             MR. JONES:  Yes, Your Honor.  2:00 p.m. on July

18   15 --

19             THE COURT:  Right.

20             MR. JONES:  -- for the other three.

21             THE COURT:  So the question is -- well, now, let

22   me turn -- well, first of all, let me ask Mr. Johnson before

23   we get to the technical problems that are going to probably

24   destroy any intent we have of marrying all these defendants

25   up.

1           Mr. Johnson, are you available on July 15th at

2      2:00 o'clock?

3           MR. JOHNSON:  I'm going to look right now, but

4      because of -- my wedding anniversary is the day before.  So

5      I have a sneaking suspicion that she has some things planned

6      for that day and the next couple days to follow.  So I'm

7      going to -- I'm checking right now, though, on my work

8      calendar, but my kids have tipped me off a little bit.  I

9      think there's something planned where I will not be around

10     on the 15th.

11          THE COURT:  Well, Mr. Johnson, I'm very

12     sympathetic to the idea that you need to celebrate your

13     wedding anniversary.  I'm -- given the needs of our -- all

14     of our needs to bring the defendants together, I wonder

15     whether it's really realistic to have a multi-day

16     celebration that takes you off the grid completely when

17     representing a defendant like this who's detained, but I'll

18     let you tell me whether you think 2:00 o'clock is -- well,

19     why don't -- while you're looking at your calendar, let me

20     ask Ms. -- let me ask the courtroom deputy, Ms. Harris.

21          Ms. Harris, remind me of the, sort of, limitations

22     we have regarding Mr. Rehl and the facility where he's being

23     held.  Is -- 2:00 o'clock, I guess, is in the afternoon.  So

24     he wouldn't be able to be there at that time anyway; is that

25     correct?

1          THE DEPUTY CLERK:  That's correct.  He wouldn't be

2     able to be there that day at all because they only do

3     Monday, Tuesday, and Wednesday.  And I also wanted to remind

4     you --

5          THE COURT:  Right.

6          THE DEPUTY CLERK:  -- that I am in the process of

7     changing that hearing to the morning because, if you recall,

8     Mr. Donohoe's facility is not available also at 2:00 p.m.

9     So I'm just actually waiting to hear back from a couple of

10    facilities -- his facility and Mr. Biggs's facility.  I'm

11    trying to change that hearing to 11:00 o'clock.

12         THE COURT:  All right.  So if it -- okay.  But

13    even if it were at 11:00 o'clock, we wouldn't have --

14         THE DEPUTY CLERK:  You still wouldn't have

15    Mr. Rehl.

16         THE COURT:  We wouldn't have Mr. Rehl because of

17    that.

18         Well, let's -- all right.  Let me pivot back,

19    Mr. Johnson.  I mean, one thing we might do, frankly, is

20    have that status regardless of whether we can have your

21    client there if we can have you there just because -- just

22    for coordination purposes and we can try to have a date

23    where we marry up -- we have a separate hearing with your

24    defendant where we can talk about what we decided on the

25    15th or try to coordinate and give him an opportunity to

```
 1    participate, but it's hard enough -- it sounds like that's

 2    going to be pretty hard.

 3              So let me just ask, Mr. Johnson, are you --

 4    looking at your calendar, is your -- your anniversary is on

 5    the 14th, you said?

 6              MR. JOHNSON:  (Indicating affirmatively.)

 7              THE COURT:  Okay.  Yes?  Okay.  I think you're

 8    either muted or your volume is so low --

 9              MR. JOHNSON:  Yes.  I don't know why.  It's the

10    same as --

11              THE COURT:  Okay.

12              MR. JOHNSON:  Yes.  Yes, it's on the 14th.

13              THE COURT:  Okay.  Looking at your -- you really

14    think you cannot participate in a status?  It would probably

15    be earlier that date on the 15th.  We're still trying to

16    work that out.  But your --

17              MR. JOHNSON:  I'll make every effort.  The only

18    issue is I think we're going to Mexico in --

19              THE COURT:  Oh.  Oh, all right.

20              MR. JOHNSON:  And so the issue is with -- the

21    Cisco and connecting have been causing some problems.  So --

22    but that's the only reason I think that I can --

23              THE COURT:  All right.

24              MR. JOHNSON:  So really, wherever I am in the

25    world, but --
```

 1          THE COURT:  Okay.  No, I understand.  If you're

 2     out of the country, that's a little different.  I

 3     understand.

 4          MR. JOHNSON:  Yeah, I wasn't saying just as a

 5     multi-day --

 6          THE COURT:  All right.  Why don't -- when do you

 7     think -- so let's just, I guess, then -- let's try to set a

 8     target date.  I think, then, it just doesn't make sense to

 9     try to marry you up at that point.  Why don't I set -- why

10     don't we set another date.  And, again, we'll try to marry

11     up everyone at -- together at some point, but I think it

12     just doesn't -- it doesn't make sense to try to do it that

13     date.  We wouldn't have your client there anyway, and I

14     don't think it makes sense to have you calling in from

15     abroad.  So looking at my calendar, we can set --

16          Well, what are the days, Ms. Harris, that the --

17     his facility will set these things?  Days of the week, I

18     mean.

19          THE DEPUTY CLERK:  So they set them on Monday,

20     Tuesday, and Wednesday, but also a reminder that I don't

21     know the exact -- what's available until the Tuesday after

22     12:00 noon the week prior to what we want.

23          THE COURT:  Okay.  So I think, then, let's just do

24     this.  For our purposes, let's set a hearing at -- I'm

25     looking at my calendar.  We could set it at 11:00 o'clock on

 1    the 28th if Mr. Johnson's available.  And that's really just

 2    going to be a placeholder, because we're going to have to

 3    find out --

 4            When would we find out -- we find out that week or

 5    the week before, Ms. Harris, about when the slots are open?

 6            THE DEPUTY CLERK:  We would find out the week

 7    before.

 8            THE COURT:  On the 19th?

 9            THE DEPUTY CLERK:  Let me look at the calendar.

10    So the 28th -- so on the 20th -- after 12:00 noon on the

11    20th, I would find out what they -- what slots they have

12    left available for the week of the 26th.

13            THE COURT:  Okay.  So let's set it for -- the

14    latest, though, that could be is the 28th; correct?

15            THE DEPUTY CLERK:  That is correct.

16            THE COURT:  All right.  So Mr. Johnson, are you

17    available the 28th at 11:00 o'clock?

18            MR. JOHNSON:  Any day that week is fine and any

19    time --

20            THE COURT:  Okay.

21            MR. JOHNSON:  -- that week.

22            THE COURT:  Okay.  So let's set it on -- 28th at

23    11:00 o'clock.

24            And let me just -- I should ask, Mr. Jones, are

25    you available then?

1           MR. JONES:  Yes, Your Honor.

2           THE COURT:  All right.  So we're going to set it

3    then with the understanding that Ms. Harris, when the 20th

4    comes, is going to reach out to the parties to see if that

5    time will stick, and if it will not stick what other times

6    are available and try to coordinate my schedule; the

7    Government's schedule; your schedule, Mr. Johnson, so that

8    we will have -- we will be all together either on the 26th,

9    27th, or 28th.  But we'll just put it in as a placeholder,

10   the 28th at 11:00 o'clock, which is basically the latest

11   spot that day that we could -- it could be scheduled and

12   we'll just go from there.

13          But, Mr. Johnson, I need you to be responsive.  I

14   need you to respond -- I need you to let us know -- Ms. --

15   when Ms. Harris reaches out to the parties to try to

16   schedule this, I need you to promptly respond whether you're

17   available or not, and I think it's incumbent upon you, given

18   the -- given that your client is now detained in the case

19   and that -- the limitations we have here, to move some

20   things around -- I'm certainly doing that on my end -- to

21   move other matters around so that his needs can be attended

22   to and we can move the case forward promptly.  Does that

23   make sense, Mr. Johnson?

24          MR. JOHNSON:  That makes all the sense in the

25   world, Judge.  Yes.

1          THE COURT:  All right.  So that's what we will do.

2          Now, the other piece I want to mention is, I think

3     we only have the speedy trial clock having been tolled

4     through June 9th.  And so just let me ask Mr. Jones, are you

5     asking me to toll Speedy Trial Act from June 9th, then,

6     through July 28th so we can come back at that point and see

7     where things stand?

8          MR. JONES:  I am, Your Honor.  For the reasons

9     stated in the -- at the June 1st hearing and previous

10    hearings, move the Court in the interests of justice to

11    exclude time between now -- I'm sorry, between June 9th --

12    going back to June 9th nunc pro tunc and going forward to

13    July 28th.

14         THE COURT:  Why don't you give me a little update

15    here about -- I mean, part of your answer -- part of your

16    argument the last time was on discovery.  Why don't --

17    Mr. Johnson, earlier in our hearing, mentioned the

18    voluminousness of the discovery.  Why don't you give me an

19    update on, sort of, where we are on that -- where you are on

20    that in terms of providing all of that and whether there's

21    any other -- whether the parties are in any other -- whether

22    there's any other basis to -- for me to rely on in excluding

23    time in the interests of justice, including whether the

24    parties are discussing any disposition of the case short of

25    a trial.

1             MR. JONES:  Certainly, Your Honor.

2             I don't have an update as to conversations between

3     the parties regarding dispositions.  I will say discovery is

4     ongoing.  As Mr. Johnson indicated, it is extensive and it's

5     been on a rolling basis.  We've been able to produce FBI

6     case files to each of the defendants and have begun

7     providing cross-discovery, so to speak, one defendant's file

8     to each of the others, consistent with the protective orders

9     and limitations on providing scoped versions of accounts or

10    cell phones that were seized.  Your Honor will recall that

11    we had proposed the possibility of a defense agreement as to

12    sharing, sort of, unscoped versions of devices.  We don't

13    have that agreement in this case, but I think the Government

14    has nonetheless endeavored to scope a substantial number of

15    devices and begun to make those scoped productions.  So that

16    will continue and, you know, we anticipate to have a further

17    update for the Court at the July 15th hearing.

18            THE COURT:  Is there -- so I certainly understand

19    that you've got a set of discovery that's going to be very

20    broad that you're going to end up making available to every

21    defendant -- every January 6th defendant.  Put that aside.

22    I know that's a work in progress.  When do you think you

23    will have the particularized -- the more particularized

24    discovery?  And in this case, I concede, that's probably

25    pretty tricky because of, you know -- I don't know whether

1    the Government's taking the view that all the -- we'll call

2    it case-specific discovery -- I don't know what -- the

3    position the Government's taking -- or the defense is

4    taking, for that matter -- about how far out from these

5    charged defendants that really extends.  But when do you

6    think -- without trying to wade into that, when does the

7    Government anticipate being able to say, Look, putting aside

8    the, sort of, non-case-specific stuff, we think we've

9    provided all the case-specific -- things that have a known

10   factual connection -- let's put it that way -- to what these

11   defendants -- when do you think you'll be able to say that

12   that's been -- that's all been provided?

13            It sounds like Mr. Johnson is, you know -- he's

14   swimming in stuff that he -- well, he'll make the

15   representation, but -- and I see him nodding.  He's getting

16   a lot.  So I doubt Mr. Johnson is going to say, I want it

17   any quicker.  But on the other hand, I want to make sure

18   we're on a track so that, at some point in the relatively

19   distant -- given the passage of time and given the detention

20   status of these defendants, that the Government can come and

21   tell me that everything case-specific has been provided.

22            MR. JONES:  I'm sorry, Your Honor.  My computer

23   cut out for a moment there.  I wasn't looking to avoid your

24   question, but I think I got the gist of it.

25            As Your Honor suggested, it's a bit difficult to

1    answer as to the entire scope of case-specific discovery, so

2    to speak, as Your Honor knows, and the Government has

3    identified several individuals not charged with this

4    indictment that are very relevant to the facts of this case,

5    will be relevant at trial.  And so as, you know -- just as

6    the Government is producing discovery as to the individual

7    defendants -- that is, evidence seized from them; evidence

8    seized about them; evidence in the FBI's holdings about

9    them -- and then producing that across other defendants, the

10   same effort will be required as to, for example,

11   co-conspirators such as Dominic Pezzola and others, you

12   know, and to include individuals who may not themselves be

13   charged at this time.  And so I'm reluctant to give a -- to

14   try to put a date on that.  I think -- certainly, by July

15   15th, I know it's our goal to be substantially completed

16   with the case-specific discovery for each of the defendants

17   and to be moving apace with additional discovery regarding

18   other individuals.  I think we expect to be, you know -- we

19   expect continued requests from defense as to specific pieces

20   of information or specific individuals about -- that they

21   would like to prioritize discovery and, you know, certainly,

22   there's a volume issue here, even putting aside the, sort

23   of, global January 6th collection of --

24             THE COURT:  Right.

25             MR. JONES:  -- and even with respect to, you know,

1    the Proud Boys, so to speak, or even those that are most

2    close to these four charged defendants with -- in a, you

3    know -- a Venn diagram that one might imagine, you know?  We

4    will be, you know, making those decisions.  We are already

5    doing that and making productions accordingly and, no doubt,

6    will be responding to discovery requests and perhaps

7    motions, but we certainly intend to provide a further update

8    on July 15th.

9         THE COURT:  All right.  And, Mr. Jones, you think

10   you would -- you could represent -- your goal is that -- on

11   July 15th to be able to say that all the -- we'll call it

12   not necessarily case-specific, but -- defendant-specific

13   discovery may be out to all these defendants?

14        MR. JONES:  I do expect that, Your Honor.  I do

15   expect we'll be there or substantially there with respect to

16   each of the four defendants.

17        THE COURT:  All right.

18        Mr. Johnson, it sounds like you're getting --

19   you're, you know -- I don't want to -- I'm not going to

20   micromanage that process.  I think this -- unless I have to.

21   And this case presents a lot of -- well, there's going to be

22   -- I'm sure there's a lot of discovery and part of, it seems

23   to me, how the Government can reasonably proceed here is by

24   taking its cues from the defense and saying, Okay.  We want

25   to prioritize this but not that or, you know, this person

1    and not that person.  So I'll leave it to all of you if --

2    it sounds like -- and I'll hear from you, Mr. Johnson,

3    just -- I want to make sure at least to your satisfaction

4    things are moving along.

5         MR. JOHNSON:  Your Honor -- discovery -- almost on

6    a weekly basis --

7         THE COURT:  Mr. Johnson, can you move your -- I

8    just can't -- I know that if I can't hear you, probably the

9    court reporter can't.  And I -- so could you move closer to

10   the microphone or --

11        MR. JOHNSON:  Yes, sir.

12        THE COURT:  All right.  That's great.  That's

13   great.

14        MR. JOHNSON:  I've been getting discovery almost

15   -- the rolling discovery on, maybe, a weekly basis.  There's

16   a flash drive, USB, set of CDs, whatever it is, that comes

17   on a weekly basis which has me, you know -- I have my fair

18   share of reading to do with this particular case.  So

19   Mr. Jones and I have been in concert with one another.

20   We've been in touch with one another regarding that.  I

21   don't see that stopping.  So I'll keep the Court apprised,

22   but, you know, we've been, you know, dealing with each other

23   very amicably so far as it relates to discovery in this

24   case.  I imagine that will persist.

25        THE COURT:  All right.  Fantastic.  I'm not going

1    to -- that's great.

2             Is -- in light of that, Mr. Johnson, do you --

3    will you agree that it's appropriate for me to toll the

4    speedy trial, then, from June 9th through July -- the date

5    we just picked to come back --

6             MR. JOHNSON:  28th.

7             THE COURT:  -- July 28th and then see where we are

8    at that point?

9             MR. JOHNSON:  Yes, sir.  I do.

10            THE COURT:  All right.

11            And so I will go ahead, then, and find that --

12            (Brief pause.)

13            Here.  Great.

14            I will find that the time between June 9th and

15   July 28th is excludable under the Speedy Trial Act because

16   the ends of justice that are served by taking such action

17   outweigh the best interests of the public and the defendant

18   in a speedy trial.  And I'm doing so here to give defense

19   counsel the opportunity to continue to receive and review

20   all the voluminous discovery in this matter, to consult with

21   his client, and to prepare for trial or to determine how

22   else best to proceed with the case moving forward.

23            Mr. Jones, is there anything else you think I need

24   to take care of here today?

25            MR. JONES:  I don't believe so, Your Honor.  Thank

1   you very much.

2          THE COURT:  All right.  Mr. Johnson, same question

3   to you.

4          MR. JOHNSON:  No, Your Honor.  Thank you for

5   asking.

6          THE COURT:  All right.

7          So you know, what we'll do is, please, if you

8   would all keep a lookout for communications from Ms. Harris.

9   Whether it's going to be the 28th, the 27th, or the 26th,

10  one way or the other, that will be our next date, and at

11  that point we'll be able to check in on discovery and see

12  where things head from there.

13         With that, then, the parties are dismissed.

14         MR. JONES:  Thank you, Your Honor.

15         MR. JOHNSON:  Thank you, Your Honor.

16         (Proceedings concluded at 2:56 p.m.)

17             * * * * * * * * * * *

18         **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

19     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

20  **certify that the above and foregoing constitutes a true and**

21  **accurate transcript of my stenographic notes and is a full,**

22  **true and complete transcript of the proceedings to the best**

23  **of my ability, dated this 23rd day of August 2021.**

24     **Please note:  This hearing occurred during the COVID-19**

25  **pandemic and is, therefore, subject to the technological**

1     limitations of court reporting remotely.

2                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
3                              United States Courthouse
                               Room 6722
4                              333 Constitution Avenue, NW
                               Washington, DC 20001
5