IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              CR Nos. 1:21-cr-00175-TJK-1
                                              1:21-cr-00175-TJK-2
        v.
                                      Washington, D.C.
1-ETHAN NORDEAN                       Monday, September 13, 2021
2-JOSEPH RANDALL BIGGS,               2:00 p.m.


                     Defendants.
- - - - - - - - - - - - - - - - x
_____
                  TRANSCRIPT OF MOTION HEARING
          HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                  UNITED STATES DISTRICT JUDGE
_____
APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          Luke M. Jones, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233


For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869


                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111



Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3      criminal matter 21-175, United States of America v.

4      Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs.

5              Present for the Government are Jason McCullough

6      and Luke Jones; present from Pretrial Services is Christine

7      Schuck; present for Defendant 1 are Nicholas Smith and David

8      Smith; present for Defendant 2 is John Hull; also present is

9      Defendant Nordean and Defendant Biggs.

10             THE COURT:  All right.  Well, good afternoon,

11     everyone.

12             We are here for both Defendant Nordean and

13     Defendant Biggs's motions to reopen the detention hearing.

14     It is, obviously, their motion.  So I'll hear from them

15     first, each of them.

16             My suggestion -- I know the parties have each

17     filed materials under seal that relate to this hearing.  So

18     my thought is to have everyone, basically, address those

19     points that we don't have to address under seal here in open

20     court -- I'll hear from the Government; I'll hear from each

21     defendant -- and then we'll go ahead and place a portion of

22     the record under seal and have whatever exchange we are

23     going to have -- whatever argument we're going to have on

24     the under-seal -- regarding the under-seal matters.

25             So why don't I turn it over, then, to whoever is

1     going to handle the motion for Mr. Nordean, since

2     Mr. Nordean filed his motion first.

3               MR. NICHOLAS SMITH:  (Indicating.)

4               THE COURT:  I see Mr. Nicholas Smith, I think,

5     raising his hand.  So sir, why don't you address the motion,

6     please.

7               MR. NICHOLAS SMITH:  Thank you, Your Honor.

8               MR. HULL:  Your Honor, before we begin, if I may,

9     Dan Hull for Joseph Biggs.

10              The lion's share of what I will be arguing today

11    in terms of volume and time taken up by the Court would best

12    be under seal.  It's not necessarily the case in

13    Mr. Nordean's -- Mr. Smith's case, but I just want to point

14    that out now before we get started.  I would prefer --

15    there's a couple of things that ought to be under seal, and

16    I would prefer that most -- say, 80 percent of what I do

17    goes under seal, but I can -- I will do it in accordance

18    with the Court's instructions.

19              THE COURT:  Well, we're going to -- yeah, we're

20    going to -- we're -- we will turn to -- we will -- at the

21    end of addressing matters that are not under seal, I will

22    turn to the -- to each of you and hear what you have to say

23    about the sealed matters.  So there's nothing to really --

24    if you don't have much to say about those matters that are

25    not under seal, that's fine.  I'm not asking you to fill up

```
1    a certain amount of time, but I -- but understood.

2              Mr. Smith?

3              MR. NICHOLAS SMITH:  Thank you, Judge.

4              MR. MCCULLOUGH:  May I just add --

5              I'm -- my apologies, Mr. Smith.

6              I just -- for the record -- and my apologies.

7    Just for the record, because a portion of the hearing will

8    be under seal, Mr. Jones is joined in his office by Jocelyn

9    Ballantine who is supervising the case.  And so I just

10   wanted to announce her present, effectively, at counsel

11   table, if you will.

12             THE COURT:  All right.  Thank you.  Thank you,

13   Mr. McCullough.  I appreciate that.

14             Mr. Smith?

15             MR. NICHOLAS SMITH:  Judge, our argument is that

16   Mr. Nordean should be released pretrial as he prepares for a

17   very complex -- Judge, I think someone who's not on mute is

18   -- there's some interference with the line.  It might be

19   Mr. Nordean's line.

20             Ethan, are -- is it possible to mute the -- to

21   mute or cover your phone -- there you go.

22             THE DEPUTY CLERK:  I've just muted it.

23             MR. NICHOLAS SMITH:  So Judge, as you know,

24   Mr. Nordean and Mr. Biggs are likely going to be preparing

25   for a very complex trial that's very document-heavy.  The
```

```
1    Justice Department calls this one of the largest

2    investigations -- if not the largest -- in its history.  It

3    is a complex case.  The Court is very familiar with

4    conspiracy cases with multiple defendants and how

5    complicated they can get and how difficult it can be,

6    particularly in this time of the pandemic, to adequately

7    prepare for a trial when you're unable to speak with your

8    counsel on a regular basis, much less review documents with

9    them at the same time.

10               So Judge, we're going to focus on information that

11   was unavailable to Mr. Nordean at the time of the April

12   revocation of his bail, but we'd like to start with some of

13   the basics, and we've made some basic arguments to reopen

14   bail and we'd just like to run through those, and the Court

15   is going to feel like it's Bill Murray in Groundhog Day

16   again, but this will only be temporary --

17               THE COURT:  Well --

18               MR. NICHOLAS SMITH:  -- temporary pain.

19               THE COURT:  And, Mr. Smith, when you get to the --

20   I will say, you -- just to comment briefly on -- and I've --

21   I'm -- if you'll all forgive me, I am going to jump in from

22   time to time with questions, you know?  I will say that I'm

23   very -- let me just say from the start, the idea that you

24   need to adequately be able to prepare for trial with your

25   client is, you know -- I don't think anyone -- anyone
```

1    participating in this hearing can't call that into question.

2    And so even if I were -- let me just say, and I don't at all

3    want to suggest how I'm leaning here, but even if I were to

4    deny your motion, we would still have a problem and an issue

5    there that we're going to have to work on to make sure you

6    have proper access to your client and your client has proper

7    access to the evidence.  So I take it.

8            But I will say just -- I don't see -- and I saw

9    the cases you ran down that invoke a very little-used

10   portion of the detention statute to detain someone for, you

11   know -- actually, it's a very open-ended -- it's 3142(i), I

12   believe.  But I guess the point I wanted to make is, though,

13   typically -- isn't it fair to say that as far as me

14   considering the typical things I have to do under -- the

15   typical considerations that I have to weigh under the

16   statute that your client's ability to prepare for trial is

17   typically not one of those considerations; right?  They're

18   about dangerousness; they're about risks of flight; they're

19   about things like the strength of the evidence, etcetera,

20   etcetera, speaking of Groundhog Day.

21           So I guess my point is, you -- again, I'm

22   sympathetic to the issue that you've raised about your

23   client being able to get at the information and prepare.

24   That's critical.  But I don't know that it -- I guess you

25   might start by saying how that -- or explaining to me in

1    your view how really that connects in with a bail -- with

2    a -- with my determination under the BRA.

3              MR. NICHOLAS SMITH:  Sure, Judge.  Thank you.

4              So we think that there's not a single factor,

5    including 3142(i) or (f), that supports the Government's

6    detention argument, but we'll start at the top from where

7    the Court pointed us.

8              The 3142(i) provision, which says that a court can

9    temporarily release a defendant to prepare for trial, has

10   become -- the Court is correct that it was underused for

11   some time, but it's been increasingly used at the onset of

12   the pandemic not just because of the risk to the health of

13   the defendant but because it makes it that much more onerous

14   and difficult for a defendant to prepare for trial when

15   counsel can't reasonably visit during normal hours.

16             There's another way in which 3142(i) looms larger

17   now during the pandemic, and that is the ability of

18   defendants to review evidence in the jail with ease during

19   the pandemic.  The lines have become much longer, so to

20   speak, for defendants to be able to access laptops that they

21   review evidence on.  There is now waits of months to access

22   laptops in the D.C. -- the section of the D.C. Jail where

23   January 6th defendants are placed.  So that's what, sort of,

24   makes 3142(i) a little bit different now than it was in the

25   '80s when it was a provision right after the Bail Reform Act

```
 1    was passed.

 2              But even if Your Honor goes back to the '80s and

 3    '90s, there's a pretty substantial body of precedent -- we

 4    cited the Persico case in the Southern District of New

 5    York -- where courts have said, Look, if you can't

 6    adequately prepare for trial in a case like in Persico,

 7    which is a large conspiracy mafia case, we're not going to

 8    cut you off at the knees with your Sixth Amendment rights to

 9    do this.

10              And, Judge, just to get back to our other

11    arguments, we think this would be particularly inappropriate

12    to leave the defendants in jail until next year -- late next

13    year probably -- because the Government has not identified a

14    particularized risk.  They have not explained why there are

15    no conditions of release that --

16              THE COURT:  Well, but, Mr. Smith, I don't want to

17    cut you off, but let me just say, obviously, they made an

18    argument and I agreed with the argument, I ordered your

19    client detained, and the Circuit affirmed me.  So I guess --

20    I'm all ears about your attempts -- about your argument as

21    to why you have new information that changes the calculus,

22    but for you to come in and now say, Well, they haven't made

23    even the -- any colorable case about a -- about

24    dangerousness going forward or a threat going forward that

25    warrants detention, I mean, I think I've already disagreed
```

1    with that and the Circuit has already affirmed me on that.

2    No -- again, I'm not trying to -- I want to hear all what

3    you have to say, but --

4              MR. NICHOLAS SMITH:  Okay, Judge.

5              THE COURT:  -- re-up --

6              MR. NICHOLAS SMITH:  We'd like to go through the

7    --

8              THE COURT:  -- that from the first step, they

9    didn't -- they haven't been able to prove that that was

10   warranted I don't think is a good use of your time.

11             MR. NICHOLAS SMITH:  Okay, Judge.  We'd like to go

12   through the new arguments.

13             So the first new argument is legal, Judge.

14   There's no basis to detain the defendants because, under

15   3142(f), the Government has to establish either one of the

16   listed offenses in (f)(1) or one of the circumstances in

17   (f)(2) which is a substantial risk of flight or a risk of

18   obstruction of justice which is interference with one of the

19   witnesses in the case.  The Government is not relying on

20   (f)(2) here; they're relying on (f)(1).  All of the felonies

21   listed in 3142(f)(1) -- all of the crimes, excuse me, are

22   felonies.  None of the crimes in this case involves an

23   offense listed in 3142(f)(1) except for a destruction of

24   property charge.  The Government conceded after the bail

25   hearing in April that there is no allegation in this case

1    that Mr. Nordean personally destroyed property over $1,000.

2    If there's no allegation of property destruction over

3    $1,000, that means it's a misdemeanor crime, not a felony.

4    Misdemeanor crimes are not listed in 3142(f)(1).

5              That leaves two theories in this case that

6    Mr. Nordean is properly detained under the Bail Reform Act.

7    One theory is that he aided and abetted property destruction

8    over $1,000 by aiding and abetting Dominic Pezzola's

9    smashing of a window on January 6th.  The second theory is

10   that Pinkerton liability -- Pinkerton conspiracy liability

11   makes him responsible vicariously for a felony offense

12   involving over $1,000 in property destruction.  There is

13   Supreme Court precedent under the Apprendi line of cases,

14   which concluded with the Alleyne case in 2013, that if a

15   fact is necessary to be pleaded and proved to a petit jury

16   beyond a reasonable doubt because it moves a statutory

17   maximum or minimum sentence, it has to be alleged in the

18   complaint and presented to the grand jury.

19             The facts that move mandatory minimums -- maximum

20   sentences in this case apply to both the aiding and abetting

21   theory of liability and the Pinkerton theory of liability in

22   the following ways.  In order to prove aiding and abetting

23   liability for over $1,000 of property destruction, the

24   Government has to allege in the indictment and prove to a

25   petit jury that Mr. Nordean committed a -- an affirmative

1    act to further Dominic Pezzola's window breaking and with

2    the intent to commit that specific offense.  The reason

3    that's an Apprendi fact, Your Honor, is that it moves a

4    mandatory maximum sentence from 1 year under the destruction

5    of property charge to 10 years.

6            Then, Your Honor, the reason that the fact is a

7    mandatory -- is an Apprendi fact under the Pinkerton

8    liability -- theory of liability is that the conspiracy is

9    charged under Section 371 in the indictment.  That has a

10   5-year statutory maximum sentence.  If Mr. Nordean is found

11   guilty of substantive vicarious liability via Pinkerton

12   through the conspiracy offense, that would move the

13   statutory maximum sentence from 5 years, Your Honor, to 10

14   years.  That means those facts that move the statutory

15   maximum are Apprendi and Alleyne facts.

16           In response to this argument, the Government cited

17   cases saying that under the constructive amendment

18   principles of the Fifth Amendment, Pinkerton facts -- a

19   court does not constructively amend an indictment by

20   allowing a jury to decide a Pinkerton issue even though it's

21   not alleged in the indictment.  Your Honor, there are

22   multiple Circuits that have held that the Apprendi and

23   Alleyne Fifth Amendment presentment issue is not the same as

24   constructive amendment of an indictment.  Constructive

25   amendment occurs when proof at trial allows a jury to

1      convict for an offense outside the indictment.  By contrast,

2      Apprendi and Alleyne are where statutory maximum and minimum

3      sentences are increased by facts not in the indictment.

4      That's why, for example, the Tenth and the Sixth Circuit --

5      and the Third Circuits have held that it is no response to

6      an Apprendi argument that constructive amendment has not

7      occurred.  In the Tenth Circuit, that's the Mann case, 768

8      [sic] F.3d 1244; in the Third Circuit, that's the Lewis

9      case, 766 F.3d 255.

10             So Your Honor, the question is whether the

11     indictment, quote, involves an offense that's listed in

12     3142(f)(1).  The indictment does not involve an offense

13     listed in 3142(f)(1) because there's a presentment error

14     involving the Apprendi and Alleyne line of cases.  The

15     indictments do not allege the facts that are necessary to

16     move the mandatory minimum on the aiding and abetting theory

17     or the Pinkerton theory from a 1-year mandatory minimum up

18     to a 10-year -- excuse me, mandatory maximum to a 10-year

19     mandatory maximum under the aiding and abetting theory and

20     from a 5-year mandatory maximum to a 10-year mandatory

21     maximum under the Pinkerton theory.

22             If the case could, quote, involve one of those

23     offenses, even though there's a presentment error under the

24     Fifth Amendment, that would mean that there is no

25     presentment error.  So the question is whether there's a

1    presentment error, and if so the case cannot involve that

2    offense; if there is no presentment error, then the case can

3    involve that offense.  Because the Government hasn't cited

4    any cases showing that it is allowed to find Mr. Nordean

5    guilty of over $1,000 in property destruction, despite not

6    alleging the facts that are necessary to establish aiding

7    and abetting and Pinkerton liability, it has not alleged an

8    offense -- a felony offense listed in 3142(f).

9            Then, Your Honor, even if the Court were to find

10   that we are in a realm where Mr. Nordean is properly

11   detained under the Bail Reform Act -- which we are not --

12   the Government's burden is to prove by clear and convincing

13   evidence that there's a threat to public safety that is not,

14   quote, reasonably mitigated by conditions or any conditions.

15   Now, Your Honor, I was pointing out before that in the prior

16   hearing, the Government did not articulate a particular

17   threat to the public and it did not explain why the

18   conditions he had offered are not reasonably sufficient to

19   protect against that risk.  Judge Lamberth recently in

20   another case involving a leader of the alleged Three

21   Percenters conspiracy essentially -- we've submitted that

22   decision -- it's the Taylor decision -- to the Court --

23           THE COURT:  Yep.

24       MR. NICHOLAS SMITH:  -- but Judge Lamberth

25   essentially rejected every single one of the arguments the

1    Government's making here about retrospective leadership

2    analysis, extremist organizations ties which Judge Lamberth,

3    a former Chief Judge, said was not sufficient to detain,

4    given First Amendment rights, among other things.

5             But, Judge, here are the new facts.  In January of

6    this year, a few months before -- a few months --

7             THE COURT:  Mr. Smith, can I -- before -- I want

8    to -- I'm going to -- I want to hear this, but let me just

9    -- just one thing on your Pinkerton aiding and abetting

10   argument.  How can I -- well, what's the new -- what makes

11   -- I mean, that is an argument that was available to you --

12   and I think you, kind of, made a flavor of -- at the -- our

13   initial hearing.  What's new about that argument such that I

14   should entertain it on a motion to reopen?

15            MR. NICHOLAS SMITH:  Thank you, Your Honor.

16            Here's what's new.  When we made the argument in

17   April and said that the only crime that's available under

18   3142(f) in the indictment is destruction of property and

19   pointed out that the fence-shaking allegation probably did

20   not involve over $1,000 in property, one of the Government's

21   responses is, Ah, but because of grand jury secrecy, we

22   don't know whether there are other properties involved that

23   might conceivably lead to Mr. Nordean being found guilty of

24   over $1,000 in property destruction.  Then, Your Honor,

25   after the hearing, we filed a motion to compel and a motion

1    for a bill of particulars.  In the hearing, the Government

2    responded for the first time -- and the Court acknowledged

3    this in the transcript -- that the Government said that it

4    is not alleging and no evidence was presented to the grand

5    jury that Mr. Nordean personally destroyed property over

6    $1,000.  So what's changed, Your Honor, is we now have been

7    able to determine what evidence was presented to the grand

8    jury -- what was presented and what isn't.  So the

9    presentment issue is different now, Your Honor.  The

10   Government has conceded there is only aiding and abetting

11   liability possibilities and Pinkerton.  Those happen to

12   have -- involve different Apprendi and Alleyne arguments

13   than, kind of, speculation about what happened in the grand

14   jury.  So that's the difference on that argument, Your

15   Honor.

16          Then on the new evidence front, one of the unusual

17   things about the way bail has proceeded in this case is it's

18   stretched on for so long that we've essentially litigated a

19   significant chunk of the case at this point.  So we can

20   compare the weight of the evidence the Government has

21   presented as of April and the weight of evidence they've

22   presented as of now.  And the new evidence that's come out

23   since then, Your Honor, not only establishes that the

24   Government has come nowhere close to showing clear and

25   convincing evidence of a particularized, unmitigable threat

1    to society, but that Mr. Nordean has provided evidence that

2    wouldn't survive a Rule 29 motion for the Government in the

3    following ways.

4             The Government began its indictment by alleging a

5    conspiracy that began one day after the election in 2020,

6    Your Honor.  The allegation in the indictment is that there

7    was a -- before any plans were involved in having a rally in

8    Washington, D.C., in January of the following year, there

9    was a conspiracy to interfere with the change of power, Your

10   Honor.  Some of the evidence that we've presented shows that

11   not only is that not true, it's not true that there was a

12   conspiracy as of a few minutes before any breach of the

13   Capitol in the following ways.  In January, the Government

14   conducted a search of the home of Eddie Block -- who is, I

15   guess, a confessed Proud Boy member -- the Government seized

16   devices from his home, and the devices show a real-time

17   video running clip of the entire movement of the defendants

18   in the alleged conspiracy from the Washington Monument to

19   the Capitol building.  What those videos show is

20   extraordinary.  The Government has had in its possession,

21   and had in its possession at the time of the last hearing,

22   evidence showing Mr. Nordean addressing the group of

23   protesters walking towards the Capitol as follows:  We're

24   heading towards the Capitol to hang out for a minute, make a

25   presence, and then go back to the rally on the ellipse.

1    When you combine that with the evidence that we had

2    presented to the Court before, a sworn affidavit from a

3    witness who had been with Mr. Nordean the night before the

4    6th and the morning of the 6th saying that the plan was to

5    return to an Airbnb house and have a party with music in

6    D.C. around 3:00 o'clock, when you combine the new evidence

7    that the Government improperly withheld for seven months,

8    there is no basis for finding the weight of evidence on a

9    conspiracy claim -- which is what is supposed to distinguish

10   this case from other January 6th cases where defendants have

11   been released on bail -- is strong.  There is no way to

12   explain why Mr. Nordean would be directing alleged

13   co-conspirators to return to the ellipse after minutes of

14   being at the Capitol if there was a conspiracy to enter the

15   building.

16           There's another video that was produced to the

17   defense seven months late, Your Honor, which the FBI has had

18   for nearly a year.  One of the videos shows the group having

19   made its way past the Washington Monument to the Capitol

20   near the food trucks outside the Frances Perkins Building

21   about a block from the Capitol.  They're standing outside

22   the food trucks and Mr. Block is explaining what the group's

23   plan is.  Why does Mr. Block know the group's plan?  Well,

24   because he's been following at the heels of the alleged

25   ringleaders of the conspiracy the entire day filming them.

1    A journalist asked, Where are you going now?  Are you going

2    -- heading towards the Capitol?  And Mr. Block says, No.

3    The plan is to go back to the rally at the ellipse.  The

4    journalist then asks, What's going on at the Capitol?  This

5    is minutes, I think, before the first breach of pickets --

6    barricades.  And Mr. Block responds, There's nothing

7    interesting going on there.  We just came down here to make

8    a show, basically, and go back.  That's what he says, Your

9    Honor.  That's one new piece of evidence.

10           The other new pieces of evidence that the Court

11   did not have are Telegram chats that the Government

12   knowingly withheld and produced shortly after the last

13   hearing which show the defendant repeatedly saying he does

14   not intend to politically rally in the future.  That's

15   significant and material new evidence because, as the Court

16   knows, it was focused very closely on two factors in

17   detaining the defendants: one is leadership; the other was

18   intent to commit dangerous rallying in the future, Your

19   Honor.

20           On the leadership point, we have submitted a new

21   affidavit from a member of the group in Seattle, Washington,

22   that says Mr. Nordean is no longer a leader in the

23   organization in any sense of the word.  The Government says,

24   Well, perhaps the Court shouldn't credit that statement.

25   It's offered no evidence to rebut the statement.  So on the

1    one hand, the Court has zero evidence showing current

2    leadership of Mr. Nordean.  And it's not just leadership, by

3    the way, Judge, because leadership per se, as the Court

4    acknowledges, is not criminal.  We don't detain Bill Gates

5    because -- or a CEO because he's a leader.  And as to the

6    criminal leadership, Your Honor, there's no contesting the

7    affidavit -- sworn affidavit submitted by the -- a true

8    leader of this organization who said that Mr. Nordean is not

9    involved now.  The Court might say, Why should I credit

10   that?  But then the question would become, what is the

11   burden of proof?  The burden of proof and persuasion is on

12   the Government to establish clear and convincing evidence of

13   an unmitigatable [sic] risk.  If all of the evidence that's

14   been presented is on one side, the Government cannot

15   establish clear and convincing evidence of a particularized

16   threat.  There's other evidence --

17            THE COURT:  Mr. Smith, let me just stop you there.

18   The -- two things.

19            One is, on the two videos you mentioned, just for

20   the record so everyone knows and we don't have to take the

21   time to describe them, I've watched those videos already

22   that the parties have submitted.

23            With regard to the last point you made, though,

24   Mr. Smith, it seems to me -- let's see.  A couple of things.

25   One is, in a sense, it's not surprising -- I mean, it also

1    may be that the reason why Mr. -- what prompted this chapter

2    to -- I can't remember how -- I don't want to

3    mischaracterize -- but what prompted the fact that

4    Mr. Nordean is no longer in a leadership position is that he

5    is, in fact, detained.  And so there would be no point in

6    him being a leader.

7              MR. NICHOLAS SMITH:  Judge, that's exactly our

8    point.  That's exactly --

9              THE COURT:  Yeah, but there's a --

10             MR. NICHOLAS SMITH:  -- our point, Judge.  Yeah.

11             THE COURT:  There's a certain chicken-and-egg to

12   that that I -- it's, sort of, like, which -- well, we do

13   know which came -- there's, sort of, a chicken-and-egg here

14   in that it's not clear -- but, you know, which caused which?

15   You're going to say -- well, I'll hear from you on that,

16   Mr. Smith.

17             But the other thing is, I'm not sure it's fair to

18   say -- I mean, I agree with you.  The Government hasn't --

19   they don't have an affidavit that says that that affiant

20   isn't telling the truth or they don't have evidence that

21   says, No, in fact, he retains that leadership position.  I

22   -- that's absolutely true, but that -- this is one slice of

23   the things that I have to consider.  So to say, well, they

24   can't have clear and convincing evidence that meets the

25   statute because you have something on your side of the

1    ledger and they have nothing, I'm not sure that's right.  It

2    certainly means that -- it certainly -- it may mean it on

3    this narrow issue of whether he's currently in a leadership

4    position, but, like you've said, I've got to look at -- my

5    -- the question is, what would -- that I've got to look at

6    is forward-looking, is what would happen if he were

7    released?  And I don't think -- it does not necessarily

8    answer that question.  It certainly bears on it, but it

9    doesn't answer that question definitively that he's not in a

10   leadership position today.  I mean, I don't know that it

11   does, but --

12          MR. NICHOLAS SMITH:  Judge, one of the things

13   that's extraordinary about what we're talking about now and

14   have been for months is that the -- when we pick at levels

15   of knowledge and we say we don't know something and it could

16   be this -- and something could be this, Judge, if a

17   defendant were required to prove negatives in order to be

18   released and defend himself before trial, there would be no

19   bail for any defendant --

20          THE COURT:  He does not have to prove a negative.

21   He does not have to.  There's no question.

22          MR. NICHOLAS SMITH:  Well, Judge, that's the

23   standard, but then when we start saying, But I don't know.

24   But this -- but, you know -- but the defendant -- the

25   Government hasn't presented evidence, but, you know, you

```
 1    haven't -- but you, by the same token, have not shown that
 2    this is not leadership going forward, Judge, that's the same
 3    thing.  It --
 4              THE COURT:  No, no, no, I get to -- I have to
 5    consider all the evidence in front of me about what the
 6    forward-looking threat is.  And all that evidence in front
 7    of me is about -- it's -- it is by nature backward-looking.
 8    It talks about -- it's -- it includes things that he's done
 9    before.  It also includes what you've submitted.  I'm just
10    saying -- including that affidavit.  My only point is, I
11    don't think that -- that's not the whole question that I
12    have to answer when making this decision.
13              MR. NICHOLAS SMITH:  So I'm just trying to imagine
14    how a defendant who doesn't have the burden would overcome
15    -- would establish that the Government has not shown by
16    clear and convincing evidence that the burden is established
17    if he shows his own written communications saying, I don't
18    intend to rally in the future; if he submits sworn
19    declarations from the only relevant people who might have
20    some input into the issue.  That's what Mr. Nordean has
21    done.  He's carried the burden of showing that the
22    Government has not presented proof -- a question.  If --
23    what he has shown the Court -- text messages showing he
24    doesn't intend to rally in the future, sworn declarations
25    saying he's not a leader anymore -- if those were the two
```

1     central criteria that the Court focused on in detaining

2     someone and if what Mr. Nordean has shown is not sufficient

3     to be released on bail, much less being exonerated, then

4     there is no hope for any defendant in a situation which is

5     politically charged.  It's so essential, Judge, that the

6     politics of this not overwhelm the facts.  And --

7               THE COURT:  Mr. Smith, let me just jump in here

8     again.  The politics of any of this has nothing to do with

9     it, not one wit, just to be clear, number one.

10              Number two, I -- again, I have to take what you've

11    given me and weigh it and apply the standards that don't put

12    the burden on your client to prove negatives, but that

13    doesn't mean -- again, courts make decisions all the time.

14    I'm not saying this is the case here, but certainly a court

15    is -- has to look at what the person's charged with and what

16    they have -- what that conduct entails as one indication of

17    the capabilities and intentions of the person going forward.

18    Now, you've provided me with additional information about

19    those intentions, in any event, and I have to weigh that,

20    for sure, but it can't be -- it also is -- and I take your

21    point that, like, we can't erect a barrier so high that no

22    defendant can ever meet that.  Of course.  And, in fact, the

23    vast majority, for example, of the defendants in front of me

24    and even the defendants -- January 6th defendants are

25    released.  So you know, that --

1          MR. NICHOLAS SMITH:  And, Judge, I think it's

2    important to look at who has been released and what they're

3    alleged with to make sure that the courts are applying a

4    standard that applies in the same way in one case than

5    another.  That's --

6          THE COURT:  That's a -- those are fair arguments.

7    My only point is, to make absolutely clear, politics is not

8    in play at all here.  It's not part of -- the -- I apply the

9    Bail Reform Act statute and I apply the Constitution and

10   those two things apply to everyone equally.  So anyway, my

11   only point is the evidence you've given me is not -- it does

12   not foreclose that the Government could also meet its

13   burden.  That's only -- my only --

14         MR. NICHOLAS SMITH:  We would agree with that,

15   Your Honor, if the Government had presented evidence, but

16   the only point we're making is they have not, Your Honor.

17   They have not proffered that evidence.

18         So the -- so we -- but would like to pick up on

19   one of the points the Court just made which is, you know, is

20   -- one of the ways the public knows that politics is not

21   involved is that the same standard is applied in one type of

22   case and as in another type of case; that it's applied in a

23   case which might be considered politically a hotrod and it's

24   also applied in cases which the public doesn't pay as much

25   attention to.  And one way we can measure those sorts of

1    things indirectly is we look at the types of January 6th

2    defendants that have been released pretrial.  And the types

3    of defendants that have been released pretrial include

4    individuals who smash poles on the top of police officers'

5    heads; who were struggling violent -- who maced police

6    officers; who were struggling violently with them, Your

7    Honor.  And what you have in this case is you do not even

8    have an accusation of violent conduct.  You have -- to put

9    it fairly, you have a series of novel legal theories that

10   have been created to bring a case into federal court from

11   D.C. Superior Court.  That is what you have in this case.

12   The only thing that distinguishes that from the D.C.

13   Superior Court case is the allegation of membership in an

14   organization that the Government alleges is extremist.  That

15   is the difference, Judge.

16            And what we would point the Court to is Judge

17   Lamberth's decision on this matter.  Judge Lamberth no one

18   would confuse for not being a law-and-order judge.  Judge

19   Lamberth was shown facts showing that a defendant in the

20   Taylor case was a member of a group that included Three

21   Percenters which are supposed to be a militia organization.

22   He was alleged to be a leader of the organization.  The

23   Government says, You have to revoke his bail, Judge

24   Lamberth, because he's associated with an extremist

25   organization and he was a leader.  Judge Lamberth said, No,

1    I don't, because pure association with a group alone is not

2    sufficient in this Circuit or anywhere in the country to

3    detain someone pretrial, and on leadership I'm looking

4    forward, not backward.  You haven't shown me that the --

5    that he's a leader now.  You have not shown me.  He did not

6    say, Taylor's -- did not do an adequate job proving he

7    wasn't.  He said, I didn't do that.

8              So Judge, we think that is a model decision in

9    this Circuit after the Munchel case.  We don't see any

10   difference between Judge Lamberth's decision and this case.

11   And, in fact, to the contrary, some of the allegations about

12   Taylor go beyond what is alleged about Mr. Nordean and

13   Mr. Biggs.  Taylor allegedly was texting people after the

14   6th saying, This was an insurrection.  There's film showing

15   him encouraging people, allegedly, to enter the building.

16   They allegedly brought weapons to the Capitol, Your Honor.

17   So I don't -- we have shown the Court video footage of

18   Mr. Nordean stopping a police officer from being shoved,

19   Your Honor.  That is the exact opposite of the types of

20   cases where people should be detained.

21             So what you also have is a video at the barricade

22   of them shaking a barricade.  We are --

23             THE COURT:  No, Mr. Smith, if you'll recall, in my

24   original ruling, I said this is not the typical type of

25   behavior that, at least to that point, courts had detained

1    defendants -- even if we're just talking about the January

2    6th group of defendants, that this was not the type of

3    behavior that typically, at least at that point, courts had

4    relied on, and that's why I went through and explained my --

5    the basis for my decision.  So I just -- we don't need to

6    rehash -- I would -- what I'd ask you to do is just focus on

7    the new facts that you want to leverage here, and you've

8    done it, but I mean focus in on the new facts rather than

9    the old facts --

10             MR. NICHOLAS SMITH:  Okay, Judge.

11             There's additional new facts.  We've offered $1

12   million bond against any material breach of the condition of

13   release.  The $1 million, where does it come from?  Well,

14   the Government insinuated that it came -- it's dirty money,

15   and then the press picked up on it and the Government was

16   made aware that it wasn't dirty money and it didn't do

17   anything about it to correct the record.  Where's the money

18   come from?  The money is substantially the life savings of

19   the defendant's father.

20             So what's new here?  One of the questions the

21   Court was asking in the April hearing was, How do I know

22   that Mr. Nordean -- well, how do I know that he won't lie

23   and bring a phone in -- like Jensen, into his home?  How do

24   I know he won't do that?  That just happened with Jensen.

25   How do I know the same thing won't happen?  You know it

1    won't happen, Judge, because the defendant's father lives a

2    block away from him, these are his life savings, and any

3    material breach is a forfeiture of his life savings.  So

4    when the Court was asking before, How do I know that won't

5    happen, Judge, I think -- if you read the affidavit

6    submitted by the defendant's father, he says, I do this --

7    this is my life savings.  I do this without fear of

8    forfeiture.  And he said, I do it without fear because I

9    know my son will not knowingly violate the conditions of

10   release.  And what is that consistent with, Judge?  That's

11   consistent with his practice when he was -- when Judge

12   Howell released him, he did not violate any conditions of

13   his release, Judge, for a couple -- I think it was a

14   month-and-a-half -- for, maybe, two months.  And then the

15   Court had the question, Well, okay.  Fine.  That's a

16   month-and-a-half, but that's not much of a track record.

17   What else have I got to go here with?  And that's what you

18   have to go here with, Judge.  You have somebody staking

19   their life savings.

20            So then the next point is the --

21            THE COURT:  Mr. Smith, let me just ask you one

22   factual question on that.  How much of the bond -- you said

23   substantially.  How much of that bond -- can you be more

24   specific about how much of that bond really is his dad's,

25   you know -- his dad -- from his dad.

1          MR. NICHOLAS SMITH:  It -- oh, 100 percent of the

2     bond is from his father.

3          THE COURT:  Oh.

4          MR. NICHOLAS SMITH:  One hundred percent, but then

5     it says -- it's substantially his father's life savings,

6     but --

7          THE COURT:  I understand.  No, I don't care about

8     the rest of it.  I see your point.  Okay.

9          MR. NICHOLAS SMITH:  Yes.  So it's 100 percent --

10         THE COURT:  His money.

11         MR. NICHOLAS SMITH:  -- his money.

12         THE COURT:  Okay.

13         MR. NICHOLAS SMITH:  And if you want to know, it

14    comes from a restaurant business.

15         THE COURT:  No, no, I just -- you understand my

16    question.

17         MR. NICHOLAS SMITH:  Yes.  Yes.  So it's 100

18    percent his money.

19         And then on -- the next question the Court said

20    was, Well, what -- the Court wasn't faced with a question

21    last time of:  Would somebody ruin their father to violate

22    conditions of release?  And I think that might -- decided

23    the Court last time, but that wasn't what the Court -- but

24    even if the Court had been facing that question last time,

25    the Court also said, Well, what about knowing what's going

1    on?  What about knowing what's going on?  So there are

2    cameras installed outside the home of every angle to the

3    home and what they're hooked up to is an app that anyone

4    could use.  The Court could use it if it wants to.  It's got

5    better things to do, but anyone can do it.  You could hook

6    it up to your phone, you can hook it up to your desktop

7    computer, and then you can see whether somebody is entering

8    if there's a condition of release.

9          Now, the only kind of response that the Government

10   would have to this is, Well, yeah, but the Pretrial Services

11   Office is not paid nearly enough to watch this thing 100,

12   you know -- 24/7.  They can't do that.  But, Judge, what

13   counts is what the defendant is afraid of.  Fear is the

14   motivator, Judge.  And, you know, we cited this old

15   precedent of the panopticon which is, you know, an old model

16   penal theory that says you don't need to watch prisoners all

17   the time.  You just stick a tower up in the prison and if

18   they think they're being watched or they're not really sure

19   if they're being watched, they follow the rules because they

20   simply don't know and the risk is too high.  That's the

21   model, and it works -- that's before the digital era.  It

22   works much better in the digital era because --

23         THE COURT:  Mr. Smith, let me just -- I get your

24   point about the panopticon.  I understand.  I guess my

25   question is -- as I recall, at the hearing that day, what I

1   said -- I think the hypothetical that I raised was, well,

2   someone could simply come in and see your client with a

3   smartphone and he could use that smartphone to, you know,

4   communicate with other people and potentially exercise a --

5   exercise leadership and potentially exercise leadership in

6   terms of planning a rally.  And do cameras -- I mean, I take

7   your point about the cameras, but they really don't -- and,

8   maybe, there's nothing that can address it.  But they don't

9   really address the scenario that I laid out that day, do

10  they?

11         MR. NICHOLAS SMITH:  Okay.  So two points.  I'm

12  going to get -- I'm going to tackle the "do they address it"

13  first and then, maybe, there's no solution, Your -- the

14  Court said.  And if there's no solution, then we're in

15  excessive bail land, Your Honor.  So -- but -- so we think

16  there are solutions.  If there's no solution, then there's

17  no hope for any --

18         THE COURT:  Well --

19         MR. NICHOLAS SMITH:  -- defendant, because if

20  crimes can be committed now in the digital era, all kinds of

21  crimes with digital devices, if it were the case that there

22  is no, quote, reasonable condition or sufficient conditions

23  to reasonably protect society and a -- because of a cell --

24  because of cell phone usage, there would be no bail, Judge.

25         So in response to the first question, Your Honor,

1    it does address whether someone is entering the Nordean home

2    without permission.  There could simply be a condition of

3    bail that says, You may not have any visitors at the home

4    except for your wife.  Mr. Nordean is married.  He has a

5    child.  So if there's a breach of that condition, that would

6    be visible by entry to the home, unless we're now positing,

7    kind of, scenarios where some -- like, the Santa Claus

8    scenario where he goes down the chimney or drills a hole in

9    the roof or, you know, one of those scenarios.  If someone's

10   entering the home, then they have to pass through the field

11   of vision of the video camera.  If Mr. Nordean does that,

12   despite a condition of release, he would lose $1 million --

13   not -- no, it's even more exquisitely torturous.  He doesn't

14   lose $1 million; his father does.  To me, that would count

15   for more.  I would rather lose $1 million myself than have

16   my father lose $1 million.  Okay?  So we think it handles

17   that scenario where Mr. Nordean allows someone to go into

18   his home against the condition that the Court has imposed.

19   That is clearly -- given the Court's concerns, if

20   Mr. Nordean knowingly allowed someone into his home, if the

21   Court entered a condition against -- then that is a material

22   breach.  Okay?

23              THE COURT:  All right.

24              MR. NICHOLAS SMITH:  So we think that that is a

25   new fact.

```
1              And then finally, Judge, the other new facts are
2       status of discovery and the types of -- the status of
3       discovery issue has changed since the Court discussed this
4       in April and the timeline for trial has changed, Judge.  So
5       the latest -- what -- the Government's latest e-discovery
6       position in these cases is there is not going to be any
7       trials in -- forget about 2021, Judge.  Those are all being
8       vacated, to the -- there's a few of them that are
9       calendared, but they're being vacated.  Then they're saying
10      for a complex case like this, first we've got the COVID
11      rules in the court -- that the Court is familiar with.  So
12      we're only at about five trials at a time right now so long
13      as the Chief Judge keeps rolling over the COVID rules.
14      Okay?
15              THE COURT:  It's three, but go ahead.
16              MR. NICHOLAS SMITH:  Three?  Okay.  Three.
17      Granted, those are prioritized for defendants that are in
18      jail; however, this case is going to be more complex of
19      600-plus defendants than the case -- the lowest -- the
20      fastest level case of a jailed defendant during those three
21      trials, (inaudible) -- Your Honor.  So realistically, this
22      is not -- this would not be going to trial for -- until, I
23      think, probably the summer, Judge, of next year.  That's
24      when, you know -- you've got one Oath Keepers trial
25      scheduled for January.  The next is April.
```

1          THE COURT:  I take your point, Mr. Smith.  I

2     understand --

3          MR. NICHOLAS SMITH:  Okay.

4          THE COURT:  -- the trial backlog --

5          MR. NICHOLAS SMITH:  But that is a new fact --

6          THE COURT:  -- here.

7          MR. NICHOLAS SMITH:  That is a new fact, Judge,

8     that the Court was not considering because it might have

9     been contemplating, who knows, four or five months before.

10    Now, it's looking down the barrel of a year or longer for

11    pretrial confinement.  Okay?

12         Then it's -- another thing that -- a new fact the

13    Court wasn't considering, a -- the exact conditions of

14    confinement vis-à-vis counsel -- access to counsel.  The

15    Court ordered the parties to confer jointly, reach out to

16    the jail, figure out what the status was.  The Government

17    ignored that.  It went right to the jail itself, cut us out;

18    then it represented what the status of what -- well, Judge,

19    this is true, and this is --

20         THE COURT:  No, I understand that.  I don't -- go

21    ahead.

22         MR. NICHOLAS SMITH:  Okay.

23         So Judge, the long and the short of it is that

24    there aren't going to be regular calls with --

25    attorney-client calls that aren't recorded -- most jail

1     calls are recorded -- where the defense and the client --

2     the defendant can look at discovery -- electronic discovery

3     at the same time and meet and confer.  And, Judge, Your

4     Honor knows that's essential.  It is not just being able to

5     talk to somebody, but being able to look at a document or a

6     video at the same time.  You're dealing with -- there's

7     already been thousands and thousands of pages of documents

8     produced.  Many millions more are on the cusp of being

9     produced.  If you can adequately prepare for a complex trial

10    like this with phone calls without being able to look at

11    documents, Judge -- it's just -- it's inconceivable, Judge.

12    It would be -- and it wouldn't -- here's the kind of

13    class-based, frankly, issue to this, Judge.  If there was a

14    defendant in here with a white-collar case who had to review

15    millions of dollars of documents and Arnold & Porter comes

16    in here and says, How could you expect us to review all

17    these documents with a corporate, you know, insured

18    defendant here?  I think 99 out of 100 courts would say,

19    You're right.  That's ridiculous.  But because these

20    defendants are who they are, it's, kind of, like, you know,

21    that argument doesn't exist, but it --

22              THE COURT:  Mr. Smith, again, I'm going to apply

23    the Bail Reform Act the same for all defendants and it

24    wouldn't -- let me put it this way.  We started with this

25    issue of, how do I consider the issues of preparation for

1      trial?  It's not formally part of the typical Bail Reform

2      Act factors.  I raised the issue of -- again, you pointed to

3      cases.  They're, I think, relatively rare, but there are --

4      there is that provision of 3142(i) that really doesn't apply

5      the factors; that just says you get released temporarily for

6      this purpose, as I understand it.  But -- so anyway,

7      continue.  But, you know, the question of whether -- some

8      other defendant with other characteristics who's got --

9      who's accused of different crimes just isn't really relevant

10     here, but --

11             MR. NICHOLAS SMITH:  So Judge, in the context of

12     the case law we cited saying that the pandemic does expand

13     and enlarge on the opportunities for courts to use 3142(i)

14     to release defendants to prepare for trial, what the Court

15     has been shown is that there would be very little

16     substantive contact regular enough to adequately prepare for

17     a complex trial.  And where we think that counts is not just

18     in the 3142(i), but it affects the Court's analysis on the

19     margins of the decisions.  So the Court, at the outset of

20     this first hearing in April, said, You know what?  I agree

21     with Judge Howell that this is a close call.  So when we're

22     in the context of a close call, then the other factors, if

23     they're really strong, they affect that analysis.  So if a

24     bunch of new evidence is presented to the Court showing this

25     conspiracy claim is not as strong as it was --

```
1              THE COURT:  Hmm.

2              MR. NICHOLAS SMITH:  -- here is a new -- if -- so

3       that -- the ability to prepare for trial is a new fact that

4       affects the other questions, Judge.

5              So we think, you know -- and, you know -- so I

6       think those are most of the new facts, Judge, except for the

7       sealed materials which are --

8              THE COURT:  All right.

9              MR. NICHOLAS SMITH:  -- very significant in

10      themselves.

11             THE COURT:  All right.  Mr. Hull, why don't I give

12      you a shot at making your non- -- your argument you can make

13      in open court, and then I'll turn to the Government and let

14      them address both of your motions.  That just might be the

15      most efficient way to do things.

16             MR. HULL:  I'd love to do that, Your Honor.  Dan

17      Hull for Joe Biggs.

18             And let me first say that I can't think of

19      anything I would disagree with that Mr. Smith just put

20      forth.  I do think that, as you just mentioned, the most

21      important part of my argument is going to be -- fortunately

22      or unfortunately -- it's going to be under seal; however,

23      what's happened with the Block videos -- and let me just

24      emphasize a few things that, I think, are important that

25      really aren't in my original motion to reopen but I think
```

1    are subsumed by it since there's been some other

2    developments.

3           Your Honor, if you were to look at all a

4    minute-and-a-half -- or excuse me, an hour-and-a-half of the

5    Block video, I'm pretty sure you'd be as convinced as I am

6    that clear and convincing evidence does not exist here

7    anymore.  We're just not there.  The future dangerousness is

8    not a concern.  And the reason I say that -- and you can see

9    this is the fourth march the Proud Boys made in Washington,

10   D.C., in a six-month period.  It is the same pattern as the

11   other marches.  They go to the Capitol, they take pictures,

12   and they back away from the Capitol.

13          In this case, as the case will show and some other

14   materials it -- we'll talk about later may show, what you

15   have is a group of people staying -- some people think it's

16   100 Proud Boys.  I think it's more like 60 to 75 in a group

17   of people.  It's the smallest Proud Boy group they ever had

18   in Washington, D.C.  There's a reason for that.  And one of

19   the reasons for that was the stabbings in December.  But

20   you've got a tightly controlled -- I think I used the word,

21   much to a few people's concern, "corralled."  You've got --

22   you see Nordean especially, who's in charge, and Biggs,

23   who's part of that group, and also, Defendant Rehl in front

24   of a group of people for that whole hour-and-a-half.

25          Now, when I say hour-and-a-half, I'm not really

1    sure that it's an hour-and-a-half, because Mr. Smith and I

2    have been involved in an exercise almost every day with

3    Mr. Smith taking the lead on trying to stitch together in

4    chronological order exactly how that march occurred, but it

5    was very similar to the marches that occurred on July 4th,

6    in November, and in December, with the possible exception

7    that you had people in stab-proof gear.  It's a smaller

8    group.  You don't have, of course, Enrique Tarrio there, but

9    you have Biggs and Rehl and Nordean out front.  Nordean is

10   saying at other junctures in the films we've received --

11   and, again, what I'd like to do is get -- see if we can put

12   this together chronologically, because I'm absolutely

13   positive that it would have -- it would move the needle for

14   you, to coin a phrase.

15            THE COURT:  Well, you filed the motion.  There

16   was -- I, you know -- I -- you should submit to me evidence

17   you think would move the needle.  I have the two --

18            MR. HULL:  Well --

19            THE COURT:  I have the two clips that I have.

20   Anyway, go ahead.

21            MR. HULL:  We're trying to --

22            MR. NICHOLAS SMITH:  Your Honor --

23            MR. HULL:  Your Honor, we're trying to get that --

24            MR. NICHOLAS SMITH:  -- it still hasn't been

25   produced, Judge.

```
 1              MR. HULL:  We're trying to get --

 2              MR. NICHOLAS SMITH:  It still hasn't been

 3    produced.  We asked for the productions of all the --

 4              THE COURT:  Okay.  Mr. Smith, it's Mr. Hull's

 5    turn.

 6              MR. HULL:  No, and Mr. Smith is right.  We have

 7    been aggressively trying to get and stitch together a

 8    chronological version starting at the Monument that morning

 9    of this group moving up through the Mall, taking a few

10    turns, going around, in front of the Supreme Court on that

11    side of the Capitol, as they had done three times before in

12    the seven months before this.  They go back to the food

13    trucks, they're at the food trucks, and the films will show

14    this, but what we'd really like to do, if we could, is show

15    this, once we get them all, to you in the hour-and-a-half it

16    probably took.  The marching is probably an hour, but there

17    are other -- there are stops.  They stop at the food trucks.

18              THE COURT:  All right.  Mr. Hull --

19              MR. HULL:  Yes.

20              THE COURT:  -- argue to me what I have in front of

21    me right now.

22              MR. HULL:  What you have in front of you right now

23    is two very strong clips that show that Mr. Nordean and

24    Mr. Biggs and Mr. Rehl along with them are very closely

25    monitoring and directing and talking about what the Proud
```

1     Boys will be doing when they get to the Capitol and when

2     they don't get to the Capitol, and it's very clear in both

3     of the clips that the main event here is not the Capitol.

4     The main event is to go back to the ellipse where the rally

5     was.  They left before Trump's speech at some point and did

6     their march, but they are having lunch and then there's a

7     new development.  They see people go up the hill.  I think

8     that's an important thing to see in complete sequence.  But

9     just from those two clips that you've seen, I think it's

10    pretty obvious that what we have here is folks who

11    certainly, at the time, didn't have a conspiracy in mind.

12    There was no conspiracy.  And I think that's the whole point

13    of most of the things we'll be talking about today.  Future

14    dangerousness goes away if there's no conspiracy anymore.  I

15    mean, the conspiracy, you know, presupposes a plan that

16    happened before you get to the Capitol.  You have acts in

17    furtherance of that plan.  If the conspiracy falls, you know

18    -- falls away, it's not there anymore, how can future

19    dangerousness ever be, you know -- you have no acts in

20    furtherance of it.  How could future dangerousness ever be

21    an issue?

22            And not only does that gut -- and I think you can

23    see that just on the basis of the two videos -- not only

24    does that gut the detention positions of the Government, it

25    guts a lot of their case.  You need a conspiracy to keep

1    this case together if you're the Government.  That -- the

2    conspiracy falls apart after you look at just those two

3    clips and some of the other evidence you may be seeing

4    later.  I don't see how future dangerousness can obtain when

5    you have a situation where the conspiracy's not there

6    anymore; there's no acts as alleged in the indictment that

7    anyone's going forward to do anything except possibly being

8    moved with the rest of the crowd, as everyone else is.  So

9    no conspiracy?  Everything, kind of, you know -- about 80

10   percent of the whole case falls apart.

11        And I don't see how future -- future dangerousness

12   in this case is not based on the fact that Joe Biggs has

13   leadership qualities.  He does.  So does Nordean.  Biggs has

14   them in spades and has almost all of his life, and I've

15   added some materials to show you that in the motion to

16   reopen.  But once future -- future dangerousness cannot be

17   any longer any kind of issue in this case if the conspiracy

18   is not there.  The conspiracy -- it -- you have -- you're

19   worried about -- and I think you said this well early on on

20   April 6th when you talked about leadership; that the

21   leadership was the strongest argument that the Government

22   had.  Once that leadership issue in context goes away, the

23   wheels fall off of this thing.

24        I mean, you've got -- I've -- and I've -- I don't

25   mean to quote back from what you said, but I thought this

1    was the critical part on April 6th.  Back on April 6th, you

2    said -- after I interrupted you on something, you turned to

3    Mr. McCullough and you said, I mean, it's clearly your

4    strongest point, I think, no doubt.  Your strongest argument

5    is a leadership argument.  What that says -- what, exactly,

6    they were leading and how connected that is to violence and

7    how connected that is to forward-looking violence, I think,

8    is, kind of, the core of the question.  Go ahead.

9            And then there's -- I don't want to take us out of

10   context.  People can look at the transcript.

11           But that's -- you said, Go ahead.

12           And Mr. McCullough said you're certainly right.

13           Then a page later around 30, I believe that the

14   Court said, I think the exact question has always been at

15   the heart of these cases and why, you know -- viewing the

16   individual act and looking at the context, but then also

17   trying to consider it was -- I mean, on, you know -- at --

18   on the record as being unique -- uniquely bad and

19   pernicious -- how uniquely bad and pernicious that effort

20   was to interrupt the peaceful transfer of power.

21           There needs to be a conspiracy for that to obtain

22   here.  There just does in the way the case is put together

23   now.

24           And you concluded -- and, again, we can look at

25   the transcript around Page 30 -- We don't have direct and

44

1    similar statements here about leadership, but we have a

2    leadership role that is clearly different and more advanced,

3    in the case of Nordean and Biggs and Rehl because of who

4    they were and, to a certain extent, Donohoe.

5         Those leadership qualities have to be tied to the

6    Proud Boy conspiracy that's being alleged.  And if that

7    conspiracy is not there anymore, there's no future

8    dangerousness.  The whole notion of Joe Biggs being in jail

9    right now is so that he cannot go on an extra insurrection

10   or commandeer something like this to happen again.  And

11   without the conspiracy, there's no acts in further [sic] of

12   it.  Yes, there's -- certainly, there's trespass.  There's

13   arguably, I suppose, some kind of interference with police

14   activities.  But, you know, it's very -- it's obvious to me

15   that once that conspiracy goes away, there's no future

16   dangerousness.  So I'll leave it at that for now.

17        I would like to reiterate, though, on -- I've said

18   this over and over again, and I don't think I've said it

19   very well -- 3142(i) which temporarily release, pretty much,

20   I don't think is normally thought of in terms of months.

21   For Joe Biggs to properly prepare for this trial, for me to

22   meaningfully -- he's a bright guy and he has a lot of

23   insights he can give me.  I can't give that to him on Smart

24   Mail through the jail.  I can't do that unless he is -- I am

25   with him or able to have some kind of conversation with him

1    either telephonically, through Zoom, something, but it would

2    really mean -- and there's lots of different ways to do

3    3142(i) -- it would really mean that Joe Biggs needs to be

4    away from the jail in a situation where he can communicate

5    with me either in person or on the phone every day for three

6    or four months -- that's a conservative estimate -- to get

7    ready for trial.

8          If -- Your Honor, bear with me a second -- if

9    you're going to do that, you know, the home release

10   restrictions he was under before were -- I know we've called

11   them onerous, but they were quite severe.  And, you know,

12   the monitoring sorts of things and the technology -- and I

13   believe there's some cases on this which I haven't cited

14   it -- cited.  I've just heard about a few of them yesterday,

15   saw them.  I've got to make sure they're right.  But if the

16   technology here, the monitoring is such that you can

17   actually do even a better job than -- as Mr. Smith was

18   saying, on making sure people aren't violating the

19   conditions of their pretrial release, why not just have this

20   gentleman home in Ormond Beach preparing for trial with a

21   monitoring device?  I don't see any difference.  A temporary

22   release here is not going to be a few days to get ready for

23   trial.  There's a long process.

24          Aside from my notion about getting Joe Biggs out

25   of jail on a temporary release that would basically be the

1    equivalent of a home release so that he could prepare for

2    trial, in the Eddie Block photos -- or excuse me, videos,

3    there's -- this is, of course, all about Sixth Amendment

4    right, being able to prepare.  The discovery keeps coming

5    out.  Over the weekend, we got thousands of pages of things.

6    I'm not sure why we always get them just before we come to

7    see you, but we did.  We got lots of them.  They're coming

8    out and --

9              THE COURT:  All right.  Mr. Hull --

10             MR. HULL:  Yeah.

11             THE COURT:  -- I get the fact that you're

12   receiving a lot of discovery.  You will continue to receive

13   a lot of discovery.  Do you want to leave it there as you

14   promised us a moment ago?

15             MR. HULL:  Want to leave it there?  Not quite.

16   Not quite finished.  I guess -- and I appreciate where

17   you're coming from, Your Honor, but there's a couple places

18   in my motion to reopen where I talk about, in real time,

19   what it would take for a person to look through this

20   discovery and prepare for it meaningfully.  And I think in

21   the case of defendants that are obviously big players to the

22   Government or at least have been, almost all the discovery,

23   either defendant-specific or discovery that's general to

24   everybody -- because they're talking about a small area of

25   land here -- is related to them.  There's a lot for them to

1    look through.  Yes, I can sort through some of it, but they

2    need to make the final call on what's relevant and what's

3    not.  They know more about it.  They're the client.

4          On non-sealed things, I do -- I -- my -- I think

5    my motion to reopen talks about what I think the important

6    things are for you to know about Joe Biggs or things that

7    perhaps theoretically that I could have argued on April 6th

8    but didn't really have time to put together for whatever

9    reason, just that -- and that happens.  This is an important

10   case.  It's novel.  All of the individuals in this have

11   stories to tell.  But the notion that there would be three

12   or four different conspiracies -- there's three now.

13   There's two besides the one that's being alleged by the

14   Government in this indictment.  Yeah, I realize that this is

15   an unusual set of circumstances and we all have a stake in

16   making sure this doesn't happen quite this way again.  I

17   don't think we can be alleging -- we're saying there's three

18   or four different conspiracies?  This doesn't make any

19   sense.  It's a little bit too -- I would ask the Government

20   to pick one.

21          That is -- I do not like going second, but I

22   believe that that is what I can argue openly on the motion

23   to reopen.  I would ask, though, that you be patient and

24   allow us to get you, once we get them from the Government

25   either through a motion to compel or whatever, the entire

1    Eddie Block 90-minute tape that will show you things that we

2    think you need to see.

3              Thank you.

4              THE COURT:  All right.  Who, from the Government,

5    is going to argue in opposition?

6              MR. MCCULLOUGH:  Your Honor, it will be Jason

7    McCullough for the Government.

8              THE COURT:  All right, sir.

9              MR. MCCULLOUGH:  Your Honor, just to begin, the

10   Government's going to decline to pick a conspiracy.  The

11   Government has chosen to charge Mr. Nordean and Mr. Biggs

12   and two of their co-conspirators with violence at the

13   Capitol.  They committed crimes at the Capitol, and it was a

14   conspiracy to obstruct the proceedings that were happening

15   there.  The Government is not, as characterized by the

16   defendants, relying on the Block videos alone.  The

17   Government has proffered evidence about the Telegram

18   messages and the extent of planning, Joe Biggs's statements

19   the night before that he is with Mr. Nordean and they are

20   planning for tomorrow.  They provide a radio frequency on

21   which they're going to organize.  Mr. Biggs makes very clear

22   that, Tomorrow is the day.  So Mr. Hull references, kind of,

23   evening marches in this.  Tomorrow is the day.

24              Now, with respect to the Eddie Block video itself,

25   the -- this is the Government's evidence, you know?  When

 1    the news broke that there was a Proud Boy that had filmed

 2    the entirety of their activities on that day, the Government

 3    moved quickly to collect that video and, basically, evaluate

 4    it.  At that time, we viewed that evidence as a treasure

 5    trove, and we still do.  And the evidence that is depicted

 6    on that film shows undeniably that Nordean and Biggs were

 7    the leaders of the group's march.  In fact, Mr. Biggs

 8    concedes they corralled those individuals -- that group of

 9    individuals.  They led them exactly where they wanted them

10    to go.  It shows that Mr. Nordean and Mr. Biggs took that

11    group to the Capitol.

12                THE COURT:  Wait.  Mr. McCullough, are you, again

13    -- are you arguing also evidence that I don't -- hasn't been

14    submitted to me?

15                MR. MCCULLOUGH:  I mean, Your Honor, the --

16                THE COURT:  I'm just -- like -- I mean, I know

17    they -- they can spin the -- this information one way and

18    you can -- it can be characterized by both sides, I'm sure,

19    but I don't have it and apparently the defense doesn't have

20    it either.  Is that fair, Mr. McCullough?  So I don't know

21    why we're spending time talking about it.  I'll certainly

22    hear -- if -- once it's -- first of all, you know, why -- is

23    there a reason it hasn't been produced, number one, to the

24    defense?  And, number two, you know, at some point, then,

25    I'm sure they'll want me to consider it, and I'm happy to do

1      it, but it's -- at the moment, they don't have it and I

2      don't have it.  So why are we talking about it?

3              MR. MCCULLOUGH:  Well, Your Honor, I don't agree

4      with that characterization that the defense doesn't have it.

5      Now, the review of the devices that were recovered from

6      Mr. Block is ongoing.  On March 26th, the Government

7      produced video from Eddie Block and it shows the group

8      marching around the Capitol and to the food trucks, as we

9      have described in previous filings with Your Honor.  And so

10     the video clip -- Video Evidence B that's submitted by

11     Mr. Nordean, that was available to the defense at the time

12     that we argued this motion previously.

13             THE COURT:  All right.

14             MR. MCCULLOUGH:  I take that -- I take it that

15     Mr. Smith is shaking his head because he's looking it up,

16     but that information was provided to the defense

17     previously --

18             MR. NICHOLAS SMITH:  The Government --

19             MR. MCCULLOUGH:  -- and --

20             MR. NICHOLAS SMITH:  The Court --

21             MR. MCCULLOUGH:  -- and --

22             MR. NICHOLAS SMITH:  The Court should just

23     understand that the -- what the Government produced was,

24     like many other videos it submitted, a highly edited version

25     with the portions that it does not prefer edited out.  The

1    only reason the defense was able to find out that the

2    Government had done this is by virtue of witness interviews

3    -- independent witness interviews that had not come through

4    the Government.  The Government has been withholding these

5    videos for the last seven months, and the claim that it

6    wasn't aware of them strains credulity.  It's issued

7    hundreds of subpoenas and it has executed search warrants.

8    It's doing all of these things very meticulously.  But it

9    doesn't review the treasure trove of evidence that it says

10   was seized on Mr. Block's devices in January, Judge?

11          Just to be clear, the video that Your Honor just

12   saw with Mr. Nordean saying, We're going to go to the

13   Capitol for a minute and then head back to the rally, was

14   produced on August 31st, Judge.  And the only way the

15   defense found out about it was through a series of

16   indirections.  We came across evidence from someone else in

17   the crowd who took a picture of Eddie Block who was, then,

18   filming it.  We then inferred that the Government possessed

19   that evidence by looking at search warrants relating to

20   other Proud Boys' homes, Your Honor.  So the Government --

21   if this is a treasure trove of evidence that supports the

22   Government's case, it's curious that was never produced and

23   hasn't been featured in the reverse-proffer sessions the

24   Government would like to put on for the defense to show how

25   strong their cases are.  So Judge, the reason it's not in

1   those is because it does not help the Government's case that

2   Mr. Nordean said the plan was not to enter the Capitol but

3   to head down there for a photo op and go back to the rally

4   after a couple of minutes.

5            THE COURT:  All right.  Let's just get back to --

6   I mean, I don't mind the parties arguing -- I mean, we can

7   -- if there's an ongoing discovery dispute, we will -- we --

8   that's -- we can argue that another day.

9            I just want -- Mr. McCullough, I want you to tell

10  me -- you started to tell me what the entire video showed,

11  and I guess my point is I -- it doesn't really make sense

12  for me to hear representations from either side about

13  evidence I don't have.  But, Mr. McCullough, do you -- I

14  mean, is it your understanding that the defense has all the

15  Block video that the Government has?

16           MR. MCCULLOUGH:  Your Honor, the -- that the

17  prosecution team has been provided from the FBI, that is

18  correct that the defense has that information.  The FBI is

19  continuing to review what I understand to be hundreds of

20  thousands of videos that were recovered and -- sorry, I

21  should say hundreds of thousands of electronic files that

22  were recovered to identify those items that may be of

23  interest to defendants and that were recorded on January

24  6th.  That is ongoing; however, the Government has provided

25  what it understands to be substantially the recordings of

1    this group as it left Washington -- the Washington Monument

2    and went to the east side of the Capitol and back to the

3    west side of the Capitol.

4             And then, Your Honor, instead of proceeding back

5    to the National Mall at 12:00 o'clock after they stopped for

6    lunch, they wait for about 45 minutes, and then Mr. Nordean

7    and Mr. Biggs assemble the group and they take the group to

8    the First Street pedestrian entrance which is back the other

9    direction from which they've come.  And within three minutes

10   of arriving, Your Honor, the crowd has stormed the First

11   Street gate along with many of the Proud Boys who begin to

12   march up that walkway.  And within minutes, the --

13   Mr. Nordean and Mr. Biggs find themselves at the third

14   barrier -- the final barrier which is restricting entrance

15   into the west plaza -- and they position themselves at the

16   front and they tear down that barrier, Your Honor, and

17   the -- we -- this is information we've covered.

18            One thing I'd note, Your Honor, is that Mr. Smith

19   has, kind of, noted this idea that -- this interesting

20   comment by Mr. Block about, There's nothing happening at the

21   Capitol.  Immediately after Mr. Block makes that comment, he

22   turns away from the reporter and he approaches Mr. Nordean,

23   who's having a conversation with Daniel Lyons Scott -- who's

24   also known as Milkshake -- and one other individual.  Block,

25   upon approaching them, attempts to make a joke; he then

1    hears some discussion that's taking place among the group;

2    and he says, I'd better get out of here.  You guys are

3    talking about stuff I don't want to hear.  And, Your Honor,

4    that happens merely seconds after the clip that Mr. Smith

5    submitted to Your Honor, and the Government would be very

6    happy to submit that to Your Honor and point it out to the

7    defendants immediately after this hearing.  But that is very

8    interesting evidence of what Mr. Block understood to be

9    happening and understood to potentially be planned.

10   Everyone there understood that Mr. Block was potentially

11   recording things and livestreaming things and it was

12   Mr. Block who definitely recognized that.  In fact,

13   Mr. Nordean and Mr. Biggs realized that Mr. Block was, in

14   fact, recording everything.

15           And so as we know, there are, kind of, numerous

16   steps to maintain operational security throughout the

17   planning for January 6th.  We've got the Telegram

18   communications; we've got efforts to nuke the chats both

19   before and after January 6th; there's advice about, We

20   shouldn't be typing plans to commit felonies into the phone;

21   and then the defendants suggest that all of that effort to

22   control the dissemination of the plan just goes out the

23   window.  They arrive at the National Mall and Mr. Nordean,

24   with assembled media around and other individuals in the

25   public, just announces the plan to everyone.  That's just

1      not the way that conspiracies work, Your Honor.

2      Conspiracies work in exactly the way that this one did; that

3      there was a group of individuals who manifested a plan and

4      tightly controlled that information.  And, frankly,

5      Mr. Nordean and Mr. Biggs knew how to march this group of

6      men to the Capitol and, within three minutes of arriving at

7      the Capitol, they stormed the gates.

8              And so the idea that Mr. Block has video of

9      Nordean announcing through a megaphone that they're going to

10     go and hang out for a minute and then return, that's not

11     what they did, and it's simply not the case that Mr. Nordean

12     would announce that plan.

13             MR. HULL:  Your Honor, I'm about to explode here.

14     Forgive me.  Why can't we have, to get some context to this

15     and to see if what Mr. McCullough is saying hangs together,

16     the entire, you know, 90-minute tape?  Why not?  And why is

17     that so disparate?  Why's it so difficult for the FBI to get

18     to us?

19             THE COURT:  Well, that's what -- I mean, let's

20     just put -- I'm not saying that's not an important question,

21     Mr. -- I'm sorry, I just -- I'm not saying that's an

22     important question -- not an important question, Mr. Hull.

23             But, Mr. McCullough, again, let me just circle

24     back to this.  Does the defense have everything in terms of

25     this -- in terms -- I realize the FBI is continuing to seek

1     video.  But as far as Block videos go, do they have

2     everything that the Government has from Mr. Block?

3                    MR. MCCULLOUGH:  Your Honor, the Government seized

4     a number of devices from Mr. Block.  It seized a number of

5     SD cards, external hard drives, telephones.  All of that

6     material is being reviewed by the FBI.  They have been asked

7     to target the information that relates to January 6th.  That

8     information is being provided.  Now, Your Honor, the fact

9     that there has been an incredible volume of information that

10    has been collected in this case, the number of devices that

11    have been seized from defendants as well as potential

12    witnesses, and the efforts to basically coordinate the

13    ingestion of all of that material in disparate field offices

14    and ensure that it gets produced, that is what has been

15    taking place.

16                    But, Your Honor, this is an example here where

17    Mr. Smith asked the Government and directed the Government

18    to identify these particular videos.  The Government

19    immediately set to work in collecting that video, producing

20    the video that Mr. Smith was interested in receiving, and

21    allowing -- and basically ensuring that this information was

22    presented to you.  Now, Your Honor, I cannot certify at this

23    point that all of Mr. Block's January 6th videos have been

24    identified by the FBI and presented to the defense, but the

25    Government would say that that effort is ongoing and, as

57

```
 1     those videos are identified, they are being promptly

 2     provided to the defendants, and that is precisely how this

 3     has -- how we've arrived at this point here.

 4              THE COURT:  Let me ask it this way.  Has any

 5     portion of one of these videos from Mr. Block that pertains

 6     to January 6th -- is the Government withholding any portion

 7     of it?

 8              MR. MCCULLOUGH:  No.

 9              THE COURT:  Okay.

10              MR. NICHOLAS SMITH:  Judge, there's a --

11              THE COURT:  All right.

12              MR. NICHOLAS SMITH:  -- docket entry --

13              THE COURT:  Mr. Smith --

14              MR. NICHOLAS SMITH:  -- that explains --

15              THE COURT:  Mr. Smith --

16              MR. NICHOLAS SMITH:  -- the whole record --

17              THE COURT:  -- I don't want to hear from you on

18     this point right now.

19              Mr. McCullough, will you please address the rest

20     of the arguments that the defendants have made on other

21     matters that may or may not mean I should reopen the

22     detention hearing and release the defendants on --

23              MR. MCCULLOUGH:  Yes, Your Honor.

24              The defendants have brought up the idea that the

25     Government has not proved future dangerousness and then
```

1    point to, among other things, the decision by Judge Lamberth

2    in Taylor, and that decision, Your Honor -- there are a

3    number of distinctions here.  Judge Lamberth, one, credited

4    the defendant's actions that day in his decision not to

5    enter the Capitol with weapons; that he, kind of, stopped

6    himself short of actually entering the Capitol with the

7    weapons that he possessed.  But even more than that, the --

8    Judge Lamberth there referred to the fact that Taylor had

9    not made any public statements celebrating his misconduct or

10   suggesting that he would participate in similar actions

11   again; that aside from, kind of, immediate aftermath, he had

12   not engaged in any additional celebration or discussion of,

13   kind of, future planning.  He also said that the Government

14   had proffered no evidence that Taylor had engaged in any

15   additional activity consistent with organizing or inciting

16   and leading others after the initial January 6th event had

17   passed.  He'd mentioned that Taylor had not indicated that

18   he'd engaged in any organization or activity indicative of

19   dangerousness.

20          Your Honor, the Government, as it put forth in ECF

21   84, it describes a number of statements that Mr. Nordean was

22   making not only in the immediate aftermath of January 6th

23   but throughout the month of January up to his arrest where

24   he was describing the ongoing efforts that he was taking to

25   organize and lead the Proud Boys going forward.  And among

1    those statements, he says, as it's quoted in ECF 84 -- this

2    is on January 12th -- I'm not going to be sitting on my ass

3    waiting for the end.  I'm going to press on with some smart,

4    level-headed, non-emotional guys and create a game plan for

5    how to approach this year.  Then he goes on to say, I've had

6    this conversation with guys for three years and every year

7    you get all worked up and want to hide.  We can be smarter,

8    train, plan, etcetera, but we will never stop.

9          He then goes on in -- on January 20th, January

10   27th, and he describes -- he puts out additional plans to

11   meet with the Proud Boys organization in his local chapter.

12   And he discusses at that time that -- the need to engage in

13   -- to get bulk armor deals; to make six-month to one-year

14   plans; to make uniformed -- a uniform change at rallies;

15   setting up regional training every three months; and he also

16   describes what is referred to as an SHTF -- Sierra, Hotel,

17   Tango, Foxtrot -- SHTF protocol, which the Government

18   understands to potentially be a reference to "shit hits the

19   fan" protocol.

20          So the idea that Mr. Nordean is anything like

21   Mr. Taylor who merely celebrated in the immediate aftermath

22   of January 6th but then did not continue organizing, in

23   fact, Mr. Nordean did continue organizing and attempting to

24   organize the group to continue to engage in potential

25   rallying and organizational efforts.  Now, why does that

1   matter?  Because, Your Honor, there have been a number of

2   media reports -- and the Government has asked for at least

3   confirmation of the basic facts of these events -- that have

4   placed the Proud Boys at various rallies.  Now -- in the

5   past few months.  Now, they are certainly permitted and,

6   frankly, people are encouraged to engage in protest and make

7   their voices heard, but the Proud Boys are showing up at

8   various events and there is violence that follows those

9   events.  And so, Your Honor --

10          THE COURT:  Well, obviously -- that may be true,

11  but, obviously, you are not representing to me that any of

12  our -- that either of these defendants had anything to do

13  with those events.

14          MR. MCCULLOUGH:  That's correct, Your Honor.  I'm

15  not representing to you that these -- that Nordean --

16  Mr. Nordean or Mr. Biggs have had anything to do with those

17  events.  And I'm -- certainly would say, Your Honor, as is

18  the case, that the Proud Boys are not showing up at these

19  events and fighting themselves; right?  There's someone else

20  -- some other group that they're engaged in conflict with.

21  But nonetheless, the prospective danger here is the ongoing

22  violent events that occur at various protests, and they do

23  occur in the Pacific Northwest and they do involve --

24  reports involve people that appear on their face to be Proud

25  Boys, dressed in Proud Boys colors, chanting Proud Boys --

1          MR. NICHOLAS SMITH:  Judge, we're just going to

2     note for the record that the Government's presenting this

3     information for the first time in the bail hearing.  It had

4     ample opportunity over the briefing to present these facts.

5     It never did.  So it's trying to sandbag the defense so that

6     we --

7          THE COURT:  Well --

8          MR. NICHOLAS SMITH:  -- don't have an opportunity

9     to respond in the middle of the hearing.  Judge, there was

10    only one reference in the Government's papers to a rally.

11    It was not referencing multiple rallies.  It did not

12    reference, like Your -- the Court said, any connection to

13    the defendants in this case.  But Mr. McCullough's now

14    expanding on this and is using this opportunity to leave the

15    defense without an opportunity to respond to the facts --

16         THE COURT:  Mr. Smith, if you want an opportunity

17    to respond to it in writing after this hearing, you'll have

18    your opportunity.  I've been very, very -- both sides --

19    through this -- throughout litigating the detention in this

20    case, I've been very liberal with my willingness to receive

21    information and argument from the -- from all the parties.

22    So if you would like that opportunity, you will certainly

23    have that opportunity.

24         Mr. McCullough, you've made your point on the

25    rallies.  What about -- what should -- how should I consider

1    the conditions of confinement these defendants find

2    themselves in here?  How should I consider that as part of

3    my determination in terms of their ability to prepare for

4    trial, etcetera?  And how should I consider the conditions

5    that Mr. Nordean suggests I consider that I could order on

6    him, including the cameras, the bond, and the

7    representations that Mr. Smith made along those lines?

8              MR. MCCULLOUGH:  So Your Honor, with respect to

9    the conditions that have been proffered, Your Honor, the

10   Government would basically submit that Defendants Nordean

11   and Biggs are basically arguing that they're unable to

12   review and access discovery in real time with their counsel.

13   That is a very serious issue and one that needs to be

14   addressed, but that can be addressed within the context of

15   their confinement.  And, Your Honor, the Government believes

16   that there are additional mechanisms that can be employed

17   here to ensure that that gets resolved.  As the Government

18   has put forward, it is the position and the policy of the

19   U.S. Marshals Service to -- for defendants to be housed in

20   the jurisdiction in which they're charged.  That would

21   provide much more control by Your Honor and, frankly, the

22   Government to be working with a local jurisdiction to ensure

23   that any access to counsel issues are promptly addressed and

24   fully addressed.

25              With respect to the $1 million that Mr. Smith

1    proposes to put up, Your Honor, that absolutely should be

2    considered for the reasons that Mr. Smith noted; that it

3    does provide some motivation for Mr. Nordean to comply;

4    however, the situation that we would be faced with is one in

5    which Mr. Nordean and Mr. Biggs would return to their homes

6    and the -- there would be an immediate ask for electronic

7    access to discovery and electronic access to counsel.  And

8    so we're going to be dealing with two defendants who are

9    going to be back at their homes with access to electronic

10   devices because that's the only way that they can confer

11   with -- because that -- it would be argued that's the only

12   way that they could confer with their counsel, and there's

13   simply no way to police the level of activity that would be

14   taking place with the electronic devices.

15          I'd also note that -- and I want to be very clear

16   about this -- the Government would -- is not suggesting that

17   there are family members or those people who would be

18   cohabitating with them would be party to any kind of

19   misconduct or violation of the hearings, but there are

20   individuals in those houses who would have additional

21   electronic devices.  And the ability for Your Honor,

22   Pretrial Services, the Government to police and ensure that

23   none of those -- that there is -- there's been no violation,

24   it would be near impossible, Your Honor, and with the --

25   Defendant Nordean and Defendant Biggs's commitment to

1    continuing these efforts and the power and control that they

2    exercise over a large group of people, that is a significant

3    prospective danger to the community.

4         And so, Your Honor, the conditions that are being

5    proposed simply cannot address the danger that these men

6    pose.

7         THE COURT:  All right.  Given the time, what I'm

8    going to ask that we do now is go to a session under seal.

9    So Ms. -- and for the reasons that the parties have -- that

10   I've approved the filings to be under seal that address the

11   issues we're about to discuss, I'll order the rest of our

12   hearing today under seal.

13        So I'll ask Ms. Harris, if you would, disconnect

14   the public line and ensure that the only parties to our

15   conversation are attorneys connected with the case and, of

16   course, the defendants and anyone else with a reason to be

17   here.

18        (Following proceedings under seal:)

19   ███████████████████████████████████████████

20   ██████████████████████████████

21   ████████████████████████████████████████

22   ███████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ██████████████████████████████████████████













71











75







78







81













87















94



















* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 20th day of September 2021.

Please note:  This hearing occurred during the COVID-19 pandemic and is, therefore, subject to the technological limitations of court reporting remotely.

/s/Timothy R. Miller, RPR, CRR, NJ-CCR
Official Court Reporter
United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001