**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
| | ) |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S FIRST OMNIBUS MOTION *IN LIMINE* TO EXCLUDE PROPOSED GOVERNMENT EXHIBITS**

Defendant Nordean, through his counsel, moves the Court to exclude various categories, and particular instances, of exhibits the government intends to introduce at trial. A significant portion of them either have no bearing on the charges in this case or possess meager probative value substantially outweighed by the risk of unfair prejudice, confusion of the issues and misleading the jury. Even where the government acknowledges that its proposed exhibits concern uncharged crimes, wrongs or acts, they defy the strictures of Federal Rule of Evidence 404(b).

These exhibits tell a story but not the one advertised in the indictment. Under intense public pressure, the government charged a conspiracy before investigating whether one existed. After looking into the matter for nearly two years, the government has no evidence of an agreement to enter the Capitol, much less one to commit crimes therein or outside it. None of its coerced cooperating defendants says otherwise. Across the country, the government has cowed into silence witnesses who do not get on board with its conspiracy claims, with one prosecutor flying out to a Midwest home to personally threaten charges against a woman with a small child.

1

She had just told the prosecutor that she found the suggestion of a conspiracy implausible.  In another case, the charging threats are directed at the son of a defense witness.  Its evidence thus consists of chat messages about politics, commonplace blog posts, and political activities, all designed to stir the jury's emotions, anger and partisan prejudice.  Saying it defends liberal values, the government seeks a demagogic trial.  If admitted, the government's exhibits would produce a trial about politics, not criminal law.

### The government's proposed exhibits and Rule 404(b) notice

On February 11, 2022, the government provided notice to the defense of its intent to introduce at trial evidence of the defendants' uncharged crimes, wrongs or acts.  The evidence categories include:

- "On or about December 12, 2020, Henry 'Enrique' Tarrio participated with a group that included members of the Proud Boys in the theft and destruction of a banner that read, '#BLACKLIVESMATTER,' which was property of Asbury United Methodist Church in Washington, D.C. Additionally, on or about January 4, 2021, Mr. Tarrio unlawfully possessed two high-capacity magazines that bore Proud Boys insignias. As a result of these actions, Mr. Tarrio entered a plea of guilty to one count of Attempted Possession of a Large Capacity Ammunition Feeding Device and one count of Destruction of Property in Superior Court for the District of Columbia, Case Nos. 2021 CF2 000105 and 2021 CMD 000106, on July 19, 2021."

- "On or about December 12, 2020, several members of the Proud Boys were involved in an altercation in the District of Columbia in which Proud Boys members were injured, including a knife wound suffered by Jeremy Bertino. The government may seek to introduce evidence of the events leading up to and immediately following that stabbing, in trial in this case."

- "The government may seek to introduce evidence related to illegal drug use by the defendants in this case, specifically references in the Telegram chats previously provided to you in discovery related to drug use."

- "The government may seek to introduce evidence regarding the structure and organization of the Proud Boys, including the different 'degree' rankings a member of the Proud Boys can attain, how they can attain those ranks, and how those rankings impact power dynamics between Proud Boys members."

- "On or about December 21, 2020, a group of armed protestors broke windows and unlawfully entered the Oregon State Capitol. The government does not assert that these are bad acts attributable to the defendants; however, the government may use evidence of these events to establish that those who were aware of these events, through communications or media reports, were aware that a state capital building had been unlawfully breached as part of a protest after the December 19, 2020, announcement of events in Washington, D.C. on January 6, 2021."

2/11/2022 Gov't Ltr., pp. 1-2.

On Friday, September 30, the government produced its Second Preliminary Exhibit List.

Exh. 1.  Many of the descriptions of government exhibits are vague, thwarting analysis for

purposes of a motion *in limine*.  For example,

- In the "U.S. Capitol Police CCTV and Body Worn Camera Video" series, the government indicates the time when the U.S. Capitol Police CCTV clips it intends to introduce begin but not when they end.  Exh. 1, p. 5.  The same is true of the body-worn camera clips it intends to introduce. *Id.*, p. 8.  Thus, the defendants do not know what evidence the government intends to introduce and the government has prevented defendants from intelligibly moving *in limine*;

- Similarly, in the "Other Video and Photographs" series and the "Social Media and Other Communications" series, many of the video clip exhibits proposed by the government are lengthy, ranging from 30 minutes to an hour or longer.  Exh. 1, pp. 21, 26.  Because the government has not identified the minute range it intends to introduce at trial, it has prevented the defendants from intelligibly moving *in limine*;

- In the "Telegram Messages and Other Communications" series, the government lists "excerpts" of Telegram chats and texts that are dozens of pages in length.  Exh. 1, p. 23.  It does not indicate which specific messages are intended for introduction at trial. *Id.*;

- In the "Physical Evidence" series, the government does not indicate which portions of a notebook seized from Nordean's home it intends to introduce.  Exh. 1, p. 3;

- In the "Travel, Financial and Other Records" series, the government does not indicate which Bank of America, Chase, GiveSendGo, Square, Stripe or Sutton Bank records it intends to introduce.  Exh. 1, pp. 26-28.

On Sunday, October 9, Nordean asked the government to clarify which portions of these

lengthy video files, communications and records it intends to introduce at trial.  As of the filing

of this motion, the government has not responded.[1]

Some of the government's general exhibit categories include:

1. **Proud Boys items:** Proud Boys flags, T-shirts, coins, hats, patches, "Rebel Rufio" T-shirt, scarfs, signs and other merchandise.  Exh. 1, pp. 1-3;

2. **Protester videos not depicting the defendants**: the government proposes introducing dozens of video clips filmed by protesters at the Capitol on January 6 that do not appear to depict the defendants.  Exh. 1, pp. 17-18 (videos of Paul Rae, Nicholas Ochs, Christopher Worrell, Anthony Mariotto);

3. **Edited open-source January 6 videos**: the government proposes introducing video clips filmed by reporters and other media outlets that feature audio and visual commentary about the January 6 events and which are edited into cinematic montages.  Exh. 1, pp. 21-22 (montages by the Los Angeles Times, the New Yorker, etc);

4. **Miscellaneous videos filmed by Nordean**: the government proposes introducing video clips filmed by Nordean of himself which have no relationship to January 6.  Its apparent motive is to show to the jury embarrassing clips of Nordean intoxicated.  Exh. 1, p. 17 (Nordean Videos January 23, 2021);

5. **Telegram chats and text messages predating any charged conspiracy**: the government proposes introducing messaging app and text communications, stretching back to the summer of 2020 and before, that bear no relationship to the charged conspiracy. Exh. 1, pp. 23-24;

6. **Telegram chats and texts involving derogatory epithets and expressions and/or controversial political views**: the government appears to propose introducing chats and texts because they contain derogatory words and/or political views that might offend minority or partisan jurors.  Exh. 1, pp. 23-24;

7. **Parler posts:** the government proposes introducing dozens of Nordean's posts on the Parler app which touch on controversial political views and nothing else.  Exh. 1, p. 25;

8. **Podcast interviews on Rumble**: the government apparently proposes introducing two, hour-long video interviews involving Nordean discussing his political views.  Exh. 1 , p. 26;

9. **Government-created video montages depicting edited, general January 6 footage**: the government proposes introducing a highly edited montage depicting January 6 scenes of violence and mayhem not involving the defendants and a montage that purports to instruct the jury on the law.  Exh. 1, p. 5 (Video Montage of USCP Footage), p. 28

---

[1] With respect to the undefined and vague exhibit entries, Nordean reserves the right to file motions *in limine* until such time as the government has clarified its proposed exhibits.

(Video Montage – including Congressional Record);

10. **Capitol Trace Modules**: the government intends to introduce and display for the jury "trace modules," multimedia displays that simultaneously depict (a) the defendants walking towards the Capitol, (b) a real-time map showing their route, and (c) transcriptions of their audio commentary on the way.  Exh. 1, pp. 22-23.

**Argument**

**I.      Admissibility standards under Rules 401, 403 and 404**

Pretrial motions *in limine* "are an important mechanism to effectuate th[e] goal" of "conduct[ing] a jury trial to the extent practicable so that inadmissible evidence is not suggested to the jury by any means." *United States v. Bikundi*, 2015 U.S. Dist. LEXIS 136768, at *9-10 (D.D.C. Oct. 7, 2015) (citing Fed. R. Evid. 103(d)).  In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to, *inter alia*, Federal Rules of Evidence 401 and 403.  *Id.* "The burden is on the introducing party to establish relevancy" as well as admissibility. *Dowling v. United States*, 493 U.S. 342, 351 n. 3, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990).

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Relevant evidence may be deemed inadmissible and subject to exclusion on multiple grounds, including that its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  "[U]nfair prejudice within [the Rule 403] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Ring*, 706 F.3d 460, 472, 403 U.S. App. D.C. 410 (D.C. Cir. 2013) (quoting Fed. R. Evid. 403 advisory committee's notes).

5

As the D.C. Circuit has noted, defendants' comments implicating racial or gender bias "threaten the fairness of a trial." *United States v. Doe*, 903 F.2d 16, 22 (D.C. Cir. 1990).  Courts cannot "treat lightly the risk that racial bias may influence a jury's verdict in [a] criminal case." *Id.* at 21; *United States v. Hazelwood*, 979 F.3d 398, 413 (6th Cir. 2020) (vacating conviction because trial court admitted defendant's racist remarks).  The Rule 403 balancing question is whether the "reverberating clang" of the defendant's inflammatory statements at issue might "drown all weaker sounds" presented by the rest of the evidence.  *Shepard v. United States*, 290 U.S. 96, 104 (1933) (Cardozo, J.).

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1).  However, the Court may in certain circumstances admit "evidence of any other crime, wrong, or act," Fed. R. Evid. 404(b)(1), for a purpose other than proving that on a particular occasion the person acted in accordance with a character trait, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).  Even where the Court determines that proffered evidence satisfies Rule 404(b)(2), the evidence is not admissible unless it also satisfies balancing under Rule 403.  *E.g.*, *United States v. Bell*, 795 F.3d 88, 100 n. 12 (D.C. Cir. 2015).

## II.    The Proud Boys group evidence is inadmissible under Rules 401, 403, 404, and the First Amendment

The government does not contend that every member of the Proud Boys group is a co-conspirator in this case.  Nordean's membership per se does not satisfy the test of relevance.  But even if it cleared that low bar, the Proud Boys exhibits and testimony would be plainly inadmissible under Rules 404 and 403 and would violate Nordean's First Amendment rights if admitted.

The government proposes introducing dozens, or perhaps hundreds, of exhibits underlining that Nordean and the other defendants are members of the Proud Boys group.  Exh. 1, pp. 1-3.  It will "seek to introduce evidence regarding the structure and organization of the Proud Boys, including the different 'degree' rankings a member of the Proud Boys can attain, how they can attain those ranks, and how those rankings impact power dynamics between Proud Boys members." 2/11/2022 Gov't Ltr., p. 2.  The government has even suggested it will attempt to offer rebuttal testimony from an expert in the field of "extremism" who will educate the jury on Proud Boys "terrorism" generally.  11/30/20222 Gov't Ltr., p. 1.

For numerous reasons none of these exhibits are admissible under Rule 404.  First, the government has failed to satisfy the notice requirement of the rule.  In order for other crimes, wrongs, or acts evidence to be admissible against a defendant, "the prosecutor must

> (A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;
>
> (B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and
>
> (C) do so in writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3).

While the government's February 11 letter announced its intent to introduce Proud Boys group evidence, such as evidence "regarding the structure and organization of the Proud Boys," it failed to "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B); *see* 2/11/2022 Gov't Ltr., Exh. 2.  Thus, the Proud Boys group evidence is inadmissible.  *United*

*States v. Blount*, 502 F.3d 674, 677 (7th Cir. 2007) ("Without notice, 404(b) evidence is inadmissible."); *United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004) (same); *United States v. Vega*, 188 F.3d 1150, 1152-55 (9th Cir. 1999) (same).

Second, even had the government provided proper notice, the Proud Boys group evidence would not satisfy Rule 404(b)(2). The only conceivable proper purpose for introducing such "bad act" evidence would be motive. Fed. R. Evid. 404(b)(2). But courts have rejected the government's attempts to conflate "motive" evidence with guilt-by-association. *E.g.*, *United States v. Roark*, 924 F.2d 1426 (8th Cir. 1991). The defendants in *Roark* were charged with a methamphetamine distribution conspiracy. All of them belonged to the Hells Angels Motorcycle Club. *Id.* at 1428. During opening statements and at trial, evidence concerning the Hells Angels and its reputation for drug-related activities "was injected into the trial over defense counsel's objection." *Id.* at 1430.

A DEA agent testified as an expert on the Hells Angels, speaking "generally about the Hells Angels and their activities." *Roark*, 924 F.2d at 1430. Effectively, the government "elected to try, at least partially, the Hells Angels Motorcycle Club, which was not necessary in [the] case." *Id.* at 1433. However, such evidence "did not go to the guilt or innocence really of the defendant[s.] It went to the general reputation [] of the Hells Angels Motorcycle Club. And [the government] had all sorts of evidence concerning the association of the co-defendants in this case, and the fact that they were all members of the club." *Id.*

The court of appeals found reversible error. It determined that the Hells Angels evidence was not admissible under Rule 404. *Roark*, 924 F.2d at 1434. Reversal was required despite a limiting instruction to disregard the Hells Angels evidence because "the jury could not disregard the entire theme of the trial: guilty by association." *Id.*

Other circuits are in accord.  *United States v. Irvin*, 87 F.3d 860, 864-66 (7th Cir. 1996) (trial court abused its discretion in not excluding evidence of gang membership when its probative value was minimal, and when "highly charged gang-affiliation evidence served as a substitute for . . . direct evidence, increasing the chance of guilt purely by association"); *United States v. Elkins*, 70 F.3d 81, 83-85 (10th Cir. 1995) (in prosecution under federal firearms laws, trial court erred in admitting evidence of defendant's gang membership where there was no showing of biased testimony due to fear).

If anything, the risks involved in conflating "motive" evidence and character evidence are far greater here than in *Roark* and the other cases.  Well before the events of January 6 and certainly after them, the Proud Boys group had become a cultural lightning rod.  It is inconceivable that any American reasonably well versed in current events is unaware of the group's reputation, deserved or otherwise, as a "fascistic" or "militia" organization.  A few random examples drawn from the news media will suffice.  *E.g.*, *Explainer: A look at far-right extremists in Jan. 6 riot*, AP News, June 10, 2022, available at: https://apnews.com/article/capitol-siege-proud-boys-donald-trump-congress-government-and-politics-a8baa24af07b20ab792f4ef6f4481fac; *Proud Boys named terrorist organization in New Zealand*, Wash. Post., June 30, 2022, available at: https://www.washingtonpost.com/world/2022/06/30/proud-boys-the-base-terrorist-new-zealand/; *How extremists like the Proud Boys weaponize irony and memes to spread hate*, NPR, Apr. 26, 2021, available at: https://www.npr.org/2021/04/26/990274685/how-extremists-weaponize-irony-to-spread-hate.

These risks are magnified even more than in the case of a group like the Oath Keepers given the perception that the Proud Boys group has some sort of perceived connection to the

highly polarizing former president.  *Explainer: President Trump asked the Proud Boys to "stand by." Who are they?* Reuters, Sept. 30, 2020, available at: https://www.reuters.com/article/us-usa-election-extremists-explainer/explainer-president-trump-asked-the-proud-boys-to-stand-by-who-are-they-idUSKBN26L3Q1; *Jan. 6 narrative is built on Trump, Proud Boys and Capitol Police*, N.Y. Times, June 9, 2022, available at: https://www.nytimes.com/2022/06/09/us/politics/jan-6-proud-boys-capitol-police.html.

Third, introduction of the Proud Boys group evidence would violate Nordean's First Amendment rights.  "[T]he First Amendment protects an individual's right to join groups and associate with others holding similar beliefs," even if repugnant.  *Dawson v. Delaware*, 503 U.S. 159, 164 (1992).  That does not mean that "the Constitution . . . erect[s] a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." *Id.*  Nevertheless, the receipt into evidence of such material can still result in constitutional error.  *Id.*  In *Dawson*, the crime involved the defendant's burglary of a house and subsequent murder of a married couple.  In the capital proceeding, the government sought to introduce evidence that the defendant belonged to the Aryan Brotherhood, that he had an Aryan Brotherhood tattoo on his hand, and expert testimony concerning the "nature" of the Aryan Brotherhood.  *Id.* at 161.

The Court held that the admission of this evidence violated the defendant's First Amendment rights.  The Aryan Brotherhood evidence showed "mere abstract beliefs on Dawson's part." *Dawson*, 503 U.S. at 167.  The Court was "left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible." *See also United States v. Lemon*, 723 F.2d 922, 939-940 (D.C. Cir. 1983)

(violation of First Amendment associational right to introduce evidence of defendant's membership in Black Hebrews organization).

Here, there is no doubt that Nordean has a First Amendment right to associate with the Proud Boys group. That is because the First Amendment guarantees freedom of association with political organizations, however unpopular, even where the organization "embraces both illegal and legal aims." *Lemon*, 723 F.2d at 939 (citing *Scales v. United States*, 367 U.S. 203, 229 (1961)). Thus the question turns to whether the government may use evidence of Nordean's exercise of that right against him in a criminal trial.

The First Amendment "proscribes punishment of an individual for membership in a protected organization unless the organization has illegal aims and the individual intends to further those aims." *Lemon*, 723 F.2d at 939. But, as the Supreme Court held in *Dawson*, that principle extends beyond affirmative defense. It determines whether evidence may be admitted in a court proceeding against the person exercising the associational right. *Id*. at 940. A fact-finder's reliance on "information about [a] defendant's alleged associations with [a political group] cannot be upheld unless the defendant intended to further the organization's illegal activities." *Id.*

None of the government's proposed general Proud Boys group evidence satisfies that standard. The relevant exhibits do not show Nordean's intent to further illegal activities by the Proud Boys group overall. Exh. 1, pp. 1-3. Indeed, the government does not cite or describe any of those activities. Accordingly, this category of evidence is inadmissible under the First Amendment. *Dawson*, 503 U.S. at 167; *Lemon*, 723 F.2d at 939.

Fourth, even if the proposed Proud Boys group evidence were admissible under Rule 404(b)(2) and even if it did not violate Nordean's First Amendment rights, it would plainly fail

Rule 403 balancing.  Whatever the probative value in this case of Proud Boys merchandise and information on "the structure and organization of the Proud Boys"—there is none—it is grossly outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury.  As indicated above, the Proud Boys group is one of the most reviled in the country, a highly politicized subject, raising suggestions of racism, likely to arouse emotionally charged decision-making.  The instructional value of the government's Proud Boys merchandise and background information evidence pales next to the overwhelmingly obvious unfair prejudice it carries.  *Irvin*, 87 F.3d at 864-66;  *Elkins*, 70 F.3d at 83-85.  Accordingly, this exhibit category should be excluded.

### III.   Protester videos not depicting the defendants; edited open-source January 6 videos; miscellaneous videos filmed by Nordean; and government-created video montages depicting edited, general January 6 footage are inadmissible under Rules 401 and 403

The government has proposed video exhibits that do not depict the defendants' activities on January 6 and/or are selectively edited by the news media or the government in prejudicial and misleading ways.  It has also proposed displaying videos of Nordean, having nothing to do with January 6, depicting the defendant intoxicated.  *Infra* at 4. These are all inadmissible.

The government proposes to introduce video clips captured at the Capitol on January 6 by, among other protesters, Paul Rae, Nicholas Ochs, Christopher Worrell and Anthony Mariotto.  Exh. 1, pp. 17-18.  Some feature highly charged scenes of mayhem and bloodshed.  But it does not appear that any of them capture the defendants' activities.  These clips are not even relevant, as they do not make it more or less likely that *the defendants* undertook the charged *actus rei* with the relevant *mens rea*.  But even if they somehow met the test of relevance, their probative value regarding the defendants in this case—nil—would be substantially outweighed under Rule 403 by the risk of unfair prejudice, confusing the issues,

and misleading the jury.  In addition, because the government intends to introduce separate video clips that actually depict the defendants' activities, these videos would "needlessly present cumulative evidence." Fed. R. Evid. 403.

The government's plan to introduce video clips selectively edited by the news media is similarly misguided.  One of them is a montage of January 6 footage created by the Los Angeles Times.  Exh. 1, p. 21.  Another is a montage created by the New Yorker magazine.  *Id.* Besides being selectively edited in such as a way as to create an exaggerated impression of events rather than complicated reality as it unfolded, these clips also feature political commentary by reporters on the events.  These video exhibits are irrelevant and fail Rule 403 balancing for the same reason as the first category of videos cited above—they do not feature the defendants—but also because the editing and commentary create the risk of unfair prejudice, confusing the issues, and misleading the jury.

Equally excludable under Rules 401 and 403 are the government-created video montages depicting edited, general January 6 footage. Exh. 1, p. 5 (Video Montage of USCP Footage), p. 28 (Video Montage – including Congressional Record).  The Video Montage of USCP Footage runs over 20 minutes in length. The purpose of the exhibit is to walk the factfinder through a highlight reel of the most inflammatory moments of January 6 caught on film in dozens of places around the Capitol. It depicts image after image of property destruction, confrontations with law enforcement, and assault. The government aims to play this one-size-fits-all montage in every January 6 trial, regardless of whether the defendant: was involved in or even saw any of the depicted episodes, entered the Capitol, confronted or disobeyed law enforcement, or committed or aided and abetted the property destruction or assaults depicted in the montage.

To analyze the U.S. Capitol Police montage through the rubric of the Federal Rules of Evidence is to miss a larger point. The montage is not merely improper evidence; it invites the Court to ignore the basic criminal law principle forbidding collective punishment, that defendants are to be judged as individuals. It is reminiscent of the "Ludovico Technique" in the film *A Clockwork Orange*, where technicians require the captive protagonist to watch uninterrupted violence montages in order to condition his beliefs.

Similarly, the Court should exclude the Congressional Record Video Montage.  It purports to instruct the jury on laws: the Elector Clause of and the Twelfth Amendment to the Constitution and the Electoral Count Act.  But whether the relevant witness is a lay witness or an expert, witnesses do not instruct the jury on the law.  *United States v. Smith*, 573 F.3d 639, 655 (8th Cir. 2009) ("It is the judge and not a witness that is to instruct the fact finder on the applicable principles of law.") (internal quotation marks and citation omitted); *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017) (the Federal Rules of Evidence do not allow witnesses to "render conclusions of law"); *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. . ."); *United States v. Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 50 (D.D.C. 2009) (same).

Finally, the government's proposal to play videos depicting Nordean intoxicated must be rejected.  The video clips have no relevance to this case.  The government's sole aim is to humiliate the defendant.  Thus, the exhibits are excludable under Rules 401 and 403.

**IV.    Telegram chats and text messages predating the charged conspiracy and/or involving derogatory epithets and controversial political views should be excluded under Rules 401 and 403**

14

As indicated above, the government has not provided sufficient clarity regarding the Telegram messages and texts it intends to introduce at trial.  It has simply identified pages and pages of such messages and indicated it will use some portion of them.  Nevertheless, it is possible to identify certain categories of messages that should be excluded from trial.

The government apparently plans to introduce hundreds of Telegram messages and texts that long predate the alleged conspiracy.  Although it is difficult to say exactly when the government contends the conspiracy began—it has changed its position on this point at least half a dozen times in this case and across various indictments—there was no planned rally in Washington, D.C., to protest the electoral vote count until the former president on December 19, 2020 called on his supporters to protest there on January 6, which he said would "be wild!" *#StopTheSteal: Timeline of Social Media and Extremist Activities Leading to 1/6 Insurrection*, Just Security, Feb. 10, 2021, available at: https://www.justsecurity.org/74622/stopthesteal-timeline-of-social-media-and-extremist-activities-leading-to-1-6-insurrection/.  Yet the government apparently intends to introduce hundreds of Telegram chats and text messages stretching back to July 2020 and earlier.  Those communications are not just irrelevant.  Even assuming they had some probative value on a case-by-case basis—and that is impossible to determine given that the government has not specifically identified the communications it intends to introduce—they would be substantially outweighed by the risks of unfair prejudice, confusing the issues, and misleading the jury.  Even as they shed no light on the charges, the communications are pockmarked with derogatory remarks that would offend racial, ethnic and religious minorities.  They also cover charged political subjects that would risk offending jurors, such as comments about "libtards" and ridiculing voters of the Democratic Party.

Similarly, even the Telegram and text communications that were sent during the charged conspiracy should be excluded to the extent they feature such derogatory remarks or inflammatory political viewpoints.  If the communications do not make the existence of the charged conspiracies or underlying obstruction-of-an-official-proceeding offense more likely, they are simply irrelevant.  And insofar as any relevance rests solely on the reasoning that people who say or believe such things are more likely to commit sedition or obstruction of justice, that incredibly thin reed of probative value would be substantially outweighed by the obvious risk of an emotionally charged jury verdict.  *Doe*, 903 F.2d at 22; *Hazelwood*, 979 F.3d at 413; *Shepard*, 290 U.S. at 104.

All of these reasons account for why this Court recently excluded such evidence from a January 6 jury trial.  *United States v. Hale-Cusanelli*, 21-cr-37-TNM (D.D.C. 2021), 5/6/2022 Hr'g Tr. at 14-15.  In excluding all the defendant's statements about Jews, Nazis, minorities or women, the Court explained:

> Decent society abhors anti-Semitic remarks.  Anyone who hears them will almost automatically make negative assumptions about the speaker that will make it difficult for the juror to separate that impression from guilt or innocence as to a particular charge.  As the D.C. Circuit has noted, discussions about racial bias "threaten the fairness of a trial." That is *United States v. Doe*, 903 F.2d 16, 22 (D.C. Cir. 1990).  The Court cannot "treat lightly the risk that racial bias may influence a jury's verdict in this criminal case." *Id.* at 21.

> That potential for influence is present here.  The visceral reaction to the defendant's statements is exactly the kind of response that might "lure the jury" into declaring him guilty.  That's *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013).  Specifically, the jury might judge Mr. Hale-Cusanelli for being a bigot rather than obstructing an official proceeding or entering a restricted area.  I also looked to *United States v. Hazelwood*, 979 F.3d 398, 413 (6th Cir. 2020) [same].

> And Mr. Hale-Cusanelli's alleged statements are odious enough that, as Justice Cardozo would say, their "reverberating clang" might "drown all weaker sounds" presented by the rest of the evidence.  That's from *Shepard v. United States*, 290 U.S. 96, 104 (1933). Because Mr. Hale-Cusanelli's statements about Jews and the Nazi party are unfairly

16

prejudicial to him and are of limited probative value, the Court holds that Rule 403 bars their admission. . . .

5/6/2022 Hr'g Tr. at 14-15.

The Court should exclude similar comments here for the same reasons.

## V.   Nordean's Parler posts, Rumble interviews, and 1776 Returns document should be excluded under Rules 401 and 403

The government's plan to introduce Nordean's posts on the Parler microblogging site, his interviews posted on the Rumble site, and the "1776 Returns" document is even more inappropriate.  None of these exhibits is admissible under Rules 401 and 403.

Unlike the aforementioned Telegram chats and text messages, Nordean's Parler posts do not even represent his communications with specific individuals, much less with co-conspirators. Parler is a social media platform where users post comments online that are viewable by the entire public user base, as on Twitter.  The government proposes introducing dozens of Nordean's public posts involving his musing on political subjects, often highly controversial ones.  For example, the proposed exhibits include such political posts as:

- Nov. 17, 2020: "Although it's been a rough road, it's been quite the adventure standing for freedom and fighting communist dorks . . rebel life baby . . rebel life."

- Nov. 17, 2020: "THE GOVERNMENT DOES NOT HAVE THE PRIVILEGE OF TAKING MY RIGHTS AWAY BY USING THE EXCUSE OF PROTECTING THE PUBLICS HEALTH FROM A LAME ASS VIRUS WITH A 99 PERCENT RECOVERY RATE!!!! DO NOT COMPLY!! REVOLT!!"

- Nov. 26, 2020: "May you all practice civil disobedience today and have a wonderful thanksgiving with your whole family!!"

- Nov. 26, 2020: "I'm sorry, but at this point in the game, if you're not aware of the corruption all around you and how it's hurting this country and your neighbors, then you

are part of the problem.  Don't be surprised when neither side stops to pick your ass up when you fall."

• Nov. 26, 2020: "Who'd think we'd be in a place in our lives . . . . that the schools would ask our children when they get back to school if they had a family thanksgiving, so they could eat out the parents about covid violations. . . .WE ARE CREATING OUR OWN LISTS NOW YOU LITTLE RATS! You'd better hope you don't end up on it ☺ ☺ ☺"

• Nov. 27, 2020: "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished.  We will grow like the flame that fuels us and spread like the love that guides us.  We are unstoppable, unrelenting and now . . . . unforgiving.  Good luck to all you traitors of this country we so deeply love . . . . you're going to need it."

• Nov. 29, 2020: "Loving Arizona and their love of patriotism.  So much better than my commie run state Washington . . . . I'll be back"

• Nov. 30, 2020: [Posts a picture of Nordean wearing a Donald Trump T-shirt].

• Nov. 30, 2020: "It's time for civil disobedience."

• Dec. 15, 2020: "Police officers need to really think hard and long about why they joined and if what they are being ordered to do is 'protecting and serving.' I spent hours getting people out of harms way with my guys, that had been separated from us and pushed to antifa and BLM by police officers . . . I'm tired of watching police stand idle by while people are getting beaten up by thug groups like BLM and ANTIFA. We've

backed the blue for 4 years while they've been hated on, but they've been putting us in more danger . . ."

- Dec. 22, 2020: "Everybody should stop paying ALL taxes, stop filing for licenses and permits, paying fees and fines.  While you suffer and lose your businesses, they stay in office and send your money overseas when you need it the most. STOP PAYING THEM."

- Dec. 23, 2020: [Nordean posts picture of himself with Roger Stone].

As the Court will notice, these posts do not concern the question whether Nordean entered into a conspiratorial agreement to obstruct the joint session or whether he actually obstructed or attempted to obstruct that assembly.  Rather, they are designed to show that Nordean subscribes to a brand of politics that members of the jury pool are overwhelmingly inclined to be repelled by, as ample jury pool polling unequivocally demonstrates.  The government will contend that raising the jury's anger towards the defendants is merely an unfortunate side effect.  It will claim that its purpose in introducing posts like these is to show Nordean's "motive."

As any observer of this case, lay or legal, will immediately understand, that explanation is sheer nonsense.  The defendants in this case entered the Capitol on January 6 with thousands of similar protesters—all of them protesting against Congress's certification of the 2020 presidential election.  If there were any investigation where *motive* is not even close to being an issue, it is this one.  Motive evidence is relevant and noncumulative where it fills some hole in the direct evidence of a crime or meaningfully corroborates that evidence.  A woman is found dead in her bed and her husband is a suspect.  He has an alibi that is not falsifiable.  The fact

that the bon vivant husband was the beneficiary on the woman's life insurance policy is proper

motive evidence because it meaningfully advances the question of guilt or innocence.

Here, showing the jury dozens of pieces of controversial political commentary—indeed,

building an entire case-in-chief out of it—does not meaningfully address the question of

Nordean's guilt or innocence of the charged crimes, even if one says the magic word "motive."

Every January 6 protester was by definition motivated by the 2020 presidential election.  The

Court should exclude the Parler posts under Rules 401 and 403 because they are exclusively

designed to arouse the jury's anger, emotion and partisan prejudice.

Similarly, the government intends to introduce two hour-long interviews involving

Nordean posted on the Rumble site.  It has not identified which portions it intends to use.  To the

extent that the portions entail political commentary like the Parler posts, they should be excluded

under Rules 401 and 403.

Finally, the government intends to introduce the document it calls "1776 Returns." Its use

of this material could not be more misleading.  The Third Superseding Indictment alleges:

> Between December 30 and December 31, 2020, TARRIO communicated multiple times
> with an individual whose identity is known to the grand jury.  On December 30, 2020,
> this individual sent TARRIO a nine-page document titled, "1776 Returns." The document
> set forth a plan to occupy a few "crucial buildings" in Washington, D.C., on January 6,
> including House and Senate office buildings around the Capitol, with as "many people as
> possible" to "show our politicians We the People are in charge." After sending the
> document, the individual stated, "The revolution is more important than anything."
> TARRIO responded, "That's what every waking moment consists of . . . I'm not playing
> games."

ECF No. 380, ¶ 41.

The indictment then immediately alleges that TARRIO held a meeting with "MOSD

leadership," insinuating that he informed the other defendants about the 1776 Returns document.

ECF No. 380, ¶ 42.  The government omits from its indictment that it has no evidence that Tarrio

ever shared the 1776 Returns document with anyone, much less the other defendants.  Indeed, it omits that it has no evidence Tarrio himself ever opened the document.  (In fact, the evidence will apparently show the attachment was never opened.) The government omits that the Capitol Building—where the defendants' crime is alleged to have occurred—was not one of the "crucial buildings" that would be "occupied" under the 1776 Returns "plan." ECF No. 380, ¶ 41.

This canard is inadmissible under Rules 401 and 403.  With respect to Nordean, the document is not relevant because there is no evidence he ever knew of its existence.  Even if it were somehow probative on a germane issue in Nordean's case, the risk of unfair prejudice and jury confusion would substantially outweigh the negligible relevance.

**VI.      The Capitol Trace Modules should be excluded under Rule 403**

The government has created "Capitol Trace Module" exhibits, multimedia displays that simultaneously depict (a) videos showing the defendants walking towards the Capitol, (b) a real-time map showing their route, and (c) transcriptions of their audio commentary on the way. These should be excluded under Rule 403 because their probative value is substantially outweighed by the risk of unfair prejudice and jury confusion.

Although they purport to merely display the defendants' movements around the National Mall and Capitol based on embedded video footage, the trace modules actually contain implicit arguments about the defendants' intent that are misleadingly presented as neutral evidence.  The real-time map displays show a line stretching from the defendants' current place to the Capitol Building.  The viewer is thus given to understand that, e.g., when the Proud Boys group was standing near the Washington Monument on the morning of January 6, it was their goal from the beginning to breach the Capitol Building.  After all, the trace module map shows the Washington Monument as the first step on a path to the Capitol.  The government may of course ask the jury

to make that inference.  But it is misleading to implicitly launder that argument through a visual display that purports to be objective evidence.  Because the government can simply show the jury the footage without the trace module multimedia display, any probative value to the modules is substantially outweighed by the risk of unfair prejudice and jury confusion.

## VII.   The government's remaining prior bad acts evidence should be excluded under Rules 401, 403 and 404

The government intends to introduce evidence of criminal activity in connection with the Proud Boys group's presence in Washington, D.C., on December 12, 2020; evidence related to alleged illegal drug use by the defendants; and evidence that a completely separate group of armed protesters on December 21, 2020 broke windows and unlawfully entered the Oregon State Capitol.  All of this material should be excluded under Rules 401, 403 and 404.

With respect to the December 12, 2020 events in D.C., the government intends to introduce evidence of Tarrio's participation with a group in the theft and destruction of a banner that read, "#BLACKLIVESMATTER," which was property of Asbury United Methodist Church in Washington, D.C., and Tarrio's unlawful possession of two high-capacity magazines that bore Proud Boys insignias.  The government also intends to introduce evidence that "several members of the Proud Boys" were involved in an altercation that day in which Proud Boys members were injured.  First, this evidence is not relevant with respect to Nordean as the alleged events do not make it more or less likely that he committed the charged crimes on January 6.  Second, this material is plainly character evidence, not proper Rule 404(b)(2) evidence.  For the reasons already discussed, these events do not constitute "motive" evidence; it is not in dispute what the motive of January 6 defendants was.  Third, even if these events were somehow "motive" evidence, their incredibly thin probative value would be substantially outweighed under Rule 403 by the risk of unfair prejudice, confusing the issues, and misleading the jury.  Informing the

jury that some of the defendants have animus towards the Black Lives Matter movement and were involved in theft of property from the Asbury Church is calculated to elicit an emotional jury verdict based on the defendants' perceived racism.  *Doe*, 903 F.2d at 22; *Hazelwood*, 979 F.3d at 413; *Shepard*, 290 U.S. at 104.  This is particularly unfairly prejudicial in connection with Nordean, who did not participate in the theft of property from the church or the altercation.  No government evidence suggests otherwise.

Next, the government contends that it may show the jury evidence of a completely different criminal event in Oregon not involving the defendants, the armed entry of protesters into the Oregon State Capitol in December 2020.  The government appears to contend that the defendants were aware of this event which is therefore relevant to January 6 somehow.  Nordean's alleged awareness of what happened at the Oregon State Capitol does not render the event relevant to this case.  There is no evidence that he or any other defendant cited that event as a model for their "plan" on January 6.  It is therefore not relevant and does not satisfy Rule 404(b)(2).  Even if the Oregon State Capitol episode were relevant and proper Rule 404(b)(2) evidence, its thin probative value would be substantially outweighed under Rule 403 by the risk of unfair prejudice, confusing the issues, and misleading the jury.  The defendants would be tarred by association with the Oregon event even though they did not participate in it and did not cite it as a model for January 6.

Finally, stray references in chats and text messages to apparent illegal drug use are plainly inadmissible.  Such use does not make it more or less likely that Nordean committed the charges in this case, unrelated to narcotics.  There is no conceivable ground for admissibility under Rule 404(b)(2).  And even if there were, whatever marginal relevance the evidence

possessed would be substantially outweighed by the risk of unfair prejudice, confusing the issues, and misleading the jury.

**Conclusion**

      For all the foregoing reasons, the above-mentioned categories of evidence should be excluded from trial.

Dated: October 14, 2022                  Respectfully submitted,


                                    */s/ David B. Smith*
                                    David B. Smith (D.C. Bar No. 403068)
                                    108 N. Alfred St.
                                    Alexandria, VA 22314
                                    Phone:(703)548-8911
                                    Fax:(703)548-8935
                                    dbs@davidbsmithpllc.com

                                    Nicholas D. Smith (D.C. Bar No. 1029802)
                                    1123 Broadway, Suite 909
                                    New York, NY 10010
                                    Phone: (917) 902-3869
                                    nds@davidbsmithpllc.com

                                    *Attorneys for Ethan Nordean*

**Certificate of Service**

I hereby certify that on the 14th day of October, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Connor Mulroe
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, VA Bar No. 25930
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com