**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

ETHAN NORDEAN et al.,

*Defendants*.

Criminal Action No. 21-175 (TJK)

**MEMORANDUM OPINION**

Defendants Ethan Nordean, Joseph R. Biggs, Zachary Rehl, Enrique Tarrio, and Dominic J. Pezzola are charged with various conspiracy and other offenses in connection with the attack on the U.S. Capitol on January 6, 2021.  Nordean and Rehl have moved to dismiss various counts in the Third Superseding Indictment, particularly the newly added charges of seditious conspiracy, in violation of 18 U.S.C. § 2384, and conspiracy to prevent a United States officer from exercising his or her duties, in violation of 18 U.S.C. § 372.  Biggs, Tarrio, and Pezzola join them.  Pezzola has also moved to dismiss a count that charges him with robbing a riot shield from a Capitol Police officer under 18 U.S.C. § 2112.[1]  For the following reasons, the Court will deny the motions.

I.      **Background**

Defendants are associated with the Proud Boys organization, charged with playing leadership or planning roles in the attack on the U.S. Capitol on January 6, 2021.  In December 2021, the Court denied Defendants' motion to dismiss the First Superseding Indictment ("FSI").  *See United States v. Nordean*, 579 F. Supp. 3d 28, 62 (D.D.C. 2021) ("*Nordean I*").  Since then,

---

[1] To keep track of the various motions, the Court will refer to the defendant who made each argument throughout.  For example, the Court will refer to "Nordean" when discussing ECF No. 434.  But the Court's rulings apply to all defendants who joined the relevant motion.

the grand jury has returned two more superseding indictments, including the operative Third Superseding Indictment in June 2022.  ECF No. 380 ("TSI").

The Court assumes familiarity with the factual background related to these charges, as set forth in *Nordean I*.  *See* 579 F. Supp. 3d at 37–40.  But the TSI reflects some changes since then: As compared to the FSI, the TSI includes both Tarrio and Pezzola as defendants and omits Charles Donohoe, who pleaded guilty to violations of 18 U.S.C. §§ 1512(k) and 111(a) on April 8, 2022. *See* ECF No. 335.  It also adds new charges for seditious conspiracy under 18 U.S.C. § 2384 (Count 1) and conspiracy to prevent a federal officer from discharging his duties under 18 U.S.C. § 372 (Count 4).  Specifically, Count 1 alleges Defendants knowingly conspired "to oppose by force the authority of the Government of the United States and by force to prevent, hinder, and delay the execution of [a] law of the United States," that is, the Twelfth Amendment to the U.S. Constitution and the Electoral Count Act, 3 U.S.C. § 15.  TSI ¶¶ 26–27.  And Count 4 charges that they knowingly conspired "to prevent by force, intimidation, and threat . . . Members of the United States Congress and law enforcement officers" from discharging the "duties of [an] office, trust, and place of confidence under the United States" and to, by the same means, induce members of Congress and law enforcement "to leave the place where their duties as officers were required to be performed."  *Id.* ¶ 114.

Nordean moves to dismiss Counts 1, 4, 7, 8, and 9.  In the alternative, he requests a bill of particulars on every count but Count 6, which charges destruction of government property in violation of 18 U.S.C. § 1361.  Rehl moves to dismiss all counts on First Amendment and Presentment Clause grounds and to dismiss Counts 1 through 4 for more targeted reasons.  Pezzola moves to dismiss his robbery charge in Count 10.  The parties devote most of their briefing to

Counts 1 and 4.  Thus, the Court begins there and then tackles the various other grounds Defendants argue for dismissal.[2]

## II.    Legal Standard

Before trial, a criminal defendant may move to dismiss a charge based on a "defect in the indictment."  Fed. R. Crim. P. 12(b)(3)(B).  One such defect is "failure to state an offense."  *Id.*  When considering such a challenge, "a district court is limited to reviewing the *face* of the indictment" and must assume the indictment's allegations are true.  *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (cleaned up).  "The operative question is whether [those] allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed."  *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).  Courts also treat constitutional challenges to the statute on which a charge is based as a claim for failure to state an offense.  *See United States v. Stone*, 394 F. Supp. 3d 1, 7 (D.D.C. 2019); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973).

## III.    Analysis

### A.    Count 1 States an Offense Under 18 U.S.C. § 2384

Nordean and Rehl both move to dismiss Count 1, which charges Defendants with seditious conspiracy under 18 U.S.C. § 2384.  Specifically, Count 1 alleges that Defendants knowingly conspired "to oppose by force the authority of the Government of the United States and by force to prevent, hinder, and delay the execution of any law of the United States."  TSI ¶ 26.  The TSI further alleges that "[t]he purpose of the conspiracy was to oppose the lawful transfer of

---

[2] In a footnote, Nordean also moves to dismiss Counts 2, 3, and 5 and to dismiss the TSI on Sixth Amendment Speedy Trial grounds.  ECF No. 434 at 40 n.7.  He does so only to preserve arguments this Court has already rejected, *see id.*, and which the Court now does again for the same reasons, *see generally Nordean I*, 579 F. Supp. 3d 28; ECF No. 408.

presidential power by force, by opposing the authority of the Government of the United States and by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth Amendment to the Constitution and [the Electoral Count Act]." *Id.* ¶ 27.

Nordean argues that Count 1 fails to state an offense because it does not charge Defendants with conspiring to prevent, hinder, or delay by force the execution of a law in all its applications and because it does not allege sufficient facts showing Defendants conspired to employ the statute's requisite "force." ECF No. 434 at 11–32. Rehl similarly argues that Count 1 fails to adequately state Section 2384's "force" element and that the element is unconstitutionally vague. ECF No. 443 at 2–5. On all fronts, the Court is unpersuaded.

### 1. Statutory Background

Under Section 2384, a "seditious conspiracy" is any conspiracy

[(1)] to overthrow, put down, or to destroy by force the Government of the United States, or [(2)] to levy war against them, or [(3)] to oppose by force the authority thereof, or [(4)] by force to prevent, hinder, or delay the execution of any law of the United States, or [(5)] by force to seize, take, or possess any property of the United States contrary to the authority thereof.

18 U.S.C. § 2384. Relevant here are clauses three and four, which the Court refers to as the "authority clause" and the "execution clause," respectively.

Some background on the statute's history, including its predecessors, informs the Court's construction of Section 2384's reach. At the outset of the Civil War, Congress passed the first precursor to Section 2384. The Conspiracies Act of 1861 made it a crime, punishable by up to six years' imprisonment, to engage in any of the conspiracies listed in Section 2384, or "by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence under the United States." Act of July 31, 1861, ch. 33, 12 Stat. 284. The statute

filled a gap in the criminal law, covering crimes short of treason but greater than misdemeanor obstruction of a federal officer.  *See* Leslie Friedman Goldstein, *Legal Histories of America's Second Revolutionary War (1860–1876)*, 52 Tulsa L. Rev. 495, 504 (2017).

Ten years later, the same conspiracy provisions reemerged as part of the Enforcement Act of 1871, or the Ku Klux Klan Act.  Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 (codified at Rev. Stat. title 70, ch. 2, § 5336 (1878)).  Congress reenacted these conspiracy offenses along with several provisions designed to combat private violence by the Ku Klux Klan and like organizations.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 722 (1989).

Materially identical provisions appeared in Title 18 for the first time in 1909.  *See* Act of Mar. 4, 1909, ch. 1, § 6, 35 Stat. 1089 (codified at 18 U.S.C. § 6 (1940)).  A series of prosecutions for these offenses followed.  After World War I broke out, several groups allegedly conspired to oppose the military draft by force.  The government brought charges under 18 U.S.C. § 6, which courts upheld consistently.  *See, e.g.*, *Isenhouer v. United States*, 256 F. 842, 843 (8th Cir. 1919); *Orear v. United States*, 261 F. 257, 260 (5th Cir. 1919); *Bryant v. United States*, 257 F. 378, 380–82 (5th Cir. 1919).

In 1948, Congress recodified these offenses in 18 U.S.C. § 2384.  With this change, Congress also adopted the term "seditious conspiracy" as the statute's title.  *See* 18 U.S.C. § 2384.  Despite its new name, the law's substance remained unchanged from the 1909 version.  *See* H.R. Rep. No. 80-304, at A148 (1947) (noting the new Section 2384 was "[u]nchanged" from the 1909 statute).  And finally, Congress raised the act's maximum penalty from six to twenty years' incarceration after the attack on the U.S. Capitol in 1954, in which armed Puerto Rican nationals opened fire in the House of Representatives' gallery, wounding five members of Congress.  *See* Act of July 24, 1956, Pub. L. No. 84-766, ch. 678, 70 Stat. 623.

**2.      The TSI Alleges that Defendants Conspired to Prevent, Hinder, or Delay by Force the Execution of a Law in All its Applications**

Nordean's first argument is that the seditious-conspiracy statute reaches "attempts to prevent the law's execution in all cases," but not "attempts to prevent the execution of a federal law in order to avoid its application to a particular set of facts."  ECF No. 434 at 13.  And he contends Count 1 alleges only that "Nordean and the defendants conspired to prevent the Twelfth Amendment and [Electoral Count Act] from being *applied in a manner* they apparently sincerely believed to be mistaken," not that they intended "to prevent the execution of the Twelfth Amendment and [Electoral Count Act] *as such*."  *Id.* at 15 (emphasis added).  The Court disagrees that the TSI fails to state a seditious-conspiracy offense.

To begin, the Court finds that a seditious conspiracy under Section 2384 is one in which defendants conspire to "oppose by force the [government's] authority" or to prevent by force the execution of a law *wholesale*—that is, in all its applications.[3]  *See* 18 U.S.C. § 2384.  As the parties seem to agree, conspiring to use force to obstruct a law's application or enforcement in a particular case is insufficient.

Such a reading reflects the statute's entire text.  The Supreme Court has "stressed" that "in expounding a statute, [a court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (cleaned up).  Thus, Section 2384's other provisions inform the execution clause's reach.  The first two clauses, which proscribe conspiracies to "overthrow, put down, or destroy" the United States government by force or to

---

[3] On this point, Nordean says little of the authority clause.  *See* ECF No. 434 at 11–17.  So the Court too will focus on the execution clause.

"levy war" against it, describe crimes against the government writ large—not those against any particular government official or action. Thus, absent some textual indication otherwise, the remaining clauses are best read to operate similarly.

In addition, the limited guidance from courts supports such a reading. In *Baldwin v. Franks*, 120 U.S. 678 (1887), the Supreme Court explained that "'opposing' by force the authority of the United States, or [] preventing, hindering or delaying the 'execution' of any law of the United States . . . evidently implies force against the government *as a government*." *Id.* at 693 (emphasis added). It "means something more than setting the laws themselves at defiance." *Id.* Rather, "[t]here must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.* For that reason, the Court held that the defendant, who had conspired to forcibly remove Chinese laborers lawfully in the United States under a treaty, did not prevent the "execution of a law of the United States." *See id.* Although the United States government, under a treaty, was "bound . . . to exert [its] power to devise measures to secure the subjects of [the Chinese] government lawfully residing" in the United States, Baldwin's "conspiracy [was] for the ill treatment itself, and not for hindering or delaying the United States in the execution of their measures to prevent it." *Id.* at 693–94.

About 30 years later, in *Bryant,* the Fifth Circuit read the statute the same way, even as it affirmed the convictions at issue. *See* 257 F. at 387. In that case, court explained that, consistent with *Baldwin*, "resistance or the conspiracy to resist the enforcement of the law must be general, and not limited to a particular instance, or against a particular officer, or from a private or personal motive." *Id.* It upheld the defendants' convictions because there was evidence "in the record, which, if believed by the jury, was sufficient to show a conspiracy on the part of the [defendants]

to prevent the enforcement of conscription under the Selective Service Act *all over the United States*, not alone in their individual cases." *Id.* (emphasis added).

With these contours of the offense in mind, the Court finds that the TSI states a seditious-conspiracy offense for conspiring to prevent, hinder, or delay the wholesale execution of a law. In contending otherwise, Nordean's understanding of what it means to oppose a law as law is too constricted.

In the Court's view, the charged conspiracy to stop the certification of the Electoral College vote from taking place on January 6, 2021, *is* a conspiracy to hinder execution of the Twelfth Amendment and Electoral Count Act in all their applications and on a nationwide basis. These laws, which together set out the procedures Congress must follow to facilitate the transition of executive power from one president to another, are executed after an election at only one time and in one place. *See* U.S. Const. amend. XII; 3 U.S.C. § 15. And when they are executed, these laws implement that transition throughout the United States. Thus, thwarting the proceeding designed to carry out these laws' commands prevents their execution in what is effectively their *only* application and with effect "all over the United States." *See Bryant*, 257 F. at 387.

In this way, the contrast with conspiracies designed to avoid a law's application to a particular set of facts—like where a drug dealer assaults a witness to prevent his testimony in a specific case—is obvious. *See* ECF No. 434 at 13–14. Nordean is right that such a crime is not a seditious conspiracy because the drug dealer does not intend to affect the nationwide enforcement of the Controlled Substances Act. But as explained above, not so with these presidential-transition laws.

Resisting this conclusion, Nordean effectively urges the Court to read a motive element into the statute. He argues that to oppose a law "as such," the conspirators must reject the target

law's "validity." ECF No. 434 at 11. And here, he says, the TSI alleges not that the conspirators believed "Congress ha[d] forfeited its legitimacy" and "the laws of presidential election [were] void," but only that, in their view, the Vice President and Congress were misapplying otherwise valid laws. *Id.* at 15. For the purpose of whether the TSI states a seditious-conspiracy offense under Section 2384, this is a distinction without a difference. While evidence of a defendant's motive is often probative, it is "ordinarily not an element of a crime." Motive, 1 Wharton's Criminal Evidence § 4:45 (15th ed. Nov. 2021 Update). And that is the case here, as Section 2384 proscribes conspiracies to "prevent, hinder, or delay the execution of any law of the United States," not to "prevent, hinder, or delay" such execution only when the conspirators believe the law is invalid.

In addition, neither of the cases on which Nordean relies support his reasoning. In both *Anderson v. United States*, 273 F. 20, 24 (8th Cir. 1921), and *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920), members of a socialist organization allegedly conspired to disrupt wartime mobilization and labor laws by targeting manufacturers and striking to limit the supply of goods. While it is true that the defendants were apparently motivated by a belief that the United States should not be ruled by "bourgeois parasites," neither court suggested that such a motive was an element of a seditious-conspiracy charge.

Thus, the TSI properly alleges a seditious conspiracy. And because the Government has neither "collaps[ed] the sedition crime into a mine-run obstruction-of-justice offense" nor alleged that Nordean "committed seditious conspiracy by challenging a law's application to a specific set of facts," Nordean's rule-of-lenity and ex post facto arguments both fail as well. *See* ECF No. 434 at 16–17.

### 3.     The TSI Need Not Allege that Defendants Directed Force at Government Officials

Nordean also argues that Count 1 must be dismissed because it does not specifically charge Defendants with targeting government officials tasked with executing the presidential-transition laws or opposing any such officials' show of authority.  The Court disagrees.

As relevant here, a seditious conspiracy consists of two or more individuals conspiring to "oppose by force the authority" of "the Government of the United States" or by force to "prevent, hinder, or delay the execution of any law of the United States."  18 U.S.C. § 2384.  Nowhere does the statute's text require that the conspirators intended to target a specific government official or otherwise suggest that an indictment must identify such an official.   Congress knows how to write a law containing such a requirement, but it did not do so here.  *See, e.g.*, 18 U.S.C. § 372 (criminalizing conspiracies targeting "any officer of the United States"); 18 U.S.C. § 111 (assaulting, resisting, or impeding federal officers); *see also Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (quoting *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000))).[4]

Nordean's arguments against the plain reading of Section 2384's text are unavailing.  First, he contends that "execution of the law" and "authority of the Government of the United States"

---

[4] Nordean insists this reading "creates unconstitutional vagueness," questioning "what constitutes using 'force' to prevent 'the government as a whole' from executing federal law" or "opposing 'authority' itself by force."  ECF No. 434 at 23.  His argument is substantially underdeveloped and conclusory.  Even so, and for reasons discussed below, the Court finds that Section 2384 is not unconstitutionally vague.  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  *United States v. Williams*, 553 U.S. 285, 306 (2008).  At the margins, juries may face hard questions surrounding the force element of the seditious-conspiracy statute.  But that alone does not render the statute unconstitutionally vague.

are "abstract" functions, which cannot be the object of the offense's actus rei (to "prevent, hinder, or delay" and to "oppose"). ECF No. 434 at 18. In support, he leans on *United States v. Aguilar*, 515 U.S. 593 (1995), in which the Supreme Court held that in 18 U.S.C. § 1503 obstruction-of-justice prosecutions, "the [obstructive] act must have [had] a relationship in time, causation, or logic with the judicial proceedings." *Id.* at 599. He argues that, like Section 2384's "'execution of any law of the United States' and 'authority [of the government],' Section 1503's 'due administration of justice' is an abstract function," and that is why the *Aguilar* Court required proof of a "nexus" to "an arm of the grand jury,"—the specific individuals "'administering justice' in the grand jury." ECF No. 434 at 18 (quoting *Aguilar*, 515 U.S. at 600).

Nordean misreads *Aguilar*. The Court's ruling in that case did not turn on—and had nothing to do with—the abstract nature of the "administration of justice." Rather, the "nexus" element the Court recognized stemmed from Section 1503's limited reach—to judicial or grand jury proceedings only—and its intent requirement. Under Section 1503, "a person lacking knowledge of a pending proceeding necessarily lack[s] the evil intent to obstruct." *Aguilar*, 515 U.S. at 599. Thus, the Court embraced a rule that had emerged in the courts below, requiring that "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Id*. And the Court found that "uttering false statements to an investigating agent . . . who might or might not testify before a grand jury [was not] sufficient to make out a violation of the catchall provision of § 1503." *Id.* at 600. *Aguilar* is simply inapposite.

That all said, Nordean is right that it is impossible to use force against "the authority of government" or "the execution of the laws" in a metaphysical sense. The United States

Government can act only through its agents.  But it does not then follow that an indictment charging seditious conspiracy under Section 2384 must, at the outset, identify specific persons targeted by the conspiracy.  Rather, it means merely that *proof* of any seditious conspiracy will include the use of force or a plan to use force against people or property.[5]

Nordean's last argument on this point again directs the Court to the Seventh and Eighth Circuits' decisions in *Haywood* and *Anderson*.  And in fairness, language in both cases might be read to support the requirement Nordean urges here.  In *Haywood*, the court wrote that Section 2384's predecessor's "prima facie meaning condemns force only when a conspiracy exists to use it against some person who has authority to execute and who is immediately engaged in executing a law of the United States."  268 F. at 800.  And in *Anderson*, the court held, "There must . . . be found in the [seditious-conspiracy] count a charge that the purpose of the conspiracy was the exertion of force against those charged with the duty of executing the laws."  273 F. at 26 (emphasis added).

Still, the Court finds that the Government offers the better reading of the language in these cases.  *See* ECF No. 454 at 15.  In context, these passages merely clarify that, even where a conspiracy aims to prevent a law's execution, the force it contemplates must still be directed *at the government*.  The *Haywood* passage followed the court's observation that "Defendants' force was exerted only against producers in various localities," that is, nongovernmental entities.  268 F. at 800.  Similarly, in *Anderson* the court found the count "charge[d] that a force was to be exerted in a manner and for a purpose not within the statute" because the "force was to be exerted, not against those whose duty it should be to execute the laws . . . [but] against industrial and commercial

_____

[5] Nordean argues elsewhere that "Section 2384's [execution clause] contemplates the use of force against persons, not property."  ECF No. 434 at 29.  The Court disagrees for reasons discussed below.

activities and interests."  283 F. at 26.  Read this way, *Anderson* and *Haywood* offer no basis for reading a new element into the statutory text.

For all these reasons, Count 1 need not have alleged that Defendants conspired to direct force at government officials.

### 4. Congress "Executes" the Twelfth Amendment and the Electoral Count Act, and No Feature of those Laws Warrants Dismissal

As set forth above, the TSI need not have expressly alleged that Defendants conspired to direct force against a person.  Still, the TSI *does* charge Defendants with conspiring to disrupt the execution of the Twelfth Amendment and the Electoral Count Act with force.  And Congress was—so the Government's theory goes—the entity "executing" these laws on January 6, 2021.  Nordean argues that Count 1 fails to state an offense because Congress does not—and cannot— "execute" laws.  *See* ECF No. 434 at 24–27.  Thus, it follows that Congress was not "executing" either the Twelfth Amendment or the Electoral Count Act, so Defendants could not have conspired to prevent, hinder, or delay these laws' execution under Section 2384.  The Court is unconvinced.

The Court begins with the word's dictionary definition.  "Execution" refers to "[t]he act of carrying out or putting into effect."  *Execution*, Black's Law Dictionary (11th ed. 2019).  More importantly, the same meaning held sway when Congress enacted Section 2384's predecessors. *See Execution*, Webster's New Illustrated Dictionary of the English Language (1908) ("the act of executing; performance; manner of carrying anything into effect; completion"); *Execution*, 1 Alexander M. Burrill, A Law Dictionary & Glossary 584 (2d ed. 1860) ("The completion of an act or proceeding, by which it is rendered operative or effectual; a following out or carrying into effect."); *Execution*, 1 Webster's American Dictionary of the English Language (1828) ("Performance; the act of completing or accomplishing."); *see also Bostock v. Clayton Cnty.*, 140

S. Ct. 1731, 1738 (courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment").

Congress "executes" the Twelfth Amendment and the Electoral Count Act within the meaning these authorities reflect. In undertaking what these laws require, Congress carries into effect their ultimate objects: the certification of the Electoral College vote and the transition of executive power from one president to the next.

Nordean argues in his reply that Congress merely *complies* with these laws. *See* ECF No. 458 at 20–21. But Congress does more than that. To "comply" is "[t]o do what is required or requested" or "to conform, submit, or adapt to (a command, demand, [or] requirement)." *Comply*, Black's Law Dictionary (11th ed. 2019). For example, one "complies" with the tax laws by paying taxes and "complies" with laws prohibiting speeding by driving the speed limit. And to be fair, Congress does something that may look like "compliance" when "[t]he Senate and House of Representatives [] meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." *See* 3 U.S.C. § 15. But Congress's proceedings carry out or put into effect an outcome with independent legal significance: the certification of the Electoral College vote and the resulting transition of power. Nothing similar is carried out or put into effect when someone merely pays taxes or drives the speed limit. In this way, Congress "executes," rather than merely "complies with," the Twelfth Amendment and the Electoral Count Act.

Nordean also argues that the Court cannot construe Congress's role vis-à-vis the Twelfth Amendment and the Electoral Count Act as "execution" because "[t]he structure of the Constitution does not permit Congress to execute laws." ECF No. 434 at 25 (quoting *Bowsher v.*

*Synar*, 478 U.S. 714, 726 (1986)).[6]  This aspect of his argument has intuitive appeal, but it still falls short.

"The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility."  *INS v. Chadha*, 462 U.S. 919, 951 (1983).  And to be sure, in nearly all circumstances, it is the executive—not Congress—that executes laws.  *See Bowsher*, 478 U.S. at 726.  But that rule is not as rigid as Nordean would have it.  The Framers understood the basic separation-of-powers principle as "entirely compatible with a partial intermixture of those departments for special purposes."  The Federalist No. 66, at 401 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.").  And the Supreme Court's pronouncements on this topic reflect this nuance.  As the Court has instructed, "the Legislature cannot exercise either executive or judicial power" "*unless otherwise provided* or incidental to the powers conferred."  *Springer v. Gov't of the Philippine Islands*, 277 U.S. 189, 201 (1928) (emphasis added).  For example, Congress can be said to "execute" its treaty and

---

[6] The Government argues that "Nordean provides no basis in the statute's text, structure, or history to support [the] assumption" that "Congress intended to limit Section 2384's reference to 'execution of the laws' to exercises of what would be regarded as executive power in a separation-of-powers sense."  ECF No. 454 at 21.  And it is true that "the Supreme Court has not reflexively imported constitutional meanings into federal statutes."  *United States v. Rhodes*, No. 22-cr-15 (APM), 2022 WL 2315554, at *8 (D.D.C. June 28, 2022) (quoting *Thompson v. Trump*, 590 F. Supp. 3d 46, 92 (D.D.C. 2022)).  But the Court does not understand Nordean to argue that Congress intended to import a special Take Care Clause meaning of "execute" into Section 2384.  *See* ECF No. 434 at 22 ("[T]he dictionary definition of 'execution' . . . is consistent with the meaning of the same term in the Take Care Clause.").  This argument is structural—not textual.

impeachment powers. *See Medellín v. Texas*, 552 U.S. 491, 505, 514 (2008) (describing non-self-executing treaties as "those the legislature must execute," meaning "they can only be enforced pursuant to legislation to carry them into effect" (cleaned up)); The Federalist No. 66, at 401–02 (describing Congress's impeachment power as "not only a proper but necessary" intermixture of the executive and legislative departments).

For these reasons, Nordean's insistence that Congress can *never* execute a law as a matter of constitutional structure is incorrect.  And in the Court's view, Congress may, consistent with separation-of-powers principles, "execute" the Twelfth Amendment and the Electoral Count Act for the "special purpose" of certifying presidential elections.[7]  That special purpose makes sense as a check on the executive, relieving it from the duty of certifying an election in which the sitting president may have been a candidate.

Nordean makes two more arguments for dismissing Count 1 based on Section 2384's execution clause that are more easily dispensed with.  First, he argues that the Electoral Count Act is not a "law," but a Rule of the House of Representatives.  ECF No. 434 at 26–27.  Second, he contends that even if Congress were "executing" the Twelfth Amendment, the seditious-conspiracy charge still may not stand because the Twelfth Amendment does not provide that the electoral votes must be counted on January 6, or any other specific day, or in a specific place.  *Id.* at 27–28.

Nordean's argument about the nature of the Electoral Count Act is, at least for now, purely academic.  To be sure, some have argued that the Electoral Count Act is unconstitutional because

---

[7] Congress may not, of course, award itself executive powers through legislation.  *See Bowsher*, 478 U.S. at 726.  But the Twelfth Amendment grants Congress a quasi-executive function, and so that special grant of authority carries through to the Electoral Count Act.

it violates the antibinding principle of rule-making, which prevents one Congress from binding another about its rules of proceedings.[8]  The Court need not resolve that debate here.  Congress enacted the Electoral Count Act of 1887 as *law*, and it remains law today.  Act of Feb. 3, 1887, ch. 90, 24 Stat. 373 (codified as amended at 3 U.S.C. §§ 5–6, 15–18).  Nordean does not attempt a collateral attack on the Electoral Count Act's validity, nor could he for any number of reasons.  So this argument offers no basis to dismiss Count 1.

Nordean's second argument is just as meritless.  The Constitution's silence on when and where the electoral count must occur is irrelevant for the purposes of whether Count 1 states an offense.  It suffices that the TSI alleges that Congress *was* executing the Twelfth Amendment on January 6, 2021, and that Defendants conspired to stop it.  That Congress might have certified the Electoral College vote at another time is of no moment, especially given that the offense covers "delaying" or "hindering" a law's execution along with "preventing" it altogether.  *See* 18 U.S.C. § 2384.  And whether Defendants conspired to prevent this process from ever happening or merely to delay it is for the jury to decide—not the Court on a motion to dismiss.  *See* ECF No. 434 at 28.

### 5.  The TSI Adequately Alleges that Defendants Conspired to Use "Force" Under Section 2384's Authority and Execution Clauses

In broad strokes, Nordean and Rehl both argue the Court should dismiss Count 1 for failing to state Section 2384's "force" element.  Both the authority and execution clauses require that the conspirators planned to accomplish their unlawful objective "by force."  *See* 18 U.S.C. § 2384.  Nordean argues that (1) the force element covers only force against people, not property; and

---

[8] Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1779 (2002); *see, e.g.*, *id.* at 1783 (arguing there is "little doubt that the Electoral Count Act is formally unconstitutional"); Laurence H. Tribe, *eroG .v hsuB and its Disguises: Freeing* Bush v. Gore *from its Hall of Mirrors*, 115 Harv. L. Rev. 170, 267 n.388 (2001) ("There is no constitutionally prescribed method by which one Congress may require a future Congress to interpret or discharge a constitutional responsibility in any particular way.").

(2) even if the force element includes force against property, the TSI's allegations are insufficient. *See* ECF No. 434 at 29–32.  For his part, Rehl argues that the TSI fails to allege that Defendants conspired to use force of the kind he claims Section 2384 requires.  None of these arguments prevail.

Nordean's first argument fails in part for some of the reasons already discussed. Section 2384 has no element that requires the TSI to allege that Defendants directed force at a particular person, or even property.  And his view that "taking the statute as a whole, it is plain that 'by force' [] means the use of force against persons, not merely property" ignores that Section 2384's fifth offense is itself a property crime.  ECF No. 434 at 29; *see* 18 U.S.C. § 2384 (punishing conspiracies to, "by force," "seize, take, or possess any property of the United States contrary to the authority thereof").  Thus, the allegations in the TSI about the Defendants use of force are sufficient to state a claim for seditious conspiracy.

Of course, Nordean is right that in a literal sense, only people exercise "authority" and "execute" laws.  And as he hypothesizes, a "judge may still exercise his authority" even if "a comet hits the courthouse."  ECF No. 434 at 30.  But conspirators who plot to blow up a government building *for the purpose* of opposing the authority of those working inside it, or *for the purpose* of preventing them from executing a law (in all its applications), surely violate Section 2384's authority and execution clauses, respectively.  In the end, whether a seditious conspiracy proves successful—whether the people inside the building can still exercise their authority—is irrelevant to whether an indictment properly states such an offense.   Rather, it is up to the jury to decide whether any conspiracy to use force—however that force is directed—evidences an intent to oppose the government's authority or the execution of a law.

Nordean's second objection is that "the TSI does not allege any fact showing Nordean's agreement to use force against persons or property on which 'execution' of the Twelfth Amendment and [Electoral Count Act] depends." ECF No. 434 at 31. The TSI need not allege anything more that it does. An indictment generally satisfies the Constitution and Federal Rule of Criminal Procedure 7(c) if it "contains the elements of the offense charged," "fairly informs a defendant of the charge against which he must defend," and allows the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (cleaned up). It need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (per curiam). The TSI meets this standard easily. Of course, courts in this jurisdiction have "long held that an indictment that is drawn in the generic words of a statute and that fails entirely to describe in any meaningful way the acts of the defendant that constitute the offenses charged is insufficient to notify a defendant of the nature of the accusations against him." *United States v. Hillie*, 227 F. Supp. 3d 57, 73 (D.D.C. 2017). But that can hardly describe the TSI, which painstakingly details acts in furtherance of the alleged conspiracy. *See* TSI ¶¶ 29–108. And as noted above, whether an alleged conspiracy seems likely to succeed as it is described in an indictment says nothing about whether it is properly charged. Like Nordean's first argument on the "force" requirement, this one also goes to the strength or sufficiency of the evidence at trial, not the TSI's validity.

Similarly, Rehl argues that Count 1 fails to state Section 2384's force element because "every seditious conspiracy case" of which he is aware "involves allegations that the 'force' used or contemplated by the defendants involved firearms or weapons of mass destruction." ECF No. 443 at 2. He is right that the TSI does not allege Defendants conspired to use such weapons. *Id.*

at 2–3.  But whatever the facts involved in other Section 2384 prosecutions, the statute does not require that a seditious conspiracy involve the contemplated use of firearms or weapons of mass destruction.  So Rehl's argument offers no basis for dismissing Count 1.

### 6.    Section 2384 Is Not Unconstitutionally Vague

Finally, Rehl further argues that the Section 2384's force element—and therefore the overall statute—is unconstitutionally vague.  Not so.

A criminal statute is unconstitutionally vague only if it "fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  But difficult questions at the margins do not render a statute unconstitutionally vague.  *See United States v. Williams*, 553 U.S. 285, 306 (2008). "Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam).

Section 2384's force element easily clears this bar.  The mere fact that the word "force" is susceptible to several definitions does not render it unconstitutionally vague.  As the Government points out, several criminal statutes contain force elements that courts routinely define without vagueness issues.  *See* ECF No. 454 at 27; *see also, e.g.*, *Johnson v. United States*, 559 U.S. 133, 139–40 (2010) (defining violent force under the Armed Career Criminal Act, 18 U.S.C. § 924(e)); *United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 135–37 (D.D.C. 2015) (defining physical force against property under 18 U.S.C. § 924(c)).  Rehl offers no persuasive explanation as to why this Court should break new ground by finding the force element vague.

*             *             *

For all these reasons, the Court will deny Defendants' motions to dismiss Count 1.

### B.      Count 4: 18 U.S.C. § 372

Nordean next moves to dismiss Count 4, which charges Nordean and his codefendants with conspiring to prevent members of Congress and law enforcement officers from discharging their duties, in violation of 18 U.S.C. § 372.  Section 372 provides:

> If two or more persons in any State, Territory, Possession, or District conspire to [(1)] prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or [(2)] to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined under this title or imprisoned not more than six years, or both.

18 U.S.C. § 372.

The TSI charges Defendants under both clauses.  In other words, it alleges that they conspired (1) "to prevent by force, intimidation, and threat, any person, that is, Members of the United States Congress and law enforcement officers, from discharging any duties of any office, trust, and place of confidence under the United States"; and (2) "to induce by force, intimidation, and threat, any officer of the United States, that is, Members of the United States Congress and law enforcement officers, to leave the place where their duties as officers were required to be performed."  TSI ¶ 114.

Nordean argues that the Court must dismiss Count 4 because neither members of Congress nor Capitol Police officers hold an "office, trust, or place of confidence under the United States."[9] Nor, he contends, are they "officers of the United States."  *See* ECF No. 434 at 32–39.  Considered

---

[9] The TSI alleges that Defendants impeded "law enforcement" generally, as opposed to Capitol Police officers. TSI ¶ 114.  But the Government, like Nordean, limits its arguments here to whether Section 372 encompasses crimes against the Capitol Police.  *See* ECF No. 454 at 37.  Thus, the Court focuses its analysis accordingly.

in isolation, Nordean offers a plausible reason for construing the phrase "officers of the United States" as limited to its constitutional meaning, which would exclude members of Congress.  But ultimately, the Court finds that Section 372's entire text, structure, and history point to a broader meaning of the phrase.  As explained below, for purposes of this statute, members of Congress and Capitol Police officers occupy an "office, trust, or place of confidence under the United States" and so too are "officers of the United States."

### 1.      Statutory Background

Once again, the Court begins with a brief history of the offense codified in 18 U.S.C. § 372. The statute's first clause originally appeared alongside the seditious-conspiracy offense discussed above.  The Conspiracies Act of 1861, along with the crimes now contained in Section 2384, punished anyone who conspired "by force, or intimidation, or threat to prevent any person from accepting or holding any office, or trust, or place of confidence, under the United States."  Act of July 31, 1861, ch. 33, 12 Stat. 284.

Section 372's second clause first appeared as part of the Enforcement Act of 1871.  *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13.  There, in the section following the first enactment of what is now 42 U.S.C. § 1983, Congress listed several conspiracies punishable by fine or imprisonment.  Among them were those that originated in the Conspiracies Act.  But the Enforcement Act added an offense for conspiring "by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office."  *Id.*  Section 372's present form mirrors its Enforcement Act predecessor in all material respects.

22

2.     **Members of Congress Occupy an "Office, Trust, or Place of Confidence" Under the United States and Are "Officers of the United States"**

The Court begins with the first clause—including the phrase "office, trust, or place of confidence under the United States"—which originated in the Conspiracies Act of 1861.  Again, courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment."  *Bostock*, 140 S. Ct. at 1738.  Reconstruction-era definitions of "office" point decisively toward reading the clause to cover members of Congress.  For example, one legal dictionary defined "office" as "a right to exercise a public function or employment, and to take the fees and emoluments belonging to it."  *Office*, 2 John Bouvier, A Law Dictionary, 259 (5th ed. 1855).  And it defined "political office" to include "the office of the president of the United States, of the heads of departments, [and] of *the members of the legislature*."  *Id.* (emphasis added); *see Thompson v. Trump*, 590 F. Supp. 3d 46, 92 (D.D.C. 2022) (collecting more definitions to find that "office, trust, or place of confidence" in 42 U.S.C. § 1985(1), Section 372's civil counterpart, includes members of Congress); *United States v. Rhodes*, No. 22-cr-15 (APM), 2022 WL 2315554, at *15 (D.D.C. June 28, 2022) (applying the same reasoning to Section 372).

If the plain meaning of "office" leaves any doubt as to whether the phrase includes members of Congress, the meanings of "trust" and "place of confidence" resolve it.  "Trust" means "a confidence reposed in one person for the benefit of another."  *Trust*, 2 Alexander M. Burrill, A Law Dictionary and Glossary 549 (2d ed. 1867); *see Thompson*, 590 F. Supp. 3d at 92 (same).  So elected officials, in the most literal sense, occupy positions of "trust" and "confidence."  *Cf. Brown v. Hartlage*, 456 U.S. 45, 52 (1982) (recognizing a State's interest in "ensur[ing] that its governing political institutions and officials properly discharge public responsibilities and maintain public *trust* and *confidence*" (emphasis added)).

Moreover, Congress's later decision to incorporate the "office, trust, or place of confidence" clause into the Enforcement Act of 1871 confirms that courts should read those terms broadly. "[T]he Supreme Court has urged us to give the Reconstruction Civil Rights Acts in general 'a sweep as broad as [their] language.'" *Spagnola v. Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)). And in any event, "[a] textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012). As the *Thompson* court said, "[i]t strains credulity to think that Reconstruction-Era members of Congress," using such "decidedly expansive" words, "meant to protect low-level Executive Branch employees but not themselves." 590 F. Supp. 3d at 91.

Turning to the later-constructed second clause, the question is this: Given that members of Congress are among those who occupy an "office, trust, or place of confidence under the United States," does the phrase "officer of the United States" include them, too? As discussed below, Nordean points out that, in certain constitutional provisions, the phrase "officer of the United States" excludes members of Congress. Viewed in isolation, it is tempting to read the phrase the same way here. But construing both of Section 372's clauses together, and in light of the Court's understanding of the first clause, the most sensible reading is that the second clause reaches members of Congress as well.

To start, for all the same reasons the Court finds that a member of Congress occupies an "office," so too does the word "officer" include members of Congress. And the substantial similarity between the terms "office . . . under the United States" and "officer of the United States" counsels reading them as coextensive. *See Shirk v. U.S. ex rel. Dep't of Interior*, 773 F.3d 999, 1004 (9th Cir. 2014) ("A basic principle of interpretation is that courts ought to interpret similar

language in the same way, unless context indicates that they should do otherwise."); *see also* Scalia & Garner, *supra*, at 170 ("A word or phrase is presumed to bear the same meaning throughout a text.").  Moreover, the presumption of consistent usage carries extra weight when, as here, the terms appear in the same sentence.  *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute, . . . a presumption surely at its most vigorous when a term is repeated within a given sentence.").

These phrases, of course, are not "identical," which the consistent-usage canon often contemplates.  *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319 (2014) ("One ordinarily assumes that identical words used in different parts of the same act are intended to have the same meaning." (cleaned up)).  But the variation here does not seem to reflect a decision to vary the scope of the terms.  Rather, it appears to be a byproduct of the clauses' different grammatical structures.  In the first clause, the offense is written to cover conspiracies directed at a person who will become, but is not yet, an officer of the United States.  *See* 18 U.S.C. § 372 (punishing conspiracies "to prevent . . . any person from *accepting*" an office (emphasis added)).  Thus, "any person" is the conspiracy's direct object, while an "office, trust, or place of confidence" is the indirect object.  The second clause is not (and logically need not be) written to reach future officeholders, allowing Congress to succinctly denote the offense's direct object as "any officer of the United States."

In this context, the Court will not infer that Congress meant to omit is own members from the second clause of Section 372's protections.  Doing so would ignore the two provisions' juxtaposition and interconnectedness, making hash of the law as a whole.  *See* Scalia & Garner, *supra*, at 167 ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure

and of the physical and logical relation of its many parts."). If it "strains credulity" to think Congress would protect executive officers but not itself under Section 372's first clause, the suggestion that Congress would protect itself under the offense's first clause, but not the second, is similarly untenable. *See Thompson*, 590 F. Supp. 3d at 91.

Against this backdrop, Nordean argues that both clauses must be read to exclude members of Congress. His arguments are hardly frivolous. But in light of the above, they cannot bear the weight he assigns them.

Nordean starts by arguing that the phrase "officer of the United States" in Section 372's second clause must reflect its constitutional meaning in the Fourteenth Amendment. He points to the term's use in Section 3 of the Amendment:

> No person shall *be a Senator or Representative in Congress*, or elector of President and Vice President, **or** *hold any office, civil or military, under the United States*, or under any state, who, having previously taken an oath, as *a member of Congress*, **or** *as an officer of the United States*, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend XIV, § 3 (emphasis added). It takes little more than a glance at the Amendment's text to recognize that it treats "member[s] of Congress" as distinct from "officer[s] of the United States." So this argument is not cut from whole cloth.

Of course, courts have "not reflexively imported constitutional meanings into federal statutes." *Rhodes*, 2022 WL 2315554, at *8, *14–15 (quoting *Thompson*, 590 F.3d at 92). But Nordean offers a better argument for doing so here than the *Thompson* and *Rhodes* defendants did. He says that because Congress first enacted Section 372's "officer of the United States" clause in the Enforcement Act of 1871, which was intended to enforce the Fourteenth Amendment, any

terms in the act that also appear in the Amendment should carry their constitutional meaning.  *See* ECF No. 434 at 34–35.

Again, at first blush, this argument is compelling.  But it starts to fray upon closer examination.  Importantly, the Fourteenth Amendment cannot persuasively supply meaning for the comparable phrase in the statute's first clause—"office, trust, or place of confidence"— because that clause *predates* the Fourteenth Amendment.  *See* Act of July 31, 1861, ch. 33, 12 Stat. 284.  So Nordean's argument does not account for the above analysis of the first clause's meaning and its effect on how best to construe the second.[10]  Additionally, the parallels between the relevant provisions of the Fourteenth Amendment and the Enforcement Act are weaker than Nordean's argument presupposes, sapping its force.  The phrase "officer of the United States" appears only in Section 3 of the Amendment—the Disqualification Clause.  *See* U.S. Const. amend. XIV, § 3.  Yet it does not appear that *any* provision of the Enforcement Act—let alone the provision in the Act that ultimately became Section 372—enforces the Disqualification Clause.  Moreover, unlike Section 1 of the Act (now amended and codified at 42 U.S.C. § 1983), which directly enforces the Fourteenth Amendment by regulating government conduct, Section 372's predecessor targeted private actors.  Thus, the Court does not find Section 372's Enforcement Act origins a persuasive reason to limit its interpretation of "officer of the United States" to its Fourteenth Amendment

---

[10] To be sure, Nordean resists the broad reading of "office, trust, or place of confidence" that the Court adopted above.  But his only response on this point directs the Court to Article II, Section 1 of the Constitution, which provides that "[e]ach State shall appoint . . . a Number of Electors . . . but *no Senator or Representative, or Person holding an Office of Trust or Profit under the United States*, shall be appointed an Elector."  U.S. Const. art. II, § 1, cl. 2 (emphasis added).  So, he argues, members of Congress are distinct from any "person holding an office of trust or profit."  *See* ECF No. 434 at 37.  But again, courts have "not reflexively imported constitutional meanings into federal statutes."  *Rhodes*, 2022 WL 2315554, at *8, *14–15 (quoting *Thompson*, 590 F.3d at 92).  Nordean offers no particular reason to do so here, especially because "office of trust or profit" and "office, trust, or place of confidence" are not even substantially similar phrases.

definition.  A broader construction of the phrase makes sense of the text's plain meaning, reads the statute as a coherent whole, and, to boot, advances—rather than obstructs—the Enforcement Act's purpose.  *See Spagnola*, 809 F.2d at 29.

Nordean's remaining arguments fare no better.  To begin, he points to *Kush v. Rutledge*, 460 U.S. 719 (1983), a case involving 42 U.S.C. § 1985—Section 1 of which provides an identical civil counterpart to Section 372.  *Id.* at 724.  Nordean cites the *Rutledge* Court's suggestion that Section 1985(1) generally covers "federal officers."  *Id.*  From there, he argues what seems like a bank shot: Because "officers" in the Constitution's Appointments Clause excludes members of Congress, when the Supreme Court said "federal officers," it must not have meant to include members of Congress.  So then, if "officer" under Section 1985(1) excludes members of Congress, the same must be true of Section 372.

There are several problems here.  The *Rutledge* Court did not elaborate at all on what it meant by "federal officers."  *See* 460 U.S. at 724.  Thus, because "officer" is the very word this Court must construe, *Rutledge* alone provides no answer.  Instead, Nordean's discussion of *Rutledge* appears to be a convoluted way to arrive at the thrust of his argument: that the Court should read "officer of the United States" in Section 372 to carry the phrase's meaning under the Appointments Clause, which (again) excludes members of Congress.  *See* U.S. Const. art. II, § 2, cl. 2.

In support, Nordean leans on Supreme Court cases from the 1800s that limited the definition of "officer" in other statutes to its meaning in the Appointments Clause.  ECF 434 at 35–36 (citing *United States v. Mouat*, 124 U.S. 303, 307 (1888); *United States v. Smith*, 124 U.S. 525, 531–32 (1888); *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1868)).  Fair enough. But the Court has not uniformly imported the Appointments Clause meaning of the phrase

"officer" into statutes.  Indeed, in *Mouat*, the Court reserved the possibility that "[C]ongress may

have used the word 'officer' in some other connections in a more popular sense . . . in which case

it will be the duty of the court in construing such an act of [C]ongress to ascertain its true meaning,

and be governed accordingly."  124 U.S. at 308.  That is what the Court has done here.[11]

Finally, even if the Court were to look to the Supreme Court's interpretation of "officer"

in other contexts, the most comparable case is *Lamar v. United States,* 240 U.S. 60 (1916) (*Lamar

I*), in which it construed the term to *include* members of Congress.  *See id.* at 65.  In that case, the

Court also had to interpret a law in the Criminal Code of 1909.  *See id*; *see also* Act of Mar. 4,

1909, ch. 321 § 21, 35 Stat. 1088, 1092 (1909) (Section 372's 1909 predecessor).  It reviewed the

defendant's conviction for "falsely assum[ing] or pretend[ing] to be an officer or employee acting

under the authority of the United States, or any Department, or any officer of the government

thereof."  *Lamar v. United States*, 241 U.S. 103, 111 (1916) (*Lamar II*).  More specifically, the

defendant had impersonated a member of Congress.  *Id.*  In *Lamar I*, the Court explained that

"[t]he question [was] in what sense the word 'offi[c]er' [was] used in the Criminal Code of March

4, 1909, [chap]. 321, § 32."  240 U.S. at 65.  It then held that "officer" "obviously" did not carry

its constitutional meaning and affirmed the defendant's conviction.  *Id*.  The Court later reiterated

that holding in *Lamar II*, noting that the issue was "not a constitutional one" and explaining that

"because [the statute] is penal, [it] is not to be narrowed by construction so as to fail to give full

effect to its plain terms as made manifest by its text and context."  241 U.S. at 112.  So too here.

---

[11] *See also Steele v. United States*, 267 U.S. 505, 507 (1925) (noting that although "[i]t is quite
true that the words 'officer of the United States,' when employed in the statutes of the United
States, is to be taken usually to have the limited constitutional meaning," "this [C]ourt, *in
consideration of context*, has sometimes given it an enlarged meaning, and has found it to include
others than those appointed by the President, heads of departments, and courts" (emphasis added)).

For all these reasons, the Court holds that members of Congress hold an "office, trust, or place of confidence under the United States" and are "officers of the United States" under 18 U.S.C. § 372.  Thus, the Court will not dismiss Count 4 on that basis.[12]

### C.   Counts 2 and 3: 18 U.S.C. § 1512(k), (c)(2)

Next, Rehl moves to dismiss Counts 2 and 3, which charge violations of 18 U.S.C. § 1512(k), for conspiracy to obstruct an official proceeding, and 18 U.S.C. §§ 1512(c)(2) and 2, for obstructing an official proceeding (or aiding and abetting the same).  As Rehl admits, Count 3 mirrors Count 2 in the FSI, which this Court already declined to dismiss.[13]  *See* ECF No. 442 at 2; *Nordean I*, 579 F. Supp. 3d at 41–54.  But he contends that another court's contrary ruling in *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022), warrants dismissal anyway.

The Government is correct that the law-of-the-case doctrine forecloses Rehl's argument.  *See Beach TV Props., Inc. v. Solomon*, 324 F. Supp. 3d 115, 123 (D.D.C. 2018).   Even so, the Court stands by its analysis in *Nordean I*—with which every court in this district besides the *Miller* court has agreed.[14]  Consistent with this near-consensus, neither the vagueness doctrine nor the

---

[12] For the same reasons, the Court also finds that 18 U.S.C. § 372's protections extend to the Capitol Police.  As the Government notes, Nordean's argument otherwise is "entirely derivative on his argument that Members of Congress do not qualify as officers as used in Section 372."  ECF No. 454 at 37.  The Court agrees.  Nordean argues only that the Capitol Police "are not Executive branch officers subject to the Appointments Clause."  ECF No. 434 at 38.  Rather, the force is "an entity of Congress."  *Id.* (quoting *Flippin v. U.S. Dep't of Interior*, 19-cv-1221 (BAH), 2019 WL 7372669, at *1 (D.D.C. Dec. 31, 2019)).  But as the Court has already explained at length, neither clause in Section 372 is limited to executive branch "officers" under the Appointments Clause.

[13] Although the FSI did not charge a conspiracy under 18 U.S.C. § 1512(k), Rehl does not make any argument unique to that count.

[14] *See, e.g.*, *United States v. McCaughey*, No. 21-cr-40 (TNM), ECF No. 388 at 2 (D.D.C. July 20, 2022) (rejecting defendants' argument premised on *Miller* and observing that "*Miller* has also persuaded no other judge on this question"); *United States v. Robertson*, No. 21-cr-34 (CRC), 2022 WL 2438546, at *3–5 (D.D.C. July 5, 2022); *United States v. Williams*, No. 21-cr-618 (ABJ), 2022 WL 2237301, at *17 n.13 (D.D.C. June 22, 2022); *United States v. Fitzsimons*, No. 21-cr-158

rule of lenity requires dismissal.  So the Court declines to revisit its prior ruling and will deny

Rehl's motion to dismiss on these grounds.  ECF No. 442.

### D.    Counts 7, 8, and 9: 18 U.S.C. § 1361, 2 and 18 U.S.C. § 111(a)(1)

Nordean also moves to dismiss Counts 7, 8, and 9, which charge violations of 18 U.S.C.

§§ 1361 and 2, destruction of government property (or aiding and abetting the same) and 18 U.S.C.

§ 111(a)(1) for assaulting, resisting, or impeding a federal officer.  He argues the TSI alleges

insufficient facts to show either that Nordean acted as a principal in these offenses or that he aided

and abetted others.

The Court rejected similar arguments in *Nordean I* related to the 18 U.S.C. §§ 231(a)(3)

and 1361 charges in the FSI.  *See* 579 F. Supp. 3d at 60–61.  These counts also pass muster.  Neither

Rule 7(c) nor the Constitution "require the Government to disclose . . . *how* it will prove its case."

*Id.* at 61.  The TSI includes the elements of each offense under Counts 7, 8, and 9 and "specifies

in great detail how Defendants are alleged to have commit[ted]" the offenses as principals, aiders

and abettors, and coconspirators.  *Id.* (cleaned up).  Thus, the TSI includes all the Rules and the

Constitution require—if not more.

### E.    Count 10: 18 U.S.C. § 2112

Count 10 charges Pezzola with violating Section 2112 by robbing a Capitol Police officer

of his riot shield.  TSI ¶ 126; *see* 18 U.S.C. § 2112 ("Whoever robs or attempts to rob another of

---

(RC), 2022 WL 1698063, at *6–12 (D.D.C. May 26, 2022); *United States v. Bingert*, No. 21-cr-91 (RCL), 2022 WL 1659163, at *7–11 (D.D.C. May 25, 2022); *United States v. McHugh*, No. 21-cr-453 (JDB), 2022 WL 1302880, at *2–13 (D.D.C. May 2, 2022); *United States v. Puma*, No. 21-cr-454 (PLF), 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022); *United States v. Grider*, 585 F. Supp. 3d 21, 29–30 (D.D.C. 2022); *United States v. Montgomery*, 578 F. Supp. 3d 54, 69–80 (D.D.C. 2021); *United States v. Mostofsky*, 579 F. Supp. 3d 9, 11–12 (D.D.C. 2021); *United States v. Caldwell*, 581 F. Supp. 3d 1, 21–34 (D.D.C. 2021); *United States v. Sandlin*, 575 F. Supp. 3d 16, 24–28 (D.D.C. 2021).

any kind or description of personal property belonging to the United States, shall be imprisoned not more than fifteen years."). He moves to dismiss that count, arguing Count 10 "fails to state an offense and lacks specificity," and the TSI's factual allegations "do not support any conclusion that [he] committed any crime." ECF No. 473 at 2, 7.

Without a doubt, Count 10 states an offense. Again, an indictment generally need only "contain[] the elements of the offense charged," "fairly inform[] a defendant of the charge against which he must defend," and allow the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Resendiz-Ponce*, 549 U.S. at 108 (cleaned up). Count 10 does that and more. By incorporating the factual allegation in Paragraph 86, the TSI goes beyond reciting the offense's elements and alleges with specificity how Pezzola committed the robbery. *See* TSI ¶ 126; *id.* ¶ 86 ("PEZZOLA moved toward the front of the police line and ripped away a Capitol Police officer's riot shield, while the officer was physically engaging with individuals who had gathered unlawfully into the west plaza of the Capitol."). In fact, it is hard to imagine how the TSI could be any more specific.

At bottom, Pezzola does not allege any defect in the charging document. Rather, he contests the veracity of its allegations and the admissibility of the evidence against him. *See* ECF No. 473 at 7–15. These arguments are improper at the motion-to-dismiss stage. The Court will deny his motion.

## F.    Rehl's Remaining Arguments

In several motions, Rehl moves to dismiss his charges for three more reasons. He argues that (1) the TSI's conspiracy counts (Counts 1, 2, and 4) are unconstitutionally duplicitous, ECF No. 437; (2) the TSI violates his First Amendment rights, ECF No. 439; and (3) the Government's

conduct before the Grand Jury violated the Fifth Amendment's Presentment Clause, ECF No. 440. None of these arguments carry the day.

### 1.      The Conspiracy Counts in the TSI Are Not Duplicitous

Rehl first argues that the TSI is duplicitous. That is, he says, "the government has strung together a series of acts and statements that impermissibly allege multiple, separate independent agreements into a single conspiracy." ECF No. 437 at 6. He is incorrect.

"Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Watt*, 911 F. Supp. 538, 549 (D.D.C. 1995) (quoting *United States v. Shorter*, 809 F.2d 54, 56 (D.C. Cir. 1987), *abrogated on other grounds by Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). Courts apply a three-step analysis to decide whether an indictment charges an impermissibly duplicitous count. *Id.* The court must determine, first, whether the challenged count in fact alleges multiple violations of a criminal statute; second, if so, whether a defendant's conduct "may legitimately be regarded as a single course of conduct and hence a single offense"; and third, again if so, whether proceeding under one count would unduly prejudice the defendant. *See id.* at 549–50 (cleaned up).

Rehl's argument fails at step one. The TSI does not charge several conspiracies under one count—it charges three conspiracies in three separate counts. *See* TSI ¶¶ 25–26, 109–110, 113–14. Yes, as the Government readily concedes, the TSI generally alleges that Rehl and his codefendants shared one overarching objective in these conspiracies—to thwart Congress's efforts to certify the 2020 presidential election results. *See* ECF No. 454 at 40. But the rule against duplicity does not prevent the Government from charging several different conspiracies, which violate separate statutes, in separate counts—even if the offenses share a similar objective.

Because "the count[s] in question allege[] only a single violation, . . . the court's analysis ends there." *Watt*, 911 F. Supp. at 550.

### 2.      The TSI Comports with the First Amendment

Rehl next asserts the TSI "violates the First Amendment because it rests solely on [his] political views and First-Amendment protected statements." ECF No. 439 at 1.  Not so.

This Court has already rejected a similar argument based on the Section 1512(c)(2) count in the FSI. *Nordean I*, 579 F. Supp. 3d at 52–54.  As before, the First Amendment does not protect the conduct with which Rehl is charged.  Rehl and his codefendants are charged with several conspiratorial agreements as well as "conduct involving acts of trespass, depredation of property, and interference with law enforcement, all intended to obstruct Congress's performance of its constitutional duties." *Id.* at 53; *see generally* TSI ¶¶ 25–124.  No matter Defendants' "political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." *Nordean I*, 579 F. Supp. 3d at 53; *see also Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

Rehl's contrary arguments—to the extent the law-of-the-case doctrine does not preclude them altogether—do not cause the Court to question this reasoning.  To start, he objects that "[m]any of the alleged statements preceded the dates of the alleged conspiracy" and "there is no allegation in the Indictment that [his] statements met the clear and present danger standard." ECF No. 439 at 2.  On the second point, Rehl points to the Supreme Court's well-known decision in *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law

violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

Rehl blurs the distinction between statutes that criminalize speech itself and the Government's use of a defendant's statements as evidence of a separate crime. *Brandenburg* deals with the former, but this case involves the latter. The Government has not charged Rehl with speech crimes. Rather, Section 2384 "proscribes 'speech' only when it constitutes an agreement to use force against the United States." *United States v. Rahman*, 189 F.3d 88, 114 (2d Cir. 1999). The TSI charges Rehl and his codefendants with "conspir[ing] to *use* force, not just to *advocate* the use of force." *Id.* at 115. So it raises no concern under *Brandenburg* or related cases. And to the extent Rehl also challenges the Government's use of his statements as evidence, Supreme Court precedent forecloses his argument. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). Thus, the First Amendment provides no basis to dismiss any count in the TSI.

### 3.    No Errors before the Grand Jury Warrant Dismissal

Finally, Rehl argues that three errors before the grand jury support dismissing the TSI under the Fifth Amendment's Presentment Clause. He presses two instructional errors and then claims that the Government provided the grand jury with inaccurate information. *See* ECF No. 440 at 9, 11–16. None of his arguments are grounds for dismissal.

Beginning with Rehl's instructional-error claims, such an error supports dismissal only if it prejudiced the defendant, meaning that it "substantially influenced the grand jury's decision to indict, or [] there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (cleaned up).

Rehl alleges two errors: (1) The Government "failed to instruct the jury that only speech that poses an imminent danger can be punished," again citing *Brandenburg*; and (2) "it failed to instruct the jury that . . . where speech falls within the shadow of the First Amendment, the alleged criminal intent must be judged *strictissimi juris*."  ECF No. 440 at 9.

For the same reasons already discussed, Rehl's first argument identifies no instructional error.  *Brandenburg* does not supply the relevant standard for this case, as the TSI charges neither Rehl nor his codefendants with crimes based on their speech.  Thus, there was no reason for the Government to instruct the grand jury on *Brandenburg*.

Nor did the Government need to instruct the grand jury on the *strictissimi juris* doctrine. The doctrine usually comes into play when the Government seeks "to impose liability on an individual solely because of his association with another."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 918–19 (1982).  In such cases, the defendant's "intent must be judged according to the strictest law," i.e., *strictissimi juris*, "for otherwise there is a danger that one in sympathy with the legitimate aims of [a group having both legal and illegal aims], but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes."  *Id.* at 919 (cleaned up).  Put another way, "a court must satisfy itself that there is sufficient direct or circumstantial evidence of the defendant's own advocacy of and participation in the illegal goals of the conspiracy and may not impute the illegal intent of alleged co-conspirators to the actions of the defendant."  *United States v. Montour*, 944 F.2d 1019, 1024 (2d Cir. 1991).

True, in rare cases, some courts have applied *strictissimi juris* beyond membership-based prosecutions.  *See United States v. Dellinger*, 472 F.2d 340, 393 (7th Cir. 1972) (antiwar protestors charged under the 1968 Anti-Riot Act); *United States v. Spock*, 416 F.2d 165, 168, 172–74 (1st

36

Cir. 1969) (anti-Vietnam War protestors charged with conspiracy "framed under" the Military Selective Service Act of 1967).  According to these cases, the doctrine applies "[w]hen the alleged [conspiratorial] agreement is both bifarious and political within the shadow of the First Amendment." *Spock*, 416 F.2d at 173; *see also Dellinger*, 472 F.2d at 393 (applying the doctrine because "the acts charged against individual defendants occurred in the context of a group undertaking with legal (protest of the war and expression, generally, of dissent) and allegedly illegal (violent) branches").

But Rehl has not been charged with being a member of the Proud Boys, and the TSI's alleged conspiracies do not have both lawful and unlawful "branches."  Rather, "both the alleged ends of the group [(stopping the electoral count)], and the alleged means chosen to achieve that end [(unlawfully storming the Capitol grounds and building, damaging property, and assaulting/interfering with law enforcement)] were illegal."  *See Montour*, 944 F.2d at 1024 (distinguishing *Dellinger*).  That is why courts that have considered the issue have declined to apply *strictissimi juris* in seditious-conspiracy cases.  *See United States v. Rodriguez*, 803 F.2d 318, 322 (7th Cir. 1986); *United States v. Stone*, 848 F. Supp. 2d 719, 722–24 (E.D. Mich. 2012).

But even if *strictissimi juris* should apply here, the Government's failure to so instruct the grand jury is not grounds for dismissal.  The doctrine informs the sufficiency of evidence to convict; it "emphasizes the need for care in analyzing the evidence against a particular defendant . . . both by the jury in its fact-finding process and by the court in determining whether the evidence is capable of convincing beyond a reasonable doubt."  *Dellinger*, 472 F.2d at 393.  So even if a *strictissimi juris* instruction to the petit jury might be proper, Rehl has identified no case suggesting the same would have been required before the grand jury at the indictment stage.  And regardless, if there was an error, Rehl has not shown it "substantially influenced the grand jury's decision to

indict," as he must to satisfy the high bar for dismissal. *See Bank of Nova Scotia*, 487 U.S. at 256 (cleaned up).

Finally, Rehl's argument that the Government presented the grand jury with inaccurate information fares no better. He cites six of his own statements, which he contends the Government took "out of context or truncated, making the information conveyed inaccurate." ECF No. 440 at 11. But as the Government counters, "Rehl does not claim that the grand jury received doctored statements that did not reflect his actual words or was based on inaccurate witness testimony." ECF No. 454 at 46. The Government must present the grand jury with accurate information. But it need not do so in the light most favorable to the defense. So this claim too fails.

## IV.   Nordean's Motion for a Bill of Particulars

Finally, as an alternative to dismissal, Nordean moves for a bill of particulars on Counts 1, 2, 3, 4, 5, 7, 8, and 9. Specifically, he asks the Court to order the Government to detail:

> facts showing Nordean's agreement to use force against persons or property in order to prevent the execution of the Twelfth Amendment and [Electoral Count Act]; facts showing the "force, intimidation and threat" Nordean agreed to use in connection with Count Four; facts showing how Nordean agreed to prevent members of Congress and USCP officers from discharging their duties in connection with Count Four; facts showing how Nordean agreed to "induce" members of Congress and USCP officers to leave the place where their duties were required to be performed in connection with Count Four; facts showing how Nordean aided and abetted the destruction of a Capitol window in connection with Count 7; facts showing how Nordean aided and abetted the throwing of a water bottle at law enforcement in connection with Count 8; facts showing how Nordean aided and abetted Defendant Pezzola's robbery of a law enforcement officer in connection with Count 9.

ECF No. 434 at 42. The Court will deny the motion.

Although an indictment need include only "a plain, concise, and definite written statement of the essential facts constituting the offense charged," a court may, in its discretion, "direct the government to file a bill of particulars" clarifying an indictment's allegations. Fed. R. Crim. P.

7(c)(1), (f).  "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987).  But it "is not a discovery tool or a devise [sic] for allowing the defense to preview the government's theories or evidence." *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999).  A bill of particulars "properly includes clarification of the indictment, not the government's proof of its case." *United States v. Martinez*, 764 F. Supp. 2d 166, 173 (D.D.C. 2011) (cleaned up).

Just like the FSI, the 32-page, 126-paragraph TSI "specifies in great detail" the Government's factual basis for the charges against Defendants.  *See* ECF No. 138 at 4 (denying Nordean's motion for a bill of particulars on the FSI).  And as before, Nordean does not explain how these allegations fail to "provide him with enough information to understand the [] charge[s] against him and prepare his defense." *Id.* at 8.  Rather, Nordean's requests—which seek "facts" showing he entered into conspiratorial agreements or aided and abetted others' conduct—are better understood as seeking the Government's legal theories and proof.  The Court will not order the Government to so "preview [its] theories [and] evidence," *Ramirez*, 54 F. Supp. 2d at 29, which in any event the parties are now litigating through motions in limine.

**V.      Conclusion**

For all the above reasons, the Court will deny each of the motions to dismiss.  A separate

order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: December 11, 2022