## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 1:21-cr-175 (TJK)** |
| **v.** | : | |
| | : | |
| **ETHAN NORDEAN, et. al.** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S RESPONSE TO NORDEAN'S NOTICE OF ARGUMENT IN SUPPORT OF IMPCEAHMENT OF WITNESS WITH HIDDEN JENCKS-RELATED COMMUNICATIONS

The United States of America respectfully files this response to defendant Ethan Nordean's Notice of Argument in Support of Impeachment of Witness with Hidden Jencks-Related Communications (ECF 678). For the reasons that follow, Nordean should be precluded from pursuing further cross-examination on the topics he has identified, and the questions he has already asked should be struck. The defense should be permitted to explore these topics, if at all, during its own case. This filing also responds briefly to the defense's unfounded allegations of a Sixth Amendment violation.

## BACKGROUND

At the end of the trial day on March 8, 2022, counsel for defendant Nordean asked Special Agent Nicole Miller a series of questions about the production of *Jencks* materials, specifically messages sent over the FBI's Lync communication system. Nordean demonstrated that Agent Miller's production of Lync messages, in the form of an Excel spreadsheet that superficially appeared to contain only her own messages, actually had a "filter" applied that obscured the presence of numerous messages from other FBI employees to Agent Miller. The government objected to Nordean's use of the third-party messages, and the court dismissed the jury for the day so that argument could be heard.

Later that evening, Nordean filed a notice of his argument in support of the lines of cross-examination he intended to pursue with the Lync messages.  ECF 678.

On March 9, 2023, the Court held a hearing at which the parties briefly examined Agent Miller on the process by which she gathered, reviewed, and provided her Lync messages. According to Agent Miller's uncontested testimony, she (1) received the complete spreadsheet of her Lync conversations from an FBI headquarters component, (2) "filtered" the spreadsheet so that only her own messages were visible, and (3) removed any messages that were classified or that were not relevant to her testimony in this case.  Trial Trans. 3/9/23 PM at 12,847-12,852.

On March 10, 2023, the government re-produced its original production, less 80 rows that were either classified or sensitive; provided messages to put those identified by Nordean in context; and provided a third spreadsheet of messages written by SA Miller.  The government's reproductions are significant overproductions.  We do not believe that the vast majority of the messages produced on March 10 were required to be produced under 18 U.S.C. § 3500 for the reasons stated below, but we nonetheless produced them now to facilitate efficient resolution of the issues pending before the Court.

The Court should limit cross-examination to the scope of Agent Miller's direct examination, which was limited to reading messages and providing factual testimony about videos she did not create.

## ARGUMENT

### A.  The Topics Nordean Seeks to Explore are Outside the Scope of the Direct Testimony

The direct examination of Special Agent Miller was simple: She authenticated multiple videos and text-message threads that she did not create, and she then either read the messages or provided a factual description of what was in the videos.  The scope of her testimony was

temporally limited (with two exceptions) to midnight on January 6, 2021, through shortly before 5:00 p.m. on that same date.   Although the direct examination of Agent Miller lasted nearly two full trial days, a large percentage of that time was spent with either video from January 6 or voice messages playing.

Nordean has identified four general areas of the Lync messages he intends to examine Agent Miller on: (1) messages that allegedly show a different FBI agent's opinion regarding the government's conspiracy evidence; (2) messages regarding whether another agent was present at a Confidential Human Source (CHS) meeting; (3) messages regarding alleged attorney-client privileged information; and (4) another agent (with no connection to this case) stating that her boss had assigned her 338 items of evidence to destroy.

None of those areas of examination have anything to do with narrowly focused set of facts elicited on direct.   On direct, Agent Miller did not testify about anyone's opinion on the strength of the conspiracy case.   She did not testify about any CHS meetings or about any reporting of such meetings.   She did not testify about any attorney-client communications.   And she did not testify about the destruction or disposition of any evidence.   Consequently, the substance of all these topics is far outside the scope of direct and should be off-limits for cross.

### B.  Jencks is limited to the scope of the direct testimony

Because none of the topics Nordean seeks to examine Agent Miller on are within the scope of her direct testimony, the government was not required to produce any of her statements on those topics under the *Jencks* Act.[1]   Nordean does not dispute that the above topics are, substantively, outside the scope of Agent Miller's direct testimony.   Instead, he frames his exploration of these topics as an effort to, first, "identif[y] . . . statements that are not produced that relate to the subject

---

[1]        Statements of others, of course, are not producible under the *Jencks* Act at all.

of her testimony," and, second, to impeach her on whether "she had disclosed to the Government every Lync message related to the subject of her testimony." Trial Trans. 3/8/22 p.m. at 12,731, 12740.  Both theories depend on the underlying premise that the reach of Jencks is broader than the "scope of direct" standard that governs substantives cross-examination.  Indeed, Nordean's counsel appears to have tentatively adopted this position: "I believe, unless I'm mistaken -- maybe Mr. Pattis or Ms. Hernandez or any defense counsel can comment on this, but 3500 is not about the scope of testimony. . . .  We think scope is a separate question." *Id.* at 12,736.

Nordean is, in fact, mistaken about the reach of the Jencks Act.  The D.C. Circuit has explained that the law requires the government to produce only those statements that relate to the specific topics covered on direct examination, not all statements the witness has made about the case as a whole.  *See Norinsberg Corp. v. U.S. Dep't of Agric.*, 47 F.3d 1224, 1229 (D.C. Cir. 1995).  The Circuit explained its reasoning: "While we recognize that the term 'relates to' is very broad in isolation, we note that the object of the prepositional phrase is 'the subject matter *as to which the witness has testified*' (emphasis added), not the 'subject matter of the proceeding' generally." *Id.  See also United States v. Emor*, 573 F.3d 778, 785 (D.C. Cir. 2009) (citing *Norinsberg Corp.* and finding that "[o]nly the first two pages of [government witness's] second investigative report relate to his testimony at trial and are thus within the scope of the Jencks Act").

Other courts agree.  In *United States v. Boyd*, the Fourth Circuit affirmed the district court's finding that case agent's reports from overall investigation, including reports that "summarized meetings with various witnesses" and "recorded general case development information," were not Jencks material because they did not relate to his "testimony on direct examination" about discrete investigative steps.  53 F.3d 631, 634 (4th Cir. 1995).  In *United States v. Butenko*, the Third Circuit held that "a defendant is not entitled to statements when they do not relate to the subject matter as

to which the witness has testified on direct examination, even though they relate to the subject matter of the indictment, information or investigation." 384 F.2d 554, 568 (3d Cir. 1967), *vacated on other grounds sub nom. Alderman v. United States*, 394 U.S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969). And in *United States v. Bin Laden*, the Southern District of New York explained, in an opinion later affirmed, that, "as the Jencks Act itself makes clear, a statement's mere relation to the subject matter at issue in a case does not render it producible. . . . Rather, only a statement related to a witness's testimony is producible." 397 F. Supp. 2d 465, 501 (S.D.N.Y. 2005) (citing *Butenko*, 384 F.2d at 568), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).

This prevailing view of the government's Jencks obligations is consistent with the law's purpose, which is "to enable the defense to impeach a government witness by bringing any [ ] variances [between Jencks material and the witness's testimony] to the attention of [the finder of fact]." *Norinsberg Corp.* 47 F.3d at 1229 (quoting and adding alterations to *United States v. Prieto*, 505 F.2d 8, 11 (5th Cir.1974)). Accordingly, "use of statements under the [Jencks] Act is restricted to impeachment," and it "does not authorize fishing expeditions" of the kind Nordean seeks to embark on. *United States v. Graves*, 428 F.2d 196, 199 (5th Cir. 1970).

### C. If a prior statement relates to matter outside the scope of direct, its nondisclosure is irrelevant and excludable under Rule 403

From the above points, it follows that Nordean had no basis to begin the line of inquiry that triggered the instant dispute. The subjects about which Nordean inquired – such as other agents' review of overtly monitored jail communications – were "related to" Agent Miller's direct testimony "only in the extremely attenuated sense that any fact about the case bears some 'relation' to any testimony in the case"; therefore, any of her prior statements about these topics were not subject to disclosure under Jencks. *Norinsberg Corp.*, 47 F.3d at 1229. Accordingly, Nordean

had no basis to seek out missing statements on these topics, and no basis to impeach Agent Miller about whether she withheld statements on these topics. It would have been entirely proper for her to have done so, and it is therefore irrelevant whether she did. The questions and answers should be struck.

While holding no probative value, each of the topics Nordean wishes to explore poses a substantial risk of confusing the jury and unfairly prejudicing the government. In particular:

Agent opinions on the strength of the conspiracy case: As the Court has already explained, it is improper for counsel on either side to elicit testimony about an agent's opinion on the strength of the evidence. *See* Trial Trans. 2/2/23 AM at 6904 ("[A]t the end of the day, I think we would all agree, the jury cannot consider [Agent Camiliere's] testimony – her opinion as to the nature of the conspiracy, whether it existed, and if it existed, what its contours are"). This is correct, because "[w]eighing trial evidence and making determinations of credibility are for the jury" and agent opinions on guilt or innocence are inadmissible. *United States v. Moore*, 651 F.3d 30, 59 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106, 133 S. Ct. 714 (2013) (cleaned up). Notwithstanding that rule, Nordean seeks to put before the jury a statement by a different, non-testifying agent about whether the FBI "go after them with conspiracy and not make a fool of ourselves" among other statements that Nordean contends evince an opinion as to guilt or innocence. *See* ECF 678 at 3-4 (seeking to impeach Agent Miller with extrinsic evidence of another agent's statements allegedly regarding the strength of the conspiracy evidence because those statements "go to the heart of whether the defendants are guilty in this case of the charged offenses"). The use to which Nordean seeks to put these messages has been explicitly forbidden by *Moore*, for reasons the Court articulated during Agent Camiliere's testimony. For the record, Agent Miller's response was "No we can. We DEF can now," which the government will elicit

and invite her to explain on redirect if Nordean is permitted to stray into this area.  But it should not come to that, because agents' opinions have no place before the jury.

Editing of CHS report:  Like all other reports, CHS reports are reviewed for accuracy before they are finalized.  The message Nordean seeks to explore, "you need to go into that CHS report you just put and edit out that I was present," was a routine part of that process.  Agent Miller responded, "[f]or which one? the most recent he cc[ed] you."  That message referred to an email sent by the CHS, who is an online researcher and not a member of the Proud Boys.[2]  The agent who sent it had recently transitioned to a supervisory role, and thus was no longer a handler of that source.  He also had not realized he was still copied on emails from the online source.  The supervisory agent made the request to edit out his name because he believed he was not copied (and thus not "present" for purposes of the email contact), and because per FBI policy, he cannot approve the write-up of a source meeting he was involved in.  After Agent Miller told the supervisory agent that he was, in fact, copied on the email from the online source, he withdrew his request not to be listed, a different supervisor approved the report, and the online source was instructed not to cc the other agent in future emails. In short, the exchange concerns a routine clerical matter and does not suggest any wrongdoing on the part of the FBI generally or of Agent Miller personally.

Other agent's review of overtly monitored jail communications:  Nordean's question about whether "another agent . . . gained access to attorney-client communications" was ostensibly designed to uncover evidence of a "Sixth Amendment violation," albeit one that that involves a different defendant and that Nordean therefore has no apparent standing to raise.  Trial Trans.

---

[2]     The source linked the true name of a member of the Proud Boys to his Telegram handle.  At the time of the source reporting in question, the government already knew the true-name identity of that individual and had previously provided it to the defense in this case.

3/8/23 p.m. at 12,724.  As the government explains below, however, any privilege associated with communications at issue was waived because that they took place over a monitored jail email system that was subject to routine monitoring, which was made known both to the inmate (who had to sign and acknowledgement upon registration and click an acknowledgement each time he used the system) and to the attorney.  Any further exploration of this topic in the jury's presence, therefore, would confuse the issues and prejudice the government by wrongly insinuating that the government was covertly spying on privileged communications.

Other agent's destruction of unrelated evidence:  As the Court knows, disposal of evidence is a routine part of the lifecycle of every criminal case.  The process through which this occurs is formalized in the policies of the Department of Justice.  *See* Justice Manual § 9-14.000 *et. Seq.* ("Procedure for Disposal of Seized Evidence in Closed Criminal Cases"). This "destruction" of evidence related to the disposition of 338 items of evidence from a nearly 20-year-old multi co-defendant trial.  Pursuant to policy, the FBI waited to dispose of the evidence until all defendants' appellate rights were extinguished.  The special agent disposed of this evidence by returning it to defendants' family members or otherwise destroying it pursuant to FBI policy.  The case was not related to this prosecution, and the agent was not involved in this investigation. The potential for confusion and unfair prejudice here is obvious, given the inflammatory use defense counsel have already made of the "destroy evidence" remark.  *See* Trial Trans. 3/9/23 at 12809, 12838 (counsel for Pezzola asserting that Agent Miller "needs to be Mirandized" because messages sent by another agent constitute "admi[ssions] to federal crimes").

The Court has the power to exercise reasonable control over the mode of examining witnesses to maximize the truth-seeking functions of the trial and to protect witnesses from undue embarrassment.  Fed. R. Evid. 611(a).  It also has the duty to conduct the trial such that

inadmissible evidence is not suggested to the jury by any means.  Fed. R. Evid. 103(d).  Because none of the allegedly withheld messages were required to be produced under the *Jencks* Act in the first place, the government's alleged late production of those statements is not proper grounds of cross-examination.  Even if some subset of Agent Miller's messages were required to be produced, the legal duty to produce them does not ripen until the defendant has made a motion for their production after the witness's direct testimony has ended.  *See* 18 U.S.C. § 3500(b).[3]  Nordean in fact concedes that he has not yet made such a motion.  *See* ECF 678 at 4 ("Nordean is entitled to move the Court to order the government to produce her statements in the government's possession that relate to her testimony").  The Court should preclude examination on the four topic areas Nordean identified as beyond the scope of cross-examination.

### D. If Impeachment is Permitted, it should be Limited to Messages Authored by Agent Miller

Nordean's notice incorrectly implied that Agent Miller falsely testified about messages she withheld and that he must confront her with the messages to impeach her testimony.  ECF 678 at 1-2.  As explained above, those questions and answers were beyond the scope of Agent Miller's direct examination and should be struck, and in any event there is no evidence that she withheld material required to be produced.  However, even if the Court declines to strike the questions and answers, any impeachment of Agent Miller's testimony on those topics can only come from *her* messages, not from the messages written by any other agent. Mr. Smith's questions made explicitly clear for the witness that he was only referring to statements she made.  Relevant portions of that colloquy are below:

---

[3]    The Court of course ordered early production of *Jencks* material, and the government made a good-faith effort to comply, which resulted in the current dispute.  Nonetheless, the defendant is not statutorily entitled to the materials until after a request is made, and after the witness's direct examination is complete.  Even then, he is only entitled to those materials that relate to the scope of the witness's testimony on direct examination, for the reasons stated above.

Q. Okay. Agent, one of your obligations as a case agent in this matter is to
provide the prosecutors in this case with written statements *that you've made*
about -- that relate to the subject matter of your testimony. Is that right?
A. It is.

…

Q. Okay. And did the prosecutors in this case ask you to collect *any of your*
*written statements* you might have made that relate to the subject matter of your
testimony?
A. They did.

Q. Okay. Thank you.
       And so did some of those *statements of yours* include messages in something
called the Lync application?
A.   Yes.

…

Q. Okay. And -- now, you said you complied with the
Government's request to produce the Lync statements relating to the subject
matter of your testimony. Correct?
A. I did.
Q. Did you withhold any statements that relate to the
subject matter of your testimony *that you made in the Lync messaging system*?
A. No.
Q. So you provided every statement *that you made in Lync* that is related to the
subject matter of your testimony?
A. Yes. I believe so.
Q. You didn't withhold Lync messages about whether a
conspiracy exists in this case?
A. Not that I'm aware of.
Q. You didn't withhold Lync messages about whether Aaron of the Bloody East
was not involved in the planning chats?
A. Not that I'm aware of.
Q. *And when you say not that you're aware of, I'm referring to only your*
*messages in Lync. Okay*?
A. Yes.

Trial Trans. 3/8/32 p.m. 12,708-12,710 (emphasis added)

The statements of other individuals—which were produced—cannot impeach Miller's

testimony, in which she answered questions about whether she withheld *her* statements.

10

Since the Court broke for the day on March 8, it has briefly heard from Agent Miller about how she created the spreadsheet that was ultimately produced to the defense. She "filtered by what [she] sent, because it was the information – [her] statements. So what [she] sent. And then [she] went through those messages, and anything that was relevant – any statement [she] made is what was provided." Trial Trans. 3/9/23 12,852. Defense were provided an opportunity to cross-examine, and none challenged Agent Miller's assertions on that point. The unchallenged testimony is thus that Agent Miller decided which messages related to the substance of her testimony based only messages she authored, which she examined without the context of the messages sent by others. To the extent she missed anything under those circumstances, the Court should find that it was a good-faith mistake that has now been remedied by the government's production on March 10, 2023, which was timely under the requirements of 18 U.S.C. § 3500.

If the Court allows any examination based on Agent Miller's alleged failure to provide relevant materials because the messages themselves impeach her testimony on cross-examination (*see* ECF 678 at 3), the Court must limit that examination to the substance of any of messages she wrote that were not produced, as only her statements are required to be produced as *Jencks*, and only her statements properly can properly impeach her testimony. For example, if the Court allowed impeachment on the question asked by Mr. Smith, "You didn't withhold Lync messages about whether a conspiracy exists in this case?", which he clarified referred only her messages, only an allegedly withheld message authored by her regarding whether a conspiracy exists in this case could impeach her negative answer. Thus, assuming *arguendo* that Agent Miller withheld messages on whether a conspiracy exists in this case, counsel can impeach her with her allegedly withheld statements on that topic, which include her saying "I think so, yes" to the question of whether certain evidence "gets us over the hurdle on the conspiracy charge," and a statement that

the "1776 Returns" document's failure to mention the Capitol is not an issue "[b]ecause of all the other chats we have."  The defendants would not be able to impeach her with the other agents' statements about the strength of the conspiracy evidence or Aaron of the Bloody East's level of participation in chats – those messages both do not impeach her testimony, as they are not her statements, and were not withheld in any event.

Nordean cites to *United States v. Libby*, 475 F. Supp. 2d 73, 98 (D.D.C. 2007) in support of his argument that he should be permitted to present extrinsic evidence of a non-testifying agent's statements because those statements "go to the heart of whether the defendants are guilty in this case of the charged offenses."  ECF 679 at 4.  For the reasons stated above, that agent's statements in this regard are irrelevant to the jury's determination of the guilt or innocence of the defendants. Additionally, unlike the statements at issue in *Libby*—and virtually every other case about impeachment by extrinsic evidence—the messages at issue were not even authored by Agent Miller.  To use the messages at all for impeachment (by extrinsic evidence or otherwise), Nordean must make a threshold showing that the statements he seeks to use were made by the witness.  The statements proffered by the defendants were not.  If any statements were made by Agent Miller on these topics, they must be inconsistent with her trial testimony to be impeachable before the Court reaches the question of extrinsic evidence. For example, Agent Miller did not offer her opinion on the strength of the evidence, but rather merely testified factually about videos and messages she did not create.  Accordingly, no statements regarding her view on the strength of that evidence would be impeachable, as they cannot be inconsistent with nonexistent testimony.

### E. The overproduced information can be used, if at all, in the defense case.

Defense counsel are, understandably, eager to make whatever use they can of the materials that were inadvertently produced to them.  While the government cannot readily foresee any valid

and/or admissible use for the various Lync communications of other FBI personnel that were produced with Agent Miller's *Jencks*, we would not deny them the opportunity to try, while reserving the right to make any arguments that the information contained therein is not admissible under Fed. R. Evid. 401, 403, or any other authority. That opportunity, however, must come during the defense case because, as explained above, the topics in question are miles outside the scope of Agent Miller's direct testimony.

"Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). The D.C. Circuit has repeatedly upheld trial courts' limitation of direct examination to the scope of direct. *See, e.g.*, *United States v. Sampol*, 636 F.2d 621, 664 (D.C. Cir. 1980). *Sampol* involved the high-profile car bomb murder, of the former Chilean Ambassador to the United States and an American associate, at the hands of operatives of the Chilean intelligence services. *Id.* at 629. The defendants in the case attempted to blame the murder on the U.S. Central Intelligence Agency (CIA), and the trial judge limited the scope of cross-examination on that topic to the government witnesses' direct examination. *Id.* at 663. The defendants were then permitted to present relevant evidence on that topic in their case. *Id.* The Circuit upheld that limitation, *id.* at 664, and cited several other binding cases that stand for a similar proposition. *See id.* at 663, *citing United States v. Stamp*, 458 F.2d 759 (D.C. Cir. 1971) and *Baker v. United States*, 401 F.2d 958 (D.C. Cir. 1968). The Court should follow a similar path here: cross-examination of Agent Miller should be limited to the scope of her direct examination, and if the defense believes that the messages provide it with an opportunity to present information in its case, it should seek to do so at that point. The government will facilitate the availability of any FBI witness, provided that the Court deems the testimony of that witness relevant and admissible, as a result of information in the messages.

**F. The Messages Do Not Suggest Any Impropriety With Respect to Attorney-Client Communications**

Special Agent Miller received a Lync message from another agent on or about October 10, 2021, which references an email sent over a monitored system and states, "found an email thread about REHL and his attorney MOSELEY. The attorney raised some interesting points." Moseley is no longer Rehl's attorney and has since been disbarred. The messages continue, "Nope. He mentioned how we (GOV) did things improperly." The defense contends that this shows that Agent Miller improperly accessed attorney-client privileged information regarding defense strategy. She did no such thing, both because any privilege was waived and, in any event, even assuming *arguendo* that the email to which the other agent was referring contained privileged information, no privileged information was passed Special Agent Miller. This message does not provide a reason for defendant Rehl to pursue a claim under *Weatherford v. Bursey*, 429 U.S. 545 (1977), but even if it did, cross-examination on that topic is irrelevant before the jury. Rather, a motion with the Court, independent of the ongoing trial, is the proper forum to pursue any such claim.

Email correspondence with inmates at the Federal Detention Center (FDC) Philadelphia, where Rehl was housed until recently, is facilitated through the TRULINCS program. TRULINCS is a computer system operated in federal facilities that facilitates the use of email communications through a program branded as CorrLinks. As relevant to the issues before the Court, inmates consent to monitoring of their use of the TRULINCS and electronic messaging systems every time they login to a TRULINCS terminal at the FDC. In the banner warning, inmates are explicitly advised that "electronic messages and system activity" are subject to monitoring and retention. Inmates are further specifically advised that electronic messages to and from an attorney are monitored and "will not be treated as privileged communications" and that they consent "to such

14

monitoring and information retrieval for law enforcement and other purposes." See TRULINCS and ELECTRONIC MESSAGING: WARNING/RESPONSIBILITY/ACKNOWLEDGEMENT, attached hereto as Exhibit A. Each time Defendant Rehl logged into TRULINCS, he reaffirmed his understanding that such communications were monitored and gave consent to the monitoring of his electronic communications. Moreover, the Bureau of Prisons provides a guide for attorneys, which states, "As with traditional mail communication, all such messages are subject to staff monitoring, including an inmate's electronic communication with his or her attorney. Message content is subject to the same restrictions as regular mail."  See https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf (last visited March 10, 2023), at 39.

Rehl waived any privilege by knowingly using FDC-Philadelphia's monitored email system to communicate with his attorney. *See*, *e.g.*, *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) ("Any voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege"). The party claiming a privilege bears the burden of establishing that it exists, including the fact that it has not been waived.  *See In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984).  Neither Rehl nor Nordean can meet this burden as it relates to monitored email communications.  Courts have routinely applied the waiver principle to jailhouse communications.  *See, e.g.*, *United States v. Walia*, No. 14-CR-213 MKB, 2014 WL 3734522, at *16 (E.D.N.Y. July 25, 2014); *United States v. Asaro*, 2014 WL 12828985, (E.D.N.Y. July 17, 2014); *Aciero v. Holder*, 2015 WL 5769223 at *4 (D. Hawaii 2015); *Fed'l Trade Comm'n v. National Urological Group, Inc.*,  2015 WL 13687741 at *2 (N.D. Ga. 2015); *United States v. Mejia,* 655 F.3d 126, 133 (2d Cir.2011) (finding that because the defendant was aware that his phone calls were being monitored by BOP, his decision to communicate telephonically constituted a waiver of privilege and noting that "[c]ourts that have been faced with

the question have similarly decided that, where an inmate is aware that his or her calls are being recorded, those calls are not protected by a privilege").[4]

Regardless of waiver, Nordean has conceded that there was no substance of attorney-client communications provided to Agent Miller through the Lync messages he identified. *See* Trial Trans. 3/8/23 p.m. 12,719. The closest the messages come to substance is another agent's statement that then-Attorney Moseley "mentioned how we (GOV) did things improperly." Setting aside the fact that Rehl had waived privilege with respect to these communications as discussed above, Mr. Moseley was busy—prior to October 10, 2021, the date of that message—filing motions that accused the government of doing things improperly. *See* ECF 184 (alleging that the indictment did not properly allege a conspiracy as to Rehl); 194 (same); 200 (arguing that the government improperly argued Rehl was as an organizer because another individual took credit for organizing the "Stop the Steal" rally); 203 (alleging that the government searched another individual's house because it knew its case against Rehl was weak). The conversation between Agent Miller and her colleague disclosed less information about the defense strategy than Jonathan Moseley's public court filings that predated the conversation.

Rehl's waiver and the lack of substance in the communications between Agents and Miller and Wang is relevant to the Court's consideration for two reasons: (1) Agent Miller's receipt of non-privileged, non-substantive information does not open her up to cross-examination on any

---

[4]     Nordean claims that the government is "obviously wrong," ECF 678 at 4-5, that use of a monitored email system constitutes a waiver, despite its citation of cases in support of its position. Nordean cites only to one case (and not to a specific document within that case). There appears to be no written order addressing the issue in the case Nordean cites, *United States v. Ahmed*, 14-cr-277-DLI (E.D.N.Y. 2014). Doc. 47 in that case is the transcript of an oral ruling where the judge barred the government from proactively reading communications sent over TRULINCS between an attorney and his client because the judge thought it should be technically feasible to separate out those emails. The judge did not rule on the waiver issue one way or the other.

impropriety because there is no good faith basis to believe that she engaged in impropriety, and (2) it does not give rise to any claim under *Weatherford v. Bursey*, 429 U.S. 545 (1977).  Even if Rehl does potentially have some claim of a Sixth Amendment violation, that question is not relevant to the jury's consideration, and he may file any motion he believes he has a basis for.  The parties can then litigate any such motion as the trial continues, or after trial if necessary, as the Court noted at the hearing on March 9.   *See* Trial Trans. 3/9/23 12,869-12,870.

Nordean claims that he should be permitted to cross-examine Special Agent Miller about the statements regarding former attorney Moseley because she "testified that she had not gained access to the content of attorney-client communications involving a defendant in this case."  ECF 678.  Nordean asked two questions about this topic before seeking to use the Lync messages to impeach Agent Miller:

> Q. Okay. Did you withhold -- have you ever gained access to the contents of attorney-client communications involving defense trial strategy in this case?
> A. Not that I can think of. No.
> Q. So another agent didn't tell you he had gained access to attorney-client communications about a Defendant in this case?
> A. Not that I can think of, no.

Trial Trans. 3/8/23 p.m. 12,711.

Nordean has conceded that the Lync messages he has identified are consistent with Agent Miller's answer to the first question.  Tr. 12719 ("Mr. Smith [in reference to the messages sent about former attorney Moseley's emails by Agent Wang]: There's no content about the communications, Your Honor, right now").  That concession was appropriate, as the messages indeed contain no substantive content of any communications between Rehl and Moseley.  As to the second question, to the extent the messages about then-attorney Moseley impeach Agent Miller's testimony, they have already been displayed to the jury and Mr. Smith has inquired about them.  The government has moved to strike those questions and answers above.  If the Court grants

that request, there is no relevance to the messages.  If the Court denies it, Nordean has already effectively cross-examined Agent Miller on this alleged discrepancy, and there is no further relevance to those messages to his cross-examination of her.  Tr. 12722-23.

## **CONCLUSION**

For the foregoing reasons, the Court should limit the scope of cross-examination of Special Agent Miller to video, photographic, and message evidence from January 6, 2021, from midnight to shortly before 5:00 p.m.  It should additionally permit cross-examination on Ethan Nordean's text messages with Ronald Loehrke and with the individual identified as "Karin Drive In," but it should preclude cross-examination on the issues identified above.

Respectfully Submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Erik M. Kenerson*
ERIK M. KENERSON // Ohio Bar No. 82960
JASON B.A. MCCULLOUGH
   NY Bar No. 4544953
NADIA E. MOORE // N.Y. Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
(202) 252-7201
Erik.Kenerson@usdoj.gov

*/s/ Conor Mulroe*
Conor Mulroe // N.Y. Bar No. 5289640
Trial Attorney // U.S. Department of Justice,
   Criminal Division
1301 New York Avenue, Suite 700
(202) 330-1788
conor.mulroe@usdoj.gov