**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **21-cr-00175 (TJK)** |
| | : | |
| **ETHAN NORDEAN, ET AL.** | : | **AUGUST 17, 2023** |

<u>**SENTENCING MEMORANDUM IN SUPPORT**</u>
<u>**OF JOSEPH BIGGS AND ZACHARY REHL**</u>

Defendants Biggs and Rehl submit a joint sentencing memorandum despite asserting different positions as to the appropriate sentence in this case. They do so to avoid unnecessary duplication of pleadings. They have been granted permission to be represented by the same counsel at sentencing after the Court engaged in a colloquy with counsel and the defendants about the potential for a conflict. Both defendants waived any potential conflicts. Counsel, mindful of his duty of loyalty to both clients, does not believe there is a conflict, and that the filing of a joint sentencing memorandum is appropriate.[1]

However disappointed Mssrs. Biggs and Rehl may be by the verdict in their cases, and whatever prospects and hopes they may have for an appeal, they accept the necessity of addressing an appropriate sentence given the counts of conviction. They concede at the outset that they violated the law, even not all of the crimes charged herein. They ask, nonetheless, for a non-guidelines sentence well below the estimate provided in the PSR, to which they have filed, under seal, their objections; and they ask for a sentence far below the sentencing recommendation the Government is expected to

---

[1] At the time this memorandum was drafted, the undersigned did not have the final version of the PSR. Any citations to paragraphs herein refer to the draft PSR submitted to counsel for review.

make. The defendants are not terrorists. Whatever excesses of zeal they demonstrated on January 6, 2021, and no matter how grave the potential interference with the orderly transfer of power due to the events of that day, a decade or more behind bars is an excessive punishment. The fact is that the counting of Electoral votes was delayed for several hours but our institutions proved equal to the task of responding to the tumult of that day, tumult fostered, in no small measure, by the prospect of then-President Donald Trump insisting that the election of 2020 had been stolen from him, and, by extension, the American people, an act which, if true, would dwarf by many orders of magnitude the hours-long delay in tabulating votes on January 6, 2021. Neither Mr. Rehl nor Mr. Biggs recites the role of President Trump as justification for their actions, but, certainly believing the commander in chief and heeding his call should yield some measure of mitigation.[2]

## I.     The Guidelines

The United States Sentencing Guidelines are no longer mandatory, they are advisory in nature, and the Court must consider them in imposing a sentence. *United States v. Booker*, 543 U.S. 2220, 245-246 (2005.) The sentencing Court is required to consider the guidelines range, and then consider the factors laid out in I8 United States Code Section 3553(a). It is the Court's responsibility to impose a sentence sufficient, but not greater than necessary to accomplish the goals of Section 3553(a). *Rita v. United States*, 551 U.S. 338, 347 (2007).

---

[2] Another jury on another day will decide whether the President acted with knowledge that these claims were false, whether, in effect, he played the American public and his supporters for fools in a venal effort to retain the power and the office of the presidency at all costs.

## II.     Sentencing Factors

Section 3553(a) requires consideration of the following factors:

- The nature and circumstances of the offense and the history and characteristics of the defendant (subsection (a)(1));

- The need for the sentence to reflect the seriousness of the offense, promote respect for the law and to provide just punishment (subsection (a)(2)(A));

- The need for adequate deterrence to criminal conduct (subsection(a)(2)(B));

- The need to protect the public from further crimes by the defendant (subsection (a)(2)(C));

- The effort to assure rehabilitation of the defendant by such services as the Bureau of Prisons may provide (subsection (a)(2)(D)).

## III.     The Verdict

Each defendant was charged tried on a nine-count indictment. The verdicts as regards Mr. Biggs and Mr. Rehl were identical. Each man was convicted of six of the nine counts, and acquitted of one counts. The jury could not reach a verdict on two counts, and those counts were dismissed.

### a.  Counts of Conviction

Each defendant was convicted of the following crimes:

Count One, seditious conspiracy, in violation of 18 U.S.C. Section 2384;

Count Two, conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. Section 1512(k);

Count Three, obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. Sections 1512(c)(2) and 2;

Count Four, conspiracy to prevent an officer from discharging duties, in violation of 18 U.S.C. Section 372;

Count Five, obstructing officers during a civil disorder and aiding and abetting, 18 U.S.C. Sections 231(a)(3) and 2;

Count Six, destruction of government property of value over $1000 (fence), in violation of 18 U.S.C Sections 1361 and 2.

### b.  Acquittals

Each defendant was acquitted of the following count:

Count Nine, assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. Section 111(a).

### c.  The Dismissed Counts

The jury could not reach a unanimous verdict as to each of the following two counts, and those counts were dismissed:

Counts Seven, destruction of government property and aiding abetting, in violation of U.S.C. Sections 1362 and 2,

Count Eight, assaulting, resisting. Or impeding certain officers, in violation of 18 U.S.C. Section 111(a).

## IV.    The PSR Recommendations

### A. Mr Biggs

The initial PSR submitted by the probation officer calculated a Guidelines range of 135 to 168 months for Mr. Biggs, based on a total offense level of 33 (Biggs PSR, para. 129) and a criminal history range of I (Biggs PSR, para. 132). The probation officer noted that Mr. Biggs appears to be unable to pay a fine. (Biggs, para. 177). Mr. Biggs filed under

seal objections to the PSR contending that 13 points of enhancements to the base offense level of 14 were inappropriate as they were based on factors relating to interference with the administration of justice (Biggs PSR, paras. 120, 121 and 122); in the instant case, the offense conduct pertains to an official proceeding, and not to the administration of justice. Mr. Biggs also objected to the two-point enhancement for obstruction arising from his giving misleading statements to FBI agents in the initial stages of the investigation on the grounds that the statements were immaterial. Mr. Biggs contacted the Government himself to correct one misstatement, and, generally, that the enhancement overstated the seriousness of the offense. Mr. Biggs does not contest the four-point leadership enhancement in the PSR. (Biggs PSR, para. 124)  According to Mr. Biggs, an appropriate offense level is therefore 18. According to the Guidelines Table, that corresponds to a sentence of 27 to 33 months.

### B.  Mr. Rehl

The initial PSR submitted for Mr. Rehl calculated a Guidelines range of 121 to 151 months, based on a total offense level of 32 and a criminal history of one. (Rehl PSR, Para 183). The probation officer noted that Mr. Rehl is unable to pay a fine. (Rehl PSR, para. 178). Mr. Rehl also objected to 13 points of enhancements as related to offenses interfering with the administration of justice as improper, contending, as did Mr. Biggs, that the instant offenses interfered with an official proceeding, and did not impair the administration of justice. (Rehl PSR, paras. 117, 118 and 119). Mr. Rehl suggested that the two-point enhancement for obstruction based on his trial testimony denying assault on a police officer and his comment to other members of the Proud Boys about "nuking" communications after the arrest of Mr. Tarrio on January 4, overstated the seriousness of

the conduct. (Rehl PSR, para. 122) Mr. Rehl does not challenge the three-point role enhancement for having a "managerial" role in the events of January 6, 2021. (Rehl PSR, para. 3) If the Court agreed with Mr. Rehl's objections, his total offense level would be reduced from a level 32 to a level 17, which corresponds to a period of incarceration of 24 to 30 months. If the Court were to reject his claims as to the obstruction enhancement, but accept his other objections, the total offense level would be 19, corresponding to 30 to 37 months imprisonment.

Mr. Biggs has been incarcerated since April 20, 2021. Mrl. Rehl has been incarcerated since March 17, 2021. Application of the Guidelines calculations proposed by the defendants would likely result in their release at or about the time sentence is imposed. Upon information and belief, the Government will seek a sentence of 20 years or more for each defendant.

Mssrs. Rehl and Biggs ask for a non-Guidelines sentence on two grounds: first, such a reading the Guidelines overstates the seriousness of the offense; and, second, such a reading of the Guidelines would yield unwarranted disparities in sentencing of similarly situated defendants, to wit, Mssrs. Rhodes and Meggs in the Oath Keepers case.

## V.  Defendants' Characteristics

### A.  Mr. Biggs

#### Military History

Mr. Biggs was medically discharged from the United States Army on February 14, 2013 after more than eight years of service. He is the recipient of numerous military honors for his active service, including a Purple Heart, resulting from a traumatic brain injury in Iraq, multiple good conduct medals, a combat action badge and a special citation

from former President Barack Obama for work done on prevention of sexual abuse in the military. He also was a member of a unit cited for commendable service by former President George W. Bush. (Biggs PSR, paras. 149, 163).

Upon his discharge from the military, he received a disability pension as a result of his medical discharge. (Biggs PSR, para. 163) That pension was terminated incident to his arrest for the instant offenses.

### Education/Employment

Mr. Biggs earned a GED and has attended community college without earning a degree. He studied communications and worked from 2014 to 2017 as a correspondent for Infowars in Austin, Texas, leaving that employment to spend time caring for his mother who, at the time, was seriously ill. (Biggs PSR, para. 154) At one point he possessed an emergency medical technician, but he permitted that to lapse prior to his arrest. (Biggs, PSR, para. 159) It is unclear whether the felony convictions in this case will be a bar to recertification. He has also worked intermittently as a security consultant. (Biggs PSR, para. 164) In 2018, he earned nominal income on a podcast focused on veterans related issues. (Biggs PSR, para. 166)

### Family Man

Mr. Biggs is separated from his wife but passionately engaged in the life of their daughter, who is in the first grade. (Biggs PST, para. 147) He remains committed to his mother's welfare. He hopes to return to his home in Ormond Beach in Florida upon his release. (Biggs PSR, para. 148)

**Medical/Mental Health History**

Mr. Biggs struggled with post-traumatic stress (PTSD) after his head injury in Iraq and subsequent to his discharge from the military. He was intermittently suicidal but reports that he has overcome PTSD and depression in the years since his return to civilian society. He is in good health today. (Biggs PSR, 149, 153-4)

**Limited Employment Prospects**

It is not obvious how Mr. Biggs will support himself or his daughter after his release from custody. He contends that a lengthy period of incarceration reduces the likelihood of a meaningful relationship with the most important person in his life – his daughter. And that the longer he remains incarcerated, the more difficult it will be for him to reintegrate into society.

**B.  Mr. Rehl**

**Military History**

Mr. Rehl served in the United States Marine Corps from late 2009 until May 30, 2012, when he was medically discharged with a 100-percent service-related disability. While a Marine, he received a Navy Commendation and a Good Conduct medal, as well as a meritorious promotion. He received a disability pension until the time of his arrest, when pension benefits were revoked. (Rehl PSR, paras. 161, 167)

**Education/Employment**

Mr. Rehl enjoys the benefit of a good education, an education he earned by pulling himself up from own bootstraps. Despite significant hardship as a young man, he entered the Marines, and, upon leaving the Marine Corps, earned undergraduate and graduate degrees at Temple University. He has at various points by licensed to sell insurance

products and to offer advice as a financial planner. Whether his conviction here will imperil his ability to regain those licenses upon release from prison is an open question. Mr. Rehl has the benefit of being a long-standing, much-loved, and well-respected member of his community, as will be evident to the Court upon inspection of more than a dozen testimonial letters he will present to the Court and the Government on the day of sentencing.

### Medical/Mental Health and Substance Abuse History

Mr. Rehl was discharged from military with a 100-percent service-related disability due to injuries to his back and right shoulder. He received treatment and through the Veterans Administration while free. (Rehl PSR, para. 150) He has a family history of depression and has sought treatment himself. (Rehl PSR, para. 152) His history with substance abuse was significant enough to lead the PSR author to recommend placement while incarcerated in a Residential Drug Abuse Program (RDAP). (Rehl PSR, paras. 153-156, 196). Mr. Rehl requests assignment to RDAP.

### Family

Mr. Rehl is married, and the couple have a two-year-old daughter; given his incarceration, the defendant has been kept from such simple and sustaining pleasures as watching his daughter take her first steps, putting her to bed, or helping her to explore the everyday contours of the world. (Rehl PSR, para. 141.) He is acutely aware of all that he, and his daughter, are missing as a result, and worries this his absence from her life on a day-to-day basis will have a profound effect on her growth the development. His marriage is strong and stable. Indeed, during the pendency of these proceedings, Mr. Rehl and his

wife worked to assure that Mr. Rehl was current on child-support obligations to an 18-year-old daughter from a prior relationship.

VI. **Offense Characteristics**

A. **Elements of the Offense Conduct Common to Both Mr. Biggs and Mr. Rehl**

1. **The Offense Conduct in This Case Related to Obstructing an Official Proceeding and Not to an Offense Against the Administration of Justice**

Both Mssrs. And Rehl tendered objections to their draft PSRs calls for a 13-point enhancement related to obstructing the administration of justice under USSG 2J1.2. At the time of the drafting of this memorandum, it is not clear whether the final PSR will reflect that recommendation. The defendants renew their objection in this memorandum.

The recommendation calls for 13-points of enhancements for three offense characteristics arising under USSG Section 2J1.2. The defendants raises two objections: first, none of the offense conduct pertains to the "administration of justice." Second, even if the Court concludes that the offense conduct does pertain to the administration of justice the double, or in this case, triple counting of the same offensive characteristics is duplicative. And results in a sentencing recommendation greater than necessary to punish the conduct resulting in a conviction.

The defendant was convicted of charges in relation to interference with an official proceeding, to wit, the counting of electoral votes by Congress. The PSR treats "official proceeding" as synonymous with "administration of justice." Nothing in either the plain meaning of the Guidelines or the Application Notes supports this reading. The definition of "substantial interference with the administration of justice" "Includes a premature or

improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."  These activities do not resemble the counting of electoral votes in a joint session of Congress.

The defendant was not convicted of a crime involving interference with a judicial proceeding, or any other proceeding involving the criminal justice system. He was convicted of obstructing an official proceeding, in this case a session of Congress. Nothing in the Application Note or the USSG suggests that the drafters of the Guidelines contemplated that official proceedings and the administration of justice are identical. As such, each of the three enhancements are improper.

Both PSRs call for an 8-point enhancement obstruction of justice arising under USSG 2J1.2(b)(1)(B). The provision calls for an 8-point enhancement "if the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." The facts supporting this in the PSR involve the storming of barricades surrounding the Capitol, the potential for injury to officers and the destruction of a fence. These violent events must have taken place "In order to obstruct the administration of justice." The PSR is devoid of any suggestion that a court proceeding, a criminal investigation or any judicial determination was affected; neither is there a claim the extra resources of expenditures were incurred to achieve the administration of justice. The certification process is certainly an official proceeding; it is not a proceeding involved in the administration of justice as contemplated by the Application Note. The defendants therefore objects to the eight-point enhancement.

Both PSRs call for a three-point enhancement arising under USSG Section 2J1.2(b)(2). The defendants rely on the arguments made regarding the eight-point enhancement here.

Both PSRs also call for a two-point enhancement arising under USSG 2J1.2(b)(3), which calls for a two-point enhancement if an offense "was otherwise extensive in scope, planning, or preparation." First, as argued earlier, the offense here did not involve the administration of justice. But even if it did the defendant's role in the offense is an independent factor for which points have already been assessed as regards leadership role. Mr. Biggs does not challenge the four-point enhancement for his role as organizer of an "activity that involved five or more participants and was otherwise extensive in scope." He contends that the four-point enhancement is sufficient, but not greater than necessary, to capture the conduct supporting his conviction of the offense. Similarly, Mr. Rehl does not challenge his three-point role enhancement.

Mssrs. Biggs and Rehl contend that the analysis in *United States v. Seefried*, 2022 U.S.Dist. LEXIS 196980 (2022) got it right: an "official proceeding" is not "administration of justice." As such, the 13-points of enhancements are inapplicable. *United States v. Seefried*, 2022 U.S.Dist. LEXIS 196980, *32 (2022)(holding that the these enhancements are not appropriate in that "administration of justice" and an "official proceeding" are not synonyms. "This Court acknowledges that this is a close interpretative call. If the Sentencing Commission had foreseen the Capitol breach, it may well have included "official proceeding" in the test of Section 2J1.2. But the Commission did not. Given that courts should interpret the Guidelines using traditional

tools of statutory interpretation, this Court declines to rewrite section 2J1.2 to say what it does not." Id. But see, *United States v. Wright*, 2023 U.S.Dist. LEXIS 372270 (2023) and and, *United States v. Bozell*, 2022 U.S. Dist.LEXIS 28075 (2002) holding to the contrary.  The defendants contend that insofar as an appropriate sentence should be sufficient to punish an offense, but no greater than necessary, it would be improper effectively to an engage in a judicial rewrite to impose a greater sentence than the plain language of the Guidelines require.

> **2. The Violence in this Case is Overstated Given the Counts of Conviction, the Acquittal, and the Jury's Inability to Convict Either Defendant of Assault; Pinkerton Liability and the Use of a Novel "Tools" Theory in this Case Ought Not to Result in an Overstatement of the Seriousness of the Crimes**

As noted above, the counts of conviction, acquittal and dismissal are identical for both Mssrs. Rehl and Biggs. Neither man was convicted of a count involving assault of a federal officer. Indeed, both men were acquitted of one count of such conduct, with the jury unable to reach a verdict on a second count. Such nexus as the man have to violence in this case comes of a tenuous application of an unusual application of conspiratorial liability, *Pinkerton v. United States*, 328 U.S. 1946, as magnified by unprecedented reliance of a "tools" theory. The result is an overstatement of the violence for which each defendant is liable.

The defendants are mindful that sentencing courts have considered acquitted offense conduct in imposition of a sentence. But the concerns raised in an opinion by three Justices of the Supreme Court in the denial of a petition for certiorari involving acquitted offense conduct are powerful. "The Court's denial of certiorari today should not be misinterpreted. The Sentencing Commission, which is responsible for the

Sentencing Guidelines, has announced that it will resolve questions about acquitted-conduct sentencing in the coming year. If the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented." *McClinton v. United States*, 143 S.Ct. 2400, 2023 U.S.LEXIS 2796, *4-5 (2023). The defendants herein preserve their objection to any consideration of acquitted offense conduct.

In this case, holding the defendants responsible for the violence of others in this case would be particularly egregious. First, the defendants were themselves acquitted of any acts of violence. Second, the jury was instructed that they could be held liable vicariously for the violent acts of others, and the jury still rejected the Government's claims. Third, to the extent the conspiracy to use force in the sedition charge was proven to the jury's satisfaction by use of the tools theory, it simply strains reason to contend that the defendants are not guilty of conspiring to use force but are guilty by association for the acts of "tools" who did use force, but who were not part of the conspiracy. In the context of a dynamically evolving riot, as the events of January 6, 2021 turned out to be, it impossible to parse lines of causation in the presence of interlocking conspiracies and independent actors. Are the defendants guilty for the "toolish" behavior of independent parties who were also inspired by the acts of others, such as the Oath Keepers, or who were simply overcome by the mob-like mentality that obtained as events spiraled out of control?[3]

---

[3] The defendants are not advancing a claim that there was no violence at the Capitol on January 6, 2021. Anyone familiar with the actual evidence in the cases knows there were violent incidents at the riot. The claim here is limited to contending that the defendants' role in causing that violence is overstated.

### 3. The Speech Used to Convict the Defendants was Vitriolic, but not Uncommon in Our Deeply Divided Times; A Significant Sentence Would Appear to Punish Hyperbole – By That Standard Few Folks Who Follow Politics and Care About the Outcome of Elections Would be Spared Prosecution

If the Court is reading this memorandum, it has denied the defendants' Rule 29 Motion for a Judgment of Acquittal. The defendants will not repeat the arguments made in that pleading, but assert that given the nature of the proof in this case -- vitriolic, but protected, speech read through the prism of a riot -- there is a danger this case will henceforth stand for the proposition that mere abstract calls for violence at some future date are now prohibited. While Courts know better, the public will not. Draconian sentences in this case will deepen divisions in this country at a time when the need to build bridges is acute.

## B. Characteristics Unique to Mr. Biggs and Mr. Rehl

Both Mr. Biggs and Mr. Rehl were assessed two points for obstruction of justice Section 3C1.1.

In Mr. Biggs' case, the points were added because he misled federal investigators, first by initially denying that he was at the Capitol at all on January 6, 2021, and, then, after he called the FBI back, minimizing his role and knowledge of others at the Capitol. Mr. Biggs did not testify at trial. (Biggs PSR, para. 124).

Mr. Rehl was assessed two points for different conduct, to wit: encouraging fellow members of the Proud Boys to erase electronic data after the arrest of Enrique Tarrio on January 4, 2021, in Washington, D.C.,; and, for offering false testimony at trial about

whether he had assaulted a police officer at the Capitol on January 6, 2021. (Rehl PSR, para. 122).[4]

The application of the enhancement in this case transforms it into a blunt instrument, this, by sharp contrast, to the more nuanced account of leadership roles where in Mr. Biggs was assessed four points for being a leader, but Mr. Rehl was assessed one fewer point for a lesser, managerial, role. Surely, there is a difference between denying culpability in an initial interview – something one of the Government's principal witnesses, Jeremy Bertino did repeatedly – and other forms of obstruction.

### 1. Mr. Biggs

Mr. Biggs contends the two-point enhancement applied in this case overstates the seriousness of his conduct. Even if he did not spontaneously confess when questioned, and even if he minimized his role when he confessed, these are routine occurrences in law enforcement interviews of subjects and persons of interest. It is one of the reasons federal agents often are required to conduct multiple proffers with important witnesses. Mr. Biggs asks the Court to disregard the two-point enhancement in his case.

### 2. Mr. Rehl

Mr. Rehl is assessed two points for obstruction for engaging two forms of obstructive conduct – encouraging the potential destruction of evidence, and being

---

[4] A thought experiment: There are three forms of obstructive conduct in this case: the initial lack of candor to investigators; counseling destruction of potential evidence; and being untruthful in trial testimony. Are the three equivalent? Suppose a defendant were assessed the two points solely for counseling destruction of potential evidence, would that defendant, too, be assessed the same two points?  Each defendant conduct is to be assessed on its own merits in light of the evidence and the guidelines. But where the guidelines fail to calibrate conduct to culpability the results are seemingly arbitrary.

untruthful while testifying. He contends that his enhancement is also overstated. Mr. Rehl denied assaulting a law enforcement officer when showed a video image of a man who may well be him spraying an irritant in the direction of the officers. Whether a layperson would understand that to be assault is, perhaps, an open question; in any case, the context makes clear that the spraying was an isolated event, but took place in a rapidly evolving, and deteriorating, confrontation between officers and rioters.

### C.   An Appropriate Sentence in this Case

#### 1.   Specific Deterrence – loss of military pension

Specific deterrence is directed at the offender. What level of punishment is sufficient, but not greater than necessary, to deter the defendant from engaging in similar misconduct. The unprecedented nature of these prosecutions, and the fact that the defendants, while presumed innocent, were held in pre-trial detention involving solitary confinement for more well over two years by the time sentence imposed suggests that he has been taught that such misconduct is regarded as intolerable by the Government. They have already paid a steep and heavy price as a result of this incarceration. During a significant period of his confinement, they were held in solitary confinement, and were deprived of the ability to do the thing they wanted most to do: be a loving, stable and consistent presence in the life of their young children. Compound these facts with the significant punishment in the form of the loss of the disability pension they earned in service to his country, and there can be but little doubt that they have been deterred.

#### 2.   General Deterrence -- unprecedented scope of prosecutions

General deterrence pertains to the effect the sentence imposed in this case will have on others. Put another way, will this sentence promote respect for the law.

This case should not be considered in isolation from the hundreds of other prosecutions – more than 1,000 to date – undertaken by the Justice Department of those identified as participants in the riot on January 6, 2021. Indeed, hardly a week passes without some new arrest as federal officials continue to study available video evidence to identify each and every person who violated to the law at the Capitol that day. More than two-and-one-half years have passed since the riot, yet dogged prosecutors continue to bring new cases. One would have to be deaf, dumb and blind not to realize that insofar as the federal Government is concerned, the events of January 6, 2021 are regarded as an intolerable insult to our institutions. The Government has made clear that the disruption of official proceedings in this manner will not be tolerated ever again. The magnitude and scope of January 6 prosecutions vitiates the general deterrent value of a long sentence in this particular case. Indeed, too long a sentence will undermine the very factor – respect for the law – critical to general deterrence.

### 3. Punishment

Whether the defendants should have been confined prior to trial was litigated thoroughly prior to trial. The defendants do not seek to reargue that here. They do request that the Court take note of the fact that their confinement was extraordinary. Each man was held for a significant period in solitary confinement, spending up to 22 hours per day in a cell isolated from contact with others. While they get credit for time served as to their ultimate sentence, they request that the Court consider the harshness of their detention while cloaked in the presumption of innocence as a factor in fashioning an appropriate sentence.

The loss of military pensions gained as a result of injuries suffered in service of the country is particularly galling. Even if this Court were to reject every other argument made in this memorandum, there is certainly something unseemly about the United States enjoying the benefit of a man's youth and health, and then turning on him in vengeance when he errs later in life.

### 4.  Rehabilitation

There is no apparent need for rehabilitative services in Mr. Biggs' case; he is a hardy survivor who has already overcome substantial obstacles and will likely do so again.

Mr. Rehl's eligibility for the RDAP program suggests a need for rehabilitation and the Court is urged to order his admission into that program.

### 5.  Unwarranted Sentencing Disparities

`       The events of January 6, 2021, were extraordinary. Indeed, well after scores of ordinary citizens were indicted, prosecuted and convicted, federal and state officials have now indicted the former president of the United States and charged him with a role in the events of that day. In Georgia, a state prosecutor has charged the former president and 18 others with being a member of a criminal enterprise as regard their efforts to subvert the results of the November 2020 election. It appears as though those with the most to gain from any disruption of the counting of electoral ballots on January 6, 2021 were among the last to be prosecuted, based on events thus far.

But the leadership of two groups – the Oath Keepers and the Proud Boys – have been prosecuted and convicted. And leaders of both groups have been charged with conspiracy to engage in seditious conspiracy, to wit, using force to oppose the authority

of the federal government, and conspiracy to engage in other offenses. There is a world of difference in the efforts of the Oath Keepers and those of the Proud Boys.

The Oath Keepers resembled a paramilitary organization with membership open primarily to former law enforcement and military members. They trained for the event of January 6, going so far as to store weapons across the Potomac River from the Capitol on January 6. Arrangements had been made to have the arms transported across the river to the Capitol upon a call from leadership of the Oath Keepers. That call never came, but the jury convicting the Oath Keepers were undoubtedly moved by this evidence. It appears that a group came to Washington, D.C. prepared to use potentially lethal force on command. They had the manner and means to do so. That they did not is the result of a simple order not being given.

The Proud Boys, by contrast, started as drinking club and evolved into a political organization, largely, it seems, after former President Trump mentioned them in a presidential debate in the fall of 2020. The jury accepted the Government's position that members of the club engaged in more than defensive violence in its confrontations with a rival political group – antifa. Yet even so, there was no evidence of military training or sophisticated weaponry on hand and available at a moment's notice. There is no evidence to support the contention that the Proud Boys acted in concert with any other group, including the Oath Keepers, or that their activities were directed by others. The jury concluded that they conspired to use force against the authority of the federal government and to obstruct an official proceeding. Both are felonies, yet neither

amounted to out-and-out rebellion[5] or the functional equivalent of a declaration of war against the United States. (Biggs PSR, para. 109; Rehl PSR, para. 106). One incident of warfare, obviously, is arming oneself; the Oath Keepers did, and in a serious way; the Proud Boys equipped themselves for street brawling. There is a difference and the sentences in this case should reflect that difference.

## VII.   Conclusion

The defendants request non-Guidelines sentences in this case. Certainly, they committed crimes; a jury has spoken, although the appellate process has yet to run its course. We will never know what would have happened if the Government had charged modest crimes for a disturbance that lasted for several hours one day in January 2021—the defendants may well have pleaded guilty to trespass, disorderly conduct, and other offenses. They could well have served their time and returned home by now.

Instead, the Government claimed the republic was in jeopardy and seeks to treat these misguided patriots as terrorists. This is grievously wrong. The defendants ask the Court to do heed what the Government cannot see, or will not acknowledge: We are a nation borne in dissent; our politics has often been raw and raucous. The challenge in divided times is not to divide and conquer, but to build bridges between people who love this country, sometimes in shockingly different ways. At a time when Congress investigates whether and how the Justice Department has been weaponized, the

---

[5] A useful and illuminating discussion of the difference between sedition and rebellion can be found in a recent law review article on the scope of the disqualification clause of section 3 of the Fourteenth Amendment. William Baude and Michael Stokes Paulsen, The Sweep and Force of Section Three, 172 U. Pa. L. Rev. (forthcoming 20240, pp. 84-86. (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4532751, last accessed August 17, 2023)

defendants ask the Court to enforce a ceasefire and to impose reasonable, and just, sentences. If time-served is too much for which to ask, the defendants request a sentence that will permit them to return home to their loved ones in the very near future. They have served enough time.

DEFENDANTS BIGGS AND REHL

By  /s/ NORMAN A. PATTIS /s/
  383 Orange Street
  New Haven, CT 06524
  203.393.3017 (phone)
  203.393.9745 (fax)
  pattis@pattislaw.com
  ct13120

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the above-captioned date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

*/s/ Norm Pattis /s/*