UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 21-CR-175 (TJK) |
| | : | |
| ETHAN NORDEAN, | : | |
| JOSEPH BIGGS, | : | |
| ZACHARY REHL, | : | |
| ENRIQUE TARRIO, and | : | |
| DOMINIC PEZZOLA, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S REPLY TO DEFENDANTS' SENTENCING MEMORANDA**

The United States respectfully submits this omnibus reply to the Sentencing Memoranda filed by defendants Enrique Tarrio, Joseph Biggs, Ethan Nordean, Zachary Rehl, and Dominic Pezzola. ECF 853, 854, 861-62.

**I.     THE DEFENDANTS ARE BEING PROSECUTED FOR THEIR CRIMINAL CONDUCT.**

Defendant Nordean repeatedly accuses the government of targeting a political group with its prosecution and sentencing recommendation. ECF 853 at 5, 15, 30 ("Nordean belongs to a political organization targeted by the government."). In support of this argument, Nordean claims that "[t]housands of others did the same thing" as him, and he simply "walked in and out of the Capitol like hundreds of Class B misdemeanants." *Id.* at 4, 11-12.

This is pure sophistry. Nordean and his co-conspirators were prosecuted for serious crimes because they committed serious crimes. The evidence at trial showed that these defendants sought to take a leadership role in advancing their cause, and they prepared for and expected to use force in the form of street violence to exert their will. Nordean and his co-conspirators prided themselves

on being men of action—men prepared to take to the streets to engage in physical violence to advance their cause. On January 6, they had an objective and they came prepared to Washington, D.C. to take action. The objective was not to attend the rally on the Ellipse or to protect patriots from Antifa. As these men plainly revealed before, during, and after the attack, they aimed to use their force and numbers to unlawfully keep their preferred candidate in power.

## II. THE TERRORISM ENHANCEMENT APPLIES TO THESE DEFENDANTS.

The defendants were convicted of a conspiracy to oppose the government by force and stop the peaceful transfer of power. As this Court explained at the outset of this case, "[i]t's no exaggeration to say that the rule of law, the durability of our constitutional order and, in the end, the very existence of our Republic is threatened by such conduct." ECF 72 (Detention Hr'g) at 15:14-17. The application of the terrorism adjustment to this crime captures the nature and seriousness of the defendants' criminal agreement and the danger posed by their conduct on January 6. A sentence within the guidelines established after application of the terrorism enhancement is justified and entirely appropriate.

### A. The Court should apply the preponderance of the evidence standard when applying the terrorism enhancement.

Under the law of this Circuit, the preponderance of the evidence standard applies to sentencing determinations. *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003). The D.C. Circuit has explicitly acknowledged the existence of a circuit split on the issue of dramatic increases in sentencing guidelines, but it has declined to establish a higher standard. *Id.* ("This court, for its part, has noted the split among the circuits on this issue but has declined to require more than the preponderance standard at sentencing."). Furthermore, in *Long*, the D.C. Circuit explicitly endorsed the imposition of an eight-level increase to the Sentencing Guidelines using

2

the preponderance standard, and it noted with approval that other circuits had similarly endorsed "probably even a ten-level" increase. *Id.* Here, whether the Court were to apply the adjustment under 3A1.4 or depart upward under Note 4, the resulting increase to the defendants' Sentencing Guidelines are in line with these calculations.[1]

Moreover, even if this Court were to apply the clear and convincing standard here, the evidence more than meets the standard. Here, a jury unanimously concluded—beyond a reasonable doubt—that defendants Tarrio, Nordean, Biggs, and Rehl "conspired or agreed with at least one other person with the goal of opposing by force the authority of the Government of the United States" and of "preventing, hindering, or delaying the execution of any law of the United States by force." ECF 767 (Jury Instruction) at 21; ECF 804 (Verdict Form) at 1. This finding plainly establishes by clear and convincing evidence that the defendants' crimes were calculated to influence or retaliate against the government by force or coercion.

### B. The defendants' destruction of the fence was carried out with the requisite intent to influence or retaliate against the government.

The defendants argue that the Court cannot apply the terrorism adjustment under Section 3A1.4 to the defendants' convictions for Count Six because the defendants did not destroy the black fence with the requisite intent—they claim the act reflected "a simple desire to be on the other side of the fence." *See*, *e.g.*, ECF 853 at 20. This assertion is reminiscent of Rehl's testimony

---

[1] For example, as calculated by the PSR, Nordean's Sentencing Guidelines in the absence of an increase under 3A1.4 or Note 4 is 108 – 135 months (Offense Level 31; Criminal History I). The government's calculation of the resulting Sentencing Guidelines range after imposition of the terrorism adjustment under 3A1.4 is 324 – 405 months, which range is associated with Offense Level 41; Criminal History I or Offense Level 36; Criminal History VI. The resulting increase is thus the functional equivalent of an increase of, at most, 10 points in the calculated Offense Level. *Compare* USSG Offense Level 31 (CHC I) *with* Offense Level 41 (CHC I).

3

at trial about his intent when the First Street barriers came down—"what was going through my head was these people, they must know where these stages are . . . and, maybe, they're trying to get there a few minutes early." Tr. 17976:4-15 (Rehl). The claim about Nordean and Biggs's intent in destroying the fence is equally absurd.

A defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose in carrying out a crime of terrorism. *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018). The "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously." *Id.* In *Van Haften*, the court concluded that the defendant's "anti-U.S. rants" on social media and in private notes had properly demonstrated to the district court that the defendant provided material support to ISIS, "at least in part, because he wanted to retaliate against the government," *i.e.*, the requisite terroristic intent. *Id.* at 544-45.

As this Court recognized, "prior statements by the accused are the heartland of criminal prosecution," and these prior statements are admissible and properly applied by the jury to evaluate, *inter alia*, a defendant's intent and motive. Hr'g Tr. (Dec. 14, 2022) at 18. The defendants characterize these words as "abstract things" that prove nothing. ECF 853 at 5. But the rules of evidence and this Court and a jury say otherwise. The defendants' destruction of the fence, push up the concrete stairs, and entry into the Capitol were all carried out for the primary purpose—but *certainly* "in part"—to "influence or affect the conduct of government by intimidation or coercion,

4

or to retaliate against government conduct." U.S.S.G. §3A1.4. The criminal objective could not otherwise have been achieved.[2]

### C. The application of a Note 4 departure to Counts One – Four would result in the same sentencing range under the Guidelines.

As argued in the omnibus Sentencing Memorandum, were the Court to apply an upward departure under §3A1.4 cmt. n.4(A) ("Note 4") rather than apply the adjustment, the result would be the same.[3] ECF 855 at 53-57. Specifically, the Court could depart upwards under Note 4 for the convictions at Counts One – Four and reach an identical guidelines range without any increase in a defendant's criminal history category.

### D. The application of the terrorism adjustment to these defendants would not create unwarranted disparities.

The defendants argue that the terrorism adjustment is improper when applied to mere "political protestors." ECF 853 at 22. But that assertion simply ignores the evidence of the case and the jury's verdicts regarding conspiracy. In numerous pleadings, the government has presented the evidence of the defendants' pre-planning, intent, and coercive action that culminated in their use of force at the Capitol on January 6. *See, e.g.*, ECF 833 at 6-33, 35-47; ECF 855. That conduct sets these defendants apart from the "misdemeanants" that the defendants liken themselves to. And that coordinated, pre-planned action with an intent to influence and affect the conduct of

---

[2] The specific intent required in Section 3A1.4 serves to guard against the sweeping application that Nordean, Biggs, and Rehl warn of. Attendees at a political rally are not at risk of becoming "terrorists" by virtue of collateral destruction of federal property. In contrast, the defendants here carried out the criminal objective of the conspiracy through the destruction of federal property.

[3] Nordean argues that the government has waived its opportunity to argue for the application of Note 4 to the defendants' other counts of conviction by failing to object to the draft PSRs in this case. However, the draft PSRs expressly contemplated the application of an upward departure pursuant to Note 4. *See, e.g.*, ECF 835 at ¶ 199.

government by intimidation and coercion, and to retaliate against government conduct, counsels for the application of the terrorism enhancement here.

The defendants assert that other judges in this district have refused to apply the terrorism adjustment to other defendants that were convicted of various felony offenses. However, the decisions with respect to those individual defendants do not compel the conclusion that the application would be wrong here. In fact, in declining to apply a Note 4 adjustment to an individual defendant that had been convicted of assault, Judge Trevor N. McFadden distinguished between an individual rioter and the conduct of those "in the seditious conspiracy cases." *United States v. Robert Gieswein*, 21-cr-24 (TNM), Sent. Tr. (June 23, 2023) at 14-16 ("[W]hen I think about terrorism, I think it suggests a level of premeditation that is almost certainly present in the seditious conspiracy cases. . . . I'm not at all quibbling with what Judge Mehta said in the *Oath Keepers* case.").

The evidence in the case, as reflected in the jury's verdict, underscores the sobering conclusion that the defendants' conduct did pose a serious threat to our country on January 6. While the crime did not entail the kind of "mass casualties" that may be present in other applications of the terrorism adjustment, the threat to our country was no less grave. Indeed, the law treats conspiracy—a combination to commit crime—as a "distinct evil" from the substantive crime with the capacity for harm far more severe. *United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003). The Supreme Court has explained why:

> collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not

6

> normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.

*Callanan v. United States*, 364 U.S. 587, 593 (1961). The criminal combination here took aim at the peaceful transfer of power, and the defendants assembled, organized, and directed a force of men prepared to use force at the Capitol for the purpose of achieving their goal. The consequences of their crime, had they succeeded, are among the most serious that a democratic nation may face—a breakdown of constitutional order and the rule of law.

Furthermore, as the defendants showed on January 6, the defendants were able to take over the Capitol unarmed. As Biggs explained, the defensive forces at the Capitol had to allow this because when "you're outnumbered 100 to 1 . . . there is nothing you can do" to stop the attack. Ex. 611-B. As co-conspirator Charles Donohoe put it, "We stormed the capitol unarmed . . . And took it over unarmed." Ex. 509-37. For this reason, the defendants' attempt to distinguish themselves from the conviction of the Oath Keepers defendants is misplaced. In the instant case, the defendants had assembled the force necessary to accomplish their unlawful objective—firearms were not required. The application of the terrorism adjustment and the imposition of significant sentences to these defendants would not create any unwarranted disparity.

### III. THE "ADMINISTRATION OF JUSTICE" ENHANCEMENTS TO SECTION 2J1.2 ARE PROPERLY APPLIED.

The PSRs properly apply U.S.S.G. § 2J2.1 to Counts One through Four, both through choosing to apply that Guideline and through its application of the specific offense characteristics tied to the administration of justice, §§ 2J1.2(b)(1)(B) and (b)(2). The defendants' insinuation that prior to the context of January 6 prosecutions, it would be "frivolous" to argue that the provisions at issue apply to obstruction of Congress, *see* ECF 853 at 12, ignores that it was uncontroversial

7

enough to go unchallenged in 1998 when a court applied § 2J1.2(b)(2) and an identical provision under the perjury Guideline, § 2J1.3(b)(2), to a defendant who withheld subpoenaed documents from and provided perjured testimony to a Congressional subcommittee. *United States v. Weissman*, 22 F. Supp. 2d 187, 194-99 (S.D.N.Y. 1998). The government demonstrated in its Sentencing Memorandum that §§ 2J1.2(b)(1)(B) and (b)(2) apply to obstruction of Congressional proceedings, and it will not repeat those arguments here. ECF 855 at 22-29.

Likewise, as the government demonstrated in its Sentencing Memorandum, the relevant conduct of the defendants plainly establishes a factual predicate for the application of the enhancements.[4] *See, e.g.*, ECF 855 at 29-35. Unsurprisingly the vast majority of judges, including this Court, have found just such a substantial interference and applied § 2J1.2(b)(2) to convictions under 18 U.S.C. § 1512.[5] The Court should do so here as well.

## IV. LENIENCY IS NOT WARRANTED.

The Court should reject Nordean's thinly veiled attempt to relitigate pretrial motions under the guise of a plea for leniency. Nordean's argument that the Court must avoid sentencing disparities with 30-some cases where the offense of conviction was a Class B misdemeanor with

---

[4] Defendants Rehl and Biggs "preserve their objection to any consideration of acquitted offense conduct." ECF 854 at 14, citing *McClinton v. United States*, 143 S. Ct. 2400 (2023) (denial of certiorari). The only acquitted conduct referenced by the government is Pezzola's assault on Officer Ode, and courts may consider acquitted conduct in their application of the Guidelines. *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008).

[5] Nordean provides no citation for his argument that "By definition, in the context of a large riot, 'substantial inference' must take on a relative quality and mean interference more serious than the average rioter's. Otherwise, 'substantial; becomes more like 'just average.'" ECF 853 at 13. The Court should not grade substantiality on a curve. If many people simultaneously commit a substantial interference with justice, they should all have to answer for their substantial interference if convicted. In any event, for the reasons outlined throughout the government's memorandum requesting a significant sentence, every defendant in this case is among the most culpable January 6 defendants.

a statutory maximum of six months of incarceration, or with "post and forfeit" offenses is misplaced. ECF 853 at 29, 31-34; 40 U.S.C. § 5109(b). Nordean argues that these cases are relevant because there is "no conceptual distinction" between obstruction as charged in this case and the "parading" offenses he compares his actions to, and because "in every single one" of the parading cases Nordean cites, he claims that "the government could have pulled the defendants' pre-January 6 text messages" and charged a conspiracy. ECF 853 at 30-31. The Court has already dispensed with both of Nordean's arguments as a legal matter during pretrial motions practice, and the jury has dispensed with them as a factual matter.[6]

Nordean's attempt to compare himself to 63 defendants convicted of violating 18 U.S.C. § 1512(c)(2) fails as well. Nordean contends, without explanation or argument, that he deserves leniency because his "personal conduct" was less severe than that of many of those sentenced for violations of § 1512(c)(2), and in support he cites only to a document that contains no factual descriptions of the offenses at issue. ECF 853 at 29. Nordean was convicted of conspiracy offenses related to attempts to stop the peaceful transfer of power by force, intimidation, threat, and corrupt conduct. By their nature, Nordean's crimes were more serious than those committed by defendants who did not lead a 200-person fighting force to the Capitol with the intent to use force to stop the proceeding inside. *See Callanan*, 364 U.S. at 593 ("[C]ollective criminal agreement, partnership in crime presents a greater potential threat to the public than individual dealings.").

The Court should likewise reject Nordean's invitation to re-litigate his motions to dismiss the 18 U.S.C. §§ 1512 and 2384 counts under the guise of a plea for leniency. *See* ECF 853 at 23-

---

[6] *See, e.g.*, ECF 378 at 3-4 (Nordean "has not come close to identifying a person who is similarly situated to him . . . that would explain different charging decisions on conspiracy charges").

9

26 (arguing that alleged novel theories of prosecution call for a reduced sentence). Nordean litigated whether the obstruction of justice and seditious conspiracy statutes apply to his conduct, and the Court ruled against him. Sentencing is not the proper forum to advance these legal claims, much less those that have already been denied.

## V. THE DEFENDANTS HAVE DEMONSTRATED NEITHER REMORSE NOR ACCEPTANCE OF RESPONSIBILITY.

None of the five defendants has shown remorse, nor have any accepted responsibility. Those who have attempted to show remorse or accept responsibility have all followed in the footsteps of Rehl, who testified at trial in a classic non-apology, "[i]f you believe that I did anything wrong that day, I really do truly apologize." Rather than recognize the effect that his and his co-conspirators' actions at the Capitol had that day, Nordean only offered an apology "to the extent" that his presence and that of those he marched with "contributed to the distress" of law-enforcement officers. ECF 853 at 28.

Defendants Tarrio, Biggs, Rehl, and Pezzola have not claimed, much less demonstrated, remorse in their sentencing memoranda. Pezzola's trial testimony and post-trial statements instead demonstrated the opposite of remorse and acceptance of responsibility. Pezzola was only willing to accept responsibility for breaking "one pane" of the window (to scrupulously keep the value under $1,000), and he fully denied assaulting Officer Ode and robbing him of a shield. Pezzola's testimony was the epitome of attempting to admit to the bare minimum required in the face of undeniable video evidence, while attempting to incredibly explain away everything else. It, along with the post-trial interview submitted with the government's memorandum as Pezzola Exhibit 1, demonstrate Pezzola's profound lack of remorse for his actions.

Nor does Tarrio's interview with CNN, occurring over a month after the riot when Tarrio was in damage-control mode, establish his remorse. Nearly every quote relied upon from that interview by Tarrio in his sentencing memorandum, ECF 862 at 11-12, is contradicted by a statement or statements he made close in time to the riot. Some examples are below:

| Quote from Tarrio's Memo | Contemporaneous Quote |
|---|---|
| The men should not have breached the Capitol with violence | • "Ok motherfuckers . . . Proud of Y'all . . . But we're going to be the fuckdolls of the government for a little . . . let's chill out for a sec while we reassess." – Ex. 510-51 (January 7, 2021)<br>• "Make no mistake . . . We did this" – Ex. 500-84 (January 6, 2021) |
| I condemn [Pezzola's] actions, I don't think he should have done that. I think it was completely wrong. | • "That looks like George Washington… Sam Adams…and Franklin" – Ex. 530-7 (January 6, 2021)<br>• "I'm not denouncing shit . . . Denounce this DICK" – Ex. 600-75 (January 9, 2021) |
| [Other Proud Boys] made a poor decision to go in there. | • "God didn't put me there for a reason . . . We would still be there" – Ex. 514-59 (January 7, 2021)<br>• "Rally boys are superior . . . StormBoys – Ex. 514-57 (January 7, 2021) |
| It was a mistake for people to enter the Capitol. | • "As crazy as the 6th was, It shows… DON'T FUCKING TREAD ON US." – Ex. 600-72 (January 9, 2021)<br>• If I were there [on January 6], I would have been saying "go, go, go." Tr. 10224:2-11 (Bertino) (January 2021) |

The defendants may be remorseful that they have been caught, but they are not remorseful for their actions.

## VI. INDIVIDUAL ARGUMENTS

In their Sentencing Memoranda, the defendants raise various individualized arguments, which are addressed in turn below.

### A. Ethan Nordean

Nordean claims to have committed "good deeds" at the Capitol; namely his purported attempts "to stop a protestor, Christopher Quaglin, from assaulting law enforcement officers." ECF

11

853 at 27. When viewed in the entirety of Nordean's conduct that day, the footage is more consistent with an effort by Nordean to prevent Quaglin from attracting less-lethal munitions to their location than it is to any benevolent intent.

Nordean also describes a defense witness, Travis Nugent, as having testified that Nordean was "pacing" between officers and the crowd in an apparent "effort to put hit body between rioters like Quaglin and law enforcement." ECF 583 at 27. But Nugent's testimony on this point was actually noncommittal ("I can't be for sure, what he was doing." Tr. 14534 – 35), and Nugent further described that Nordean ignored his entreaties to control the crowd or leave the Capitol grounds altogether. *Id.* at 14649-52. Regardless, even if the Court were to adopt Nordean's characterization of his actions at two snapshots in time, they are trivial compared to his overall conduct, to say nothing of the planning that preceded it and the celebration that followed. These so-called "good deeds" ought not weigh in the Section 3553(a) balancing.

### B. Joseph Biggs

Biggs argues that the Court should not assess the two-point obstruction of justice adjustment under U.S.S.G. § 3C1.1 because his conduct—lying to federal agents about what he and others did on January 6—is a "routine occurrence[] in law enforcement interviews of subjects and persons of interest." ECF 854 at 16. It is evident in the Guidelines that not *every* lie to law enforcement is worthy of the adjustment: a non-exhaustive list of covered conduct identifies a "materially false statement to a law enforcement officer *that significantly obstructed or impeded the official investigation or prosecution of the instant offense*." U.S.S.G. § 3C1.1, Application Note 4(G) (emphasis added). Biggs's lies satisfy that standard: he was no ordinary criminal suspect but rather (as the government later learned) the leader of a jointly undertaken criminal endeavor that involved scores of participants acting under his direct influence.

### C. Zachary Rehl

Rehl too objects to the application of the § 3C1.1 obstruction adjustment, calling it "overstated" as applied to him. Regarding his encouraging subordinate MOSD members to destroy evidence, he makes no specific argument; regarding his perjury, he suggests that it is an "open question" whether he would have understood that spraying chemical irritant at a person qualifies as "assault." ECF 854 at 17. Although the government doubts whether there is room for misunderstanding on that point, it is not necessary to resolve the question, because Rehl did not only falsely deny that he "assaulted" anyone on January 6, he also swore he did not "attack any police officer," Tr. 17827, did not "assault or attack any police officer," Tr. 17839, did not "assault or attack any other person," *id.*, did not "think any Proud Boys committed any violence that day," Tr. 17932, did not "forcibly oppose" any officer, Tr. 18053, and did not "interfere with" any officer, Tr. 18054. These varied phrasings leave Rehl no room to now claim he was confused by the nuances of the term "assault."

### D. Enrique Tarrio

#### 1. Criminal History

The government's response to Tarrio's draft pre-sentence report included a recommendation that he be assessed two criminal history points under U.S.S.G. § 4A1.1(d) because he committed the offense of conviction while under supervision for one or more prior offenses, namely, the banner burning and magazine possession for which he was charged (and later convicted) in D.C. Superior Court. Tarrio responds that he should not receive the extra points because he "pled guilty in those prior cases AFTER the instant offense." ECF 862 at 8.

Upon further consideration, the government agrees that Section 4A1.1(d) by its terms does not apply to pre-trial supervision of the kind Tarrio was subject to as of January 6. The guideline

13

is triggered only by supervision that is part of a "criminal justice sentence," which is separately defined to require an "adjudication of guilt." *See* U.S.S.G. 4A1.1(d); Application Note 4 thereto; and U.S.S.G. 4A1.2(a)(1). The Court should therefore not apply criminal history points under Section 4A1.1(d), but the Court should consider an upward departure under Section 4A1.3 to the extent Tarrio's criminal history category "substantially underrepresents the seriousness of [his] criminal history." *See* U.S.S.G. 4A1.3(a)(2)(D) (explaining that upward departure may be appropriate when "the defendant was pending trial or sentencing on another charge at the time of the instant offense.").

### 2. Prior Cooperation

Tarrio urges the Court to consider his "prior yet significant efforts to assist law enforcement" by cooperating as part of his plea agreement in a previous federal case. ECF 862 at 16. As Tarrio acknowledges, however, he already received the benefit for this cooperation in the form of a sentence reduction. *Id.* The Court should not allow Tarrio to "carry over" credit from his old federal case into his new one, especially given that he has not accepted responsibility and certainly has not assisted the authorities in connection with the instant offense. Instead, the Court should view Tarrio's previous cooperation within his broader pattern of conduct, where it appears not as a sincere expression of remorse and desire to make things right, but rather as a calculated effort to promote his own self-interest.

### E. Dominic Pezzola

Pezzola also argues that his family circumstances justify a downward departure. While it is regrettable that Pezzola's criminal conduct has adversely affected his loved ones, he has identified no extraordinary circumstances warranting an exception to the Guidelines' general policy statement that "family ties and responsibilities are not ordinarily relevant in determining

14

whether a departure may be warranted." U.S.S.G. § 5H1.6. Pezzola's presence in his family's lives is no doubt important both "mentally and emotionally," ECF 861 at 15, but he has not shown that a sentence within the guidelines range would "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support," nor that the intangible harm would "substantially exceed[] the harm ordinarily incident to incarceration for a similarly situated defendant." U.S.S.G. § 5H1.6, Application Note 1(B)(i); (ii).

### VII. CONCLUSION

For the reasons set forth above and in its previous filing, the government recommends that the Court impose a lengthy sentence of imprisonment on each defendant.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Jason B.A. McCullough*
JASON B.A. MCCULLOUGH
   NY Bar No. 4544953, D.C. Bar No. 998006
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530


*/s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov