IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

ZACHARY REHL, DOMINIC PEZZOLA, and JOSEPH BIGGS

Defendant.

No. 1:21-cr-175 (TJK)

## MOTION TO DISMISS CASE WITH PREJUDICE DUE TO PROSECUTORIAL MISCONDUCT AND OUTRAGEOUS GOVERNMENT CONDUCT

COMES NOW, the Defendants, Dominic Pezzola, Joseph Biggs and Zachary Rehl, by and through undersigned counsel, and respectfully moves this Honorable Court to dismiss this case (and all consolidated case numbers within this case), with prejudice, on grounds of outrageous government conduct and extreme prosecutorial misconduct.  In support of this Motion, Defendant states as follows:

1

**I. INTRODUCTION**

A month ago, on February 4, 2025, the D.C. Court of Appeals issued a per curiam order vacating this District Court's judgment and remanding this case to this District Court "with instructions to dismiss the case as moot." Docket #: 23-3160 Docketed: 09/25/2023 (USA v. Dominic Pezzola);

The current administration's Department of Justice moved and argued in the appeal above, and the Court of Appeals found, that this case is **moot** due to President Trump's pardon proclamation on January 20, 2025. The President's proclamation pardoned all January 6 defendants with closed cases. In addition, President Trump proclaimed that all live cases would be dismissed with prejudice:

> **I further direct the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021.**

https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/

The mandate was received by the District Court and filed on February 5, more than a month ago.

Pezzola, Rehl, and Biggs <u>agree with the United States</u> and the D.C. Circuit that this case must be dismissed with prejudice. However, this case should be dismissed *due to prosecutorial misconduct*, fundamental injustice, and <u>actual innocence</u> rather than due to mootness.  Rehl, Pezzola, and Beggs were wrongly pursued and prosecuted by a weaponized justice department, and convicted based on proceedings tainted by prosecutorial misconduct, government overreach, and due process violations. The prosecution's conduct in this case, including the suppression of exculpatory evidence, reliance on misleading testimony, entrapment tactics, and improper political motivations, necessitates vacatur of the conviction and dismissal of all charges in the interest of justice. Furthermore, the case was marred by **outrageous government conduct**, violating fundamental fairness and due process under the Fifth Amendment.

In the words of President Trump, the DOJ's January 6 prosecutions need to be ended to correct a "grave national injustice." Defendants Biggs, Rehl, and Pezzola were subjected to a

weaponized prosecution, designed and intended to subvert America's constitutional order and to impose a one-party slave-plantation-style government wherein political dissidents would be jailed, tormented and silenced. Only the election of Donald J. Trump on November 5 stopped the advancement of this evil design.

## II. LEGAL BASIS FOR DISMISSAL WITH PREJUDICE
### 1. Brady Violations – Suppression of Exculpatory Evidence:

The government failed to disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). Evidence that could have refuted key allegations against Defendant was withheld, depriving him of a fair trial. Ex: a) Global production 36, which included exculpatory law enforcement investigations that were favorable to the defense. b) 44,000 hours of Capital video that demonstrated an alternate narrative that was exculpatory to the defense c) Cellebrite software update for Telegram (see next bullet point.)

The government's late disclosures and failures to timely disclose the **government's use of undercover informants** among the Proud Boy defendants left the defense unable to adequately

prepare for trial. These revelations came by trickles to the defense—mostly at or near the end of the trial.  (In fact, these revelations are still incomplete, and new information of government involvement behind January 6 is revealed each month.)  However it was revealed that important key players in the government's allegations were actually undercover confidential human sources (CHS's). For example the individual who drove codefendant Tarrio to a D.C. parking garage to meet Oath Keeper leader Stewart Rhodes on January 5 was later revealed as an FBI CHS.

    Additionally, during trial it was revealed that defense witness J. K. (who took the stand as "Aaron," was a CHS who literally texted his FBI handlers in real time informing them that the Proud Boy defendants had no plan or intention of breaching the Capitol grounds.  This testimony remains entirely unrebutted by any evidence.  Thus the FBI knew throughout the entire case that there was no plan, no seditious conspiracy, and no organized effort to riot or unlawfully obstruct the proceedings on January 6.  It was FBI-informant 'Aaron' himself who placed furniture in a doorway area to keep the entry open for demonstrators to stream into the Capitol.

"Aaron" also admitted that it was he—a paid undercover FBI CHS—who invited the scariest and most heavily armored marcher (Robert Geiswein) to join the Proud Boy march on the morning of January 6. The prosecution made a point of Geiswein's 'tactical' clothing and appearance amidst Pezzola, Rehl and Biggs; but the government knew all along that its own informant had placed Geiswein amidst the defendants.

It was revealed only on the eve of another witness's testimony that the witness was an undercover CHS. This information should have been disclosed to the defense prior to trial. Indeed, if codefendant Tarrio had not planned to call the CHS as a defense witness, the prosecutors would likely have never revealed that a person who was hanging around with defense lawyers and witnesses was an undercover CHS for the FBI

But the government moved and demanded that defendants could not mention or bring up the topic of undercover informants during trial. All the while the government had a CHS planted amid the defense teams.

6

In the final days of trial it was revealed that the Metropolitan Police Department had **more than two dozen undercover plainclothes officers** among the defendants and other demonstrators.  One of these officers is heard on camera urging protestors to "Go! Go! Go!" and "push forward" up the steps toward the Capitol building. The defendants still have not been provided with all the body-worn camera footage of all these **undercover MPD** officers.

Even with entire squadrons of informants among the defendants and the Proud Boy organization, not a single informant was able to report any plans of sedition being made by Proud Boys. If there were any agreement to storm or breach the Capitol or use non-expressive means to influence Congress, the many government informants in and around the Proud Boys would have reported so immediately.

So because of this lack of inculpatory evidence, the government relied on a concocted "tool theory" to wrongfully convict the defendants.  This legal concept was previously unheard of outside third world dictatorships.

**Use of Altered or Missing Evidence:**

So baseless were the government's claims that the government had to use an entirely fabricated set of exhibits to prove its false allegations. The government introduced a document entitled <u>"1776 Returns/Winter Palace"</u> to the jury with suggestions that the Proud Boy defendants had authored or approved the document or even used the document as an outline for January 6. Meanwhile the government knew all along that the document was **authored and created by the government's "intelligence community"**—and that the document was planted in codefendant Tarrio's inbox at the direction of the government.

The prosecution also admitted to knowingly using fabricated and **misleading chat-group evidence** to secure its wrongful convictions. Various "Telegram" exhibits formed the backbone of the government's allegations against Rehl, Biggs, and Pezzola. However, the government concealed important context to conversations between defendants. The prosecution had the updated software that included the full complete and accurate features and conversations prior to the start of trial but also never turned over the updated software which provided the exculpatory evidence to the

defense, which was material evidence favorable to the defense comparable to *Kyles v. Whitley*, 514 U.S. 419 (1995).

7864

```
 1              When you say there is -- I'm sorry.  There is a
 2   what that tracks it?
 3   A.   The database tracks it.
 4   Q.   You said there is something that tracks whether it's a
 5   direct response.
 6   A.   Yes.  Potentially there's a table with a record.
 7   Q.   And would that be -- would I need the phone to see if
 8   it's a direct response?
 9   A.   We could see that in the database.
10   Q.   You could see that in the database?
11   A.   Yes, ma'am.
12   Q.   You could see that in Cellebrite?
13   A.   Not earlier versions.  That is a functionality that they
14   added this past year in one of their releases.  Yes.
15   Q.   So do you know whether you've reextracted Mr. Rehl's
16   phone using this new database?
17   A.   We did not -- well, we don't -- it's not reextracting.
18   It would be reprocessing that extraction.  We would still
19   work off of that original copy of the device.
20   Q.   So as to Mr. Rehl's phone, do you know whether you
21   reprocessed it with this new upgraded format?
22   A.   No, we did not.  I believe it came out in November or
23   December past, when we had made all of our final exhibits
24   for this.
25   Q.   So today, you could go back and reprocess -- tell me if
```

Cain - CROSS - By Ms. Hernandez

```
                                                                    7865

 1   this is true.  Today, if you wanted to go back and
 2   reprocess, you could reprocess the information from
 3   Mr. Rehl's data and actually see which messages he responded
 4   to or which he didn't respond to?
 5   A.  Well, it wouldn't be -- it would be if the user directly
 6   replied, took the action of selecting a message and then
 7   replying directly to that message.
 8   Q.  Okay.
 9   A.  Yes.
10   Q.  So maybe you can -- before I go on, so let me -- so the
11   program that you used, or the model number or however you
12   want to define it, you used when you extracted Mr. Rehl's
13   phone on Cellebrite did not have this function that you're
14   describing for the jury today?
15   A.  At the time, no.  None of our forensic tools did.
16   Q.  So the information that we -- and the Cellebrite
17   extraction that you did, I believe you know was provided to
18   the defense.  Correct?
19   A.  Yes, ma'am.
20   Q.  Okay.  So the Cellebrite extraction that we have -- we,
21   the defense counsel and Mr. Rehl -- does not contain this
22   new function that you're describing today.  Correct?
23   A.  I do not believe it does.  No.
24   Q.  So what we have doesn't -- what we have -- and I believe
25   it's what the Government has, what the prosecutors have
```

Cain - CROSS - By Ms. Hernandez

This astounding Brady violation was revealed only due to the persistence of defendants, and mostly on cross-examination of key witnesses. Government's witness Jennifer "Kate" Cain, an FBI Special Agent, admitted on cross-examination that the Telegram exhibits presented to the jury were inaccurate and misleading. In some instances, the government introduced violent or threatening Telegram posts to trick the jury into thinking Rehl, Biggs or Pezzola were directly communicating agreement—even though the government knew that the messages may not have been seen by the defendants.

**2. Use of False or Misleading Testimony**:

The prosecution knowingly introduced or failed to correct false testimony, violating due process principles outlined in *Napue v. Illinois*, 360 U.S. 264 (1959). The government relied on unreliable witness statements that have since been contradicted by newly uncovered evidence. For example, when FBI agent Nicole Miller was caught contradicting herself on the witness stand, the defense was

instructed not to talk about that topic again or face sanctions from the court.

**3. Political Bias and Selective Prosecution**:

Defendants were targeted based on their political beliefs rather than the merits of the case. This selective prosecution violates equal protection and due process rights, as recognized in *United States v. Armstrong*, 517 U.S. 456 (1996). Numerous statements shown to the jury from defendants had nothing to do with January 6th, but were politically related and used to inflame the jury's emotions, rather than as proof of any crime.

**4. Entrapment and Government Misconduct**:

The government employed tactics that could be construed as entrapment or undue coercion in its drive to manufacture charges against the defendants. Under *Jacobson v. United States*, 503 U.S. 540 (1992), convictions based on such tactics cannot stand. A Sr. Capital police officer testified that Capitol Police uniformly allowed protestors into the building after the first breach.  Thus anyone who was not there until after the first breach was entrapped, including Rehl who did not enter the Capitol until 45 minutes later.

**5. Outrageous Government Conduct**:

13

The prosecution engaged in conduct that is so grossly shocking and fundamentally unfair that it violates due process. See *United States v. Russell*, 411 U.S. 423 (1973); *Rochin v. California*, 342 U.S. 165 (1952). The government's behavior in this case, including coercive investigative techniques, politically motivated charging decisions, and suppression of exculpatory evidence, rises to a level warranting dismissal.

With regard to one government witness, N.M., it was revealed during trial that FBI special agents in this case communicated with each other by messages in which they casually discussed destruction of evidence, intercepting defendant Rehl's attorney/client communications (and announced their intention to find <u>more</u>), and deliberately evaded a filter team. It was revealed in sealed hearings that the FBI altered a document relating to a CHS, and exploited the financial and family distress of defendant Rehl and other witnesses in order to pressure them to cooperate with the government. The FBI also ordered that "338 pieces of evidence" be destroyed.

When these facts were revealed to the defense in discovery, the government immediately moved to censor, silence, seal, and prevent

all discussion of the facts. The government demanded sealed proceedings to prevent the public knowing these revelations, in violation of the 6th amendment. The government further demanded, and the Court ordered, that defendants delete these outrageous and astonishing revelations from their files.

**6. Violation of Defendants' Sixth Amendment Rights**:

The government interfered with the defendants' right to effective legal counsel and a fair trial. This misconduct deprived defendants of their ability to fully present their defense. The government also admitted to spying on defendant Rehl's attorney client privileged emails and was even on record discussing strategies moving forward based on conversations the prosecution read (the latter conversations were included in JENCKS material between prosecutors and FBI agents.)

Defendant Pezzola was never able to review the evidence and discovery in his own case until the trial began. This was despite efforts by Pezzola's counsel (including undersigned counsel) to deliver discovery files to Pezzola at the Arlington jail. Each visit to the jail by Pezzola's attorneys or paralegals resulted in different

rules, hurdles or obstacles which prevented Pezzola from viewing the discovery.

**7. Jury Stalked, terrified and Intimidated:**

Throughout the trial there was proof that the jury was being intimidated, threatened and stalked. Although the jury brought these threats to the attention of the government, the government did little to inquire or investigate.  Out of desperation the terrified jurors then launched their own investigation, photographing and monitoring their stalker(s). Still the government opposed a declaration of mistrial, and did little to protect the jurors.  The trial result was fundamentally tainted by this terrorized jury. Sealed hearings prevented the public from properly knowing and evaluating the verdict in light of the terrified and intimidated jury, in violation of the 6th amendment right to fair trial, jury trial, and public trial.

## III. RELIEF REQUESTED

WHEREFORE, Defendant Zachary Rehl respectfully moves this Honorable Court to:

1. **Vacate the convictions** due to prosecutorial misconduct, outrageous government conduct, and constitutional violations;

2. **Dismiss all charges with prejudice** to prevent further violations of Defendant's rights;

3. **Hold an evidentiary hearing** to assess the government's misconduct, in which prosecutors McCullogh, Mulroe, Kenerson, Ballantine and Moore will be under subpoena to provide testimony, along with FBI Agents Cain, Miller and Dumbrowski. See *United States v. Brande*, 329 F.3d 1173 (9th Cir. 2003) (evidentiary hearing was required to determine whether ex parte juror contact prejudiced defendants); *Torres v. First Transit, Inc.*, 979 F.3d 876 (11th Cir. 2020) (evidentiary hearing was required to investigate jurors' misstatements); *Sanders v. Sullivan*, 701 F.Supp. 996 (S.D.N.Y. 1987) (evidentiary hearing was warranted on whether prosecutor knowingly used perjured testimony in trial).

3. **Grant any other relief** the Court deems just and appropriate.

## IV. CONCLUSION

The record in this case demonstrates serious misconduct and constitutional violations by the prosecution, including outrageous government conduct. To uphold the integrity of the judicial process and protect Defendants' rights, this Court must vacate the conviction and dismiss the case.

RESPECTFULLY SUBMITTED,

By: */s/ Roger Roots*
Roger Roots, Esq.
John Pierce Law, P.C.
21550 Oxnard Street
3rd Floor, PMB#172
Woodland Hills, CA 91637
(775) 764-9347
rroots@johnpiercelaw.com

*Attorney for the Defendants*

## CERTIFICATE OF SERVICE

I hereby certify, that on March 6, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in

this matter who are registered with the Court's CM/ECF system.

Dated: March 6, 2025 /s/ *Roger Roots*
Roger Roots